**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                          :

In re                                   :           **Chapter 11**
                                         :

**UNO RESTAURANT HOLDINGS**     :           **Case No. 10-_____ (   )**
**CORPORATION,**                         :
                            **Debtor.**     :           **(Joint Administration Requested)**
                                         :
-------------------------------------------------------------x

### AFFIDAVIT OF LOUIE PSALLIDAS PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2 IN SUPPORT OF FIRST-DAY MOTIONS AND APPLICATIONS

STATE OF NEW YORK     )
                               )     ss:
COUNTY OF NEW YORK  )

        Louie Psallidas, being duly sworn, hereby deposes and says:

        1.       I am Chief Financial Officer, Senior Vice President of Finance, and Treasurer of Uno Restaurant Holdings Corporation (**"URHC"** and together with its affiliated debtors and debtors in possession, **"Uno"** or the **"Debtors"**). I have been employed in these and other capacities since April 2008.[1] Accordingly, I am familiar with Uno's day-to-day operations, businesses, and financial affairs.

        2.       On the date hereof (the **"Commencement Date"**), each of the Debtors commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the **"Bankruptcy Code"**). In order to enable the Debtors to operate effectively and minimize any disruption caused by the commencement of these chapter 11 cases, the Debtors have requested certain relief in "first day" motions and applications filed with the Court

---

[1] All of the Debtors' employees, including myself, are employed by Uno Restaurants, LLC, one of the Debtors in these chapter 11 cases. In addition to serving as an officer of URHC, I also serve as an officer and/or director of each of the other Debtors.

(collectively, the **"First Day Pleadings"**).  As described herein, the First Day Pleadings seek, among other things, to ensure the continuation of the Debtors' cash management system and other business operations without interruption, preserve vendor and customer relations, maintain employee confidence and morale, and establish certain other administrative procedures to promote a seamless transition into chapter 11.  Such relief is critical to the Debtors' effort to maximize the value of their estates for the benefit of all stakeholders and to effectively reorganize.

3.      I submit this affidavit (the **"Affidavit"**) pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the **"Local Bankruptcy Rules"**) to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of the Debtors' petitions for relief under chapter 11 of the Bankruptcy Code and the First Day Pleadings.  I have reviewed the factual support set forth in each of the First Day Pleadings and attest to the accuracy thereof. Except as otherwise indicated, all facts set forth herein are based on my personal knowledge, my discussions with other members of the Debtors' senior management, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning the Debtors' operations and financial affairs.  If called upon to testify, I would testify competently to the facts set forth in this Affidavit.  I am authorized to submit this Affidavit on behalf of the Debtors.

4.      This Affidavit is intended to provide a summary overview of the Debtors' businesses and these chapter 11 cases.  Sections I through V of this Affidavit provide an overview of Uno's businesses, organizational structure, capital structure, events giving rise to these chapter 11 cases, and information regarding the chapter 11 cases.  Section VI summarizes

the relief requested with respect to, and the support for, the Debtors' motion for entry of interim and final orders authorizing postpetition financing.  Section VII summarizes the relief requested in certain of the First Day Pleadings.  Finally, Section VIII lists the schedules of information required by Local Bankruptcy Rule 1007-2.

# I.

## Uno's Businesses

5.      Uno, headquartered in West Roxbury, Massachusetts, began operations in Chicago, Illinois in 1943 with its first restaurant, "Pizzeria Uno," serving its proprietary Chicago-style, deep-dish pizza.  Over the following 67 years, Uno has expanded its brand to include (i) restaurants operating under the Uno Chicago Grill® trade name, (ii) quick-service venues operating under the Uno Due Go® and Uno Express® trade names, and (iii) an extensive consumer products business that manufactures products under the Uno® brand (**"Uno Foods"**).

### A.      Uno Chicago Grill

6.      The Debtors own and operate 99 Uno Chicago Grill® full-service casual dining restaurants (the **"Company-Owned Restaurants"**).[2]  In addition, there are 76 Uno Chicago Grill® and two take-out restaurants owned and operated by independent franchisees (the **"Franchisees"**) that are not Debtors in these chapter 11 cases.  The Franchisees are parties to franchise or development agreements with Pizzeria Uno Corporation, one of the Debtors in

---

[2] All of the Debtors' Company-Owned Restaurants operate at leased restaurant locations.  As discussed below in Section IV, prior to the Commencement Date, the Debtors closed 17 underperforming restaurants.

The Debtors also lease the space housing Uno Foods' production plant in Brockton, Massachusetts, their woodworking shop in Newport News, Virginia, and their executive offices, which are located in West Roxbury, Massachusetts.  Uno also owns and operates an 18,000 square foot facility in Norwood, Massachusetts which houses its test kitchen, research and development offices, and training center.

these chapter 11 cases, pursuant to which the Franchisees are permitted to develop and operate restaurants using the Uno® brand (the **"Franchised Restaurants"**).

7. Uno Chicago Grill® is a full service casual dining concept featuring Uno's signature Chicago-style, deep-dish pizza and a variety of other high quality, fresh and flavorful menu items prepared daily in Uno restaurants. Uno Chicago Grill® restaurants also offer full bar service and operate a successful take-out business. A typical Uno Chicago Grill® restaurant ranges in size from approximately 5,800 to 6,200 square feet, has seating capacity for approximately 180 to 210 guests, and is open from 11:00 a.m. to midnight, seven days a week.

8. Although Uno Chicago Grill® restaurants, including the Franchised Restaurants, are concentrated in the Northeast and Mid-Atlantic regions of the United States, the restaurants are located in 28 states and the District of Columbia. Franchised Restaurants are also located in Puerto Rico, South Korea, United Arab Emirates, Honduras, Kuwait, and Saudi Arabia. As of September 2009, (i) the Company-Owned Restaurants accounted for approximately 86% of the Debtors' revenue or 67% of EBITDA (exclusive of SG&A costs) and (ii) the Franchised Restaurants accounted for approximately 2% of the Debtors' revenue or 18% of EBITDA (exclusive of SG&A costs).

**B.      Uno Express and Uno Due Go**

9. In addition to Uno's traditional Chicago Grill style restaurants, Uno developed two extensions of the brand: Uno Express® and Uno Due Go®. Uno Express is a small footprint, quick-service kiosk format of the brand designed to sell Uno Foods' individual deep dish pizza, gourmet flat bread pizzas, or its hand tossed pizza by the slice. Uno generates revenue from the sale of Uno Foods' products at the 215 Uno Express locations throughout the United States, which are operated by third parties, such as membership club stores, movie theatres, food courts, sports complexes, colleges, travel plazas, and airports, among others.

10. Uno Due Go is a quick casual format of the Uno brand designed for a variety of traditional and non-traditional venues, but with a slightly larger footprint and range of menu offerings than Uno Express. There are two Uno Due Go units which are operated by a Franchisee and located in the Dallas Fort Worth airport.

### C. **Uno Foods**

11. The Debtors have capitalized on the Uno brand by developing a consumer products business through Uno Foods Inc., a Debtor, that produces a variety of Uno Chicago Grill® branded products, such as refrigerated and frozen deep-dish, thin crust, and hand tossed pizzas and pizza-related products for sale to supermarkets, membership club stores, airlines, hotels, movie theatres, schools, and a variety of other retail venues. Uno Foods' products are manufactured in Uno's 40,000 square-foot baking facility located in Brockton, Massachusetts. As of September 2009, the Uno Foods' division accounted for approximately 12% of the Debtors' revenue or 15% of EBITDA (exclusive of SG&A costs).

## II.

## Organizational Structure

12. As demonstrated on the organizational chart attached hereto as Exhibit A, URHC is a Delaware corporation and the direct or indirect parent company of each of the other Debtors, other than Uno Acquisition Parent, Inc. (**"Acquisition Parent"**), Uno Holdings, LLC, and Uno Holdings II LLC.[3] In February 2005, URHC became an indirect wholly-owned subsidiary of Acquisition Parent (the **"2005 Acquisition"**), which is controlled by Centre Partners Management LLC and its affiliates (collectively, **"Centre"**) who, together, own approximately 66% of the outstanding common stock of Acquisition Parent. The remaining

---

[3] Several of the debtor entities are inactive and the Debtors intend to dissolve or restructure these entities pursuant to a plan of reorganization.

equity in Acquisition Parent is held by Uno's founder, director, and chairman emeritus, Aaron Spencer, his family, Uno's management and other investors.

**III.**

**Capital Structure**

13.     The instruments evidencing the Debtors' significant indebtedness are described below.

A.      **The Prepetition Credit Agreement**

14.     URHC and 119 of its direct and indirect subsidiaries, all of which are Debtors in these chapter 11 cases (the **"Borrowers"**), are parties to that certain senior secured Credit Agreement, dated as of February 22, 2005 (as amended from time to time, the **"Prepetition Credit Agreement"**) with Wells Fargo Foothill, Inc. (**"Wells Fargo"**), as administrative agent (the **"Prepetition Agent"**), and certain lenders party thereto (together, the **"Prepetition Lenders"**). The Prepetition Credit Agreement consists of (i) a revolving credit facility (the **"Revolver"**) in the maximum aggregate amount of $32 million, including letters of credit not to exceed $20 million, and (ii) a term loan facility (the **"Term Loan"**) in the aggregate principal amount of $14.25 million. Obligations arising under the Prepetition Credit Agreement are obligations of each of the Borrowers and are guaranteed by Uno Holdings II LLC.

15.     Prepetition, the amounts borrowed under the Prepetition Credit Agreement were used to provide a portion of the proceeds required to consummate the 2005 Acquisition, pay fees and expenses incurred in connection therewith, and to provide for working capital and other general corporate purposes. As of the Commencement Date, approximately $33.9 million was outstanding under the Prepetition Credit Agreement, in addition to approximately $9.975 million in outstanding letters of credit. The Prepetition Credit Agreement matures on February 22, 2010.

16.     Pursuant to certain security agreements (the **"First Lien Security Agreements"**), dated as of February 22, 2005, the Borrowers and Uno Holdings II LLC granted first priority security interests in and liens on substantially all of their assets to Wells Fargo, as collateral agent for the Prepetition Lenders.[4]  As of the Commencement Date, the Debtors believe that the Prepetition Lenders are over-secured.

### B.     Senior Secured Notes

17.     On February 22, 2005, URHC issued $142 million in senior secured notes bearing interest at the rate of 10% and due to mature on February 15, 2011 (the **"Senior Secured Notes"**).  URHC's obligations under the Senior Secured Notes are guaranteed by Uno Holdings II LLC and 116 of URHC's direct and indirect subsidiaries (collectively, the **"Note Guarantors"**).  U.S. Bank National Association (**"U.S. Bank"**) is the trustee under the indenture governing the Senior Secured Notes.  Interest on the Senior Secured Notes is payable semi-annually in cash in arrears on February 15 and August 15 of each year.  Prepetition, a portion of the proceeds from the issuance of the Senior Secured Notes were used to provide the funds required to consummate the 2005 Acquisition.

18.     To secure the obligations to the holders of the Senior Secured Notes (the **"Noteholders"**), URHC and each of the Note Guarantors granted to U.S. Bank, as indenture trustee, second priority security interests in and liens on substantially all of their assets (which also secure the Prepetition Credit Agreement).

---

[4] Five of the Borrowers under the Prepetition Credit Agreement are not grantors under the First Lien Security Agreements: (i) Uno Restaurants II, LLC, (ii) UR of Fredericksburg VA, LLC, (iii) UR of Merritt Island FL, LLC, (iv) UR of Winter Garden, LLC, and (v) UR of Melbourne FL, LLC.

C.     **Intercreditor Agreement**

19.     In connection with the issuance of the Senior Secured Notes, Wells Fargo, as agent under the Prepetition Credit Agreement, and U.S. Bank, as collateral agent and indenture trustee under the Senior Secured Notes, entered into that certain Intercreditor and Lien Subordination Agreement, dated as of February 22, 2005, to govern their rights with respect to the priority of their respective security interests in and liens on the Debtors' collateral.[5]

D.     **Recent Financial Information**

20.     As of September 27, 2009, the consolidated financial statements for URHC reflected approximately $286.9 million of revenue for the prior 12 month period, assets of $144.6 million, and long-term debt of $171.8 million.

## IV.

## Events Leading to the Chapter 11 Cases

21.     In February 2005, Centre and certain other investors completed a leveraged buyout of URHC and its subsidiaries. Post-acquisition, as part of Centre's investment thesis, Uno sought to differentiate itself from its peers in the casual dining segment by upgrading the overall guest experience to offer more nutritious and high quality foods and improved service. To this end, in 2005 and 2006, Uno's management implemented a number of initiatives, including a significant new and expanded menu with an enhanced nutritional focus, lounge upgrades, increased staffing levels and upgrades to restaurant management teams. Uno also launched a new advertising campaign with a focus on food quality.

---

[5] Pursuant to the Intercreditor Agreement, the liens granted to the holders of the Senior Secured Notes are subordinated to the liens granted to the Prepetition Lenders pursuant to the Prepetition Credit Agreement up to a certain "Maximum Priority Debt Amount."

22.     While Uno began to see the benefits of its efforts in late 2006 and 2007, a difficult macro economic environment began to have a negative impact on Uno's operations, as well as the overall restaurant industry.  As the national economy suffered and consumers cut discretionary spending, Uno, like its peers, experienced a significant decline in sales.  Reduced sales, coupled with increased structural costs, including the cost of key commodities, such as energy, wheat, and cheese, negatively impacted cash flow.  Accordingly, Uno's ability to invest in its brand and its operations became impaired, and it became increasingly difficult to support its existing capital structure.

23.     In an effort to adapt to concurrent rising costs and reduced consumer demand associated with the current recession, beginning in 2008, Uno put in place stringent cost controls which significantly reduced its general and administrative expenses, advertising budgets, travel, recruitment, and training costs.  Capital investments were also significantly reduced, limiting new restaurant expansion and upgrades.

24.     Despite these effective cost-saving measures, Uno suffered a net loss for fiscal year 2009 of approximately $22.2 million and a net loss for fiscal year 2008 of approximately $15.1 million.  The increase is principally attributable to decreased consumer spending and corresponding reductions in restaurant sales.  In 2009, Uno also experienced an increase in interest and other expenses due to, among other things, higher interest rates associated with an amendment of the Prepetition Credit Agreement in January 2009.[6]

---

[6] On January 29, 2009, Uno amended the terms of its Prepetition Credit Agreement to provide for, among other things, a conversion of $3 million of outstanding borrowings under the Revolver into the term loan and a corresponding reduction in the maximum Revolver from $35 million to $32 million, a reduction of the minimum EBITDA requirement, the exclusion of certain non-recurring costs from the definition of EBITDA, the elimination of $250,000 per quarter amortization requirement on the term loan and certain other administrative matters.

25.     Given the liquidity constraints resulting from the current weakness in Uno's principal markets, coupled with the impending maturity of the Prepetition Credit Agreement in February 2010, Uno began analyzing various restructuring alternatives and refinancing opportunities. To this end, in July 2009, Uno engaged Jefferies & Company, Inc. (**"Jefferies"**) to assist in exploring alternatives for restructuring or recapitalizing Uno's balance sheet. Uno also retained Weil, Gotshal & Manges LLP as its counsel in July 2009.

26.     Beginning in June 2009, Uno's engaged in negotiations with an informal group of unaffiliated holders of the Senior Secured Notes (the **"Majority Noteholder Group"**), Centre, and their legal advisors to develop a comprehensive plan to restructure and/or recapitalize Uno's balance sheet prior to the maturity of its long-term debt. Uno also engaged in numerous discussions with Wells Fargo, as agent for the Prepetition Lenders.[7]

27.     In August 2009, Uno reached an agreement in principle with the Majority Noteholder Group to pursue a restructuring that would significantly reduce the Debtors' outstanding debt through an exchange of the Senior Secured Notes for equity in reorganized Uno through a plan of reorganization (the **"Debt-for-Equity Exchange"**). In furtherance thereof, on January 19, 2010, Uno, the Majority Noteholder Group, and Centre executed that certain Restructuring Support Agreement, a copy of which is annexed hereto as Exhibit C (the **"Restructuring Support Agreement"**). Implementation of the proposed Debt-for-Equity Exchange will reduce Uno's outstanding debt by approximately $142 million.

---

[7] On or about December 14, 2009, the Debtors and the Prepetition Lenders amended the Prepetition Credit Agreement to exclude costs and expenses incurred by Uno in connection with the restructuring and recapitalization of its balance sheet from the definition of EBITDA used in the calculation of its minimum EBITDA loan covenant and borrowing base. The amendment also permitted the issuance of a going concern opinion for the fiscal year ending September 27, 2009.

28.     As part of its restructuring plan, Uno also retained Huntley, Mullaney, Spargo & Sullivan, LLC to assist in reviewing Uno's extensive lease portfolio and to identify cost savings associated with a restructuring of Uno's leasehold interests.  After an extensive analysis of Uno's lease portfolio and each of the corresponding restaurants, the Debtors determined that the closure of 17 restaurants would be in their best interests.  Prior to the Commencement Date, the Debtors closed these underperforming restaurants and vacated the leased premises in which they are located.  Likewise, the Debtors determined to pursue the renegotiation of lease terms for certain other restaurant locations, which negotiations are underway.  In the event the Debtors are unable to negotiate acceptable terms, they may seek to close additional restaurants.  Post-restructuring, Uno expects to have a more streamlined and concentrated footprint of its full service Uno Chicago Grill® restaurants.

## V.

## <u>The Chapter 11 Cases</u>

29.     As described below, through the First Day Pleadings, the Debtors seek to ensure the continuation of their business operations without interruption.  The Debtors are also seeking authorization to obtain postpetition debtor-in-possession financing from Wells Fargo and the Majority Noteholder Group in the amount of $52 million, which will provide the Debtors' businesses with ample liquidity.

30.     The Debtors intend to file a plan of reorganization in the very near term to implement, among other things, the Debt-for-Equity Exchange contemplated by the Restructuring Support Agreement.

31.     Finally, in connection with the closure of certain underperforming restaurants, as discussed above, the Debtors will be seeking authority to immediately reject

19 real property leases, all of which are no longer necessary to the Debtors' operations.[8]

Likewise, during the pendency of these cases, the Debtors intend to pursue the renegotiation of

burdensome lease terms for certain other restaurant locations. If the Debtors are unable to

negotiate acceptable lease terms, they may seek to close additional restaurants.

32. The Debtors believe it is in the best interest of all stakeholders to

commence the chapter 11 cases. In the short-term, chapter 11 will facilitate the reorganization of

the Debtors' capital structure and provide the best forum to consummate much needed

operational changes, such as the streamlining of Uno's restaurant footprint. In the long-term, the

financial restructuring will better position the Debtors to continue operating successfully and

enhance their growth potential, especially the opportunity to grow the Uno Chicago Grill®, Uno

Express®, and Uno Due Go® brands and increase the market share of Uno Foods' consumer

products business. Furthermore, completion of the financial restructuring will allow

management to focus its attention on operations and long-term planning rather than on short-

term financial management.

## VI.

## DIP Financing, Use of Cash Collateral, and Adequate Protection

### A.    Summary of Relief Requested

34. By motion filed contemporaneously herewith (the **"DIP Motion"**), the

Debtors seek authorization, pursuant to section 364(c) of the Bankruptcy Code, for entry of

interim and final orders permitting them to obtain debtor in possession financing from Wells

Fargo Capital Finance, Inc., as Arranger and Administrative Agent (in such capacity, together

---

[8] Inclusive of leases relating to 16 out of the 17 restaurants closed prior to the Commencement Date (i.e., excluding one restaurant lease assigned to a third party without recourse) and leases relating to 3 additional restaurants closed in the prior fiscal year.

with it successors in such capacity, the **"DIP Agent"**), for and on behalf of itself and the other lenders party thereto from time to time (collectively, including the DIP Agent, the **"DIP Lenders"**), including the Majority Noteholder Group, in the amount of $52 million (the **"DIP Facility"**). The Debtors intend to use up to $5.0 million of the DIP Facility, over and above the amount necessary to satisfy the funded obligations under the Prepetition Credit Agreement, prior to the final hearing to consider approval of the DIP Facility.

35. The Debtors also seek interim and final orders authorizing the use of cash collateral pursuant to section 363 of the Bankruptcy Code. The cash collateral to be used consists of cash on hand sourced from the proceeds of collateral under the Prepetition Credit Agreement.

36. The Debtors have requested the interim use of cash collateral to address their working capital needs and fund their reorganization efforts in an amount consistent with the Debtors' receivables and payables for the upcoming 21-day period, in accordance with a budget attached as Exhibit C to the DIP Motion.

37. Pursuant to section 361 of the Bankruptcy Code, the Debtors propose to provide adequate protection to the Prepetition Lenders (to the extent any obligations remain outstanding to the Prepetition Lenders following entry of an interim order approving the DIP Facility and consummation of the transactions contemplated thereby) and the Noteholders whose cash collateral they seek to use. To adequately protect the Prepetition Lenders, the Debtors propose to grant to the Prepetition Agent, for the benefit of itself and the Prepetition Lenders, certain adequate protection liens, superpriority administrative expense treatment, and reimbursement of fees and expenses incurred by the Prepetition Agent, all subject to a carve out, (the **"Carve Out"**) as defined in the documents evidencing the DIP Facility. To adequately

protect the Noteholders, the Debtors propose to grant to U.S. Bank, indenture trustee, for the benefit of itself and the Noteholders, adequate protection liens and superpriority administrative expense treatment that is junior to the adequate protection payments to the Prepetition Lenders and reimbursement of fees and expenses of the indenture trustee and the Majority Noteholder Group, all subject to the Carve Out.

**B.      Risk of Irreparable Harm and Need for Immediate Relief**

38.      The Debtors require the immediate use of cash on hand, the DIP Facility, and other income generated from its commercial activities in order to maintain their day-to-day business operations.  Absent such relief from the Court, the Debtors will not have sufficient sources of working capital and financing to ensure uninterrupted business operations and will suffer a substantial loss of value to the detriment of all parties in interest.  The Debtors do not have unencumbered assets which they could liquidate on short notice to fund their operations.  Accordingly, the use of cash collateral and the DIP Facility is absolutely necessary to pay the costs of maintaining critical services to each of the Debtors' business operations.  Without use of cash collateral and the DIP Facility to pay employees and vendors, the Debtors will be unable to operate their restaurants and manufacturing operations, causing enormous disruption to employees, customers, and suppliers and fundamentally impairing the value of their business platforms.  Without the liquidity provided by the use of cash collateral and the DIP Facility, the Debtors' objective of restructuring their businesses as a going concern, while maintaining the value of their assets for the benefit of creditors, will fail without a fair opportunity to achieve the purposes of the chapter 11 process.

39.      The interests of the Debtors' Prepetition Lenders and Noteholders will be protected and enhanced by the Debtors' use of cash collateral and the DIP Facility because such

relief will ensure the uninterrupted operation of each of the restaurants and other operations securing the lenders' claims, thus protecting the Debtors' revenue streams and protecting the going concern value of the Debtors. In the absence of the DIP Facility, vendors would likely require the Debtors to pay cash in advance putting a severe strain on the Debtors' ability to sustain operations.

40. The Debtors undertook a broad and sustained effort to obtain the best available terms for debtor-in-possession financing. Prior to the Commencement Date, with the assistance of Jefferies, the Debtors solicited interest from numerous sources, including secured lenders who already had a position in the Debtors' capital structure and ones who did not. The DIP Facility was ultimately determined to provide the requisite liquidity on the most advantageous terms. Moreover, due to the participation of certain Noteholders in the DIP Facility and the existence of certain Prepetition Lenders who will not be participating in the DIP Facility, a priming debtor in possession facility was not possible and satisfaction of obligations under the Prepetition Credit Agreement is required on an interim basis.

41. The fees payable under the DIP Facility were also determined to be fair, reasonable, and the best available to the Debtors under the circumstances, reflecting the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and the Debtors believe that these fees are supported by reasonably equivalent value and consideration. The Debtors negotiated with the DIP Lenders and other stakeholders extensively, in good faith, and at arm's-length with respect both to the DIP Facility and the use of Cash Collateral. The Debtors believe that the DIP Agent and the DIP Lenders each have acted in good faith in connection with negotiating the DIP Facility, extending credit under the DIP Facility and allowing the use of Cash Collateral.

42.     Without the DIP Facility, I believe the Debtors will suffer permanent and irreparable harm to the value of the enterprise.

## VII.

### Summary of Other First Day Pleadings[9]

33.     As discussed above, concurrently with the filing of their chapter 11 petitions, the Debtors filed various First Day Pleadings, which they believe are necessary to enable them to operate with minimal disruption and loss of productivity.  Through the First Day Pleadings, the Debtors seek to, among other things, pay their employees' wages and continue all employee benefits in the ordinary course of business; preserve vendor relations and pay vendors that are critical to their operations; and continue to honor all customer programs, including gift cards.  It is my understanding that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides that to the extent "relief is necessary to avoid immediate and irreparable harm," a Bankruptcy Court may approve a motion to "pay all or part of a claim that arose before the filing of the petition" prior to twenty-one days after the Commencement Date.  Certain First Day Pleadings request that the Court authorize the Debtors to pay claims that arose prior to the date hereof in the first twenty-one days of these chapter 11 cases (the **"Interim Period"**).  As set forth in more detail below, in such instances, I believe the relief sought is necessary to avoid immediate and irreparable harm to the Debtors.

**Cash Management Motion**

A.     **Relief Requested**

34.     The Debtors seek entry of an interim order and, following notice and a hearing, a final order (i) authorizing them to (a) continue their existing Cash Management

---

[9] Unless otherwise defined, terms defined herein have the meaning ascribed to them in the respective First Day Pleading described.

System, (b) honor certain prepetition obligations related thereto, certain of which will be due and payable in the Interim Period, and (c) maintain existing Bank Accounts and Business Forms and (ii) extending the time to comply with section 345(b) of the Bankruptcy Code.

**B.    Basis for Relief Requested**

35.     I am familiar with the Debtors' Cash Management System.  Based on my knowledge and experience, I believe that the Cash Management System is similar to those used by other large businesses to efficiently collect, transfer, and distribute funds generated by their business operations.  All of the Debtors[10] participate in and are dependent on the Cash Management System.  The Debtors also utilize the Cash Management System to reimburse their Franchisees for, among other things, amounts relating to gift cards and Vendor Rebates.  The continuation of intercompany and Franchisee-related transactions are in the best interests of the Debtors' estates.  In particular, it is very important that the Debtors be permitted to continue to honor commitments to Franchisees, who contribute strength to the Debtors' brand.  Failure to do so would cause significant harm to the Franchised Restaurants and in turn negatively impact the Debtors' operations.

36.     In order to maintain their operations, the Debtors' require the existing Cash Management System to continue during the pendency of these chapter 11 cases.  The Debtors will continue to maintain all receipts and disbursements and records of all transfers within the Cash Management System utilized postpetition and accurate intercompany balances will be maintained.

37.     Any disruption of the Cash Management System, including the closure of Bank Accounts, would cause delays in the collection, concentration, and disbursement of funds.

---

[10] With the exception of inactive Debtor entities.

Such delays could cause the Debtors to default in their postpetition accounts payable obligations to third parties, including the Banks with whom the Debtors' Bank Accounts are held, which, in turn, could cause employees, vendors, and other third parties to cease providing goods and services to the Debtors, or to impose interest and additional penalties on the Debtors. Such a result would have a severe and adverse impact upon the Debtors' reorganization efforts.

38.     Moreover, if the Debtors were required to immediately close their existing Bank Accounts and terminate their Cash Management System, it would be extremely difficult and expensive to promptly establish new Bank Accounts and a new Cash Management System appropriate for the Debtors' business needs.

39.     It is my understanding that the Debtors' Bank Accounts are maintained at Banks that have been approved by the U.S. Trustee as authorized depositories. Accordingly, the Debtors believe that any funds on deposit with such depositories are secure. Likewise, the Debtors believe that their limited investment of cash in the Overnight Investment Account is prudent and secure.

40.     Accordingly, I believe that the relief in the cash management motion, during the Interim Period and on a final basis, is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

**Insurance Motion**

A.     **Relief Requested**

41.     The Debtors seek entry of an interim order and, following notice and a hearing, a final order authorizing the Debtors to (i) continue their Insurance Programs on an uninterrupted basis in accordance with the same practices and procedures as were in effect prior to the Commencement Date, and to renew their Insurance Programs or obtain replacement

coverage, as needed in the ordinary course of business and (ii) pay, in their sole discretion, all undisputed premiums, claims, deductibles, administrative fees, broker fees, and other obligations relating to the Insurance Programs, as applicable, that were or are due and payable, and relate to the period before or after the Commencement Date. The Debtors also seek authority to modify the automatic stay solely and for the limited purpose of permitting employees holding workers' compensation claims to proceed with their claims in accordance with the Debtors' Workers Compensation Programs in the appropriate judicial or administrative forum. Certain of the prepetition Insurance Obligations will be due and payable during the Interim Period.

**B.** **Basis for Relief Requested**

42. I am generally familiar with the Debtors' Insurance Programs. The Debtors believe, and I agree, that the nature of the Debtors' businesses and the extent of their operations make it essential for the Debtors to maintain their Insurance Programs on an ongoing and uninterrupted basis. If the Debtors fail to pay their Insurance Obligations, then the Insurance Carriers may seek to terminate existing Insurance Programs or may decline to renew the programs or refuse to insure the Debtors in the future. If the Debtors were required to obtain replacement policies on an expedited basis, doing so would result in significant cost to the estates.

43. It is also my understanding that if the Debtors are not authorized to pay their prepetition obligations under their Insurance Programs, letters of credit and surety bonds will be drawn, resulting in significant claims against the Debtors' estates. It is my understanding that without maintaining certain surety bonds, the Debtors would not have the right to conduct business in certain states.

44.     It is also my understanding that if the Debtors' Insurance Programs lapse without renewal, the Debtors could be exposed to substantial liability for personal and/or property damages and would also be in default under their real property leases.

45.     It is also my understanding that the Debtors could be fined substantial amounts by various state workers' compensation boards if the Workers' Compensation Programs are not maintained. In addition, if eligible workers' compensation claimants do not receive timely payment for prepetition employment-related injuries, I believe that there would be a negative effect on the financial and physical well-being and morale of the Debtors' employees.

46.     Finally, it is my understanding that the United States Trustee for the Southern District of New York's Operating Guidelines require the Debtors to maintain certain of the Insurance Programs, including workers' compensation, general liability, and casualty insurance. Accordingly, I believe that the relief requested in the insurance motion, during the Interim Period and on a final basis, is necessary to avoid immediate and irreparable harm that would result from the failure to authorize the Debtors to maintain their Insurance Programs.

**Employee Wage Motion**

    **A.      Relief Requested**

47.     The Debtors seek an interim order and, following notice and a hearing, a final order authorizing, but not requiring, the Debtors to (i) pay, in their sole discretion, all obligations incurred under or related to Employee Obligations, including but not limited to Wage Obligations, Garnishment Obligations, Supplemental Workforce Obligations, Independent Contractor Obligations, Reimbursement Obligations, Payroll Tax Obligations, Incentive Obligations, and Employee Benefit Obligations and all costs incident to the foregoing and (ii) maintain and continue to honor their practices, programs, and policies for their Employees as

they were in effect as of the Commencement Date, and as such may be modified, amended, or supplemented from time to time in the ordinary course. Certain of the prepetition Employee Obligations will be due and payable during the Interim Period.

**B.      Basis for Relief Requested**

48.      In connection with the Debtors' operations, Uno Restaurants, LLC, one of the Debtors employs approximately 5,750 Employees on behalf of all of the Debtors, inclusive of approximately 115 corporate personnel for their restaurants and Uno Foods, 370 field service or restaurant managers, 75 employees working at Uno Foods' manufacturing facility, and approximately 145 Employees located at three Company-Owned Restaurants in Chicago, Illinois who are covered by collective bargaining agreements.[11] The remaining employees are restaurant personnel, many of whom are part-time. The Debtors also employ, through certain staffing agencies, approximately 80-100 Supplemental Workers also integral to the operation of Uno Foods.

49.      The Employees, inclusive of the Supplemental Workers, service all aspects of the Debtors' businesses, including management and service at the Debtors' restaurants, assistance in manufacturing Uno Foods' products, and management of the Debtors' operations from their corporate headquarters. The Employees are at the center of the Debtors' business operations as they directly interface with customers and vendors. Accordingly, their dedication and service drives the Debtors' profitability.

50.      I believe without the continued services of the Employees and Supplemental Workers an effective reorganization of the Debtors will not be possible. Consequently, I believe that it is critical that the Debtors be authorized to satisfy their Employee-

---

[11] The collective bargaining agreements expired in November 2009 and are in the process of renegotiation.

related obligations and continue their ordinary course employee plans, policies, and programs in effect as of the Commencement Date. The Debtors' Employee Benefit Plans are standard and customary for the restaurant industry.

51. The Debtors believe, and I agree, that it is inequitable for the Employees to bear the burden of these chapter 11 cases where the Debtors must rely upon them for the continued sustainability of their businesses. First, continued payment of the Debtors' Wage Obligations in the ordinary course is essential to ensure that the Employees and Supplemental Workers do not suddenly find their lives interrupted by the filing of these chapter 11 cases. Failure to honor these obligations would result in immediate and irreparable harm to the Employees' and Supplemental Workers' personal financial health, including, among other things, to their personal credit ratings and standards of living.

52. The continuation of the Debtors' Employee Benefit Plans and the payment of prepetition obligations associated therewith, including during the Interim Period, is necessary to ensure the continued service, without distraction, of the Employees to the Debtors' reorganization efforts. Failure to continue the Debtors' Employee Benefit Plans in the ordinary course of business would threaten the viability of the Debtors' businesses as Employees would suddenly find themselves without appropriate healthcare or insurance coverage. Given the importance of continued coverage for the Employees and their families, the Debtors cannot afford the likely result that, if such programs were discontinued, Employees would become distracted from their work and their productivity would be reduced. Likewise, it would be inequitable to require the Debtors' Employees to bear personally the cost of any business expenses they incurred prepetition for the benefit of the Debtors with the understanding that they would be reimbursed. Employee concerns about personal liability for business charges would

understandably distract them from devoting attention to the Debtors' businesses and would be detrimental to morale.

53.     The Debtors also believe that honoring prepetition Severance Obligations to former employees is crucial to the financial well-being of such employees and necessary to preserve the goodwill and morale of current Employees.

54.     Accordingly, I believe that the relief requested in the employee wage motion is necessary to avoid immediate and irreparable harm to these estates that would result from the Debtors' failure to honor their immediate Employee Obligations.  The continued operation of the Debtors' businesses and their successful reorganization depends upon the retention and cooperation of the Debtors' Employees and Supplemental Workforce.  Any failure to pay outstanding obligations may lead to the deterioration of employee morale, which, at this juncture, could negatively affect the value of the Debtors' assets and businesses and their ability to reorganize successfully.  Moreover, I believe if the checks issued and fund transfers requested in payment of prepetition Employee Obligations are dishonored, or if such earned obligations are not timely paid postpetition, the Debtors' Employees may suffer extreme personal hardship and may even be unable, in some instances, to pay their daily living expenses or be forced to forego medical treatment due to lack of insurance coverage.  It is inequitable to place Employees in such an untenable position while relying upon such individuals for the continuation of the Debtors' operations.

55.     Based upon the foregoing, I believe that the relief requested during the Interim Period and on a final basis is in the best interests of the Debtors and their respective estates and will enable the Debtors to continue to operate their businesses in an economic and efficient manner without disruption and should be granted.

**Tax Motion**

### A. Relief Requested

56.    The Debtors request that this Court enter interim, and after a notice and hearing, a final order authorizing the Debtors to pay, in their sole discretion, all prepetition Taxes and Assessments, including Sales Taxes, Use Taxes, Property Taxes, and Other Governmental Assessments and any penalties and interest thereon to various Taxing Authorities, including those obligations subsequently determined upon audit to be owed for periods prior to the Commencement Date. A limited amount of the prepetition Taxes and Assessments will be due and payable during the Interim Period.

### B. Basis for Relief

57.    I believe that the payment of the Taxes and Assessments is critical to the Debtors' continued and uninterrupted operations. Among other things, failure to pay outstanding amounts could, in some instances, jeopardize the Debtors ability to do business in certain states, cause the Taxing Authorities to file liens on the Debtors' property, and/or result in excessive interest and penalties. In addition, it is my understanding that non-payment of certain outstanding Taxes and Assessments may result in personal liability for the Debtors' directors or officers and could trigger unwarranted governmental action in the form of increased audits, all of which would be very disruptive to the Debtors' operations. Furthermore, it is my understanding that certain taxes, such as Sales Taxes and Use Taxes, are only being held by the Debtors in trust for the benefit of the Taxing Authorities and, thus, are not property of the Debtors' estates. Finally, based on my knowledge and conversations with the Debtors' counsel, it is my understanding that certain of the Debtors' taxes are entitled to priority status under the Bankruptcy Code and, therefore, must be paid in full before any general unsecured obligations

may be satisfied.  Accordingly, I believe that the relief requested in the tax motion, during the Interim Period and on a final basis, is necessary to avoid immediate and irreparable harm that would result from the failure to authorize the Debtors to pay their Taxes and Assessments.

**Customer Programs Motion**

### A.    Relief Requested

58.    The Debtors seek authority to (a) continue their Customer Programs, (b) perform and honor their prepetition obligations to customers under the Customer Programs, (c) renew, replace, implement new and/or terminate one or more of the Customer Programs, (d) continue paying third-party vendors and administrators who facilitate certain of the Customer Programs in the ordinary course of business, and (e) honor credit card and debit card transactions, in each case, as they deem appropriate, in the ordinary course of business, without further application to the Court.

### A.    Basis for Relief Requested

59.    As the Chief Financial Officer of Uno, I believe that customers are the lifeblood of the Debtors' businesses.  In the highly competitive restaurant and consumer products industries, customer satisfaction is the key to survival.  The Debtors have implemented various Customer Programs to drive customer sales and traffic in their restaurant and retail venues, develop and sustain a positive reputation in the marketplace, engender customer loyalty, ensure customer satisfaction, meet competitive pressures, and generate goodwill for the Uno brand, thereby retaining current customers, attracting new ones, and ultimately maximizing revenues and profitability.

60.    I believe that immediate assurance to the consumer public that all of the Debtors' Customer Programs will be honored on an uninterrupted basis is crucial to Uno's

ongoing business operations.  Maintaining goodwill is absolutely essential to continued customer loyalty on a going-forward basis, particularly given the increased pressure from competitors that the Debtors believe will inevitably arise during the course of these chapter 11 cases.  The Uno customer base will be depleted and the Uno brand will be tarnished if, for example, Gift Cards are not honored, various coupons and discounts are not redeemable, the benefits of membership in Uno Insider's Club[R] are stripped, obligations in connection with Uno Dough Rai$ers[TM] events that occurred prior to the Commencement Date are not honored, and participation in the School Cheese Rebate Program ceases.  I believe that the Debtors' businesses and the Uno brand will be immediately and irreparably harmed if the Debtors are unable to perform and honor their prepetition obligations under the Customer Programs.

## PACA Motion

### A.      Relief Requested

61.      The Debtors seek authority to timely and fully pay, in the ordinary course of business and consistent with their historical practices, all valid claims under the Perishable Agricultural Commodities Act of 1930 to vendors that supply fruits and fresh vegetables to the Debtors' Uno Chicago Grill® restaurants and consumer products division.

### B.      Basis for Relief Requested

62.      The fruits and fresh vegetables purchased by certain of the Debtors from the PACA Vendors are a critical component of the Debtors' restaurant and consumer products businesses.  Without uninterrupted access to these perishable agricultural commodities, the Debtors would not be able to meet the demands of their restaurant and consumer products customers.  In order to avoid disruption to the Debtors' businesses, and because it is my understanding that PACA Vendors that adhere to certain statutory notice requirements (including

putting statutorily-mandated language on the face of their invoices) are entitled to prompt payment from the Debtors as beneficiaries of trust assets, it is essential that the Debtors be able to continue to pay these claims in the ordinary course of business, as required by PACA. Accordingly, I believe that the relief requested in the PACA motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

**Essential Vendor Motion**

### A.     Relief Requested

63.     The Debtors seek entry of an interim order and, following notice and a hearing, a final order authorizing, but not directing, them to pay the prepetition claims of certain Essential Vendors of the Restaurant Business and the Consumer Products Business that are critical to maintaining the going-concern value of the Debtors' business enterprise and the Uno brand. These Essential Vendors are, among others, providers of essential food, products, and supplies, liquor distributors, brokers, mechanics, and other service providers.

### B.     Basis for Relief Requested

64.     The Restaurant Business and the Consumer Products Business are supported by a highly-integrated system of sole source and specialized suppliers of goods and services. These Essential Vendors must function in nearly perfect coordination for the Debtors' operations to carry on uninterrupted. The Essential Vendors are critical to the Restaurant Business and the Consumer Products Business because, among other reasons, (i) they are the only source (or one of a handful of sources) for a particular food, product, supply, or service, (ii) they supply to Uno Foods particular food and supplies critical to the production of the Uno consumer products which are produced using proprietary recipes/formulas or are manufactured for specific use by Uno Foods in its Consumer Products Business, or (iii) obtaining a

replacement source would entail substantial delay or significantly increased costs. Failure to pay the Essential Vendor Claims would likely result in Essential Vendors halting their provision of necessary goods and/or services to the Debtors which, in turn, would have an immediate devastating impact on the Debtors' businesses and severe negative effects on Uno's reorganization efforts.

65. In connection with the Consumer Products Business, certain of the Essential Vendors supply to Uno Foods particular food and supplies critical to the production of the Uno consumer products of which they are the sole source (or one in a handful of sources) or which are produced using proprietary recipes/formulas or are manufactured for specific use by Uno Foods in its Consumer Products Business. The ingredients used to manufacture the Uno consumer products, the nutritional information listing the ingredients contained therein, and the packaging of the finished products are fixed. If Uno Foods does not receive the food, supplies, and services necessary for its production process from the Essential Vendors, it will be either impossible, or time-consuming and extremely costly, to find alternative vendors. Moreover, because Uno Foods' products are taste-tasted and approved by its customers and tested with respect to the nutritional information contained on the packaging, needing to use a replacement ingredient or change nutritional information would disrupt the production process and severely impair Uno Foods' ability to satisfy its customers. Producing new nutritional information to reflect the inclusion of a new ingredient would take no less than five weeks, a delay that Uno Foods cannot afford.

66. In particular, it is my belief that maintaining the valuable historical relationships with two particular Essential Vendors – US Foodservice, Inc. (**"USF"**) and Perkins Paper, Inc. (**"Perkins"**) – is critical to the continued operation of the Debtors' businesses. These

Essential Vendors are essential providers of goods and services to both the Restaurant Business and the Consumer Products Business.  These two Essential Vendors provide the Uno Chicago Grill® restaurants with approximately 75% of their essential food, products, and supplies, in addition to critical services.  With respect to the Consumer Products Business, USF, by managing a supply and distribution chain of more than 200 individual vendors, is accountable for supplying and, in many instances, transporting to and storing at, the Uno Foods Facility approximately 60% of the products needed to operate the Consumer Products Business.  USF delivers products to the Uno Foods Facility six days per week and at least two times per day.  Perkins, located in close proximity to the Uno Foods Facility, supplies to Uno Foods all of the needed packaging supplies for the Consumer Products Business, including corrugated and retail boxes and essential components such as trays and susceptors.  The corrugated and retail boxes are pre-printed to reflect the Uno brand name as well as customer-specific UPC bar codes and nutritional information for the various Uno Foods products.  Because the Uno Foods Facility is unable to warehouse the packaging needs for the 125 product codes (SKUs) that are available on Uno Foods' price lists, Perkins acquires these packaging products and holds them on its warehouse floor awaiting orders from Uno Foods to fulfill production requirements; floor inventory can be 30 to 90 days' worth at any point in time.  In connection with rendering these services, Perkins runs a shuttle service that delivers products to the Uno Foods Facility daily, typically one to three times per day.  To ensure that the Debtors' businesses operate uninterrupted following the commencement of these chapter 11 cases, the Debtors are requesting the ability to pay USF, Perkins, and other Essential Vendors if deemed necessary in the Debtors' business judgment.

67.     Approximately 20% of the Debtors' gross sales at the Uno Chicago Grill®

restaurants relate to the sale of Liquor.  Payment of any outstanding invoice for Liquor is critical

for two reasons.  First, most of the Liquor supplied to the Uno Chicago Grill® restaurants is

provided by certain vendors who have exclusive territorial distribution rights in the areas in

which the Uno Chicago Grill® restaurants are located.  Because the various Liquor Distributors

have the exclusive right to sell certain alcoholic beverages featured on the Uno Chicago Grill®

menu, the Liquor Distributors are irreplaceable.  Second, and more importantly, the laws of

many states in which the Debtors operate mandate that retailers who have defaulted on payments

to any liquor wholesaler must purchase all alcoholic beverages from all wholesalers on a cash

(non-credit) basis until the original debt is repaid.  Accordingly, if prepetition amounts owed by

the Debtors to the Liquor Distributors are not paid, the Liquor Distributors would be obligated,

under state law, to require that the Debtors pay for the Liquor in cash on delivery.  Forcing the

Debtors to pay cash on delivery of Liquor as opposed to payment on normal payment terms

(typically, 30 days from invoice date) would impair the Debtors' liquidity to the detriment of all

stakeholders.  All prepetition amounts outstanding to the Liquor Distributors will become due

and payable in the Interim Period; it is essential to the continued operation of the Restaurant

Business that the Debtors be authorized to pay such amounts.

68.     Additionally, in the ordinary course of business, the Debtors engage a

number of mechanics and other service providers – certain of which are intimately familiar with

the Debtors' equipment and cannot be easily replaced – to repair and maintain equipment at Uno

Chicago Grill® restaurants nationwide and the production equipment and other equipment in the

Uno Foods Facility.  It is my understanding that the Restaurant Essential Service Providers and

the Uno Foods Essential Service Providers may hold valid mechanics liens on the Debtors'

equipment if not paid but, regardless, the Debtors seek authorization to pay such providers if it appears they might not otherwise provide services to the Debtors going forward.

69.     Last, as is customary in the consumer products industry, Uno Foods utilizes the services of a number of brokers to generate business, including to market its products, and to facilitate sales of its products to over 4,000 valuable points of distribution. The Brokers, paid on a commission basis, have direct relationships with Uno Foods' customers and, in many respects, are the "face" of the Uno brand. Comprising more than 50% of the retail side of Uno Foods sales, the Brokers are an integral part of Uno Foods' sales efforts. If not paid on account of their prepetition commissions, it is my belief that the Brokers may refuse to garner business for Uno Foods on a going-forward basis and, at a minimum, their morale will be adversely impacted. Without the continued support of the Brokers, it is my belief that Uno Foods will not be in a position to take advantage of business opportunities in the marketplace, to the detriment of the Debtors and all stakeholders.

70.     My understanding is that the vast majority of the Essential Vendor Claims (approximately 85% overall) will become due and payable, in the ordinary course and consistent with the Debtors' past practices, in the Interim Period. It is imperative that the Debtors be authorized to make these payments when necessary in the Debtors' business judgment. Without the ability to make payments in respect of Essential Vendor Claims, the Debtors' businesses will be immediately and irreparably harmed.

**Common Carriers and Warehouseman and Customs Broker Motion**

**A.     Relief Requested**

71.     The Debtors seek entry of an order authorizing, but not directing, them to (i) pay those prepetition Common Carrier and Warehousing Charges to Common Carriers and

Warehousemen that the Debtors determine, in the exercise of their business judgment, to be necessary or appropriate to obtain the release of, among other things, raw materials, finished products, supplies, menus, signage, promotional materials, and employee uniforms held by such Common Carriers and Warehousemen and (ii) pay prepetition Customs Broker Fees.

**B.      Basis for Relief Requested**

72.      In connection with both the Consumer Products Business and the Restaurant Business, the Debtors routinely use and make payments to (a) domestic and foreign commercial common carriers to transport (i) raw materials to and from various warehouses to the Uno Foods Facility for production of the Uno consumer products, (ii) finished Uno consumer products from the Uno Foods Facility to customers worldwide, and (iii) other Goods to and from the Restaurants and (b) third-party warehouses to store excess inventory, finished Uno consumer products, and other goods.  At any given time, valuable goods are in transit or in storage facilities.  The Debtors' distribution network and storage system require the coordinated services of the Common Carriers and Warehousemen and unfettered access to the goods that they transport and store.  It is my concern that certain Common Carriers and Warehousemen may refuse to deliver goods to their final destination, or hold the Debtors' goods hostage in their warehousing facilities, if not paid prepetition amounts owed to them and, in some instances, may assert a lien on the goods in their possession.  If the Customs Broker refuses to coordinate the export of finished Uno consumer products from the Uno Foods Facility to customers in Canada and to facilitate the payment of applicable customs duties in connection therewith because a prepetition amount remains outstanding, the Consumer Products Business will be adversely affected.  In sum, if the Debtors' distribution network and storage system is interrupted – even for a short period of time – the impact on the Restaurant Business and the Consumer Products

Business would be devastating and the Debtors' businesses would be immediately and irreparably harmed.

## VIII.

## Information Required by Local Bankruptcy Rule 1007-2

73.    Local Bankruptcy Rule 1007-2 requires certain information related to the Debtors, which is set forth below.  The information requested in Local Bankruptcy Rule 1007-2(a)(1) is set forth in Sections I and IV above.

74.    Pursuant to Local Bankruptcy Rule 1007-2 (a)(3), <u>Schedule 1</u> hereto lists the names and addresses of the members of, and attorneys for, the Majority Noteholder Group. A brief description of the circumstances surrounding the formation of this Majority Noteholder Group is set forth above in Section IV.

75.    Pursuant to Local Bankruptcy Rule 1007-2(a)(4), <u>Schedule 2</u> hereto lists the following information with respect to each of the holders of the Debtors' 30 largest unsecured claims on a consolidated basis, excluding claims of insiders: the creditor's name, address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), and telephone number; the name(s) of persons(s) familiar with the Debtors' accounts; the amount of the claim; and an indication of whether the claim is contingent, unliquidated, disputed, or partially secured.

76.    Pursuant to Local Bankruptcy Rule 1007-2(a)(5), <u>Schedule 3</u> hereto provides the following information with respect to each of the holders of the five (5) largest secured claims against the Debtors on a consolidated basis: the creditor's name, address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), and telephone number; the amount of the claim; a brief description of the

collateral securing the claim; an estimate of the value of the collateral; and whether the claim or lien is disputed.

77.     Pursuant to Local Bankruptcy Rule 1007-2(a)(6), <u>Schedule 4</u> hereto provides a  summary of the Debtors' assets and liabilities on a consolidated basis.

78.     Pursuant to Local Bankruptcy Rule 1007-2(a)(7), there are no shares of stock, debentures, or other securities in the Company that are publicly held.

79.     Pursuant to Local Bankruptcy Rule 1007-2(a)(8), <u>Schedule 5</u> hereto provides a list of the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity, giving the name, address, and telephone number of such entity and the location of the court in which any proceeding relating thereto is pending.

80.     Pursuant to Local Bankruptcy Rule 1007-2(a)(9), <u>Schedule 6</u> hereto provides a list of the premises owned, leased, or held under other arrangement from which the Debtors operate their business.

81.     Pursuant to Local Bankruptcy Rule 1007-2(a)(10), <u>Schedule 7</u> hereto provides the location of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

82.     Pursuant to Local Bankruptcy Rule 1007-2(a)(11), <u>Schedule 8</u> hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property where a judgment against the Debtors or a seizure of their property may be imminent.

83.     Pursuant to Local Bankruptcy Rule 1007-2(a)(12), <u>Schedule 9</u> hereto provides the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

84.     Pursuant to Local Bankruptcy Rule 1007-2(b)(1)-(2)(A), <u>Schedule 10</u> hereto provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors, stockholders, and partners) and the estimated amount to be paid to officers, stockholders, directors and financial, partners, and business consultants retained by the Debtors, for the 30-day period following the filing of the Debtors' chapter 11 petitions.

85.     Pursuant to Local Bankruptcy Rule 1007-2(b)(3), <u>Schedule 11</u> hereto provides, for the 30-day period following the filing of the chapter 11 petitions, a list of estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, and any other information relevant to an understanding of the foregoing.

86.     The foregoing is true and correct to the best of my knowledge, information, and belief.

By:   /s/ Louie Psallidas
      Name: Louie Psallidas
      Title:   Chief Financial Officer, Senior Vice President of Finance, and Treasurer

Dated: January 20, 2010

Sworn to and subscribed before me, a notary public for the State of New York, County of New York, this 20th day of January, 2010.

By:   /s/ Duke Amponsah
      Notary Public
      Notary Public, State of New York
      No. 01AM6172357
      Qualified in Kings County
      Commission Expires August 6, 2011

**Exhibit A**

**Organizational Chart**



Updated: 01/31/10

**Exhibit B**

**1007-2 Schedules**

## Schedule 1

### Majority Noteholder Group

Pursuant to Local Bankruptcy Rule 1007-2(a)(3), the following is a list of the members of and attorneys for a group of unaffiliated secured bondholders organized prior to the Commencement Date (the "Majority Noteholder Group"), with their respective addresses. The Majority Noteholder Group has not retained financial advisors.

| Members | Address |
|---|---|
| Coliseum Capital Management, LLC | 767 Third Avenue, 35th Floor<br>New York, NY 10017<br>Attn: Adam Gray |
| Twin Haven Capital Partners, LLC | 11111 Santa Monica Blvd.<br>Suite 525, Los Angeles, CA 90025<br>Attn: Robert Webster / Paul Mellinger |

| Attorneys | Address |
|---|---|
| Akin Gump Strauss Hauer & Feld LLP | One Bryant Park<br>New York, NY 10036<br>Attn:  Philip Dublin |

# Schedule 2

## 30 Largest Unsecured Claims (Excluding Insiders)[1]

Pursuant to Local Bankruptcy Rule 1007-2(a)(4), the following is a list of creditors holding, as of January 20, 2010, the 30 largest unsecured claims against the Debtors, on a consolidated basis, excluding claims of insiders as defined in 11 U.S.C. § 101.

| (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|
| Name of creditor and complete mailing address, including zip code | Name, telephone number, and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to setoff[2] | Estimated amount of claim (if secured, also state value of security) |
| US Foodservice, Inc 806 Tyvola Road, Suite 108 c/o JP Morgan Chase Charlotte, NC 28217 | 9399 West Higgins Road Suite 500 Rosemont, IL 60018 Attn: William Murray Fax: 847-420-4956 Ph: 847-720-8080 Email: William.murray@usfood.com | Trade Debt | | $1,769,279.22 |
| Hanover Insurance PO Box 4031 Woburn, MA 01888-4031 | The Hanover Insurance Group, Inc. 440 Lincoln Street Worcester, MA 01653-0002 Attn: Kate Somers Fax: 508-855-8078 Ph: 508-855-8274 Email: ksomers@hanover.com | Outstanding premiums and claims | | $355,000.00 |
| Perkins Paper PO Box 229 Taunton, MA 02780 | 630 John Hancock Road Taunton, MA 02780 Attn: Gary Perkins Fax: 508-822-9161 Ph: 800-733-5708 Email: gperkins@perkins1.com | Trade Debt | | $301,784.69 |

---

[1] The information herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. All claims are subject to customary offsets, rebates, discounts, reconciliations, credits, and adjustments, which are not reflected on this Schedule.

[2] All claims are subject to customary offsets, rebates, discounts, reconciliations, credits, and adjustments, which are not reflected on this Schedule.

| (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|
| **Name of creditor and complete mailing address, including zip code** | **Name, telephone number, and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted** | **Nature of claim (trade debt, bank loan, government contract, etc.)** | **Indicate if claim is contingent, unliquidated, disputed, or subject to setoff[2]** | **Estimated amount of claim (if secured, also state value of security)** |
| Amelia Island Plantation 1501 Lewis Street Amelia Island, FL 32034 | PO Box 3000 Amelia Island, FL 32035-3000 Attn: Merritt Hardy Fax: 904-277-5945 Ph: 904-261-6161 | Trade Debt | | $248,567.51 |
| The City of New York Department of Finance 59 Maiden Lane, 28th Floor New York, NY 10038 | New York City Department of Finance 59 Maiden Lane, 28th Floor New York, NY 10038 Attn: Barry Roberts Fax: 212- Ph: 212-487-2099 | Tax Settlement | | $138,496.00 |
| Bellweather Properties of Massachusetts 75 Middlesex Turnpike Burlington, MA 01803 | c/o Simon Properties 115 W. Washington Street Indianapolis, IN 46204 Attn: Julie Carriere Fax: 317-263-2339 Ph: 317-636-1600 | Real estate taxes due for store 210 | | $133,473.84 |
| David I. Berley 419 Park Avenue South c/o Walter & Samuels, Inc. New York, NY 10016 | 419 Park Avenue South c/o Walter & Samuels, Inc. New York, NY 10016 Attn: David Berley Fax: 212-685-6429 Ph: 212-685-6200 With Copy to: Mark Altschul, Esq. Altschul & Altschul Attorneys at Law 18 East 12th Street New York, NY 10003 Fax: 212-727-9615 Ph: 212-924-1505 | Landlord | | $118,653.81 |

| (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|
| **Name of creditor and complete mailing address, including zip code** | **Name, telephone number, and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted** | **Nature of claim (trade debt, bank loan, government contract, etc.)** | **Indicate if claim is contingent, unliquidated, disputed, or subject to setoff[2]** | **Estimated amount of claim (if secured, also state value of security)** |
| Greater Orlando Aviation Authority<br>One Airport Blvd<br>Orlando, FL 32827-4399 | One Airport Blvd.<br>Orlando, FL 32827-4399<br>Attn: Executive Director<br>Fax: 407-825-4580<br>Ph: 407-825-7799<br><br>Copy to:<br>Juan Carlos B. Gomez<br>Marchena and Graham, P.A.<br>976 Lake Baldwin Lane<br>Suite 101<br>Orlando, FL 32814<br>Fax: 407-281-8564<br>Ph: 407-658-8566 | Landlord | | $116,405.60 |
| New York State Department of Taxation and Finance<br>Civil Enforcement – Capital Regions Office<br>One Broadway Center<br>Schenectady, NY 12305 | New York State Department of Taxation and Finance<br>Civil Enforcement – Capital Regions Office<br>One Broadway Center<br>Schenectady, NY 12305<br>Attn: Maria Sangetti<br>Fax: 518-435-8419<br>Ph: 518-388-5224 | Tax Settlement | | $114,666.00 |
| NSTAR<br>One NSTAR Way<br>Westwood, MA 02090 | NSTAR<br>800 Boylston Street, P1700<br>Boston, MA 02199-8003<br>Attn: Douglas S. Horan, General Counsel<br>Fax: 617-424-2421<br>Ph: 617-424-2635 | Utility | | $112,117.00 |
| Heinz North America<br>PO Box 4508<br>Boston, MA 02297-0030 | Heinz 57 Center<br>357 6th Ave.<br>Pittsburgh, PA 15222-2530<br>Attn: Rick Domhoff<br>Fax: 412-237-5785<br>Ph: 513-509-3790 | Trade Payable | | $110,340.33 |
| H & M Bay, Inc.<br>PO Box 631935<br>Baltimore, MD 21263-1935 | PO Box 631935<br>Baltimore, MD 21263-1935<br>Fax: 410-883-2101<br>Ph: 410-754-0765 | Trade Payable | | $97,116.43 |

| (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|
| Name of creditor and complete mailing address, including zip code | Name, telephone number, and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to setoff[2] | Estimated amount of claim (if secured, also state value of security) |
| National Grid<br>300 Erie Blvd. West<br>Syracuse, NY 13202 | National Grid<br>300 Erie Blvd. West<br>Syracuse, NY 13202<br>Attn: Terry Fitzgerald<br>Fax: 315-424-2160<br>Ph: 1-800-322-3223 | Utility | | $94,926.00 |
| Ecolab<br>Ecolab Center<br>370 N. Wabasha Street<br>St. Paul, MN 55102-2233 | One Edgewater Drive, Suite 210<br>Norwood, MA  02062<br>Attn: Bill Clifford<br>Fax: 781-688-2144<br>Ph: 781-688-2108<br>Email:<br>bill.clifford@ecolab.com | Trade Payable | | $88,057.48 |
| NCR Corporation<br>2651 Satellite Boulevard<br>Duluth, GA 30096-5810 | 2651 Satellite Boulevard<br>Duluth, GA  30096-5810<br>Attn: Legal Dept<br>Fax:937-445-5541<br>Ph: 937-445-1936 | Trade Payable | | $82,933.29 |
| Accutech Packaging<br>157 Green Street<br>Foxboro, MA 02305 | 157 Green Street<br>Foxboro, MA 02305<br>Attn: Legal Dept<br>Fax: 508-543-0330<br>Ph: 508-543-3800 | Trade Payable | | $82,307.24 |
| McGirr Graphics, Inc.<br>19 Richards Road<br>Plymouth, MA 02360 | d/b/a Cranberry Graphics<br>19 Richards Road<br>Plymouth, MA 02360<br>Attn: Legal Dept<br>Fax: 508-747-6550<br>Ph: 508-747-6400 | Trade Payable | | $77,576.60 |
| Rupp LLC<br>295 Madison Avenue, 2nd Floor<br>c/o Philips International Holding Corp<br>New York, NY 10017 | 295 Madison Avenue, 2nd Floor<br>c/o Philips International Holding Corp<br>New York, NY 10017<br>Attn:  Diana Marrone<br>Fax: 212-545-1355<br>Ph: 212-545-3818 | Landlord | | $74,063.94 |
| Stone Ridge Construction Services<br>PO Box 237<br>New Windsor, MD  21776 | 634 Jasontown Road<br>Westminster, MD 21776<br>Attn: Kevin Woolihan<br>Fax: 410-871-0038<br>Ph: 410-871-0028 | Trade Payable | | $72,978.00 |

| (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|
| **Name of creditor and complete mailing address, including zip code** | **Name, telephone number, and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted** | **Nature of claim (trade debt, bank loan, government contract, etc.)** | **Indicate if claim is contingent, unliquidated, disputed, or subject to setoff[2]** | **Estimated amount of claim (if secured, also state value of security)** |
| DirectTV<br>2230 East Imperial Highway<br>El Segundo, CA 90245 | 2230 East Imperial Highway<br>El Segundo, CA 90245<br>Attn: Adam Lombardo<br>Fax: 310-964-3235<br>Ph: 310-964-4685 | Trade Payable | | $72,917.00 |
| 7272 Wisconsin Building Corp<br>1201 Seven Locks Rd, Suite 350<br>c/o Vanguard Realty Group<br>Potomac, MD 20854 | 1201 Seven Locks Rd, Suite 350<br>c/o Vanguard Realty Group<br>Potomac, MD 20854<br>Attn: Christopher Rowe<br>Ph: 301-795-1400<br>Email:<br>crowe@vanguardrealty.com<br><br>Copy to:<br>Timothy P. Schwartz<br>Bregamn, Berbert, Schwartz & Gilday, LLC<br>Suite 800 West<br>7315 Wisconsin Ave.<br>Bethesda, MD 20814 | Landlord | | $71,314.30 |
| Richard P. Jaffe, Nominee<br>300 North Nova Road<br>c/o The Jaffe Companies<br>Ormond Beach, FL 20854 | 300 North Nova Road<br>c/o The Jaffe Companies<br>Ormond Beach, FL 20854<br>Attn: Richard Jaffe<br>Fax: 386-673-8500<br>Ph: 386-673-3100 | Landlord | | $69,309.76 |
| WFXT (FOX Television Station)<br>3707 Collections Center Drive<br>Chicago, IL 60693 | 25 Fox Drive<br>Dedham, MA 02026<br>Fax: 781-467-7210<br>Ph: 781-467-2525 | Trade Payable | | $63,965.90 |
| Price Reit Renaissance<br>PO Box 5020<br>New Hyde Park, NY 11042 | c/o Kimco Realty Corporations,<br>3333 New Hyde Park Road, Suite 100,<br>New Hyde Park, NY 11042-0020<br>Attn: Joseph Santigate<br>Fax: 516-869-9001<br>Ph: 516-869-9000 | Litigation Final Judgment | Disputed | $60,575.51 |
| Costa Fruit & Produce<br>PO Box 843009<br>Boston, MA 02284-3009 | 18 Bunker Hill Industrial Park<br>Charlestown, MA 02129-1621<br>Attn: Manny Costa<br>Fax: 617-241-8718<br>Ph: 617-241-8007 | Trade Payable | | $59,944.45 |

| (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|
| **Name of creditor and complete mailing address, including zip code** | **Name, telephone number, and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted** | **Nature of claim (trade debt, bank loan, government contract, etc.)** | **Indicate if claim is contingent, unliquidated, disputed, or subject to setoff[2]** | **Estimated amount of claim (if secured, also state value of security)** |
| Archer Daniels Midland Company<br>1917 Henry Ave, SW<br>Canton, OH 44706 | 1917 Henry Ave, SW<br>Canton, OH 44706<br>Fax: 518-828-7736<br>Ph: 800-637-5843 | Trade Payable | | $59,128.25 |
| Carando<br>14622 Collection Center Drive<br>Chicago, IL 60693 | 14622 Collection Center Drive<br>Chicago, IL 60693<br>Attn: Linda Harris<br>Fax: (408) 220-9641<br>Ph: (630) 281-5096 | Trade Payable | | $57,307.60 |
| Cohas Brook Shopping Center, LLC<br>202 N. Main Street<br>P.O. Box 2445<br>Natick, MA 01760 | c/o Integrated Properties<br>202 N. Main Street<br>P.O. Box 2445<br>Natick, MA 01760<br>Attn: William Prendergast<br>Fax: 508-651-8796<br>Ph: 866-614-7767 | Landlord | | $56,832.79 |
| Comcast Spotlight Inc.<br>5 Times Square<br>New York, NY 10036 | Legal Demands Center<br>650 Centerton Road<br>Moorestown, NJ 08057<br>Fax: 856-317-7319<br>Ph: 856-317-7272 | Trade Payable | | $55,781.25 |
| Katsiroubas Bros.<br>40 Newmarket Square<br>Boston, MA 02118 | 40 Newmarket Square<br>Boston, MA 02118<br>Attn: Nicholas Katsiroubas<br>Fax: 617-442-3856<br>Ph: 617-442-6473<br>Email:<br>nick@katsiroubasproduce.com | Trade Payable | | $54,259.89 |

# Schedule 3

## 5 Largest Secured Claims

Pursuant to Local Bankruptcy Rule 1007-2(a)(5), the following lists the creditors holding, as of January 20, 2010, the five largest secured claims against the Debtors, on a consolidated basis. [1]

| Contact | Contact | Mailing Address & Phone Number | Approx. Amount of Claim | Type of Collateral | Value of Collateral | Disputed |
|---|---|---|---|---|---|---|
| Wells Fargo Foothill, Inc., as agent under that certain senior secured Credit Agreement dated as of February 22, 2005 (as amended). | Kelly Walsh, Specialty Finance Division Manager | 2450 Colorado Avenue, Suite 3000 West Santa Monica, CA 90404 Telephone: (310) 453-7921 | $33,900,000 | Substantially all assets of (i) Uno Restaurant Holdings Corporation and certain of its subsidiaries and (ii) Uno Holdings II LLC. | Unliquidated | No |
| U.S. Bank National Association, as indenture trustee under that certain second lien indenture dated as of February 22, 2005. | Rick Prokosch | 60 Livingstone Avenue EP-MN-WS3C St. Paul, MN 55107-2292 Telephone: (651) 495-3918 | $142,000,000 | Substantially all assets of (i) Uno Restaurant Holdings Corporation and certain of its subsidiaries and (ii) Uno Holdings II LLC. | Unliquidated | No |

---

[1] The information herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.

## Condensed Consolidated Balance Sheet
## (Dollars in Thousands, Except for Share Data)

|  | FY 09 | FY 08 |
|---|---:|---:|
| **Assets** | | |
| Current Assets | | |
|    Cash and cash equivalents | 231 | 2,457 |
|    Accounts receivable, net of allowance | 5,132 | 5,984 |
| Inventories | 4,301 | 3,924 |
| Assets Held for Sale | - | - |
| Prepaid expenses | 2,470 | 869 |
| Deferred income taxes | 869 | 452 |
| Income tax receivable | - | - |
| Total current assets | **13,003** | **13,686** |
| | | |
| Property and equipment, net | **64,104** | **80,176** |
| | | |
| Intangible assets, net | 12,066 | 13,968 |
| Indefinite-lived intangible assets | 53,450 | 54,931 |
| Other assets, net | 1,947 | 4,395 |
| | **144,570** | **167,156** |
| | | |
| **Liabilities and shareholder's deficit** | | |
| Current liabilities | | |
|    Accounts payable | 8,400 | 8,142 |
|    Accrued expenses | 17,934 | 18,084 |
|    Accrued compensation and taxes | 4,408 | 4,929 |
|    Accrued income taxes | 4,262 | 5,501 |
|    Current portion of long-term debt | 29,707 | 1,006 |
| Total current liabilities | **64,711** | **37,662** |
| | | |
| Long-term debt, net of current portion | 142,052 | 169,290 |
| Deferred income tax liabilities | 20,184 | 20,634 |
| Other long-term liabilities | 6,852 | 6,745 |
| | | |
| Shareholders' deficit | | |
|    Common stock | - | - |
|    Additional paid-in capital | 43,912 | 43,710 |
|    Excess of purchase price over predecessor basis | (45,417) | (45,417) |
|    Note receivable from shareholder | (717) | (690) |
|    Accumulated deficit | (87,007) | (64,778) |
| Total shareholders' deficit | **(89,229)** | **(67,175)** |
| | | |
| | **144,570** | **167,156** |

# Schedule 5

## Debtors' Property Not in the Debtors' Possession

Pursuant to Local Bankruptcy Rule 1007-2(a)(8), the following lists the Debtors' property that is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity.

| Type of Property | Person or Entity in Possession of the Property | Address & Telephone Number of Person or Entity in Possession of the Property | Location of Court Proceeding, if Applicable |
|---|---|---|---|
| Utilities Deposits | Consolidated Edison | P.O. Box 1701<br>New York, NY 10116 | N/A |
| Utilities Deposits | Consolidated Edison | Columbus P.O. Box 1702 GPO<br>New York, NY 10060 | N/A |
| Utilities Deposits | National Fuel Gas Distribution | P.O. Box 4103<br>Buffalo, NY 14264 | N/A |
| Utilities Deposit | Providence Gas | 100 Weybosset St.<br>Providence, RI 02903 | N/A |
| Utilities Deposit | Virginia Natural Gas | P.O. Box 70991<br>Charlotte, NC 28272 | N/A |
| Utilities Deposits | Dominion Virginia Power | P.O. Box 26666<br>Richmond, VA    23261 | N/A |
| Utilities Deposits | Dominion Virginia Power | P.O. Box 26543<br>Richmond, VA 23290 | N/A |
| Utilities Deposits | Baltimore Gas and Electric | P.O. Box 1475<br>Baltimore, MD    21203 | N/A |
| Utilities Deposits | Baltimore Gas and Electric | P.O. Box 1431<br>Baltimore, MD 21203 | N/A |
| Utilities Deposits | Peco Energy Company | P.O. Box 8699<br>Philadelphia, PA 19101 | N/A |
| Utilities Deposits | Peco Energy Company | P.O. Box 13437<br>Philadelphia, PA 19162 | N/A |
| Utilities Deposits | Orlando Utilities Commission | P.O. Box 31626<br>Tampa, FL 33631 | N/A |
| Utilities Deposits | Orlando Utilities Commission | P.O. Box 4901<br>Orlando, FL 32802 | N/A |
| Utilities Deposits | Kissimmee Utility Authority | P.O. Box 620000<br>Orlando, FL 32891 | N/A |

| Type of Property | Person or Entity in Possession of the Property | Address & Telephone Number of Person or Entity in Possession of the Property | Location of Court Proceeding, if Applicable |
|---|---|---|---|
| Utilities Deposits | Kissimmee Utility Authority | P.O. Box 850001<br>Orlando, FL 32885-0087 | N/A |
| Utilities Deposits | Florida Public Utilities | P.O. Box 530969<br>DeBary, FL 32753 | N/A |
| Utilities Deposits | Florida Public Utilities | P.O. Box 7005<br>Marianna, FL 32447 | N/A |
| Utilities Deposits | FPL Energy Services | P.O. Box 25426<br>Miami, FL 25426 | N/A |
| Utilities Deposits | FPL Energy Services | Energy Services, P.O. Box 25426<br>Miami, FL 33102 | N/A |
| Utilities Deposits | Florida City Gas | 10 Peachtree Place<br>Atlanta, GA 30309 | N/A |
| Utilities Deposits | Florida City Gas | P.O. Box 1559 / P.O. Box 1560<br>Newark, NJ 07101 | N/A |
| Utilities Deposit | Progress Energy Florida, Inc. | P.O. Box 33199<br>St. Petersburg, FL 33733 | N/A |
| Utilities Deposit | C&P Telephone | P.O. Box 60<br>Cockeysville, MD 21030 | N/A |
| Deposit | American Compressed Gases | P.O. Box 715<br>Westwood, NJ 07675 | N/A |
| Deposit | Time Warner Cable | P.O. Box 4222<br>Buffalo, NY 14240 | N/A |
| Deposit | EDF Riverside Plaza | 120 Presidential Way #300<br>Woburn, MA 01801 | N/A |
| Deposit | City of Virginia Beach | 2401 Courthouse Drive<br>Virginia Beach, VA 23456 | N/A |
| Deposit | New York City (D&C Dept.) | DCA Comptroller, 42 Broadway<br>New York, NY 10004 | N/A |
| Deposit | LaSalle Partners | 40 Massachusetts Ave. NE<br>Washington DC | N/A |
| Deposit | York County | 185 East Rochambeau Drive<br>Williamsburg, VA 23188 | N/A |
| Deposit | CMS, Inc. | 2650 Pilgrim Court<br>Winston-Salem, NC 27106 | N/A |
| Deposit | Ahold Financial Services | 3213 Paysphere Circle<br>Chicago, IL 60674 | N/A |

| Type of Property | Person or Entity in Possession of the Property | Address & Telephone Number of Person or Entity in Possession of the Property | Location of Court Proceeding, if Applicable |
|---|---|---|---|
| Deposit | BiLo, Inc. | P.O. Box 99<br>Mauldin, SC 29662 | N/A |
| Tax Escrow | Columbia Mall SPE, LLC | c/o General Growth Properties, Inc., Columbia Regional Office, 10275 Little Patuxent Pky<br>Columbia, MD, 21044 | N/A |
| Liquor License Escrow | Skene Law Firm | 2614 Route 516, 2nd Floor<br>Old Bridge, NJ 08857 | N/A |
| Liquor Deposits | Virginia Imports | 881 South Picket Street<br>Alexandria, VA 22304 | N/A |
| Liquor Deposits | Wantz Distributing Co. | 11743 Hopewell Road<br>Hagerstown, MD 21740 | N/A |
| Liquor Deposits | Wayne Densch, Sanford Branch | 2900 West First Street<br>Sanford, FL 32771 | N/A |
| Liquor Deposit | Zink Distributors | 3150 Shelby St.<br>Indianapolis, IN 46227 | N/A |
| Liquor Deposit | American Distributors | P.O. Box 60489<br>Jacksonville, Fl 32236 | N/A |
| Liquor Deposit | Anheuser-Busch Inc | 550 Food Center Drive<br>Bronx, NY 10474 | N/A |
| Liquor Deposits | Associated Distributors | 401 Woodlake Drive<br>Chesapeake, VA 23320 | N/A |
| Liquor Deposit | B & T Distribution | P.O. Box 50188<br>Knoxville, TN 37950-0188 | N/A |
| Liquor Deposit | Bayside Distributors | P.O. Box 710<br>Epping, NH 03042 | N/A |
| Liquor Deposit | Bees Distributing Co. | P.O. Box 716<br>Finksburg, MD 21048 | N/A |
| Liquor Deposits | Bellavance Beverage | 130 Northwest Blvd<br>Nashua, NH 03063 | N/A |
| Liquor Deposit | Beverage Control | 4333 Edington Road<br>Knoxville, TN 37920 | N/A |
| Liquor Deposits | Bob Hall | P.O. Box 1308<br>Upper Marlboro, MD 20773 | N/A |
| Liquor Deposits | Bow Street Dist. | 79 Bow Street<br>Freeport, ME 04032 | N/A |
| Liquor Deposits | Bozick Dist. | 2840 Old Washington Rd | N/A |

| Type of Property | Person or Entity in Possession of the Property | Address & Telephone Number of Person or Entity in Possession of the Property | Location of Court Proceeding, if Applicable |
|---|---|---|---|
| | | Waldorf, MD 20601 | |
| Liquor Deposits | Broudy-Kantor | 3501 E Princess Anne Road<br>Norfolk, VA 23502 | N/A |
| Liquor Deposits | Buck Dist. | P.O. Box 1490<br>Upper Marlboro, MD 20773 | N/A |
| Liquor Deposits | Capitol Dist. | 510 Hall Street<br>Bow, NH 03304 | N/A |
| Liquor Deposit | Carroll Distributing | 1553 Silicon Ave<br>Melbourne, FL 32940 | N/A |
| Liquor Deposits | Central Distributors, Inc. | 15 Foss Rd Box 1936<br>Lewiston, ME 04241-1936 | N/A |
| Liquor Deposit | Central Florida Distributing | 1563 Pine Ave<br>Holly Hill, FL 32117 | N/A |
| Liquor Deposits | Chesbay Dist. | 3928 Cook Boulevard<br>Chesapeake, VA 23323 | N/A |
| Liquor Deposit | Chicago Beer Distributing | 2064 W. 167th Street<br>Markham, IL 60426 | N/A |
| Liquor Deposits | Chicago Beverage System | 135 South Lasalle Dept.6230<br>Chicago, IL 60674-6230 | N/A |
| Liquor Deposits | Churchill (Reliable) Distributors | 7621 Energy Parkway<br>Baltimore, MD 21226-2702 | N/A |
| Liquor Deposits | City Beverages | P.O. Box 620006<br>Orlando, FL 32862-0006 | N/A |
| Liquor Deposit | Clarke Dist., Inc. | P.O. Box 624<br>Keene, NH 03431 | N/A |
| Liquor Deposit | Cumberland & York | 192-233 Presumpscott St<br>Portland, ME 04103 | N/A |
| Liquor Deposit | D & V Distribution | P.O. Box 50698<br>Knoxville, TN 37950-0698 | N/A |
| Liquor Deposits | Daytona Beverages | 2275 Mason Avenue<br>Daytona Beach, FL 32117 | N/A |
| Liquor Deposit | Daytona Budweiser | 2275 Mason Avenue<br>Daytona Beach, FL 32117 | N/A |
| Liquor Deposits | Direct Import Wineco. | 2401 Waukegan Road<br>Bannockburn, IL 60015-1505 | N/A |
| Liquor Deposits | Dops | 116 Pates Drive | N/A |

| Type of Property | Person or Entity in Possession of the Property | Address & Telephone Number of Person or Entity in Possession of the Property | Location of Court Proceeding, if Applicable |
|---|---|---|---|
| | | Ft Washington, MD 20744-4841 | |
| Liquor Deposit | Doyle Distributors | 1333 Northwestern Ave<br>Gurnee, IL 60031 | N/A |
| Liquor Deposit | Eagle Distribution | P.O. Box 27190<br>Knoxville, TN 37927 | N/A |
| Liquor Deposit | Erwin Distributing Co. | 530 Monocacy Blvd<br>Frederick, MD 21701 | N/A |
| Liquor Deposit | Forman Dist. | 7550 Accotink Park Rd<br>Springfield, VA 22150 | N/A |
| Liquor Deposit | Fowler Distributing | 921 Old Philadelphia Road<br>P.O. Box D<br>Aberden, MD 21001 | N/A |
| Liquor Deposits | Fred Losch | 436 Park Avenue<br>Lake Villa, IL 60046 | N/A |
| Liquor Deposits | Frederick P. Winner | 7001 Quad Ave Suite A<br>Baltimore, MD 21237-2442 | N/A |
| Liquor Deposits | Fredericksburg Distributors | P.O. Box 5039<br>Fredericksburg, VA 22403 | N/A |
| Liquor Deposits | Freeman Beverage | 30 Baron Park Road<br>Fredericksburg, VA 22405 | N/A |
| Liquor Deposit | George Dinwiddie Wine & Spirits | 6250 Enterprise Dr<br>Knoxville, TN 37909 | N/A |
| Liquor Deposits | Grantham Distr. | 2685 Hansrob Road<br>Orlando, FL 32804 | N/A |
| Liquor Deposit | Great State Beverage | 1000 Quality Drive<br>P.O. Box 16550<br>Hooksett, NH 03106-6550 | N/A |
| Liquor Deposit | Guiffre Distributing | 6839 Industrial Rd<br>Springfield, VA 22151 | N/A |
| Liquor Deposit | Hayes Beer Distributing | 12160 S. Central Ave.<br>Alsip, IL 60803 | N/A |
| Liquor Deposits | Henry Wine Group | 8100 Dorsey Run Rd # C<br>Jessup, MD 20794 | N/A |
| Liquor Deposits | Hoffman Beverage | 5464 Greenwich Rd<br>Virginia Beach, VA 23462 | N/A |
| Liquor Deposits | Hop & Wine Beverage | 45490 Ruritan Circle<br>Sterling, VA 20164 | N/A |

| Type of Property | Person or Entity in Possession of the Property | Address & Telephone Number of Person or Entity in Possession of the Property | Location of Court Proceeding, if Applicable |
|---|---|---|---|
| Liquor Deposits | JF Fick Inc | P.O. Box 7567<br>Fredericksburg, VA 22404 | N/A |
| Liquor Deposits | Jim Taylor Corp | 133 Atlantic Drive<br>Maitland, FL 32751 | N/A |
| Liquor Deposit | Joseph Gies Imports | 3347 N Southport Ave<br>Chicago, IL 60657 | N/A |
| Liquor Deposit | Knoxville Beverage | P.O. Box 51628<br>Knoxville, TN 37950-1628 | N/A |
| Liquor Deposit | Larkin Wholesale Co. Inc. | 929 Eldridge Dr<br>Hagerstown, MD 21740 | N/A |
| Liquor Deposit | Learned Distributors, Inc. | 52 Victoria St<br>Keene, NH 03431 | N/A |
| Liquor Deposits | Legendary Dist | 321 West Seventh Street<br>Richmond, VA 23224 | N/A |
| Liquor Deposit | Lesky Distributing Co. Inc. | 120 Western Maryland Pkwy<br>Hagerstown, MD 21740 | N/A |
| Liquor Deposits | Louis Glunz Beer | 7100 N. Capitol Dr<br>Lincolnwood, IL 60712 | N/A |
| Liquor Deposits | M Price Distributors | One Budweiser Street<br>Hampton, VA 23661 | N/A |
| Liquor Deposit | Maine Distributors | 5 Coffey St<br>Bangor, ME 04401 | N/A |
| Liquor Deposit | Mark Yonce Selections | 206 23rd Street<br>Newport News, VA 23607 | N/A |
| Liquor Deposit | Microsource Beverage | 5701 Courthouse Rd<br>Providence Forge, VA 23140 | N/A |
| Liquor Deposit | Monarch Beverage Company | 3737 Waldmere Rd.<br>Indianapolis, IN 46241 | N/A |
| Liquor Deposit | Montgomery, County Of | Liquor Accounting Section<br>16650 Crabbs Branch Way | N/A |
| Liquor Deposit | Nappi Distributors | 615 Main Street<br>Gorham, ME 04038 | N/A |
| Liquor Deposits | National Dist (Republic Nat) | 5401 Eubank Road<br>Sandston, VA 23150 | N/A |
| Liquor Deposits | National Dist (Republic Nat) | 9423 N Main St<br>Jacksonville, FL 32218 | N/A |

| Type of Property | Person or Entity in Possession of the Property | Address & Telephone Number of Person or Entity in Possession of the Property | Location of Court Proceeding, if Applicable |
|---|---|---|---|
| Liquor Deposits | National Distributors | 5401 Eubank Road<br>Sandston, VA 23150 | N/A |
| Liquor Deposits | National Distributors | 116 Wallace Avenue<br>So. Portland, ME 04106 | N/A |
| Liquor Deposits | New Hampshire Dist | 65 Regional Dr<br>P.O. Box 267<br>Concord, NH 03301 | N/A |
| Liquor Deposits | Norfolk Beverage | 550 Woodlake Dr -<br>P.O. Box 1566<br>Chesapeake, VA 23320 | N/A |
| Liquor Deposits | Northeast Beverage | 1 Coors Drive Bldg#3<br>Peninsula Industrial Park | N/A |
| Liquor Deposit | Oak Terrace Beverage | 1586 Old Deerfield Road<br>Highland Park, IL 60035 | N/A |
| Liquor Deposit | Pacific Wine | 2701 Western Ave<br>Chicago, IL 60608 | N/A |
| Liquor Deposits | Pine Street Trading Co. | P.O. Box 1080<br>Augusta, ME 04332 | N/A |
| Liquor Deposits | Premier Beverage Company | P.O. Box 592248<br>Orlando, FL 32859 | N/A |
| Liquor Deposits | Premium Distributors | 3500 Fort Lincoln Dr NE<br>Washington, DC | N/A |
| Liquor Deposits | Premium Distributors | 15001 Northridge Drive<br>Chantilly, VA 20151 | N/A |
| Liquor Deposits | Reliable (Churchill) Liquors | 7621 Energy Parkway<br>Baltimore, MD 21226-2702 | N/A |
| Liquor Deposits | Republic (f.k.a. Forman Distr.) | 5401 Eubank Road<br>Sandston, VA 23150 | N/A |
| Liquor Deposit | Republic National | P.O. Box 40709<br>Jacksonville, FL 32203 | N/A |
| Liquor Deposits | Republic Nat'l Dist (f.k.a. The Kronheim Co) | 5401 Eubank Road<br>Sandston, VA 23150 | N/A |
| Liquor Deposit | Rinella | 915 Tower Rd<br>Mundelein, IL 60060 | N/A |
| Liquor Deposits | River North Distributing | 75 Remittance Drive Suite 1196<br>Chicago, IL 60675-1196 | N/A |
| Liquor Deposit | Rocky River Brew. | 75 Remittance Drive Suite 1196 | N/A |

| Type of Property | Person or Entity in Possession of the Property | Address & Telephone Number of Person or Entity in Possession of the Property | Location of Court Proceeding, if Applicable |
|---|---|---|---|
| | | Chicago, IL 60675-1196 | |
| Liquor Deposit | Romano Bros (Southern Wine) | 2971 Paysphere Circle<br>Chicago, IL 60674 | N/A |
| Liquor Deposits | Schamberger Bros., Inc. | P.O. Box 7440<br>Villa Park, IL 60181-7440 | N/A |
| Liquor Deposits | Schenck Company | 3964 Shader Rd<br>Orlando, FL 32808 | N/A |
| Liquor Deposit | Selected Brand Distributors | DBA The Country Vintner<br>5001 N.W. 13th Ave; Ste L | N/A |
| Liquor Deposit | Senecal Beverage | 22 Charron Ave<br>Nashua, NH 03063 | N/A |
| Liquor Deposit | Sentman Distributors | 400 Maloney Rd<br>Elkton, MD 21921 | N/A |
| Liquor Deposits | Service Distributing | 8397 Paris Street<br>Lorton, VA 22079 | N/A |
| Liquor Deposits | Skokie Valley Beverage | 199 Shepard Avenue<br>Wheelling, IL 60090 | N/A |
| Liquor Deposits | Southern Wine & Spirits | P.O. Box 90249<br>Lakeland, FL 33804-0249 | N/A |
| Liquor Deposits | Southern Wine & Spirits Of Illinois (f.k.a. Union Bev.) | 2971 Paysphere Circle<br>Chicago, IL 60674-2971 | N/A |
| Liquor Deposit | Southern Wine & Spirits Of S.FL | P.O. Box 90249<br>Lakeland, FL 33804-0249 | N/A |
| Liquor Deposit | Southern Wine and Spirits | P.O. Box 90249<br>Lakeland, FL 33804-0249 | N/A |
| Liquor Deposit | Southwest Beer Distributing | 4427 Midlothian Turnpike<br>Crestwood, IL 60445 | N/A |
| Liquor Deposits | Specialty Beverage Co. | 2200 Lanier Lane<br>Rockville, VA 23146 | N/A |
| Liquor Deposits | SR Perrott Inc. | 4 North Perrott Drive<br>Ormond Beach, FL 32174 | N/A |
| Liquor Deposit | Stoller Wholesale Wine & SPI | 3325 Mt. Prospect Rd<br>Franklin Park, IL 60131 | N/A |
| Liquor Deposits | The Country Vintner | P.O. Box 1540<br>Ashland, VA 23005 | N/A |
| Liquor Deposits | Town & Country Distributors Inc. | 1050 W Ardmore Ave | N/A |

| Type of Property | Person or Entity in Possession of the Property | Address & Telephone Number of Person or Entity in Possession of the Property | Location of Court Proceeding, if Applicable |
|---|---|---|---|
| | | Itasca, IL 60143 | |
| Liquor Deposits | Tri Cities Beverage | 612 Industrial Park Dr<br>Newport News, VA 23608 | N/A |
| Liquor Deposit | Triple C Distribution | 6600 Deane Hill Drive<br>P.O. Box 10068<br>Knoxville, TN 37939-0068 | N/A |
| Liquor Deposits | Vierk Distributing | 16745 Lathrop<br>Harvey, IL 60426 | N/A |
| Liquor Deposit | Virginia Dept of ABC | 2901 Hermitage Rd<br>Richmond, VA 23261 | N/A |
| Rent Deposit | Lake Hills | 2181 Black Rock Turnpike<br>Fairfield, CT 06825 | N/A |
| Rent Deposit | Riverside Improvements, LLC | Riverside Investments, LLC<br>c/o DLC Management Corp.<br>580 White Plains Road<br>Tarrytown, NY 10591 | N/A |
| Rent Deposit | Danbury Mall, LLC | c/o Macerich<br>401 Wilshire Blvd., Suite 700<br>Santa Monica, CA 90401 | N/A |
| Rent Deposit | Z'Tejas Inc. | 4800 N Scottdale Road Ste. #3400,<br>Scottsdale, AR 85251 | N/A |
| Gas Card Deposits | Emkay | 805 W. Thorndale Ave<br>Itsca, Il 60143 | N/A |
| Finished Goods | Rich's Transportation Services, Inc. | 425 Constitution Drive<br>Taunton, MA 02780 | N/A |
| Finished Goods | Burris Refrigerated Logistics | 451 Fletchwood Road<br>Elkton, MD 21921 | N/A |
| Finished Goods | Burris Refrigerated Logistics | 10900 Central Port Dr.<br>Orlando, FL 32824 | N/A |
| Finished Goods | Burris Refrigerated Logistics | 490 Brook St.<br>Rocky Hill, CT 06067 | N/A |

## Schedule 6

### Debtors' Property

Pursuant to Local Bankruptcy Rule 1007-2(a)(9), the following lists the property or premises owned, leased or held under other arrangement from which the Debtors operate their businesses.

### Owned Property

| Debtor/Location Name | Lease Address | City | State | Zip Code |
|---|---|---|---|---|
| Saxet Corporation / Test Kitchen, Research and Development Offices and Training Center | 44 Industrial Way | Norwood | MA | 02062 |

### Leased Real Property[1]

| Debtor/Store Name | Lease Address | City | State | Zip Code |
|---|---|---|---|---|
| Uno Restaurants, LLC / Corporate Headquarters | 100 Charles Park Road | West Roxbury | MA | 02132 |
| Uno Restaurants, LLC / Corporate Headquarters Parking Lot | 100 Charles Park Road | West Roxbury | MA | 02132 |
| SLA Brockton, Inc. / Brockton Plant | 180 Sparks Street | Brockton | MA | 02401 |
| Uno Restaurants, LLC / Millshop #525 | Camp Morrison Industrial Park 525 Export Circle | Newport News | VA | 23601 |
| Uno Restaurants, LLC / Boylston Street #201 | Condo Unit #1 727-731 Boylston Street (Copley Square) | Boston | MA | 02116 |
| Uno Restaurants, LLC / Harvard Square #202 | 22 John F. Kennedy Street | Cambridge | MA | 02138 |
| Uno Restaurants, LLC / Framingham #203 | Route 9 70 Worcester Road | Framingham | MA | 01701 |
| Uno Restaurants, LLC / Allston #204 | 1230 Commonwealth Avenue | Allston | MA | 02134 |
| Uno Restaurants, LLC / Springfield #206 | 1722 Boston Road | Springfield | MA | 01109 |

---

[1] The classification of the contractual agreements listed herein as real property leases or property held by other arrangements is not binding upon the Debtors.

| Debtor/Store Name | Lease Address | City | State | Zip Code |
|---|---|---|---|---|
| Uno Restaurants, LLC / Kenmore Square #209 | 1 Brookline Avenue (645 Beacon Street) | Boston | MA | 02215 |
| Uno Restaurants, LLC / Burlington #210 | Burlington Mall 1150 Middlesex Turnpike | Burlington | MA | 01803 |
| Uno Restaurants, LLC / Porter Square #215 | 820 Somerville Avenue | Cambridge | MA | 02140 |
| Pizzeria Uno of Kingston, Inc. / Kingston #216 * | Route 3 and Smith Lane (Independence Mall) | Kingston | MA | 02364 |
| Uno Restaurants, LLC / Dedham #217 | 270 Providence Highway | Dedham | MA | 02026 |
| Uno Restaurants, LLC / Huntington #218 | 280 Huntington Avenue | Boston | MA | 02115 |
| Uno Restaurants, LLC / Hanover #219 | 1799 Washington Avenue | Hanover | MA | 02339 |
| Pizzeria Uno of Brockton, Inc. / Brockton #221 | 510 Westgate Drive (Westgate Mall) | Brockton | MA | 02401 |
| SL Uno Hyannis, Inc. / Hyannis #222 | 574 Iyanough Road | Hyannis | MA | 02601 |
| Uno Restaurants, LLC / Revere #224 | 399 Squire Road Suite 210 | Revere | MA | 02151 |
| Uno Restaurants, LLC / Newton #226 | One Newton Place 287 Washington Street | Newton | MA | 02158 |
| Uno Restaurants, LLC / Braintree #227 | South Shore Plaza 250 Granite Street | Braintree | MA | 02184 |
| Uno Restaurant of Woburn, Inc. / Woburn #231 | Woburn Mall Shopping Center 300 Mishawum Road | Woburn | MA | 01801 |
| Waltham Uno, Inc. / Waltham #235 | 155 Bear Hill Road | Waltham | MA | 02154 |
| Uno Restaurants, LLC / Bellingham #236 | 205 Hartford Avenue Crossroads Shopping Center | Bellingham | MA | 02019 |
| Uno Restaurants, LLC / Westborough #238 | Stage Coach Plaza 255 Turnpike Road | Westborough | MA | 01581-2807 |
| Uno Restaurants, LLC / Leominster #239 | 905 Merriam Avenue | Leominster | MA | 01453 |
| Uno Restaurants, LLC / Sturbridge #241 | 100 Charlton Road Center at Hobbs Brook | Sturbridge | MA | 01566-1505 |
| Uno of Haverhill, Inc. / Haverhill #242 | 30 Cushing Avenue | Haverhill | MA | 01830-1405 |
| Uno of Massachusetts, Inc. / Fairhaven #245 * | 214 Huttleston Avenue | Fairhaven | MA | 02719 |

| Debtor/Store Name | Lease Address | City | State | Zip Code |
|---|---|---|---|---|
| UR of Wrentham MA, Inc. / Wrentham #246 | 1048 South Street Suite #30 | Wrentham | MA | 02093 |
| UR of Methuen MA, Inc. / Methuen #247 * | 552 Broadway Route 28 | Methuen | MA | 01844 |
| UR of Plymouth MA, LLC / Plymouth #248 | 10 Shops at 5 Way | Plymouth | MA | 02360 |
| UR of Millbury MA, LLC / Millbury #249 | 70 Worcester-Providence Turnpike, Suite #441 | Millbury | MA | 01527 |
| UR of Attleboro MA, LLC / Attleboro #250 | 211 Washington Street | Attleboro | MA | 02703 |
| UR of Taunton MA, LLC / Taunton #251 | 904 County Street | Taunton | MA | 02780 |
| UR of Swampscott MA, LLC / Swampscott, MA #252 | 970 Paradise Road | Swampscott | MA | 01907 |
| Uno Restaurants II, LLC / West Village #301 * | 391 6th Avenue | New York | NY | 10014 |
| Pizzeria Uno of Forest Hills, Inc. / Forest Hills #302 | 107-16 70th Road | Forest Hills | NY | 11375 |
| Pizzeria Uno of Albany, Inc. / Albany #304 | 120 Washington Avenue Crossgates Mall | Albany | NY | 12203 |
| Pizzeria Uno of Lynbrook, Inc. / Lynbrook #305 * | 693 Sunrise Highway | Lynbrook | NY | 11563 |
| Pizzeria Uno of Columbus Avenue, Inc. / Columbus Avenue #308 | 432 Columbus Avenue | New York | NY | 10024 |
| Pizzeria Uno of Bayside, Inc. / Bayside #310 | 39-02 Bell Blvd. | Bayside | NY | 11361 |
| Pizzeria Uno of Syracuse, Inc. / Syracuse #311 | 9558 Carousel Center | Syracuse | NY | 13290 |
| Pizzeria Uno of Bay Ridge, Inc. / Bay Ridge #312 | 9201 Fourth Avenue | Brooklyn | NY | 11209 |
| Pizzeria Uno of South Street Seaport, Inc. / South Street Seaport #313 | 89 South Street | New York | NY | 10038 |
| Pizzeria Uno of 86th Street, Inc. / Bremen House #315 | 220 86th Street | New York | NY | 10028 |
| Uno Restaurants, LLC / Vestal #318 | 2503 Vestal Parkway East | Vestal | NY | 13850 |
| Uno Restaurants, LLC / Yonkers #319 | Central Plaza Shopping Center 2650 Central Park Avenue | Yonkers | NY | 10710 |

| Debtor/Store Name | Lease Address | City | State | Zip Code |
|---|---|---|---|---|
| Uno Restaurants, LLC / Amherst, NY #320 * | 4125 Maple Road | Amherst | NY | 04226 |
| Uno Restaurants, LLC / Latham #321 | 601 Troy Schenectady Road Intersection of NYS Rte. 2 and Interstate 87 | Latham | NY | 12110 |
| Uno of Henrietta, Inc. / Henrietta #322 | 1000 Hylan Drive | Rochester | NY | 14467 |
| Uno of Victor, Inc. / Victor #323 | 7724 Victor Pittsford Road | Victor | NY | 14564 |
| Uno of Astoria, Inc. / Queens (Astoria) #325 | 37-11 35th Avenue | Long Island City | NY | 11106 |
| Uno of New York, Inc. / Woodbury #327 | 20 Centre Drive | Central Valley | NY | 10917 |
| UR of Fayetteville NY, LLC / Fayetteville #328 | 520 Towne Drive | Fayetteville | NY | 13066 |
| UR of Clay NY, LLC / Clay, #329 | 39 74th Street, Rt. 31 | Liverpool | NY | 13090 |
| UR of New Hartford NY, LLC / New Hartford #330 | 8645 Clinton Street | New Hartford | NY | 13413 |
| UR of Webster NY, LLC / Webster #331 | 931 Holt Road | Webster | NY | 01450 |
| Uno Restaurants, LLC / Warwick #401 | 399 Bald Hill Road, Suite 10 | Warwick | RI | 02886 |
| Uno of Providence, Inc. / Providence #402 | 82 Providence Place – R103 | Providence | RI | 02903-1739 |
| Uno Restaurants, LLC / Smithfield #403 | 371 Putnum Pike | Smithfield | RI | 02917 |
| UR of Danbury CT, Inc. / Danbury #452 | Seven Backus Avenue Danbury Fair Mall | Danbury | CT | 06810 |
| UR of Milford CT, Inc. / Milford #454 | 1061 Boston Post Road | Milford | CT | 06460 |
| Uno of Manchester, Inc. / Manchester #455 * | 180 Deming Street | Manchester | CT | 06040 |
| Uno Restaurants, LLC / Nashua #501 | 304 Daniel Webster Highway | Nashua | NH | 03060 |
| Uno Restaurants, LLC / Manchester #502 * | 1875 South Willow Street | Manchester | NH | 03101 |
| Plizzettas of Concord, Inc. / Concord #503 | City Plaza Mall 15 Ford Eddy Road | Concord | NH | 03301 |
| UR of Keene NH, Inc. / Keene #505 * | Riverside Plaza 342 Winchester Street | Keene | NH | 03431 |

| Debtor/Store Name | Lease Address | City | State | Zip Code |
|---|---|---|---|---|
| UR of Dover NH, Inc. / Dover #506 | 238 Indian Brook Drive | Dover | NH | 03820 |
| UR of Nashua NH, LLC / Nashua #507 | 593 Amherst Street | Nashua | NH | 03063 |
| UR of Tilton NH, LLC / Tilton #509 | 122 Laconia Road | Tilton | NH | 03276 |
| B.S. of Woodbridge, Inc. / Woodbridge #603 | 61 U.S. Highway No. 1 | Woodbridge | NJ | 08840 |
| Westminster Uno, Inc. / Westminster #641 * | 9310 Sheridan Boulevard | Westminster | CO | 80031 |
| Pizzeria Uno of Union Station, Inc. / Union Station #701 | Union Station – Box 6 Second Floor Concourse Area 50 Massachusetts Avenue, N.E. | Washington | DC | 20002 |
| Pizzeria Uno of Bethesda, Inc. / Bethesda #702 * [2] | 7272 Wisconsin Avenue | Bethesda | MD | 20814 |
| Pizzeria Uno of Reston, Inc. / Reston #703 | 11948 Market Street | Reston | VA | 22090 |
| UR of Inner Harbor MD, Inc. / Harbor Place/ Baltimore #704 | 201 East Pratt St. | Baltimore | MD | 21202 |
| SLA Norfolk, Inc. / Norfolk #710 | 5900 Virginia Beach Boulevard | Norfolk | VA | 23502 |
| SL Uno Potomac Mills, Inc. / Potomac Mills #712 | 2680 Prince William Parkway | Woodbridge | VA | 22192-9201 |
| Uno Restaurant of St. Charles, Inc. / St. Charles/Waldorf #713 * | 11110 Mall Circle St. Charles Towne Center | Waldorf | MD | 20603 |
| UR of Bel Air MD, LLC / Bel Air #714 | 601 Baltimore Pike | Bel Air | MD | 21014 |
| Uno Restaurants, LLC / Williamsburg, VA #715 | 205 Bypass Road | Williamsburg | VA | 23185 |
| Newport News Uno, Inc. / Newport News #716 | Village Square Shopping Center, 5007 Victory Boulevard, Unit 120 | Tabb | VA | 23693 |
| Fairfax Uno, Inc. / Merrifield #719 * | 3058 Gatehouse Plaza | Falls Church | VA | 22042 |
| SL Uno Ellicott City, Inc. / Ellicott City #720 | 4470 Long Gate Parkway | Ellicott City | MD | 21043 |
| SL Uno Frederick, Inc. / Frederick, MD #721 | 5449 Urbana Pike | Frederick | MD | 21701 |

[2] Restaurants marked "*" have been closed.

| Debtor/Store Name | Lease Address | City | State | Zip Code |
|---|---|---|---|---|
| Uno of Kingstowne, Inc. / Kingstowne #722 | 5935 Kingstowne Towne Center | Alexandria | VA | 22315-5877 |
| Uno of Hagerstown, Inc. / Hagerstown #723 | 17734 Garland Groh Boulevard | Hagerstown | MD | 21740 |
| Uno of Dulles, Inc. / Dulles #724 * | 21035 Dulles Town Center | Sterling | VA | 20166 |
| Uno of Manassas, Inc. / Manassas #725 | 10701 Bulloch Drive | Manassas | VA | 20109-2237 |
| UR of Bowie MD, Inc. / Bowie #727 | 4001 Town Center Blvd. | Bowie | MD | 20716 |
| UR of Landover MD, Inc. / Landover #729 * | 1101 Shoppers Way | Largo | MD | 20785 |
| UR of Virginia Beach VA, LLC / Lynnhaven #730 | 1005 Lynnhaven Mall Loop Pkwy Suite #1143 | Virginia Beach | VA | 23452 |
| UR of Columbia MD, Inc. / Columbia #731 | 10300 Little Patuxent Parkway | Columbia | MD | 21044 |
| UR of Gainesville VA, LLC / Gainesville #732 | 7390 Atlas Walk Way | Gainesville | VA | 20155 |
| UR of Fredericksburg VA, LLC / Fredericksburg, VA #733 * | 10107 Southpoint Parkway | Fredericksburg | VA | 22407 |
| Pizzeria Uno of Fairfield, Inc. / Chesterfield #752 * | 15525 Olive Street Road | Chesterfield | MO | 63117 |
| Uno of Kirkwood, Inc. / Kirkwood #755 | 1244 South Kirkwood Road | Kirkwood | MO | 63122 |
| SLA Uno, Inc. / Pizzeria Uno #761 | 29 East Ohio Street | Chicago | IL | 60611 |
| SLA Due, Inc. / Pizzeria Due #762 | 619 North Wabash Avenue | Chicago | IL | 60611 |
| SLA Su Casa, Inc. / Su Casa, Inc. #763 | 49 East Ontario Street | Chicago | IL | 60611 |
| Uno of Schaumburg, Inc. / Schaumburg #767 | 1160 Plaza Drive | Schaumburg | IL | 60173 |
| SL Uno Gurnee Mills, Inc. / Gurnee #768 | 6593 Grand Avenue | Gurnee | IL | 60031-1643 |
| Uno of Crestwood, Inc. / Crestwood #772 | 4901 Cal-Sag Road | Crestwood | IL | 60445 |
| Uno Restaurants, LLC / Tuttle Crossing #781 | Tuttle Crossing, 5930 Britton Parkway | Dublin | OH | 43016-1207 |
| Uno Restaurants, LLC / Pickerington #783 | 1720 Hill Road | Pickerington | OH | 43147 |

| Debtor/Store Name | Lease Address | City | State | Zip Code |
|---|---|---|---|---|
| Uno of Indiana, Inc. / Southport #791 | 4740 East Southport Road | Indianapolis | IN | 46237 |
| SL Uno Burlington, Inc. / So. Burlington #810 | 1330 Shelburne Road | South Burlington | VT | 05403 |
| SL Uno Portland, Inc. / So. Portland #830 | 280 Maine Mall Road | South Portland | ME | 04106 |
| Uno of Bangor, Inc. / Bangor #831 | 725 Stillwater Avenue | Bangor | ME | 04401 |
| SL Uno Franklin Mills Inc. / Franklin Mills #841 | 789 Franklin Mills Circle | Philadelphia | PA | 19154 |
| SL Uno Waterfront, Inc. / Waterfront #843 | 205 E. Waterfront Drive | Homestead | PA | 15120 |
| SL Uno Maryville, Inc. / Maryville #851 | 743 Watkins Road | Maryville | TN | 37801-4598 |
| 8250 International Drive Corporation / Orlando, FL #960 | 8250 International Drive | Orlando | FL | 32819 |
| Uno Restaurants, LLC / Ormond Beach #962 * | 794 South Atlantic Avenue | Ormond Beach | FL | 32173 |
| Uno of Daytona, Inc. / Daytona #963 | 1798 West International Speedway Blvd. | Daytona | FL | 32114 |
| Kissimmee Uno, Inc. / Kissimmee #964 | 5350 West Irlo Bronson Memorial Highway | Kissimmee | FL | 34747 |
| URC II, LLC / East Colonial #966 * | 4120 East Colonial Drive | Orlando | FL | 32803 |
| SLA Lake Mary, Inc. / Lake Mary #967 | 901 Currency Circle | Lake Mary | FL | 32746 |
| SL Uno University Blvd, Inc. / University Blvd. #969 | 11633 University Boulevard | Orlando | FL | 32819 |
| UR of Winter Garden FL, LLC / Winter Garden FL #972 | 3167 Daniels Road Toll Road 429 and Country Road 535 | Winter Garden | FL | 34787 |
| UR of Merritt Island FL, LLC / Merritt Island, FL #973 * | Merritt Square Mall 777 East Merritt Island Causeway | Merritt Island | FL | 32952 |
| UR of Melbourne FL, LLC / Melbourne, FL #974 | 8260 Wickham Road | Melbourne | FL | 32940 |

## Schedule 7

### Location of Debtors' Assets, Books and Records

Pursuant to Local Bankruptcy Rule 1007-2(a)(10), the following lists the locations of the Debtors' substantial assets, the location of its books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

### Location of Debtors' Substantial Assets

The Debtors' substantial assets consist of its properties, leaseholds, and inventory, and the location of these assets is provided in Schedule 6.

### Books and Records

The Debtors' consolidated books and records are maintained at 100 Charles Park Road, West Roxbury, Massachusetts 02132.

### Debtors' Assets Outside the United States

As of the Commencement Date, the Debtors only assets located outside of the United States were comprised of their interest in franchised restaurants located in Puerto Rico, South Korea, United Arab Emirates, Honduras, Kuwait, and Saudi Arabia.

# Schedule 8

## Litigation

Pursuant to Local Bankruptcy Rule 1007-2(a)(11), the following is a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent.

| Action or Proceeding | Nature of the Action | Status of the Action |
|---|---|---|
| Greater Orlando Aviation Authority v. URC II, LLC, f/n/a Uno Restaurants, Inc. and Uno Restaurant Corporation, etc., Case No. 2009-CA-35583, Orange County Circuit Court, Florida | Action for breach of lease. | Motion to dismiss filed on behalf of URC as to guarantor Uno Restaurants, Inc.; hearing scheduled for February 2010. |
| Uno of Massachusetts, Inc. v. TMI Properties, Fairhaven, LLC, Case No. SUCV2009-01979-E, Massachusetts Superior Court | Action for breach of contract. | Motion sought by TMI seeking preliminary injunction; hearing date scheduled for January 20, 2010. |
| Sixth Avenue Owner, LLC v. Uno Restaurants of New York Inc., d/b/a Pizzeria Uno Case No: 10N051217, Civil Court for the City of New York, County of New York, Non-Housing Part 52 | Action for breach of lease. | Notice of petitions for non-payment and judgment filed. |

# Schedule 9

## Senior Management

Pursuant to Local Bankruptcy Rule 1007-2(a)(12), the following provides the names of the individuals who comprise the Debtors' existing senior management, a description of their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

| Name | Title | Experience / Responsibilities |
|------|-------|-------------------------------|
| Francis W. Guidara | Chief Executive Officer, President, and Director | Francis W. Guidara has been a Director of Uno Restaurant Holdings Corporation since 2001 and was appointed Chief Executive Officer in January 2005. Prior to joining the Debtors, Mr. Guidara served as President and Chief Executive Officer of Au Bon Pain from 2000 to 2005, as President and Chief Executive Officer of Wolfgang Puck Food Company from 1996 to 2000 and as President of the Restaurant Division of Restaurant Associates in New York from 1986 to 1996. He began his restaurant career with The Ground Round Inc. and served as their Vice President of Operations from 1974 to 1984. Mr. Guidara has over 30 years of experience in the restaurant and foodservice industry. |
| Aaron D. Spencer | Founder, Director, and Chairman Emeritus | Aaron D. Spencer, Uno's founder, has been Chairman of the Board since 1986. He previously served as Chief Executive Officer until September 1996 and as President through 1986. In February 2005, Mr. Spencer became Uno's Chairman Emeritus in 2005. Mr. Spencer has 39 years of experience in the restaurant industry. He was the founder and owner of Uno's predecessor, which operated a chain of 24 Kentucky Fried Chicken franchised restaurants at the time the restaurants were sold. |
| Roger L. Zingle | Chief Operating Officer | Roger L. Zingle joined Uno Restaurant Holdings Corporation as Chief Operating Officer in March 2006. Prior to joining the Debtors, Mr. Zingle served as President and Chief Operating Officer of O'Charleys of Michigan from 2004 to 2006. Previously, he served for 12 years with C.A. Muer Corporation, as Chief Operating Officer from 1990 to 1996, and as President and Chief Executive Officer from 1997 to 2002. Mr. Zingle also served as Vice President of Operations for T.G.I. Fridays from 1983 until 1988. He has over 35 years of experience in the restaurant and hospitality industry. |

| Name | Title | Experience / Responsibilities |
|---|---|---|
| Louie Psallidas | Senior Vice President - Finance, Chief Financial Officer, and Treasurer | Louie Psallidas joined Uno Restaurant Holdings Corporation as Chief Financial Officer in April 2008. Prior to joining the Debtors, Mr. Psallidas was Senior Vice President and Chief Financial Officer of the Papa Gino's and D'Angelo restaurant brands since 2000. Prior to 2000, he was the Chief Financial Officer of John Harvard's Brew House, also holding the role of President for his final two years with that company. During his career he has also held the roles of Vice President of Finance with DAKA International, Inc. and Audit Manager with the accounting firm of Deloitte & Touche. Mr. Psallidas is a Certified Public Accountant and a graduate of Suffolk University. Mr. Psallidas has over 17 years of experience in the restaurant and foodservice industry. |
| William J. Golden | Senior Vice President - Operations | William J. Golden was appointed Senior Vice President-Operations in January 2004. He served as Vice President - Operations from 2000 to 2004 and was Divisional Vice President of Operations from 1997 to 2000. Mr. Golden was a Regional Director - Operations from 1993 to 1997 and held various unit level operations positions from 1984 to 1993. Prior to joining the Debtors, Mr. Golden worked for Ground Round, Inc. for ten years, holding various managerial positions. Mr. Golden has over 30 years of experience in the restaurant industry. |
| George W. Herz II | Senior Vice President - General Counsel, and Secretary | George W. Herz II was appointed Senior Vice President, General Counsel and Secretary of Uno Restaurant Holdings Corporation in April 2001. He served as Vice President, General Counsel, and Secretary of Uno Restaurant Corporation from 1999 to 2000, and then was appointed Senior Vice President, General Counsel and Secretary. Prior to joining the Debtors, Mr. Herz served as Vice President and general counsel for Sbarro, Inc. from 1995 to 1999. From 1993 to 1995, Mr. Herz was General Counsel for Minuteman Press International and from 1983 to 1993 he served as corporate counsel for that company. |

| Name | Title | Experience / Responsibilities |
|---|---|---|
| Roger C. Ahlfeld | Senior Vice President - Human Resources and Training | Roger C. Ahlfeld was appointed Senior Vice President of Human Resources and Training of Uno Restaurant Holdings Corporation in October 2004.  He served as Vice President of Human Resources and Training from 2001 to 2004, Vice President of Training from 2000 to 2001, and Director of Training from 1997 to 2000.  Mr. Ahlfeld has a total of 18 years of experience in the restaurant industry. |
| Richard K. Hendrie | Senior Vice President - Marketing | Richard K. Hendrie joined Uno Restaurant Holdings Corporation as Senior Vice President - Marketing in November 2006.  Prior to joining the Debtors, Mr. Hendrie served as President of his own consulting firm, Remarkable Branding from January 1999 to November 2006.  Previously, Mr. Hendrie served for 9 years with DAKA International, the parent of Fuddruckers, Champps Americana, French Quarter Coffee Company, and Daka Restaurants, a contract foodservice provider, as Vice President of Marketing from 1990 to 1994 and Senior Vice President of Marketing from 1994 to 1998.  Mr. Hendrie served as Vice President of Marketing for Charlie Brown's and The Office, casual restaurant concepts owned by Restaurant Associates from 1984 to 1989.  Mr. Hendrie began his career in 1975 with Longchamps Inc., the parent of Beefsteak Charlie's, a company for whom he served as Vice President of Marketing from 1981 to 1984. |
| Chuck Kozubal | Senior Vice President – Uno Foods | Chuck Kozubal joined Uno Foods Inc. as Senior Vice President of Uno Foods in November 1999.  Prior to joining Uno Foods, Mr. Kozubal was Director of Sales for Baker & Baker, a custom manufacturer of baking ingredients and frozen products for the baking, industrial, and foodservice industries.  Baker & Baker sold products under The Orth Company and Karp's brand names and Mr. Kozubal served there from 1991 to 1999.  Prior to working for Baker and Baker, Mr. Kozubal was General Manager of various wholesale baking plants across the country for Vie de France Bakery (Yamazaki) and worked for Vie de France from 1984 to 1991.  Mr. Kozubal is a graduate of Pennsylvania State University.  Mr. Kozubal has over 25 years experience in the food manufacturing and consumer products industries. |

| Name | Title | Experience / Responsibilities |
|---|---|---|
| Louis Miaritis | Senior Vice President of Franchise and Purchasing | Louis Miaritis joined Uno Restaurant Holdings Corporation in March 2009 as Senior Vice President of Franchising and Purchasing. Prior to joining the Debtors, Mr. Miaritis held executive roles in finance, development, strategic planning and acquisitions for Restaurant Associates and operations and has entrepreneurial experience as owner of the Three Village Inn, a three-star fine dining inn and restaurant. Mr. Miaritis holds an MBA in Finance and Accounting and a BS in Business Administration from Long Island University. |

# Schedule 10

## Payroll

Pursuant to Local Bankruptcy Rule 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors, and stockholders) and the estimated amount to be paid to officers, stockholders, directors, and financial and business consultants retained by the Debtors, for the 30-day period following the filing of the chapter 11 petitions.

| | |
|---|---|
| **Payments to Employees (Not Including Officers, Directors and Stockholders)** | $6,661,524 |
| **Payments to Officers, Stockholders, and Directors** | $629,380 |
| **Payments to Financial and Business Consultants** | $0[1] |

---

[1] This does not include any payments to attorneys or auditors.

**Schedule 11**

**Cash Receipts and Disbursements,**
**Net Cash Gain or Loss, Unpaid Obligations and Receivables**

       Pursuant to Local Bankruptcy Rule 1007-2(b)(3), the following provides, for the thirty (30) day period following the filing of the chapter 11 petition, the estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue but remain unpaid, other than professional fees.

| | |
|---|---|
| **Cash Receipts** | $20,993,863 |
| **Cash Disbursements** | $(25,908,114) |
| **Net Cash Gain or Loss** | $(4,914,251) |
| **Unpaid Obligations** | $7,000,000 |
| **Unpaid Receivables** | $5,500,000 |

**Exhibit C**

**Restructuring Support Agreement**

RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (this "Agreement"), dated as of January 19, 2010, is entered into by and among (i) Uno Restaurant Holdings Corporation ("Uno"), Uno Acquisition Parent, Inc. ("Uno Acquisition"), Uno Holdings, LLC ("Uno Holdings"), and Uno Holdings II, LLC ("Uno Holdings II" and, together with Uno, Uno Acquisition, Uno Holdings, and their respective subsidiaries, the "Company"); (ii) Centre Carlisle Uno LP, Centre Capital Investors IV LP, Centre Capital Coinvestment IV LP, Centre Capital NQ Investors IV LP and Centre Bregal Partners LP, the indirect, controlling shareholders of the Company (collectively, "Centre"); and (iii) each of the undersigned noteholders (each a "Consenting Noteholder," and collectively, the "Consenting Noteholders"). The Consenting Noteholders, the Company, Centre and any subsequent person that becomes a party hereto in accordance with the terms hereof are referred to herein as the "Parties." All capitalized terms used but not defined herein shall have the respective meanings ascribed thereto in the term sheet relating to the plan of reorganization annexed hereto as Exhibit A (the "Plan Term Sheet").

RECITALS

WHEREAS, as of the Effective Date (as defined in Section 9), the Company is a party to that certain Indenture (the "Indenture"), dated as of February 22, 2005, among Uno (as successor to Uno Restaurant Merger Sub, Inc.), as issuer, Uno Holdings II LLC and U.S. Bank National Association, as Trustee, governing the 10% Senior Secured Notes due 2011 (the "Notes");

WHEREAS, as of the Effective Date, the Consenting Noteholders hold in excess of a majority of the aggregate principal amount Notes issued under the Indenture;

WHEREAS, the Company, Centre and the Consenting Noteholders wish to reorganize and recapitalize the Company consistent with the terms of the Plan Term Sheet (the restructuring and recapitalization transactions, collectively, the "Restructuring") through pre-arranged voluntary reorganization cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") pursuant to a chapter 11 plan of reorganization to be filed with the Bankruptcy Court (the "Plan");

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

1.     Proposed Restructuring.

(a)     The principal terms of the Restructuring are set forth in the Plan Term Sheet, which Plan Term Sheet is expressly incorporated by reference herein and made a part of this Agreement as if fully set forth herein, as such Plan Term Sheet may be modified in accordance with Section 8 hereof.

(b)     The Parties intend to implement the Restructuring on a consensual basis in the context of the Chapter 11 Cases.  As part of the Chapter 11 Cases, the Company intends to file the Plan and the plan-related documents (the "Plan Related Documents"), which shall include, but not be limited to, (i) a disclosure statement, (ii) the materials related to the solicitation (the "Solicitation") of the Plan pursuant to applicable provisions of the Bankruptcy Code, (iii) an amended and restated credit agreement or a new credit agreement, as the case might be, and such other definitive documentation (including, without limitation, security documents) as is necessary to consummate the Restructuring, all on the terms set forth in the Plan Term Sheet, (iv) a schedule of nonresidential real property leases the Company proposes to reject under the Plan, (v) a proposed confirmation order, and (vi) any other documents or agreements filed with the Bankruptcy Court by the Company or at the Company's direction that are necessary to implement the Plan, including: (a) any appendices, amendments, modifications, supplements, exhibits and schedules relating to the Plan or the disclosure statement; (b) the amended and restated certificate of incorporation and bylaws for the Company as reorganized; and (c) the stockholders agreement.  Each of the Plan Related Documents shall be (y) in form and substance acceptable in all respects to the Consenting Noteholders owning more than 50% in aggregate principal amount of the Notes held by all Consenting Noteholders (the "Requisite Consenting Noteholders"), except that the stockholders agreement shall be acceptable in all respects to each Consenting Noteholder that is to be a party thereunder, and (z) be consistent with this Agreement and the Plan Term Sheet in all material respects (the Plan Related Documents that contain such terms and conditions and are acceptable to the Requisite Consenting Noteholders in accordance with the foregoing requirements, the Plan Term Sheet and this Agreement are referred to herein collectively as the "Approved Plan Documents").

2.     Representations of the Parties.

Each Party hereby represents and warrants severally and not jointly, to the other Parties that the following statements are true, correct and complete as of the date hereof:

(a)     It has all requisite corporate, partnership, limited liability company or similar authority to execute this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, partnership, limited liability company or other similar action on its part.

(b)     The execution and delivery by such Party of this Agreement does not and shall not (i) violate (A) any provision of law, rule, regulation, or governmental order or decree applicable to it or any of its assets or (B) its certificate of incorporation or formation, or bylaws (or other similar governing documents), or (ii) conflict with, result in a violation or breach of or constitute (with due notice or lapse of time or both) a default under or cause an acceleration or termination right under, any material license, permit or contractual obligation to which it is a party or any of its assets are bound.

(c)     This Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting

creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(d)     The execution, delivery and performance by such Party of this Agreement does not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or other governmental authority or regulatory body, except such filing as may be necessary and/or required for approval by the Bankruptcy Court of the Company's authority to implement this Agreement and any applicable requirements under state liquor licensing laws, rules and regulations.

(e)     If such Party is a Consenting Noteholder, such Party (i) either (A) is the sole legal and beneficial owner of the Notes set forth below its name on the signature page hereof, free and clear of all claims, liens and encumbrances, or (B) has investment or voting discretion with respect to such Notes in respect to matters relating to the Restructuring contemplated by this Agreement and has the power and authority to bind the beneficial owner(s) of such Notes to the terms of this Agreement and (ii) has full power and authority to act on behalf of, vote and consent to matters concerning such Notes in respect to matters relating to the Restructuring contemplated by this Agreement and dispose of, exchange, assign and transfer such Notes. Furthermore, such Consenting Noteholder has made no prior assignment, sale, grant, conveyance, or other transfer of, and has not entered into any other agreement to assign, sell, grant, convey or otherwise transfer, in whole or in part, any portion of its right, title, or interest in any Notes that are subject to this Agreement, the terms of which agreement are, as of the date hereof, inconsistent with the representations and warranties of such Consenting Noteholder herein or would render such Consenting Noteholder otherwise unable to comply with this Agreement and perform its obligations hereunder.

(f)     If such party is a Consenting Noteholder, such Party (i) has such knowledge and experience in financial and business matters of this type that it is capable of evaluating the merits and risks of entering into this Agreement and of making an informed investment decision, and has conducted an independent review and analysis of the business and affairs of the Company that it considers sufficient and reasonable for purposes of entering into this Agreement and (ii) is an "accredited investor" (as defined by Rule 501 of the Securities Act of 1933, as amended).

3.     <u>Commitment of the Consenting Noteholders and Centre</u>.

(a)     Subject to the terms and conditions hereof and as long as this Agreement has not been terminated in accordance with <u>Section 5</u>, and except as the Company may expressly release the Consenting Noteholders in writing from any of the following obligations, each of the Consenting Noteholders and Centre (to the extent applicable) shall:

(i)     (A) vote its claims arising from the Notes (the "<u>Noteholder Claims</u>") in favor of the Plan (when solicited to do so), (B) deliver its duly executed and completed ballot voting in favor of the Plan on a timely basis following commencement of the Solicitation for the Plan, and (C) not change or withdraw such agreement or vote (or cause or direct such agreement or vote to be changed or withdrawn), <u>provided</u> that such agreement or vote may be revoked or withdrawn immediately upon termination of this Agreement in accordance with <u>Section 5</u>;

(ii)     not object to, or vote any of its Noteholder Claims to reject or impede, the Plan, support directly or indirectly any such objection or impediment or otherwise take any action or commence any proceeding to oppose or to seek any modification of the Plan or, to the extent applicable, any of the Approved Plan Documents filed by the Company in connection with the Chapter 11 Cases and confirmation of the Plan; and

(iii)     not directly or indirectly seek, solicit, support, encourage, vote its Noteholder Claims for, or consent to (A) any plan of reorganization, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets or restructuring of or with respect to the Company other than the Plan (each, an "Alternative Proposal") or (B) any other action that is inconsistent with, or that would delay, hinder or prevent the Plan.

(b)     Centre and each Consenting Noteholder agree that, as long as this Agreement has not been terminated in accordance with Section 5, they shall not (i) pursue any right or remedy in connection with their Noteholder Claims or equity interests in the Company (the "Equity Interests") that is inconsistent with the terms of this Agreement, or (ii) initiate, or have initiated on their behalf, any litigation or proceeding of any kind with respect to the Noteholder Claims or Equity Interests that is inconsistent with the terms of this Agreement other than to enforce this Agreement.

(c)     Centre and each Consenting Noteholder agrees that, as long as this Agreement has not been terminated in accordance with Section 5, they shall not sell, transfer, assign or otherwise dispose of any of their Noteholder Claims or Equity Interests, or any option thereon or any right or interest (voting or otherwise) therein, provided that a Consenting Noteholder may transfer, assign or otherwise dispose of any of its Noteholder Claims if the transferee is a party to this Agreement or agrees in writing to be bound by all of the terms of this Agreement by executing the Joinder attached hereto as Exhibit B.  This Agreement shall in no way be construed to preclude any Consenting Noteholder or Centre from acquiring additional Noteholder Claims or Equity Interests; provided, however, that each such Consenting Noteholder and Centre agree that such additional Noteholder Claims or Equity Interests shall automatically be deemed to be subject to this Agreement and that, to the extent applicable, it shall vote (or cause to be voted) any such additional Noteholder Claims or Equity Interests entitled to vote on the Plan and otherwise act with respect to such additional Noteholder Claims and Equity Interests in a manner consistent with its obligations hereunder.  Each Consenting Noteholder and Centre agree to provide to the Company's counsel and counsel to the Consenting Noteholders (i) a copy of any Joinder and (ii) a notice of the acquisition of any additional Noteholder Claims or Equity Interests or the transfer of any Noteholder Claims or Equity Interests, in each case within five (5) business days of the consummation of the transaction disposing of, or acquiring, such Noteholder Claims or Equity Interests; provided, however, that if such transfer is to occur on or after the record date for solicitation of votes on the Plan, such transferring Party executes and delivers to the voting agent of the Company an irrevocable ballot to accept the Plan.

(d)     Transfer of Equity; Other Action.  (i) Prior to the consummation of the Restructuring, Centre shall not transfer any or all of its interest in Uno Acquisition; and (ii) Centre shall not treat any stock in Uno Acquisition held thereby as becoming worthless within the meaning of Section 382(g)(4)(D) of the Internal Revenue Code of 1986, as amended.  For

purpose of this Section 3(d), "transfer" means to directly or indirectly sell, contract to sell, give, assign, pledge, hypothecate, encumber, grant a security interest in, sell a participation in, offer, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right, or warrant to purchase, or otherwise transfer or dispose of, any economic, beneficial, voting, or other rights in or to, by operation of law or otherwise.

4.      Commitment of the Company.

(a)      As long as this Agreement has not been terminated in accordance with Section 5, and except as the Requisite Consenting Noteholders may expressly agree otherwise in writing:

(i)      The Company hereby agrees to (A) prepare or cause the preparation of the Plan and the Plan Related Documents, (B) provide draft copies of the Plan and the Plan Related Documents to counsel for the Consenting Noteholders as soon as reasonably practicable, but in no event less than three (3) business days before such documents are filed with the Bankruptcy Court, and (C) except in an emergency where it is not reasonably practicable, provide draft copies of all motions, applications and other documents the Company intends to file with the Bankruptcy Court to counsel for the Consenting Noteholders no less than one (1) business day before such documents are filed with the Bankruptcy Court, and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing.

(ii)      The Company agrees to use commercially reasonable efforts to, and to cause each of its subsidiaries and affiliates to (A) support and complete the Restructuring and all other actions contemplated in connection therewith and under the Plan Term Sheet, Plan, and Plan Related Documents, (B) take any and all reasonably necessary and appropriate actions in furtherance of the Restructuring and the other actions contemplated under the Plan Term Sheet, the Plan, and the Plan Related Documents, (C) obtain any and all required regulatory approvals and third-party approvals for the Restructuring consistent with industry standards, and (D) not take any actions inconsistent with this Agreement, the Plan Term Sheet, the Plan, or the Approved Plan Documents and the confirmation and consummation of the Plan.

(iii)      Subject to their fiduciary duties, neither the Company nor any of its subsidiaries or affiliates shall directly or indirectly, seek, solicit, negotiate, support or engage in any discussions relating to, or enter into any agreements relating to, any Alternative Proposal other than the Plan (as it may be amended, supplemented or otherwise modified as provided herein), nor shall the Company or any of its subsidiaries or affiliates solicit or direct any person or entity, including, without limitation, any member of the Company's board of directors or any holder of Equity Interests, to undertake any of the foregoing; provided, however, that the Company may agree to modifications to the Plan and the Approved Plan Documents as provided herein;

(b)      Subject to the approval of the Bankruptcy Court, to the extent applicable, and in accordance with the terms of the existing engagement letter, the Company shall pay all fees and expenses of Akin Gump Strauss Hauer & Feld LLP, counsel to the Consenting Noteholders, which are due and owing prior to the date of termination of this Agreement.

5.     Termination.  This Agreement may be terminated by the Consenting Noteholders or the Company on the terms set forth herein:

(a)     This Agreement may be terminated by the mutual written consent of the Company and the Requisite Consenting Noteholders, provided, however, that notice of such termination is provided within one (1) business day to the persons and entities listed on Schedule 1 annexed hereto, in accordance with Section 18 hereof:

(b)     This Agreement may be terminated by the Requisite Consenting Noteholders upon the occurrence of any of the following (each, a "Noteholders Termination Event"), upon three (3) business days written notice thereof to the Company and Centre:

(i)     at 5:00 p.m. prevailing Eastern Time on February 1, 2010, unless the Chapter 11 Cases are commenced (the date that the Chapter 11 Cases are commenced is referred to herein as the "Commencement Date") and the Company has filed, and is pursuing a motion for authority to enter into debtor-in-possession financing in form and substance acceptable to the Requisite Consenting Noteholders (the "Approved Financing");

(ii)     at 5:00 p.m. prevailing Eastern Time on February 25, 2010 unless the Debtors have filed the Plan in form and substance acceptable to the Requisite Consenting Noteholders and such Plan provides for, among other things, the conditions set forth with respect to such Plan in the Approved Financing;

(iii)     at 5:00 p.m. prevailing Eastern Time on May 1, 2010 unless the Disclosure Statement has been approved by the Bankruptcy Court;

(iv)     at 5:00 p.m. prevailing Eastern Time on June 15, 2010 unless the Plan has been confirmed by the Bankruptcy Court;

(v)     at 5:00 p.m. prevailing Eastern Time on July 15, 2010 if there has not occurred substantial consummation (as defined in section 1101 of the Bankruptcy Code) of the Plan on or before such date;

(vi)     upon the filing by the Company of any motion or other request for relief seeking to (A) dismiss any of the Chapter 11 Cases, (B) convert any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or (C) appoint a trustee or an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases;

(vii)     upon the entry of an order by the Bankruptcy Court (A) dismissing any of the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (C) appointing a trustee or an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases, or (D) making a finding of fraud, dishonesty or misconduct by any officer or director of the Company, regarding or relating to the Company;

(viii)     upon the withdrawal, amendment or modification by the Company of the Plan or any of the Approved Plan Documents or the filing of a pleading seeking to amend or

modify the Plan or any of the Approved Plan Documents, which withdrawal, amendment, modification or filing is inconsistent with the Plan (with such amendments and modifications as have been effected in accordance with the terms hereof) or is adverse to the Consenting Noteholders, or if the Company files any motion or pleading with the Bankruptcy Court that is materially inconsistent with this Agreement, the Plan or any of the Approved Plan Documents (in each case with such amendments and modifications as have been effected in accordance with the terms hereof) and such motion or pleading has not been withdrawn prior to the earlier of (i) five (5) business days after the Company receives written notice from the Requisite Consenting Noteholders that such motion or pleading is materially inconsistent with this Agreement, the Plan or the Approved Plan Documents, as applicable, and (ii) the entry of an order of the Bankruptcy Court approving such motion; provided, that this Section 5(b)(viii) shall not apply with respect to any motion or pleading that is inconsistent with this Agreement if such motion or pleading is consistent with the Plan;

(ix)    the Bankruptcy Court grants relief that is inconsistent with this Agreement, the Plan Term Sheet, or the Plan in any material respect (in each case with such amendments and modifications as have been as have been effected in accordance with the terms hereof); provided that this Section 5(b)(ix) shall not apply with respect to any relief that is materially inconsistent with this Agreement if such relief is consistent with the Plan in all material respects;

(x)    the Company files, proposes or otherwise supports any plan other than the Plan or any Alternative Proposal;

(xi)    the Company files, proposes, or otherwise supports any debtor-in-possession financing other than the Approved Financing;

(xii)    upon the discovery of any fraud committed by, or dishonesty or misconduct of, any officer or director of the Company;

(xiii)    upon the breach by the Company of any of the undertakings, representations, warranties or covenants of the Company set forth in this Agreement, including the Company's obligations under Section 4, which breach remains uncured for a period of five (5) business days after the receipt of written notice of such breach from the Requisite Consenting Noteholders;

(xiv)    upon the breach by Centre of any of the undertakings, representations, warranties or covenants of Centre set forth in this Agreement, which breach remains uncured for a period of five (5) business days after the receipt of written notice of such breach from the Requisite Consenting Noteholders;

(xv)    upon the material breach by any of the Consenting Noteholders of any of the undertakings, representations, warranties or covenants of such Consenting Noteholder(s) set forth in this Agreement that would have a material adverse effect on the Company or the consummation of the Restructuring, which breach remains uncured for a period of ten (10) business days after the receipt by the Consenting Noteholder(s) of notice of such breach from the Company;

(xvi)   the issuance by any governmental authority, including the Bankruptcy Court or any other regulatory authority or court of competent jurisdiction, of any ruling or order enjoining the consummation of a material portion of the Restructuring; or

(xvii)   the entry of an order by the any court of competent jurisdiction invalidating, disallowing, subordinating, or limiting, in any respect, as applicable, the enforceability, priority, or validity of the Noteholder Claims or the liens securing them.

(c)   The Company may terminate this Agreement upon the occurrence of the following events (each, a "Company Termination Event" and, together with Noteholders Termination Event, each, a "Termination Event"), upon three (3) business days written notice thereof to the Consenting Noteholders and Centre:

(i)   upon the material breach by any of the Consenting Noteholders of any of the undertakings, representations, warranties or covenants of such Consenting Noteholder(s) set forth in this Agreement that would have a material adverse effect on the Company or the consummation of the Restructuring, which breach remains uncured for a period of ten (10) business days after the receipt by the Consenting Noteholder(s) of notice of such breach from the Company;

(ii)   upon the breach by Centre of any of the undertakings, representations, warranties or covenants of Centre set forth in this Agreement, which breach remains uncured for a period of five (5) business days after the receipt of written notice of such breach from the Requisite Consenting Noteholders or the Company;

(iii)   the issuance by any governmental authority, including the Bankruptcy Court or any other regulatory authority or court of competent jurisdiction, of any ruling or order enjoining the consummation of a material portion of the Restructuring; or

(iv)   the entry of an order by the any court of competent jurisdiction invalidating, disallowing, subordinating, or limiting, in any respect, as applicable, the enforceability, priority, or validity of the Noteholder Claims or the liens securing them.

provided, however, that any of the foregoing Termination Events may be waived or extended by the Company and the Requisite Consenting Noteholders in writing; further provided, that with respect to a waiver or extension of the requirements of Section 5(b)(i)-(v), the Parties shall also obtain the written approval of the agent and lenders under the Approved Financing and such requirements may be extended by no more than ninety (90) days.

For the avoidance of doubt, the Parties hereby waive any requirement under Bankruptcy Code section 362 to lift the automatic stay thereunder for purposes of providing notice under this Agreement (and agree not to object to any non-breaching Party seeking, if necessary, to lift such automatic stay in connection with the giving any such notice).

Upon termination of this Agreement as provided herein, this Agreement shall forthwith become void and of no further force or effect, each Party hereto shall be released from its commitments, undertakings and agreements under or related to this Agreement, the Plan and the Approved Plan Documents, and there shall be no liability or obligation on the part of any Party hereto; provided,

<u>however</u>, that in no event shall any such termination relieve a Party hereto from (i) liability for its breach or non-performance of its obligations hereunder prior to the date of such termination and (ii) obligations under this Agreement which by their terms expressly survive any such termination; and <u>provided</u>, <u>further</u> that, notwithstanding anything to the contrary herein, any Termination Event may be waived in accordance with the procedures established herein, in which case the Termination Event so waived shall be deemed not to have occurred, this Agreement shall be deemed to continue in full force and effect, and the rights and obligations of the Parties hereto shall be restored, subject to any modification set forth in such waiver.  Upon termination of this Agreement, any and all votes delivered by a Consenting Noteholder prior to such termination shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Company.

6.      <u>Good Faith Cooperation; Further Assurances; Transaction Documents</u>.  The Parties shall, and shall cause each of their subsidiaries and affiliates to, cooperate with each other in good faith and shall coordinate their activities (to the extent practicable) in respect of all matters concerning the implementation and consummation of the Restructuring.  Furthermore, each of the Parties shall, and shall cause each of their subsidiaries and affiliates to, take such action (including executing and delivering any other agreements and making and filing any required regulatory filings) as may be reasonably necessary to carry out the purposes and intent of this Agreement.  Each Party hereby covenants and agrees to (a) negotiate in good faith the Plan and the Plan Related Documents, each of which shall (i) except as otherwise provided for herein, be in form and substance reasonably acceptable in all respects to the Parties signatory thereto or beneficiaries thereof and counsel for the Consenting Noteholders, and (ii) be consistent with this Agreement and the Plan Term Sheet in all material respects, and (b) execute the Approved Plan Documents (in each case to the extent such Party is a party thereto).

7.      <u>Remedies</u>.  All remedies which are available at law or in equity, including specific performance and injunctive or other equitable relief, to any Party for a breach of this Agreement by another Party shall be available to the non-breaching Party.  All rights, powers and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power or remedy by such Party or any other Party.

8.      <u>Amendments</u>.

(a)      <u>Plan Term Sheet and Plan</u>. The Plan Term Sheet and Plan may be amended only upon prior written approval of (i) the Company, (ii) the Requisite Consenting Noteholders, and (iii) with respect to matters directly relating to Centre, Centre; <u>except</u> that with respect to matters directly affecting the Consenting Noteholders, the consent of each such affected Consenting Noteholder shall be required.  Notwithstanding the foregoing, the consent of the agent and the lenders under the Approved Financing shall be required with respect to any modifications of the Plan Term Sheet relating to <u>Sections (5)(b)(i)-(iv)</u> hereof.

(b)      <u>This Agreement</u>.  This Agreement may be amended, supplemented, modified or restated, so long as any such amendment, modification, supplement or restatement, is consistent with the Plan (as it may be amended in accordance with Section 8(a)), only upon written

approval of the Company and the Requisite Consenting Noteholders; provided however, that with respect to matters directly affecting Centre, written approval of Centre shall also be required.

(c)  Time Periods and Deadlines.  The Company and the Requisite Consenting Noteholders may from time to time mutually agree in writing to further extend any time period or deadline set forth herein; provided however, that with respect to matters directly affecting Centre, written approval of Centre shall also be required.

9.  Effectiveness.  This Agreement shall become effective and binding on each Party upon the execution and receipt by the Company of signature pages signed by the Company, Centre and the Consenting Noteholders (the "Effective Date") representing a majority in aggregate principal amount of the Notes.  Delivery by telecopier or electronic mail of an executed counterpart of a signature page to this Agreement shall be effective as delivery of an original executed counterpart hereof.

10.  GOVERNING LAW; JURISDICTION; JURY TRIAL WAIVER.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW), WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.  BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT OR PROCEEDING, MAY BE BROUGHT IN ANY FEDERAL OR STATE COURT IN THE BOROUGH OF MANHATTAN, THE CITY OF NEW YORK, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF EACH SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING.  NOTWITHSTANDING THE FOREGOING CONSENT TO JURISDICTION, UPON THE COMMENCEMENT OF THE CHAPTER 11 CASES, EACH OF THE PARTIES AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.  THE PARTIES WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE BETWEEN THE PARTIES, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

11.  Survival.  Notwithstanding (i) any sale of the Noteholder Claims or Equity Interests in accordance with Section 3(c) or (ii) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Sections 4(b), 10, 19, 20 and 23 shall survive such sale and/or termination and shall continue in full force and effect for the benefit of the Consenting Noteholders in accordance with the terms hereof.

12.     Headings.  The headings of the Sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

13.     Successors and Assigns; Severability; Several Obligations.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective permitted successors, assigns, heirs, executors, estates, administrators and representatives.  Notwithstanding the foregoing, neither the Company nor Centre shall assign any of its rights or obligations hereunder, without the prior written approval of the Requisite Consenting Noteholders.  The invalidity or unenforceability at any time of any provision hereof in any jurisdiction shall not affect or diminish in any way the continuing validity and enforceability of the remaining provisions hereof or the continuing validity and enforceability of such provision in any other jurisdiction. The agreements, representations and obligations of the Consenting Noteholders under this Agreement are, in all respects, several and not joint.

14.     No Third Party Beneficiaries.  This Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third party beneficiary hereof.

15.     Entire Agreement.  This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements (oral and written) and all other prior negotiations but shall not supersede the Plan Term Sheet; provided, however, that the Parties acknowledge and agree that any confidentiality agreements heretofore executed between the Company and (i) Centre or (ii) any Consenting Noteholder(s) shall continue in accordance with their respective terms as applicable.

16.     Counterparts.  The Agreement and any amendments, waivers, consents or supplements hereto or in connection herewith may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

17.     Consideration.  Other than as provided in the Plan Term Sheet, it is hereby acknowledged by the Parties that, other than the agreements, covenants, representations and warranties of the Parties, as more particularly set forth herein, no payment or additional consideration shall be due or paid to Centre or any of the Consenting Noteholders for their agreement to vote in accordance with, and otherwise comply with the terms and conditions of, this Agreement.

18.     Notices.  All demands, notices, requests, consents and other communications under this Agreement shall be in writing, sent contemporaneously to all of the Parties, and deemed given when delivered, if delivered by hand, or upon confirmation of transmission, if delivered by email or facsimile, during standard business hours (from 8:00 A.M. to 6:00 P.M. at the place of receipt) at the addresses, facsimile numbers and email addresses set forth on Schedule 1 hereto (and/or to such other persons and addresses as any Party shall have specified in writing to the other Parties by notice as aforesaid).

19.     Reservation of Rights.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of Centre and each Consenting Noteholder to protect and preserve their rights, remedies and interests, including

Noteholder Claims and Equity Interests.  Nothing herein shall be deemed an admission of any kind.  If the transactions contemplated herein are not consummated, or this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights.  Pursuant to Rule 408 of the Federal Rule of Evidence, any applicable state rules of evidence and any other applicable law, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

20.     Publicity.  The Company and Centre will submit to counsel for the Consenting Noteholders all press releases, public filings, public announcements or other communications with any news media relating to this Agreement or the transactions contemplated hereby and any amendments thereof, and such press releases, public filings, public announcements or other communications shall not be published without the prior written consent of the Requisite Consenting Noteholders (or counsel on their behalf).  Neither the Company nor Centre shall (a) use the name of any Consenting Noteholder in any press release without such Consenting Noteholder's prior written consent or (b) disclose to any person, other than legal, accounting and financial advisors to the Company, the principal amount or percentage of Noteholder Claims held by any Consenting Noteholder or any of its respective affiliates; provided, however, that the Company shall be permitted to disclose at any time after the commencement of the Chapter 11 Cases the aggregate principal amount of, and aggregate percentage of, the Noteholder Claims held by the Consenting Noteholders as a group.  Notwithstanding the foregoing, to the extent applicable, the Consenting Noteholders hereby consent to the disclosure by the Company in the Plan, the Disclosure Statement, the Approved Plan Documents and any required filings by the Company with the Bankruptcy Court, or as otherwise required by law or regulation, of the execution and contents of this Agreement.

The Company and the Consenting Noteholders shall not use the name of Centre or Disclose the amount of Centre's investment in the Company in any press release, public filings, public announcements or other communications with any news media relating to this Agreement or the transactions contemplated hereby and any amendments thereof without Centre's prior written consent unless required by law.  In the event any such disclosure is required by law, the Company or the Consenting Noteholders, as the case may be, will make commercially reasonable efforts to consult with Centre as to the manner and consent of such disclosure prior thereto.

21.     Further Assurances.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be appropriate or necessary, from time to time, to effectuate the Plan and consummate the Restructuring.

22.     Representation by Counsel.  Each Party acknowledges that it has had the opportunity to be represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

23.     Fiduciary Duties.  Notwithstanding anything to the contrary herein, nothing in this Agreement shall require (a) the Company or any director or officer of the Company, in such

person's capacity as a director or officer of the Company, to take any action, or to refrain from taking any action, to the extent required to comply with its or their fiduciary obligations under applicable law, (b) Centre or any Consenting Noteholder, or any of their respective representatives, that is a member of a statutory committee established in the Chapter 11 Cases to take any action, or to refrain from taking any action, in such person's capacity as a statutory committee member, to the extent required to comply with such person's fiduciary obligations applicable under the Bankruptcy Code, or (c) any Consenting Noteholder to take any action or refrain from taking any action to the extent required to comply with its fiduciary duties to investors.

24.     <u>Participation in Chapter 11 Cases</u>.  Nothing in this Agreement shall be construed to prohibit any Party from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and the Restructuring and are not for the purpose of, and would not be reasonably expected to have the effect of, hindering, delaying or preventing the consummation of the Restructuring.

*[Remainder of page intentionally left blank.]*

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

UNO RESTAURANT HOLDINGS CORPORATION

By: _____
     Name: Louie Psallidas
     Title: Chief Financial Officer

UNO ACQUISITION PARENT, INC.

By: _____
     Name: Louie Psallidas
     Title: Chief Financial Officer

UNO HOLDINGS, LLC

By: _____
     Name: Louie Psallidas
     Title: Chief Financial Officer

UNO HOLDINGS II, LLC

By: _____
     Name: Louie Psallidas
     Title: Chief Financial Officer

CENTRE CARLISLE UNO LP

By: _____
     Name: David Jaffe
     Title: Managing Partner

CENTRE CAPITAL INVESTORS IV LP

By: _____
     Name: David Jaffe
     Title: Managing Partner

**Signature Page to Restructuring Support Agreement**

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

UNO RESTAURANT HOLDINGS CORPORATION

By:_____
    Name: Louie Psallidas
    Title: Chief Financial Officer

UNO ACQUISITION PARENT, INC.

By:_____
    Name: Louie Psallidas
    Title: Chief Financial Officer

UNO HOLDINGS, LLC

By:_____
    Name: Louie Psallidas
    Title: Chief Financial Officer

UNO HOLDINGS II, LLC

By:_____
    Name: Louie Psallidas
    Title: Chief Financial Officer

CENTRE CARLISLE UNO LP

By:_____
    Name: David Jaffe
    Title: Managing Partner

CENTRE CAPITAL INVESTORS IV LP

By:_____
    Name: David Jaffe
    Title: Managing Partner

**Signature Page to Restructuring Support Agreement**

CENTRE CAPITAL COINVESTMENT IV LP

By: _____
    Name: David Jaffe
    Title: Managing Partner

CENTRE CAPITAL NQ IV LP

By: _____
    Name: David Jaffe
    Title: Managing Partner

CENTRE BREGAL PARTNERS LP

By: _____
    Name: David Jaffe
    Title: Managing Partner

Twin Haven Special Opportunities Fund II, L.P.
Twin Haven Special Opportunities Fund III, L.P

By: Twin Haven Capital Partners, LLC
     As Investment Manager

By: _____

Name: Robert B. Webster

Title:   Managing Member

          Principal amount of Notes held:  $67,732,000 total
                                      (Fund II - $28,312,000;
                                      Fund III - $39,420,000)

          Date:  January 19, 2010

          Address:

          Twin Haven Capital Partners, LLC
          11111 Santa Monica Blvd, Ste 525
          Los Angeles, CA 90025
          Attn: Robert Webster/Paul Mellinger
          Fax: 310-689-5199

**NOTEHOLDERS:**

*Blackwell Partners, LLC*

By:     Coliseum Capital Management, LLC, as attorney-in-fact

By:     *Adam L. Gray*

Name: Adam L. Gray

Title:   Managing Director

Principal amount of Notes held: **$6,500,000.00**

Date: January 15th, 2010

Address:

Blackwell Partners, LLC
406 Blackwell Street, Suite 300
Durham, NC 27701-3984

Attention:     Bart Brunk
Fax:           919-668-9954

*With a copy to*

Coliseum Capital Management, LLC
767 Third Avenue, 35th Floor
New York, NY 10017

Attention:     Adam Gray
Fax:           212-644-1001

**Signature Page to Restructuring Support Agreement**

<u>Exhibit A</u>

CHAPTER 11 PLAN TERM SHEET

# U N O  R E S T A U R A N T  H O L D I N G S  C O R P O R A T I O N, E T  A L.
## SUMMARY OF PRINCIPAL TERMS OF PROPOSED RESTRUCTURING
## FOR DISCUSSION PURPOSES ONLY

## I. OVERVIEW

This following summary of principal terms (the "Term Sheet") sets forth certain of the principal terms for a restructuring (the "Restructuring") of the debt and liabilities of Uno Restaurant Holdings Corporation ("Uno") and its affiliates (collectively with Uno, the "Company"), which Restructuring shall be agreed to by the Company, Centre Partners (defined below) and the informal group of unaffiliated investors (the "Majority Noteholder Group") who, in the aggregate, hold in excess of a majority of the outstanding principal amount of the 10% Senior Secured Notes (the "Senior Secured Notes") due 2011, issued pursuant to that certain Indenture (the "Indenture"), dated as of February 22, 2005, among Uno (as successor to Uno Restaurant Merger Sub, Inc.), as issuer, Uno Holdings II LLC and U.S. Bank National Association, as Trustee.

This Term Sheet sets forth certain of the principal terms of the Restructuring. This Term Sheet does not include a description of all of the terms, conditions and other provisions that are to be contained in the definitive documentation necessary for the consummation of the proposed Restructuring and the transactions contemplated in connection therewith. Such definitive documentation remains subject to discussion and negotiation among the Company, the Majority Noteholder Group and, to the extent set forth below, Centre Partners (as such term is defined below). This Term Sheet is binding only to the extent provided for in the Restructuring Support Agreement to which it is attached.

Nothing herein shall be deemed to be the solicitation of an acceptance or rejection of a plan of reorganization. Further, nothing herein shall be an admission of fact or liability or deemed binding on the Company, the members of the Majority Noteholder Group or Centre Partners (as such term is defined below).

## II. PARTIES IN INTEREST

| | |
|---|---|
| Company | Uno Restaurant Holdings Corporation and its affiliates. |
| Uno Parents | Uno Acquisition Parent, Inc., Uno Holdings, LLC and Uno Holdings II, LLC. |
| Management | Existing management of the Company. |
| Centre Partners | Centre Carlisle UNO LP, Centre Capital Investors IV LP, Centre Capital Coinvestment IV LP, Centre Capital NQ Investors IV LP, and |

| | |
|---|---|
| | Centre Bregal Partners LP. |
| Existing Equity Holders | Centre Partners and all parties holding equity interests in Uno or the Uno Parents immediately prior to the consummation of a Restructuring. |
| Credit Facility Lenders | Those lenders under the Credit Agreement, dated as of February 22, 2005, among Uno (as successor to Uno Restaurant Merger Sub, Inc.) and each of its subsidiaries that are parties thereto, as borrowers, Wells Fargo Foothill, Inc., as Administrative Agent and the Lenders Party thereto, as may be amended from time to time (the "<u>Credit Agreement</u>"). |
| Senior Secured Noteholders | The holders of the Senior Secured Notes. |
| Majority Noteholder Group | The Majority Noteholder Group consists of Twin Haven Capital Partners, LLC ("<u>Twin Haven</u>") and Coliseum Capital Management, LLC ("<u>Coliseum</u>"), in each case on their own behalf and on behalf of their respective managed funds and accounts. |

### III. <u>IMPLEMENTATION</u>

| | |
|---|---|
| Restructuring Implementation | (a)  Senior Secured Noteholders representing a majority in outstanding principal amount of Senior Secured Notes, the Company and Centre Partners have entered into the Restructuring Support Agreement to which this Term Sheet is attached (the "<u>RSA</u>").  Under the RSA, such Senior Secured Noteholders have agreed to vote their respective claims relating to the Company to accept a mutually agreed upon prenegotiated chapter 11 plan of reorganization (the "<u>Plan</u>") pursuant to chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") to carry out a debt-for-equity exchange in a chapter 11 case. |
| | (b)  The Company, in consultation with the Majority Noteholder Group, will negotiate amendments to certain of the Company's leases of nonresidential real property (the "<u>Leases</u>"). |
| | The Company may, in connection with the Plan and with the consent of the Majority Noteholder Group, terminate or reject certain of the Leases such that on or before the date the Plan is substantially consummated (as such term is defined in Bankruptcy Code section |

| | |
|---|---|
| | 1101) (the "<u>Effective Date</u>"), the revised portfolio of Leases will consist of only those Leases that have terms and conditions acceptable to the Company and the Majority Noteholder Group. |
| Rights Offering and Purchase Commitment | Each Senior Secured Noteholder will have the right to purchase a pro rata amount (based on its ownership of the Secured Notes on the record date for the solicitation of votes to accept or reject the Plan) of $27.0 million principal amount of new second lien notes (the "<u>New Second Lien Notes</u>") to be issued by Uno (or its successor as described under "<u>Asset Contribution</u>") on the Effective Date (the "<u>Rights Offering</u>"). The proceeds from the New Second Lien Notes will be used to repay the outstanding obligations under the term loan portion of the DIP Facility. The New Second Lien Notes shall accrue interest at a rate of 15% per annum (of which, 10% shall be payable in cash and 5% shall PIK) and shall have a final maturity that is 90 days after the final maturity of the new exit financing facility to be entered into by the Company on the Effective Date. |
| | The obligation to repay the New Second Lien Notes will be guaranteed by Uno's subsidiaries and will be secured, on a second lien basis, by all of the assets of Uno and its subsidiaries, subject to customary baskets and exceptions. The New Second Lien Notes shall have such other terms reasonably satisfactory to the Company and the Majority Noteholder Group. |
| | Subject to certain customary conditions, including maximum debt of $55 million, Twin Haven and Coliseum (the "<u>Backstop Noteholders</u>") will commit to purchase any portion of the New Second Lien Notes that are not subscribed for by the Senior Secured Noteholders pursuant to the Rights Offering. In consideration of such commitment, the Backstop Noteholders, pro rata based on their respective commitment to purchase New Second Lien Notes, will receive on the Effective Date a fully earned non-refundable cash fee equal to 2% of the total amount of New Second Lien Notes being offered for purchase. |

## IV.  <u>TREATMENT OF PARTIES UNDER THE PLAN</u>

| **Party In Interest** | **Treatment** |
|---|---|
| DIP Facility Claims | Debtor-in-possession financing will be on terms reasonably acceptable to the Company and the Majority Noteholder Group. |
| | DIP Facility Claims, if any, will be paid in full in cash on the Effective Date or receive such other treatment as may be acceptable to the parties thereto, including payment pursuant to the Rights Offering and Purchase Commitment set forth in <u>Section III</u> above. |

| Party In Interest | Treatment |
|---|---|
| Administrative Expense Claims | On or as soon as practicable after the Effective Date, each holder of an administrative expense claim shall be paid in full in cash or otherwise receive treatment consistent with the provisions of Bankruptcy Code section 1129. |
| Priority Tax Claims | On or as soon as practicable after the Effective Date, each holder of a priority tax claim shall be paid in full in cash or as otherwise agreed by the holders and the Company, or otherwise receive treatment consistent with the provisions of Bankruptcy Code section 1129. |
| Other Priority Claims | On or as soon as practicable after the Effective Date, each holder of a priority claim, other than a Priority Tax Claim, shall be paid in full in cash or otherwise receive treatment consistent with the provisions of Bankruptcy Code section 1129. |
| Credit Facility Lenders | On or as soon as practicable after the Effective Date, all allowed claims arising under or in connection with the Credit Agreement (to the extent such claims are not repaid with proceeds of the DIP Facility, if any) shall be paid in full in cash or otherwise receive treatment consistent with the provisions of Bankruptcy Code section 1129; provided, however, that the Majority Noteholder Group consents to such treatment.  Notwithstanding the foregoing, the revolver portion of the Credit Agreement shall be paid in full, in cash on the Effective Date. |
| Senior Secured Noteholders | On the Effective Date, the Senior Secured Noteholders shall be issued an aggregate amount of shares of common stock of Uno representing 100% of the equity of Uno (the "New Uno Equity")[1] (subject to dilution for the Management Incentive Equity and the Consulting Agreement (each as defined below)) in exchange for, or extinguishment of, the Senior Secured Notes.  It is intended that this exchange will qualify as a recapitalization under section 368(a)(1)(E) of the Internal Revenue Code of 1986, as amended. |
| Other Secured Claim Holders | On or as soon as practicable after the Effective Date, holders of Other Secured Claims will receive one of the following treatments at the option of the Company, and with the consent of the Majority Noteholder Group: (i) payment of such claim in full in cash; (ii) delivery of the collateral securing such claim and payment of interest required to be paid under Bankruptcy Code section 506(b); (iii) treatment of such claim in any other manner such that the claim shall |

---

[1] The holders of the Senior Secured Notes shall receive common stock or such other similar equity interests in reorganized Uno as the Majority Noteholder Group deems to be most economically advantageous.

4

| Party In Interest | Treatment |
|---|---|
| | be rendered unimpaired; or (iv) such other treatment as permitted under Bankruptcy Code section 1129. |
| General Unsecured Creditors | No recovery. |
| Existing Equity Holders | On the Effective Date, all existing equity of Uno shall be extinguished, liquidated or otherwise terminated for no consideration.<br><br>On the Effective Date, each of the Uno Parents shall be liquidated and dissolved. Uno shall fund Uno Parents' liabilities in such liquidation and dissolution (including any tax liabilities) solely to the extent such liabilities relate to the Uno Parents being directly or indirectly the parent companies of Uno. Uno shall not be obligated to fund any costs or expenses to effectuate such liquidation in excess of $25,000; provided that tax liabilities shall not be included in such limit.<br><br>On the Effective Date, all outstanding options and warrants to acquire equity of Uno or any of the Uno Parents shall be extinguished, liquidated or otherwise terminated, in each case for no consideration. |
| Intercompany Claims | There shall be no monetary distributions on account of intercompany claims. To the extent determined appropriate by the Company, with the consent of the Majority Noteholder Group, which consent shall not be unreasonably withheld, the Company may cause the reduction, reinstatement or discharge of any intercompany claim, including the contribution by the Company or a direct or indirect subsidiary of the Company of an intercompany claim against a direct or indirect subsidiary of the Company to the capital of such subsidiary on or prior to the Effective Date. |
| Intercompany Equity Interests | On the Effective Date, all equity interests in the subsidiaries of Uno shall be reinstated for the benefit of the holders thereof. |

# V. GENERAL PROVISIONS REGARDING THE RESTRUCTURING

| | |
|---|---|
| Conditions to Confirmation | The conditions precedent to confirmation of the Plan shall be customary for a reorganization of this size and type, including, without limitation, the following: |
| | • The bankruptcy court shall have entered an order, in a form acceptable to the Company and the Majority Noteholder Group, approving the adequacy of the disclosure statement. |
| | • The proposed confirmation order approving and confirming the Plan shall be in form and substance acceptable to the Company and the Majority Noteholder Group. |
| | • All Plan Documents (as defined below) shall be in a form and substance acceptable to the Company and the Majority Noteholder Group. "Plan Documents" shall include, but not be limited to, the Plan, the disclosure statement, the solicitation materials, and any other documents or agreements filed with the bankruptcy court by the Company or at the Company's direction that are necessary to implement the Plan, including any appendices, amendments, modifications, supplements, exhibits and schedules relating to the Plan or the disclosure statement. |
| | • Each of the foregoing may be waived by the Company, with the consent of the Majority Noteholder Group. |
| Conditions to Consummation | The conditions precedent to the occurrence of the Effective Date shall be customary for a reorganization of this size and type, including, without limitation: |
| | • The Company shall have obtained tail liability policies for the directors and officers of the Company immediately prior to the Effective Date in amounts and on terms acceptable to the Majority Noteholder Group and the existing board of directors of the Company; provided, however, that the cost of such insurance policies in the aggregate shall not exceed 150% of the aggregate annual premium for the Company's existing director and officer liability policies. |
| | • The receipt of all other legal and regulatory approvals required to consummate the Plan. |
| | • The satisfaction of all other conditions set forth in the Plan and RSA, as applicable, including, but not limited to, (i) operation of the Company in the ordinary course of business and in accordance with a budget approved by the Majority Noteholder Group, in its sole discretion, and (ii) information sharing rights to be granted to the |

| | Majority Noteholder Group, in form and substance acceptable to the Majority Noteholder Group. |
|---|---|
| | • The confirmation order approving and confirming the Plan shall have become a final order in a form and substance acceptable to the Company and the Majority Noteholder Group. |
| | • The Consulting Agreement, substantially in the form attached hereto as Attachment 1, shall have been executed. |
| | • All conditions to confirmation shall have been satisfied or waived. |
| | Each of the foregoing may be waived by the Company, with the consent of the Majority Noteholder Group and, in the case of the Consulting Agreement, Centre. |
| Stockholders Agreement | On the Effective Date, the Company, members of the Majority Noteholder Group, the Consultant (as hereinafter defined) and such other persons designated by the Majority Noteholder Group will enter into a stockholders agreement (the "Stockholders Agreement") pursuant to which the minority shareholders shall receive, on customary terms, tag-along rights, preemptive rights, information rights and piggyback registration rights. The minority shareholders shall be subject to, on customary terms, forced sale provisions and transfer restrictions (subject to exceptions relating to transfer to affiliates, including limited partners). |
| Corporate Restructuring | On or prior to the Effective Date, the Company may conduct an internal corporate restructuring in a manner acceptable to the Majority Noteholder Group. |
| Asset Contribution | On or prior to the Effective Date, Uno is expected to contribute all of its assets (other than its equity interests in Uno Restaurants, LLC) to Uno Restaurants, LLC. Uno Restaurants, LLC is expected to be a borrower under the exit financing facility, including any New Second Lien Notes. This contribution will allow Uno to guarantee the exit financings and to pledge the equity of Uno Restaurants, LLC as security for such financings if required by the exit financing lenders. |
| Corporate Governance Documents | All organizational documents of restructured Uno shall be in form and substance acceptable to the Majority Noteholder Group and the Company; including, without limitation, any articles of incorporation, bylaws, registration rights agreement, the Stockholders Agreement, or any similar governance documents; provided, however, that the provisions of any registration rights agreement and the Stockholders Agreement shall also be in form and substance reasonably acceptable to Centre Partners with respect to provisions that directly affect |

| | minority shareholders. |
|---|---|
| Fees and Expenses | The fees and expenses of any professionals retained by the Company and the Majority Noteholder Group in connection with the Restructuring, as well as the out of pocket expenses of the (i) Company, (ii) Centre Partners, up to an aggregate amount of $50,000, and (iii) the members of the Majority Noteholder Group, shall be paid in full in cash. Such payments shall be made by the Company promptly upon the Company's receipt of invoices, or as otherwise ordered by the Court. |
| Corporate Governance Matters | On the Effective Date, the current members of the board of directors of Uno (the "Uno Board") not identified as members of the New Board (as defined below) shall resign. |
| | After giving effect to the Restructuring, the board of directors of Uno (the "New Board") shall consist of seven directors, comprised of (a) Frank Guidara (so long as he remains chief executive officer), (b) three directors selected by Twin Haven, (c) one director selected by Coliseum, and (d) two independent directors selected by agreement of management and the Majority Noteholder Group. |
| | The board of directors and managers, as applicable, of the subsidiaries of Uno shall be similarly reconstituted. |
| Management | Uno shall approve an incentive equity compensation plan for the benefit of Management ("Management Incentive Equity") for 10% of the New Uno Equity (on a fully diluted basis), the form, exercise price, vesting and allocation of which shall be determined by the Majority Noteholder Group, in consultation with the Company's chief executive officer. |
| Consulting Agreement | On the Effective Date, Uno shall enter into a consulting agreement (the "Consulting Agreement") with a designee of the Existing Equity Holders (the "Consultant"), whereby the Consultant shall provide the Company with consulting services. The Consulting Agreement shall be substantially in the form of Attachment 1 hereto, unless otherwise agreed by the Company, the Majority Noteholder Group and the Consultant. |
| Releases and Exculpation | The Restructuring shall provide for certain customary releases and exculpations for the benefit of the Company, its directors, officers, agents and affiliates (including the Existing Equity Holders), the Majority Noteholder Group, the Indenture Trustee (as defined below) and each of their respective agents, attorneys, financial advisors or other specified professionals, in each case to the extent permitted by applicable law. |

| Indenture Trustee Fees | The reasonable fees and expenses of the indenture trustee (the "Indenture Trustee") under the Indenture will be paid in full, in cash, on the Effective Date. |
| --- | --- |

## CONSULTING AGREEMENT

Consulting Agreement (this "**Agreement**"), dated as of [●], 2010, by and between Uno Restaurant Holdings Corporation[1] (the "**Company**"), and [●][2] ("**Consultant**").

W I T N E S S E T H:

WHEREAS, the Company, its subsidiaries and certain affiliated companies (collectively, the "**Uno Companies**") consummated a reorganization (the "**Reorganization**") under chapter 11 of title 11 of the United States Code as of the date hereof;

WHEREAS, the stockholders of Uno Acquisition Parent, Inc. (the "**Parent**"), the Company's prior ultimate parent (the "**Prior Stockholders**"), developed significant understanding and expertise with regard to the Uno Companies' business, operations, assets, liabilities and prospects during their ownership of the Uno Companies;

WHEREAS, pursuant to the Restructuring Support Agreement, dated as of January [●], 2010 (the "**RSA**"), among the Parent, certain of the Uno Companies, certain Prior Stockholders and holders of a majority of aggregate principal amount of the 10% Senior Secured Notes due 2011 of certain of the Uno Companies (the "**Consenting Noteholders**"), the Consenting Noteholders desire that the Uno Companies secure the future services of the Prior Stockholders to advise and assist the Consenting Noteholders in the management and operation of the Uno Companies following the Reorganization;

WHEREAS, the Consenting Noteholders own a majority of the equity interests in the Company as a result of the Reorganization;

WHEREAS, the Prior Stockholders constitute all of the members of Consultant;

WHEREAS, as a result of the foregoing, the Company desires to retain Consultant for independent consulting services to take advantage of the Prior Stockholders' experience and understanding; and

WHEREAS, Consultant desires to provide, and to make the Prior Stockholders available to provide, such services to the Company for the consideration specified herein.

NOW, THEREFORE, in consideration of the covenants and agreements hereinafter set forth, the parties hereto agree as follows:

---

[1] Insert Uno Restaurant Holdings Corporation or its successor on the effective date of the plan of reorganization (the "**Plan Effective Date**").

[2] Entity to be designated by a majority of the Prior Stockholders.

1. <u>Term</u>.  The Company hereby retains Consultant, and Consultant hereby agrees to perform consulting services for the Company, upon the terms and conditions contained in this Agreement.  The term of this Agreement (the "**Term**") shall commence on the date hereof (the "**Effective Date**") and shall continue for a period of four years from and after the Effective Date, unless sooner terminated as hereinafter provided.  Subject to <u>Section 11</u>, neither party hereto shall have any further obligation or liability to the other hereunder following the termination of this Agreement.

2. <u>Services</u>.  During the Term, Consultant shall provide to the Company such consulting services relating to the management and operations of the Uno Companies, in such scope and such times as reasonably requested by the Company and agreed by the Company and Consultant, including services relating to the tax affairs or any tax proceedings of the Company as reasonably requested by the Company.  The Consultant shall make available to the Company such of the Prior Stockholders as the Company shall reasonably request to provide such services.

3. <u>Compensation</u>.  On the Effective Date and each of the first three anniversaries thereafter (each, a "**Compensation Date**"), the Company shall issue and deliver to Consultant, and Consultant shall receive and accept, [[●] shares (the "**Base Number**") of common stock of the Company, par value $0.01 per share][3] ("**Company Interests**"), as the same may be adjusted as to the form, amount and timing of such compensation pursuant to <u>Exhibit A</u> hereto, as compensation hereunder (the "**Compensation**").  Consultant hereby subscribes, effective as of each Compensation Date, to such Company Interests as shall constitute the Compensation as of such Compensation Date.  The Company shall have the right, in its sole discretion, to accelerate the time of payment of any Compensation.

4. <u>Adjustment of Compensation</u>.  The Compensation shall be subject to adjustment from time to time as follows:

(a) <u>Subdivision or Combination of Company Interests</u>.  If the Company at any time subdivides (by any split, dividend or otherwise) its outstanding Company Interests into a greater number of shares, the Base Number, the Additional Shares number and Company Interests issuable upon exercise of the Warrants, if any, in each case as in effect immediately prior to such subdivision shall be proportionately increased for any future Compensation Date.  If the Company at any time combines (by reverse split, combination or otherwise) its outstanding Company Interests into a smaller

---

[3] Specify number of shares of common stock.  Subject to adjustments pursuant to <u>Exhibit A</u>, the number of shares issuable on each Compensation Date shall be 0.5% (for a total of 2% for all four Compensation Dates) of the Company's outstanding equity on the Plan Effective Date, before giving effect to issuance of management incentive equity.  It is contemplated that on the Plan Effective Date the Company will have one class of common stock.  If the Company issues more than one class or type of equity securities, the Consultant will be issued the same types of equity securities in the same relative proportions as issued to the Consenting Noteholders.

number of shares, the Base Number, the Additional Shares number and Company Interests issuable upon exercise of the Warrants, if any, in each case as in effect immediately prior to such combination shall be proportionately decreased for any subsequent Compensation Date.

(b) <u>Reorganization, Reclassification, Consolidation, Merger or Sale</u>. Any recapitalization, reorganization, reclassification, consolidation or merger with, or into another person or entity or other transaction which is effected in such a way that holders of Company Interests are entitled to receive (either directly or upon subsequent liquidation) stock, securities, assets or other property with respect to or in exchange for Company Interests is referred to herein as "**Organic Change**." Prior to the consummation of any Organic Change, the Company will make appropriate provision to ensure that Consultant shall thereafter have the right to receive any Compensation that is due pursuant to this Agreement but remains unpaid at the time of such Organic Change in the form of such shares of stock, securities, assets or other property ("**Exchangeable Property**") as may be issued or payable to other holders of Company Interests in connection with such Organic Change.

(c) <u>Certain Other Actions</u>. The Company (i) shall take all reasonable actions as may be necessary under the Delaware General Corporation Law in order that the Company may validly and legally issue fully paid and nonassessable shares of Company Interests to Consultant at such times as required under this Agreement and (ii) shall reserve and keep available out of its authorized but unissued shares of common stock a sufficient number of Company Interests to permit the issuance of Company Interests as payment of all Compensation payable hereunder, as may be adjusted hereunder.

5. <u>Fair Compensation</u>. The Company acknowledges and agrees that in light of Consultant's experience and knowledge relating to the history, management and operations of the Uno Companies, and the uncertain nature of the time and effort that may be expended by Consultant in fulfilling its duties under this Agreement, Consultant's opportunity costs in entering into this Agreement, and the unique expertise and experience of the Prior Stockholders, which will provide services on behalf of Consultant, in matters relating to the business of the Uno Companies, the Compensation payable to Consultant hereunder is fair, just and reasonable. The Company further agrees that the value to the Company of Consultant's services derives in substantial part from its experience and familiarity with the business, operations, assets, liabilities and prospects of the Uno Companies, and accordingly, the structure and amount of the Compensation of Consultant hereunder is reasonable regardless of the amount of time to be expended by the Consultant and the Prior Stockholders in the performance of the services to be provided hereunder.

6. <u>Indemnification; Expenses</u>.

(a) The Company agrees to indemnify and hold harmless the Consultant and each Prior Stockholder (collectively, the "**Indemnified Parties**") that actually renders services hereunder on behalf of the Consultant, to the maximum extent

3

lawful, from and against any losses, claims, damages, liabilities or expenses related to third party claims or proceedings which directly relate to the services actually provided hereunder by such Indemnified Party; provided, that the Company shall not indemnify any Indemnified Party to the extent of any losses, claims, damages, liabilities or expenses arising from the gross negligence or willful misconduct of any Indemnified Party or any of its Representatives. In any case where an indemnification obligation arises under the preceding sentence, the Company will reimburse each Indemnified Party for all out-of-pocket expenses (including reasonable counsel fees) as they are incurred by such Indemnified Party in connection with investigating, preparing or defending any such action or claim, whether or not in connection with pending or threatened litigation to which any Indemnified Party is a party. The foregoing shall be in addition to any rights that any Indemnified Party may have at common law or otherwise, including, but not limited to, any right to contribution. The Company shall not be liable for any settlement of any such action or proceeding effected without the Company's written consent, but if settled with the Company's consent the Company agrees, subject to the limitations set forth in this Section 6(a), to indemnify and hold harmless the applicable Indemnified Party from and against any loss or liability to such Indemnified Party by reason of such settlement. If any action or proceeding shall be brought or asserted against any Indemnified Party in respect of which indemnity may be sought from the Company, such Indemnified Party shall promptly notify the Company in writing and the Company shall have the right to assume the defense thereof. Such Indemnified Party shall have the right to employ separate counsel in any such action and participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party unless (i) the Company has agreed to pay such fees and expenses or (ii) the Indemnified Party shall have been advised by counsel that counsel for the Indemnifying Party could not adequately represent the interests of the Indemnified Party because the Indemnified Party's interests would be in conflict with those of the Indemnifying Party.

(b) During the Term, the Company agrees promptly to reimburse Consultant, in accordance with the Company's standard policies, for all reasonable out-of-pocket third party expenses paid or incurred by Consultant and its officers, designees and agents in connection with the performance of its duties for the Company hereunder, provided that all expenses in excess of $500 individually or $2,500 in the aggregate shall have been approved by the Company in advance.

7. Securities Matters. Consultant hereby represents and warrants to the Company as of the date hereof and on each Compensation Date that: (i) it is acquiring Company Interests hereunder for its own account, and not with a view to, or for the offer or sale in connection with, any distribution or sale of Company Interests or any interest in them directly or indirectly in violation of the Securities Act of 1933, as amended (the "**Securities Act**") and (ii) it has sufficient knowledge and experience in financial and business matters to be capable of evaluating the merits and risks of its ownership of any Company Interests and it is capable of bearing the economic risks of such ownership. Consultant acknowledges that the Company Interests issuable hereunder (including any shares of Common Stock underlying the Warrants, if issuable under the terms set forth in Exhibit A) have not been registered and, unless and until registered by the Company, will not be registered under the Securities Act or any state securities laws, and understands

and agrees that it will not be able to and it may not sell or dispose of any such Company Interests except pursuant to a registered offering in compliance with, or in a transaction exempt from, the registration requirements of the Securities Act and any other applicable state or federal securities laws.

8. [Reserved].[4]

9. Confidential Information.

(a) Consultant recognizes and acknowledges that all information about the Company or relating to any of its respective products, services or any phase of its operations, business or financial affairs which is not a matter of public record, including without limitation, trade secrets, financial data, know-how, customers, suppliers, inventions, recipes, formulas, processes, price and rate information, plans and strategies ("**Confidential Information**"), is not generally known to the Company's competitors and is valuable, special and unique to the business of the Company. Prior to being provided or accessing any Confidential Information, Consultant shall cause each Prior Stockholder who is requested to provide Services hereunder to execute a joinder (reasonably satisfactory to the Company) to become a party to this Agreement for purposes of this Section 9 , Section 13 and Section 14 of this Agreement as if such Prior Stockholder had been a party to this Agreement on the date hereof.

(b) Consultant shall not, and shall cause its managers, employees and other representatives (collectively, the "**Representatives**") not to, directly or indirectly, use any such Confidential Information for its/his own benefit, divulge, disclose or make accessible any such Confidential Information or any part thereof to any person, firm, corporation, association or other entity for any reason or purpose whatsoever (other than in the course of carrying out its/his duties hereunder). Confidential Information shall not include any information which is or becomes (i) generally available to the public other than as a result of disclosure in violation of this Agreement or (ii) generally known in the industry in which the Company is or may become involved during the term of this Agreement other than as a result of disclosure in violation of this Agreement. Consultant shall be responsible for any breach of this Section 9 by any Representative except to the extent there is a separate confidentiality

---

[4] Concurrently with the execution of this Agreement, Consultant, the Company and the Company's other stockholders (holding at least a majority of the equity interests of the Company) shall enter into a stockholders agreement pursuant to which Consultant shall (a) receive, on customary terms, mutually agreeable tag-along rights, preemptive rights, information rights and piggyback registration rights; and (b) be subject to, on customary terms, mutually agreeable forced sale provisions and transfer restrictions (subject to exceptions relating to transfer to its members, subsidiaries and affiliates) covering all Company Interests issued or issuable to the Consultant hereunder (including any shares of common stock underlying the Warrants, if issuable under the terms set forth in Exhibit A).

agreement between the Company and such Representative with respect to the Confidential Information.

(c)     All memoranda, notes, lists, records and other documents (and all copies thereof) constituting Confidential Information made or compiled by, or made available to, Consultant, the Prior Stockholders or any of their respective Representatives, shall be the Company's property, shall be kept confidential in accordance with the provisions of this <u>Section 9</u> and shall be delivered to the Company at any time on request and in any event upon the termination of the Term.

(d)     Since the Company will be irreparably damaged if the provisions of this <u>Section 9</u> are not specifically enforced, Consultant acknowledges and agrees that the Company shall be entitled to an injunction or any other appropriate decree of specific performance (without the necessity of posting any bond or other security in connection therewith) restraining any breach, violation or non-fulfillment of Consultant's covenants under this <u>Section 9</u>.  Such remedies shall not be exclusive and shall be in addition to any other remedy, at law or in equity, which the Company may have for any breach or threatened breach of this <u>Section 9</u> by Consultant.

10. <u>Termination</u>.  The Term may be terminated prior to its expiration as set forth in <u>Section 1</u> hereof only upon the mutual agreement of the Consultant and Company.  Section 9 shall survive any termination or expiration of this Agreement for a period of eighteen months following such termination or expiration.

11. <u>Effect of Early Termination</u>.  In the event of an early termination of this Agreement pursuant to <u>Section 10</u> hereof, the Company shall promptly (a) issue to Consultant any remaining unpaid Compensation that would have been payable to Consultant pursuant to <u>Section 3</u> hereof but for such termination and (b) pay to Consultant any monetary sums then due and owing pursuant to <u>Section 6</u> hereof.  All additional payments made pursuant to the foregoing <u>clause (a)</u> shall be deemed fully earned upon the date of such termination.

12. <u>Independent Contractor</u>.  Consultant hereby acknowledges and agrees that the Consultant (along with the Consultant's Representatives) is solely an independent contractor and consultant and will not be entitled to and shall not claim any of the rights, privileges, or benefits of an employee of the Company or any of its affiliates.  Furthermore, nothing in this Agreement or the Services shall be deemed to create any partnership, agency, or joint venture relationship between or among the parties.  The Consultant understands that neither the Consultant nor any of the Consultant's Representatives will receive any of the rights, privileges, benefits or perquisites that the Company extends or may extend to its employees, including, but not limited to, any pension, 401(k), health, or welfare benefits; compensation incentives; profit sharing participation; stock options/grants; vacation; termination pay; and/or severance pay.  The Consultant, on behalf of all of the Consultant's Representatives, hereby releases and waives any and all right, claim, or interest to any privileges or to any and all such benefits and perquisites.  The Consultant will be solely responsible for ensuring the services to be provided hereunder comply with the Fair Labor Standards Act; all other federal, state,

and local wage and hour and overtime laws; and all other laws. The Company will not withhold or pay on behalf of Consultant any withholding or social security taxes or any other taxes or benefits which would be payable if Consultant or any of its Representatives was an employee of the Company.  Consultant shall indemnify the Company for any liability in connection therewith.

13. <u>Notices</u>.  Any and all notices or other communications required or permitted to be given under any of the provisions of this Agreement shall be in writing and shall be deemed to have been duly given when personally delivered or mailed by first class registered mail, return receipt requested, or by commercial courier or delivery service, or by facsimile, addressed to the parties at the addresses set forth below:

(a)    if to the Company, to:

[Uno Restaurant Holdings Corporation]
100 Charles Park Road
Boston, MA 02132
Facsimile No.: (617) 218-5375
Attn:  Louie Psallidas

(b)    if to Consultant (or to any Prior Stockholder who becomes a party hereto), to:

c/o Centre Partners Management, LLC
30 Rockefeller Plaza, 50th Floor
New York, NY 10020
Facsimile No.: (212) 332-5801
Attn:  Mr. Michael Schnabel

(or such other address as such Prior Stockholder shall provide in his or its joinder referred to in Section 9(a) hereof)

and/or to such other persons and addresses as any party shall have specified in writing to the other by notice as aforesaid.

14. <u>Miscellaneous</u>.

(a)  This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof and may not be modified, amended or terminated except by a written agreement signed by the Consultant and the Company.

(b)  This Agreement is not assignable by any party without the prior written consent of the other party.  Any assignment by a party in violation of the terms of this Agreement shall have no force and effect and shall be null and void ab initio.  This Agreement will be binding upon and will inure to the benefit of the parties hereto and their respective successors and permitted assigns

(c)  No waiver of any breach or default hereunder shall be considered valid unless in writing, and no such waiver shall be deemed a waiver of any subsequent breach or default of the same or similar nature.

(d)  If any provision of this Agreement shall be held invalid or unenforceable, such invalidity or unenforceability shall attach only to such provision and shall not in any manner affect or render invalid or unenforceable any other severable provision of this Agreement, and this Agreement shall be carried out as if any such invalid or unenforceable provision were not contained herein, unless the invalidity or unenforceability of such provision substantially impairs the benefits of the remaining portions of this Agreement.

(e)  The section headings contained herein are for the purposes of convenience only and are not intended to define or limit the contents of said sections.

(f)  This Agreement may be executed in two or more counterparts, all of which taken together shall be deemed one original.

(g)  This Agreement shall be deemed to be a contract under the laws of the State of New York and for all purposes shall be construed and enforced in accordance with the internal laws of said state.

(h)  Each of the parties irrevocably agrees that any legal action or proceeding arising out of or relating to this Agreement brought by any other party or its successors or assigns shall be brought and determined in any New York State or federal court sitting in the Borough of Manhattan in The City of New York (or, if such court lacks subject matter jurisdiction, in any appropriate New York State or federal court), and each of the parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such action or proceeding arising out of or relating to this Agreement and the transactions contemplated hereby.

(i)  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

(j)  This Agreement shall not confer any rights or remedies upon any person or entity other than the parties hereto and their respective successors and permitted assigns.

[Signatures appear on following page.]

IN WITNESS WHEREOF, the parties hereto have caused this Consulting Agreement to be duly executed as of the date first above written.

**[Uno Restaurant Holdings Corporation]**

By: _____
   Name:
   Title:

**[Insert Consultant Name]**

By: _____
   Name:
   Title:

**Adjustment of Compensation**

In the event the total amount of tax, interest and penalties paid or payable pursuant to the voluntary disclosure agreements ("**VDAs**") initiated or otherwise pursued by any of the Uno Companies prior to or in connection with the Reorganization or as a result of an audit of any of the Uno Companies with respect to the issues addressed in the VDAs that is commenced on or prior to the third anniversary of the Effective Date (such total, the "**Total Amount**") as of the Determination Date (i) exceeds $6 million but does not exceed $10 million, then in addition to the Base Number of Company Interests to be issued on each Compensation Date pursuant to Section 3 hereof, the Company shall issue to Consultant on each Compensation Date a warrant to purchase ___[5] shares of Company Interests (each, a "**Warrant**") having the terms set forth on <u>Exhibit B</u> hereto; or (ii) does not exceed $6 million, the Company shall issue to the Consultant on each Compensation Date an additional _____[6] shares of Company Interests (the "**Additional Shares**"). If any Warrants or Additional Shares are issuable in accordance with the terms hereof, then any Warrant or Additional Shares that are issuable on Compensation Dates occurring prior to the Determination Date shall be issued promptly after the Determination Date and the balance of such Warrants or Additional Shares shall be issued on the applicable future Compensation Dates, if any.

For purposes hereof, (i) "**Determination Date**" means the earliest to occur of (x) the final determination of the Total Amount (taking into account any audits of any of the Uno Companies with respect to the issues addressed in the VDAs that are commenced on or prior to the third anniversary of the Effective Date), (y) the fourth anniversary of the Effective Date and (z) the termination of this Agreement; and (ii) the amount of tax, interest and penalties shall only include (A) tax with respect to (1) the Uno Companies' tax periods that ended on or prior to January 19, 2010 and (2) the portion of the tax period that includes January 19, 2010 that ended on such date and (B) interest and penalties with respect to the tax described in clause (A) above.

On the Effective Date, the Company shall provide the Consultant a schedule setting forth (i) the amount of tax, interest and penalties owed by any of the Uno

---

[5]  The total number of shares of Company Interests exercisable in the aggregate under the Warrants issued in all four Compensation Dates shall be 2% of the Company's outstanding equity on the Plan Effective Date, before giving effect to issuance of management incentive equity, with any Warrant to be issued on any Compensation Date exercisable into no more than one-fourth of such shares of Company Interests.

[6]  The total number of Additional Shares to be issued in the aggregate in all four Compensation Dates shall be 2% of the Company's outstanding equity on the Plan Effective Date, before giving effect to issuance of management incentive equity, with no more than one-fourth of the earned Additional Shares to be issued on any Compensation Date.

Companies pursuant to the VDAs or audits that have been determined on or prior to that date and (ii) any VDAs or ongoing audits in respect of which such amount has not been determined as of such date.  With respect to any VDAs or ongoing audits on such schedule that are described in clause (ii) of the preceding sentence, the Company shall provide the Consultant with written notice of the determination of the amount of tax, interest and penalties owed by any of the Uno Companies in connection therewith within ten (10) business days of the determination thereof.  For purposes hereof, the date any such amount is determined is the date such amount is set forth in a tax return filed pursuant to the VDA or final resolution of the audit, as applicable, irrespective of the date on which such amount is payable by any of the Uno Companies.

**Form of Warrant**

**[Attached]**

NEITHER THIS WARRANT NOR THE SECURITIES ISSUABLE UPON EXERCISE OF THIS WARRANT HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR REGISTERED OR QUALIFIED UNDER ANY STATE SECURITIES LAWS AND NEITHER THIS WARRANT, SUCH SECURITIES NOR ANY INTEREST THEREIN MAY BE OFFERED, SOLD, TRANSFERRED, PLEDGED OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT OR SUCH LAWS OR AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT AND SUCH LAWS.

THE SECURITIES ISSUABLE UPON EXERCISE OF THIS WARRANT ARE SUBJECT TO THE CONDITIONS AND RESTRICTIONS ON TRANSFER SPECIFIED IN THE STOCKHOLDERS AGREEMENT DATED AS OF [●], 2010, BY AND AMONG THE COMPANY, THE REGISTERED HOLDER AND OTHER STOCKHOLDERS OF THE COMPANY (AS AMENDED FROM TIME TO TIME, THE "STOCKHOLDERS AGREEMENT").  A COPY OF SUCH CONDITIONS AND RESTRICTIONS WILL BE FURNISHED BY THE COMPANY TO THE HOLDER HEREOF WITHOUT CHARGE.

## WARRANT

Date of Issuance: [●]                                          Certificate No. W-__


**FOR VALUE RECEIVED**, Uno Restaurant Holdings Corporation, a Delaware corporation (the "Company"), hereby grants to [●][1] or its registered assigns (the "Registered Holder") the right to purchase [●] shares of the Company's Common Stock[2] (as further adjusted from time to time, the "Exercise Shares") at a price per share of $[●][3] (as adjusted from time to time hereunder, the "Exercise Price").  This Warrant is issued by the Company (this "Warrant"). Certain capitalized terms used herein are defined in Section 3.  Certain capitalized terms used but not defined herein are defined in the Stockholders Agreement.  The amount and kind of securities purchasable pursuant to the rights granted hereunder and the Exercise Price for such securities are subject to adjustment pursuant to the provisions contained in this Warrant.

This Warrant is subject to the following provisions:

Section 1.          Exercise of Warrant.

---

[1] Entity to be designated by a majority of the stockholders of Uno Acquisition Parent, Inc., which is the Consultant under that certain Consulting Agreement, dated as of the same date hereof, by and between Consultant and the Company (the "Consulting Agreement").

[2] It is contemplated that on the Effective Date the Company will have one class of common stock.  If the Company issues more than one class or type of equity securities, the Warrant will be exercisable into the same types of equity securities in the same relative proportions as issued to the Consenting Noteholders (as defined in the Consulting Agreement).

[3] Exercise Price to reflect an enterprise value of $197 million.

1A.    Exercise Period and Amount.  The Registered Holder may exercise, in whole or in part, the purchase rights represented by this Warrant for the Exercise Shares at any time and from time to time up to and including the Expiration Date (the "Exercise Period").  This Warrant shall expire and no longer be exercisable on the Expiration Date

(i)    Exercise Procedure.  This Warrant will be deemed to have been exercised when the Company has received all of the following items or such later time as may be specified by the Registered Holder in the Exercise Agreement (the "Exercise Time"):

(a)    a completed Exercise Agreement, as described in Section 1B, executed by the Registered Holder;

(b)    this Warrant; and

(c)    a check payable to the Company in an amount equal to the product of the Exercise Price multiplied by the number of shares of Common Stock being purchased upon such exercise (the "Aggregate Exercise Price"); provided, however, that the Registered Holder may exercise this Warrant in whole or in part by the surrender of this Warrant to the Company, with a duly executed Exercise Agreement marked to reflect "Net Issue Exercise" and specifying the number of shares of Common Stock to be purchased, and upon such Net Issue Exercise, the Registered Holder shall be entitled to pay the exercise price for Common Stock purchased hereunder by cancellation of a number of shares of Common Stock to be purchased hereunder, valued at fair market value less the Exercise Price thereof.  For purpose of this Warrant, "**fair market value**" shall be determined by the Board of Directors of the Company.

(ii)    Certificate(s) for shares of Common Stock purchased upon exercise of this Warrant will be delivered by the Company to the Registered Holder within five (5) days after the date of the Exercise Time.  Unless this Warrant has expired or all of the purchase rights represented hereby have been exercised, the Company will prepare a new Warrant, substantially identical hereto, representing the rights formerly represented by this Warrant which have not expired or been exercised and will, within such five-day period, deliver such new Warrant to the Person designated for delivery in the Exercise Agreement.

(iii)    The Common Stock issuable upon the exercise of this Warrant will be deemed to have been issued to the Registered Holder at the Exercise Time, and the Registered Holder will be deemed for all purposes to have become the record holder of such Common Stock at the Exercise Time.

(iv)    The issuance of certificate(s) for shares of Common Stock upon exercise of this Warrant will be made without charge to the Registered Holder for any issuance tax in respect thereof or other cost incurred by the Company in connection with such exercise and the related issuance of shares of Common Stock.  Each share of Common Stock issuable upon exercise of this Warrant will, upon exercise of this Warrant in accordance with the terms hereof and payment of the Exercise Price therefor, be fully paid and nonassessable and free from all liens and charges (but subject to the Stockholders Agreement) with respect to the issuance thereof.  Unless the shares of Common Stock issuable upon exercise of this Warrant have been

registered under the Securities Act of 1933, as amended (the "Securities Act"), each certificate representing any such shares shall bear a legend substantially in the following form:

> "THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED OR ANY STATE SECURITIES LAWS, AND NEITHER THESE SECURITIES NOR ANY INTEREST HEREIN MAY BE OFFERED, SOLD, TRANSFERRED, PLEDGED OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT OR SUCH LAWS OR AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS."

Such shares may be subject to additional restrictions on transfer, and the certificate representing such shares shall have such additional legends, as imposed or required under the Stockholders Agreement or applicable state and federal securities law.

(v)     The Company will not close its books against the transfer of this Warrant or of any share of Common Stock issued or issuable upon the exercise of this Warrant in any manner which interferes with the timely exercise of this Warrant.

(vi)     The Company shall provide reasonable assistance and cooperation to any Registered Holder required to make any governmental filings or obtain any governmental approvals prior to or in connection with any exercise of this Warrant (including, without limitation, making any filings reasonably required to be made by the Company), provided that the foregoing shall not require the Company to incur or pay expenses in excess of $5,000.

(vii)     The Company shall notify the Registered Holder of any Conversion Event at least ten (10) days prior to the consummation or occurrence of such Conversion Event, which notice shall contain a summary of the material terms and conditions of such Conversion Event. The Registered Holder may provide an Exercise Agreement pursuant to Section 1B prior to such Conversion Event which is conditioned on the consummation or occurrence of such Conversion Event. In such event, the Registered Holder shall be deemed to have exercised this Warrant immediately prior to the consummation or occurrence of a Conversion Event (and such exercise shall not be deemed to be effective until the consummation or occurrence of such Conversion Event).

(viii)     The Company shall at all times reserve and keep available out of its authorized but unissued shares of Common Stock solely for the purpose of issuance upon the exercise of this Warrant. All shares of Common Stock that are so issuable shall, when issued in accordance with the terms of this Warrant, be duly and validly issued, fully paid and nonassessable and free from all taxes, liens and charges but subject to the Stockholders Agreement. The Company shall take all such actions as may be reasonably necessary to assure that all such shares of Common Stock may be so issued without violation of any applicable law or governmental regulation.

(ix)     No fractional shares of Common Stock shall be issued upon exercise of this Warrant. In lieu of any factional Exercise Shares to which the Registered Holder would

otherwise be entitled, the Registered Holder shall be entitled to receive a cash payment based on the fair market value of the Common Stock.

1B. <u>Exercise Agreement</u>. Upon any exercise of this Warrant, the Exercise Agreement will be substantially in the form set forth in <u>Exhibit I</u> hereto. Such Exercise Agreement will be dated the actual date of execution thereof.

1C. <u>Payment of Expenses and Taxes</u>. The Company shall pay all expenses and taxes imposed by law or any governmental agency, including any documentary stamp taxes, attributable to the issuance of Exercised Shares upon the exercise of this Warrant, unless any expense or tax is imposed upon the Registered Holder, in which case such expenses or taxes shall be paid by the Registered Holder. For the avoidance of doubt, nothing in this <u>Section 1C</u> shall make the Company liable for any income or other taxes payable by the Registered Holder and associated with the issuance of this Warrant or the exercise thereof.

Section 2. <u>Adjustment of Number of Exercise Shares</u>. In order to prevent dilution of the rights granted under this Warrant, the number of Exercise Shares shall be subject to adjustment from time to time as provided in this <u>Section 2</u>.

2A. <u>Subdivision or Combination of Common Stock</u>. If the Company at any time subdivides (by any stock split, stock dividend or otherwise) one or more classes of its outstanding shares of Common Stock into a greater number of shares, the number of Exercise Shares in effect immediately prior to such subdivision will be proportionately increased and the Exercise Price proportionately decreased. If the Company at any time combines (by reverse stock split, combination or otherwise) one or more classes of its outstanding shares of Common Stock into a smaller number of shares, the number of Exercise Shares in effect immediately prior to such combination will be proportionately decreased and the Exercise Price proportionately increased.

2B. <u>Reorganization, Reclassification, Consolidation, Merger or Sale</u>. Any recapitalization, reorganization, reclassification, consolidation, merger, with or into another Person or other transaction which is effected in such a way that holders of Common Stock are entitled to receive (either directly or upon subsequent liquidation) stock, securities, assets or other property with respect to or in exchange for Common Stock is referred to herein as "<u>Organic Change</u>." Prior to the consummation of any Organic Change which is not a Change of Control, the Company will make appropriate provision (in form and substance reasonably satisfactory to the Registered Holder) to ensure that the Registered Holder shall thereafter have the right to acquire and receive in lieu of or in addition to (as the case may be) the shares of Common Stock immediately theretofore acquirable and receivable upon the exercise of this Warrant, such shares of stock, securities, assets or other property ("<u>Exchangeable Property</u>") as may be issued or payable with respect to or in exchange for the number of shares of Common Stock immediately theretofore acquirable and receivable upon exercise of this Warrant had such Organic Change not taken place. In any such case, the Company shall make appropriate provision (in form and substance reasonably satisfactory to the Registered Holder) with respect to the Registered Holder's rights and interests to ensure that the provisions of this <u>Section 2</u> and <u>Section 4</u> will thereafter be applicable to this Warrant (including, in the case of any such consolidation, merger or sale in which the successor entity or purchasing entity is other than the Company, an

immediate adjustment of the Exercise Price in proportion to the Exchangeable Property receivable for each share of Common Stock reflected by the terms of such consolidation, merger or sale, and a corresponding immediate adjustment in the number of Exercise Shares).

2C.    Certain Other Actions.  The Company shall take all such actions as may be reasonably necessary under the Delaware General Corporation Law in order that the Company may validly and legally issue fully paid and nonassessable shares of Common Stock upon the exercise of this Warrant from time to time outstanding.

2D.    Notices.

(i)    As soon as practicable following any adjustment of the number of Exercise Shares, the Company will give written notice thereof to the Registered Holder, setting forth in reasonable detail and certifying the calculation of such adjustment.

(ii)    The Company will give written notice to the Registered Holder at least ten (10) days prior to the date on which the Company closes its books or takes a record (A) with respect to any dividend or distribution upon the Common Stock, (B) with respect to any pro rata subscription offer to all holders of Common Stock or (C) for determining rights to vote with respect to any Organic Change, dissolution or liquidation.

(iii)    The Company will also give written notice to the Registered Holder at least five (5) days prior to the date on which any Organic Change, dissolution or liquidation will take place.

Section 3.    Definitions.  The following terms have meanings set forth below:

"Change of Control" means, whether in a single transaction or a series of related transactions, and whether or not the Company is a party thereto, (i) a sale or transfer of shares of Common Stock (including new issuances by the Company and secondary transfers by stockholders) to a purchaser or purchasers which results in such purchaser(s) owning a majority of the issued and outstanding shares of capital stock of the Company, (ii) a sale, transfer or other disposition of all or substantially all of the assets of the Company and its direct and indirect subsidiaries or (iii) a merger, consolidation, combination, recapitalization or similar transaction involving the Company or any of its direct or indirect subsidiaries (other than solely among or between the Company and any of its subsidiaries) where, after giving effect to such transactions(s), (a) the Company is not the surviving entity or (b) stockholders holding a majority of the Common Stock immediately prior to the such transaction(s) no longer have the ability to elect at least a majority of the board of directors of the Company.

"Common Stock" means, collectively, the common stock, $0.01 par value, of the Company.

"Conversion Event" means the consummation of (i) any Change of Control or (ii) the initial public offering and sale of the Common Stock (other than on Forms S-4 or S-8 or their equivalent) pursuant to an effective registration statement filed by the Company under the Securities Act.

"Expiration Date" means the earliest to occur of (x) the tenth (10th) anniversary of the Plan Effective Date and (y) any Conversion Event.

"Person" means any individual, corporation, company, partnership, limited liability company, trust or other group or entity (including any court, government or agency, commission, board or authority thereof, federal, state or local, domestic, foreign or multinational.

"Plan Effective Date" means [●], 2010.

Section 4.    No Voting Rights; Limitations of Liability.  This Warrant shall not entitle the Registered Holder to any voting rights or other rights of a stockholder of the Company.  No provision hereof, in the absence of affirmative action by the Registered Holder to purchase Common Stock, and no enumeration herein of the rights or privileges of the Registered Holder shall give rise to any liability of such Registered Holder for the Exercise Price of Common Stock acquirable by exercise hereof or as a stockholder of the Company.

Section 5.    [Intentionally Omitted].

Section 6.    Warrant Exchangeable for Different Denominations.  This Warrant is exchangeable, upon the surrender hereof by the Registered Holder at the principal office of the Company, for new Warrants of like tenor representing in the aggregate the purchase rights hereunder, and each of such new Warrants will represent such portion of such rights as is designated by the Registered Holder at the time of such surrender.  The date the Company initially issues this Warrant will be deemed to be the "Date of Issuance" hereof and thereof regardless of the number of times new certificates representing the unexpired and unexercised rights formerly represented by this Warrant shall be issued.

Section 7.    Replacement.  Upon receipt of evidence reasonably satisfactory to the Company (including at the request of the Company an affidavit of the Registered Holder) of the ownership and the loss, theft, destruction or mutilation of any certificate evidencing this Warrant, and in the case of any such loss, theft or destruction, upon receipt of indemnity reasonably satisfactory to the Company or, in the case of any such mutilation upon surrender of such certificate, the Company shall execute and deliver in lieu of such certificate a new certificate of like kind representing the same rights represented by such lost, stolen, destroyed or mutilated certificate and dated the date of such lost, stolen, destroyed or mutilated certificate.

Section 8.    Notices.  Except as otherwise expressly provided herein, all notices referred to in this Warrant shall be in writing and shall be delivered personally, sent by reputable express courier service (charges prepaid) or sent by registered or certified mail, return receipt requested, postage prepaid and will be deemed to have been given when so delivered, one (1) day after being so sent or three (3) days after being so deposited in the U.S. Mail at the addresses set forth below:

(a) if to the Company, to:

Uno Restaurant Holdings Corporation
100 Charles Park Road
Boston, MA 02132
Facsimile No.: (617) 218-5375
Attn: Louie Psallidas

if to the Registered Holder, to:

c/o Centre Partners Management, LLC
30 Rockefeller Plaza, 50th Floor
New York, NY 10020
Facsimile No.: (212) 332-5801
Attn: Mr. Michael Schnabel

and/or such other persons and addresses as the Company or the Registered Holder shall have specified in writing to the other by notice as aforesaid.

Section 9. <u>Amendment and Waiver</u>. Except as otherwise provided herein, (i) the provisions of this Warrant may be amended and the Company may take any action herein prohibited, or omit to perform any act herein required to be performed by it, only if the Company has obtained the written consent of the Registered Holder) and (ii) no action may change the Exercise Price of this Warrant or the number of shares or class of stock obtainable upon exercise of this Warrant without the written consent of the Registered Holder.

Section 10. <u>Descriptive Headings; Governing Law</u>. The descriptive headings of the several Sections and paragraphs of this Warrant are inserted for convenience only and do not constitute a part of this Warrant. The construction, validity and interpretation of this Warrant will be governed by the internal law, and not the conflicts law, of the State of New York.

*   *   *   *   *

**IN WITNESS WHEREOF**, the Company has caused this Warrant to be signed and attested by its duly authorized officers under its corporate seal and to be dated the Date of Issuance hereof.

**Uno Restaurant Holdings Corporation**

By: _____

     Name:

     Title:

<u>EXHIBIT I</u>

<u>EXERCISE AGREEMENT</u>

To:

Dated:

         The undersigned, pursuant to the provisions set forth in the attached Warrant (Certificate No. W-__) (the "<u>Warrant</u>") , hereby agrees to subscribe for the purchase of _____ shares of the Common Stock covered by the Warrant and makes payment herewith in full therefor at the price per share provided by the Warrant.  This subscription shall be effective on [the later of] the date the Company has received this Exercise Agreement and the other items required under Section 1A(i) of the Warrant [[and _____, 20__] [the Exercise Event]].

         The undersigned acknowledges and agrees that immediately upon the issuance of shares of Common Stock pursuant to the Warrant and this Exercise Agreement it shall become (if not already) a party to the Stockholders Agreement as a ["Stockholder"] thereunder, and that all shares of Common Stock issued in connection with the exercise of the Warrant shall be subject to the terms of the Stockholders Agreement.

☐    **Check Box for Net Issue Exercise**

Signature_____

Address_____

## Exhibit B

## JOINDER

## JOINDER

The undersigned ("***Transferee***") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of ***January [___]***, 2010 (the "***Agreement***"), by and among Uno Restaurant Holdings Corporation, Uno Acquisition Parent, Inc., Uno Holdings, LLC, and Uno Holdings II, LLC (collectively, the "***Company***"), [***Transferor's Name***] ("***Transferor***"), and the other holders of claims against, and equity interests in, the Company signatory thereto, and agrees to be bound by the terms and conditions thereof to the extent Transferor was thereby bound, and shall be deemed a "***Party***" and a "***Consenting Noteholder***" under the terms of the Agreement, as if an original signatory thereto.

Date Executed: _____, 2010

[Transferee's name]

By:_____
    Name:_____
    Title:_____

Principal amount of Notes held:
$_____

Number of Equity Interests held:

_____

Date: _____

[Address]
Attention:
Fax: [*]
Email:

<u>**Schedule 1**</u>

**NOTICE ADDRESSES**

If to the Company, to:

Uno Restaurant Holdings Corporation
100 Charles Park Road
Boston, MA 02132
Facsimile No.: (617) 218-5375
Attn:  Louie Psallidas

with a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY  10153
Facsimile No.: (212) 310-8007
Attn:  Christopher Aidun
       Jeffrey Tanenbaum

If to Centre, to:

Centre Partners Management LLC
30 Rockefeller Plaza, 50th Floor
New York, NY 10020
Facsimile No.: (212) 332-5801
Attn:  Michael Schnabel

If to the Consenting Noteholders, to

Twin Haven Capital Partners, LLC [CONFIRM ADDRESS AND FAX]
[11111 Santa Monica Boulevard, Suite 525
Los Angeles, CA 90025
Facsimile No.:  (310) 689-5199]
Attn:  Robert Webster

Coliseum Capital Management, LLC
767 Third Avenue, 35th Floor
New York, NY 10017
Facsimile No.:  (212) 644-1001
Attn:  Adam Gray

With a copy to:

Akin Gump Strauss Hauer & Feld LLP

One Bryant Park
New York, NY 10036
Facsimile No.:  (212) 872-1002
Attn:   Michael Stamer, Esq.
        Philip Dublin, Esq.
        Kristina M. Wesch, Esq.