WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jeffrey L. Tanenbaum
Joseph H. Smolinsky

Attorneys for the Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                     :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| | : | |
| **UNO RESTAURANT HOLDINGS** | : | **Case No. 10-10209 (   )** |
| **CORPORATION,** *et al.* | : | |
| **Debtor.** | : | **(Joint Administration Requested)** |
| | : | |

-------------------------------------------------------------x

**MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL**
**ORDERS PURSUANT TO SECTIONS 105(a), 363(b), 364, 503(b)(9), 507(a)(2),**
**AND 1107(a) OF THE BANKRUPTCY CODE AUTHORIZING THE DEBTORS**
**TO PAY PREPETITION CLAIMS OF CERTAIN ESSENTIAL VENDORS**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

            Uno Restaurant Holdings Corporation and its debtor affiliates, as debtors and

debtors in possession in the above-captioned chapter 11 cases (collectively, **"Uno"** or the

**"Debtors"**), respectfully represent:

**Background**

            1.      On the date hereof (the **"Commencement Date"**), each of the Debtors

commenced with this Court a voluntary case under chapter 11 of title 11 of the United States

Code (the **"Bankruptcy Code"**). The Debtors are authorized to operate their businesses and

manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code. Contemporaneously herewith, the Debtors have filed a motion seeking joint

administration of their chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**).

2.     Additional information regarding the Debtors' businesses, capital structure, and the circumstances leading to these chapter 11 filings is contained in the Affidavit of Louie Psallidas Pursuant to Local Bankruptcy Rule 1007-2 in Support of First Day Motions and Applications (the **"Psallidas Affidavit"**) filed contemporaneously herewith.

<u>**Jurisdiction and Venue**</u>

3.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

<u>**Relief Requested**</u>

4.     By this motion (the **"Motion"**), the Debtors seek entry of an interim order, pursuant to sections 105(a), 363(b), 364, 503(b)(9), 507(a)(2), and 1107(a) of the Bankruptcy Code, (i) authorizing, but not directing, them to pay prepetition claims of certain of their vendors that are essential to maintaining the going-concern value of the Debtors' business enterprise (the **"Essential Vendors,"** whose prepetition claims shall be identified as **"Essential Vendor Claims"**) and (ii) scheduling a final hearing (the **"Final Hearing"**) to consider the relief requested on a final basis.

5.     These Essential Vendors are critical to maintaining and maximizing the going-concern value of the Debtors' restaurant business (the **"Restaurant Business"**) and consumer products business (the "**Consumer Products Business"**) because, among other reasons, they are the only source (or one of a handful of sources) for a particular food, product, supply, or service, or obtaining a replacement source would entail substantial delay or significantly increased costs.  Failure to pay these Essential Vendors would result in the Debtors

losing the ability to obtain the requisite food, products, supplies, and services necessary to operate their Restaurant Business and Consumer Products Business in an orderly and efficient manner. Payment of the Essential Vendor Claims is further justified because a substantial portion of such claims are in respect of goods received by the Debtors in the ordinary course of business within 20 days of the Commencement Date (the **"503(b)(9) Period"**) and thus are entitled to administrative expense priority under sections 503(b)(9) and 507(a)(2) of the Bankruptcy Code.

6. The Debtors estimate that the vast majority of the Essential Vendor Claims (approximately 85% overall) will become due and payable, in the ordinary course and consistent with past practices, in the 21 days after the Commencement Date. The Debtors seek an order authorizing, but not obligating, them to pay, in their sole discretion, the amounts needed to satisfy the Essential Vendor Claims that become due and payable prior to the Final Hearing.[1]

7. The Debtors also request that the Court authorize and direct banks and financial institutions (the **"Banks"**) at which the Debtors maintain disbursement and other accounts (the **"Bank Accounts"**), at the Debtors' instruction, to receive, honor, process, and pay, to the extent of funds on deposit, any and all checks (the **"Checks"**) or electronic funds transfers (the **"Electronic Transfers"**) relating to the Essential Vendor Claims.

### Uno's Businesses

8. Uno, headquartered in West Roxbury, Massachusetts, began operations in Chicago, Illinois in 1943 with its first restaurant, "Pizzeria Uno," serving its proprietary Chicago-style, deep-dish pizza. Over the following 67 years, Uno has expanded its brand to

---

[1] This amount may include amounts for prepetition claims the Debtors are seeking authority to pay under other orders entered by the Court in these chapter 11 cases. To the extent the requests for relief overlap, the Debtors, of course, do not seek authorization to make duplicative payments to the Essential Vendors.

US_ACTIVE:\43268197\06\99980.2300

include (i) restaurants operating under the Uno Chicago Grill®, (ii) quick-service venues operating under the Uno Due Go® and Uno Express® trade names, and (iii) an extensive consumer products business that manufactures products under the Uno® brand.

## I. *Restaurant Business*

9.      The Debtors own and operate 99 Uno Chicago Grill® full-service casual dining restaurants featuring Uno's signature Chicago-style, deep-dish pizza and a variety of other high quality, fresh, and flavorful menu items prepared daily.  Uno Chicago Grill® restaurants also offer full bar service and operate a successful take-out business.  A typical Uno Chicago Grill® restaurant ranges in size from approximately 5,800 to 6,200 square feet and has seating capacity for approximately 180 to 210 guests.  Although the Uno Chicago Grill® restaurants are concentrated in the Northeast and Mid-Atlantic regions of the United States, Uno Chicago Grill® restaurants are located in 28 states, the District of Columbia, Puerto Rico, South Korea, the United Arab Emirates, Honduras, Kuwait, and Saudi Arabia.  All restaurants outside the United States are franchised and not owned and operated by Uno.  As of September 2009, the Uno Chicago Grill® restaurants owned and operated by Uno accounted for approximately 86% of the Debtors' revenue or 67% of EBITDA (exclusive of SG&A costs).

## II. *Quick Service Venues*

10.      In addition to Uno's traditional Chicago Grill style restaurants under the Uno Chicago Grill® name, Uno owns two extensions of the brand:  Uno Express® and Uno Due Go®.  Uno Express® is a small footprint, quick-service kiosk format of the brand designed to sell Uno Foods' individual deep dish pizza, gourmet flat bread pizzas, and its hand tossed pizza by the slice.  Uno Express® kiosks are located in non-traditional venues such as movie theatres, food courts, sports complexes, colleges, travel plazas, and airports.  Uno generates revenue from

4

the sale of Uno Foods products (discussed below) at the 215 Uno Express® locations throughout the United States, which are operated by third parties. Uno Due Go® is a quick casual format of the Uno brand designed for a variety of traditional and non-traditional venues but with a slightly larger footprint and range of menu offerings than Uno Express®. There are two Uno Due Go® units which are operated by a franchisee and located in the Dallas Fort Worth airport.

### III.    *Consumer Products Business*

11.    The Debtors have capitalized on the Uno brand by developing a consumer products business through Uno Foods Inc. (**"Uno Foods"**), a Debtor, that produces a variety of Uno Chicago Grill® branded products, such as refrigerated and frozen deep-dish, thin crust, and hand tossed pizzas and pizza-related products for sale to supermarkets, membership club stores, airlines, hotels, movie theatres, schools, and a variety of other retail venues. Uno Foods' products are manufactured in Uno's 40,000 square-foot baking facility located in Brockton, Massachusetts (the **"Uno Foods Facility"**). As of September 2009, the Uno Foods' division accounted for approximately 12% of the Debtors' revenue or 15% of EBITDA (exclusive of SG&A costs).

### Obligations to Essential Vendors

### I.    *Essential Vendors of the Restaurant Business*

### A.    **Food, Product, and Supply Vendors**

12.    The Debtors rely on two Essential Vendors to provide the Uno Chicago Grill® restaurants with approximately 75% of their essential food, products, and supplies, in addition to critical services:

> ➢ US Foodservice, Inc. (**"USF"**), one of the largest broadline foodservice distributors in the United States, distributes essential food and products to all of the Uno Chicago Grill® restaurants using highly-integrated IT systems for ordering and processing. USF's supply and equipment division is utilized by

the Uno Chicago Grill® restaurants outside of the New England market for direct order and online purchasing of restaurant supplies (including smallwares, china, glass, pots and pans, silver, utensils, and linens) at wholesale prices. USF maintains relationships with the more than 200 individual vendors that supply food, products, and supplies to the Uno Chicago Grill® restaurants through USF's network. Approximately 73% of the essential food, products, and supplies needed to operate the Restaurant Business is delivered to the Uno Chicago Grill® restaurants by USF. The Debtors estimate that, as of the Commencement Date, they owed USF and its affiliate approximately $1,355,000, in the aggregate, for goods delivered to the Uno Chicago Grill® restaurants in the prepetition period.

➤ Perkins Paper, Inc. (**"Perkins"**), a leading wholesale supplier of paper products and other supplies for the foodservice industry, is a distributor of paper products, smallwares, and janitorial supplies to Uno Chicago Grill® restaurants in the New England area. The Debtors estimate that, as of the Commencement Date, they owed Perkins approximately $110,000 for goods delivered to the Uno Chicago Grill® restaurants in the prepetition period.

Both USF and Perkins are also Essential Vendors to the Consumer Products Business, as discussed below.

13. In connection with the normal operation of the Restaurant Business, the Debtors also rely on a handful of other Essential Vendors to supply food, products, supplies, and services to the Uno Chicago Grill® restaurants. Each of the Essential Vendors has developed a complex logistics system developed by the Essential Vendors to timely make deliveries at multiple geographic locations, often multiple times per day. Should these Essential Vendors cease supplying or rendering services to the Debtors, it would take substantial time to replace them. The Debtors estimate that, in addition to prepetition amounts owed to USF and Perkins, as of the Commencement Date, they owed these other Essential Vendors approximately $195,000, in the aggregate, for goods delivered and services rendered to the Uno Chicago Grill® restaurants in the prepetition period.

14. The Debtors typically pay for the food, products, and supplies from the above-referenced Essential Vendors within 7 to 30 days of receipt of such goods by the Uno

6

Chicago Grill® restaurants, with the majority paid for within 15 days of receipt. Prior to the

Commencement Date, the Debtors were paying their invoices within these payment terms. As

such, the vast majority of prepetition amounts owed in respect of food, products, and supplies

(approximately 93%) will become due and payable, in the ordinary course and consistent with

past practices, in the 21 days after the Commencement Date. Moreover, virtually all of the

amounts owed to the Essential Vendors as of the Commencement Date are in respect of goods

that are essential to the operation of the Restaurant Business and will have been received by the

Debtors within the 503(b)(9) Period. The Debtors estimate that, as of the Commencement Date,

they owed these Essential Vendors $1,537,359, in the aggregate, for goods delivered to the Uno

Chicago Grill® restaurants within the 503(b)(9) Period; this amount is approximately 93% of the

total prepetition amounts owed to these Essential Vendors.

**B.      Liquor Distributors**

15.     Approximately 20% of the Debtors' gross sales at the Uno Chicago Grill®

restaurants relate to the sale of various liquor, beer, wine, and other alcoholic beverages

(collectively, **"Liquor"**). Payment of any outstanding invoice for Liquor is critical for two

reasons. First, most of the Liquor supplied to the Uno Chicago Grill® restaurants is provided by

certain vendors who have exclusive territorial distribution rights in the areas in which the Uno

Chicago Grill® restaurants are located (the **"Liquor Distributors"**). Because the various Liquor

Distributors have the exclusive right to sell certain alcoholic beverages featured on the Uno

Chicago Grill® menu, the Liquor Distributors are irreplaceable. Second, and more importantly,

the laws of many states in which the Debtors operate mandate that retailers who have defaulted

on payments to any liquor wholesaler must purchase all alcoholic beverages from all wholesalers

on a cash (non-credit) basis until the original debt is repaid. Accordingly, if prepetition amounts

7

owed by the Debtors to the Liquor Distributors are not paid, the Liquor Distributors would be

obligated, under state law, to require that the Debtors pay for the Liquor in cash on delivery.

Forcing the Debtors to pay cash on delivery of Liquor as opposed to payment on normal payment

terms (typically, 30 days from invoice date) would impair the Debtors' liquidity to the detriment

of all stakeholders.

16.　　The Debtors estimate that, as of the Commencement Date, they owed the

Liquor Distributors approximately $465,000, in the aggregate, for Liquor delivered to the Uno

Chicago Grill® restaurants in the prepetition period.  The estimated $465,000 will become due

and payable in the 21 days after the Commencement Date.  Approximately 84% of this amount is

for Liquor delivered to the Uno Chicago Grill® restaurants within the 503(b)(9) Period and,

accordingly, claims for such amounts are afforded administrative expense priority status.  Failure

to pay these amounts in the ordinary course would jeopardize the Debtors' restructuring

initiatives and cause irreparable injury to the Debtors' estates.

## C.　　Restaurant Essential Service Providers

17.　　In the ordinary course of business, the Debtors engage a number of

mechanics and other service providers to repair and maintain equipment at Uno Chicago Grill®

restaurants nationwide, certain of which are intimately familiar with the Debtors' equipment and

cannot be easily replaced (the **"Restaurant Essential Service Providers"**).  Moreover, these

Restaurant Essential Service Providers may hold valid mechanics liens on the Debtors'

equipment under applicable state law[2] but, regardless, the Debtors seek authorization to pay

---

[2] For example, Section 108 of New York's Lien Law provides, in pertinent part:

> A person who makes, alters, repairs or performs work or services of any nature and
> description upon, or in any way enhances the value of an article of personal property, at the
> request or with the consent of the owner, has a lien on such article, while lawfully in
> possession thereof, for his reasonable charges for the work done and materials furnished, and
> may retain possession thereof until such charges are paid.

these Restaurant Essential Service Providers if it appears they might not otherwise provide services to the Debtors going forward. The Debtors estimate that, as of the Commencement Date, these Restaurant Essential Service Providers are owed approximately $110,000 for services rendered at the Uno Chicago Grill® restaurants prior to the Commencement Date, which is a small portion of the amounts owed to all of the mechanics and other service providers for services rendered at the Uno Chicago Grill® restaurants in the prepetition period (totaling approximately $900,000). By this Motion, the Debtors only request authority to pay the $110,000 owed to the Restaurant Essential Service Providers, if deemed necessary in their business judgment.

## II. *Essential Vendors of the Consumer Products Business*

### A. Food, Packaging, Paper Supply, and Other Supply Vendors

18. As with respect to the Restaurant Business, the two largest Essential Vendors for the Consumer Products Business are USF and Perkins:

> ➢ USF, by managing a supply and distribution chain of more than 200 individual vendors, is accountable for supplying and, in many instances, transporting to and storing at, the Uno Foods Facility approximately 60% of the products needed to operate the Consumer Products Business. USF delivers products to the Uno Foods Facility six days per week and at least two times per day. The Debtors estimate that, as of the Commencement Date, they owed USF approximately $495,000 for goods delivered to Uno Foods in the prepetition period.

> ➢ Perkins, located in close proximity to the Uno Foods Facility, supplies to Uno Foods all of the needed packaging supplies for the Consumer Products Business, including corrugated and retail boxes and essential components such as trays and susceptors. The corrugated and retail boxes are pre-printed to reflect the Uno brand name as well as customer-specific UPC bar codes and nutritional information for the various Uno Foods products. Because the Uno Foods Facility is unable to warehouse the packaging needs for the 125 product codes (SKUs) that are available on Uno Foods' price lists, Perkins acquires

---

N.Y. Lien Law § 108.

US_ACTIVE:\43268197\06\99980.2300

these packaging products and holds them on its warehouse floor awaiting orders from Uno Foods to fulfill production requirements; floor inventory can be 30 to 90 days' worth at any point in time. In connection with rendering these services, Perkins runs a shuttle service that delivers products to the Uno Foods Facility daily, typically one to three times per day. The Debtors estimate that, as of the Commencement Date, they owed Perkins approximately $155,000 for goods delivered to Uno Foods in the prepetition period.

In addition to USF and Perkins, Uno Foods relies on a number of other Essential Vendors to provide the Consumer Products Business with food, packaging, paper supplies, other supplies, and services. The Debtors estimate that, as of the Commencement Date, they owed these other Essential Vendors approximately $600,000, in the aggregate, for goods delivered to Uno Foods in the prepetition period for use in the Consumer Products Business.

19.     Certain of the Essential Vendors supply to Uno Foods particular food and supplies critical to the production of the Uno consumer products of which they are the sole source (or one in a handful of sources) or which are produced using proprietary recipes/formulas or are manufactured for specific use by Uno Foods in its Consumer Products Business. The ingredients used to manufacture the Uno consumer products, the nutritional information listing the ingredients contained therein, and the packaging of the finished products are fixed. If Uno Foods does not receive the food, supplies, and services necessary for its production process from the Essential Vendors, it will be either impossible, or time-consuming and extremely costly, to find alternative vendors. Moreover, because Uno Foods' products are taste-tasted and approved by its customers and tested with respect to the nutritional information contained on the packaging, needing to use a replacement ingredient or change nutritional information would disrupt the production process and severely impair Uno Foods' ability to satisfy its customers. Producing new nutritional information to reflect the inclusion of a new ingredient would take no less than five weeks, a delay that Uno Foods cannot afford. To ensure that the Consumer

Products Business production process is not adversely affected, it is imperative that the Debtors be authorized to pay the Essential Vendor Claims.

20.     As in the Restaurant Business, Uno Foods typically pays for the food, packaging, paper supplies, and other supplies from the above-referenced Essential Vendors within 7 to 30 days of receipt of such goods by Uno Foods, with the majority paid for within 15 days of receipt.  Prior to the Commencement Date, the Debtors were paying their invoices within the payment terms.  As such, the majority of prepetition amounts owed in respect of food, packaging, paper supplies, and other supplies (approximately 81%) will become due and payable, in the ordinary course and consistent with past practices, in the 21 days after the Commencement Date.  Moreover, almost all of the amounts owed to Essential Vendors as of the Commencement Date are in respect of goods that are essential to the operation of the Consumer Products Business and will have been received by the Debtors from these Essential Vendors within the 503(b)(9) Period.  The Debtors estimate that, as of the Commencement Date, they owed these Essential Vendors $1,141,231, in the aggregate, for goods delivered to Uno Foods within the 503(b)(9) Period; this amount is approximately 91% of the total prepetition amounts owed to these Essential Vendors.  Failure to pay these amounts in the ordinary course would jeopardize the Debtors' restructuring initiatives and cause immediate and irreparable harm to the Debtors' estates.

**B.     Brokers**

21.     As is customary in the consumer products industry, Uno Foods utilizes the services of a number of brokers (the **"Brokers"**) to generate business, including to market its products, and to facilitate sales of its products to over 4,000 valuable points of distribution.  The Brokers, paid on a commission basis, have direct relationships with Uno Foods' customers and,

in many respects, are the "face" of the Uno brand. Comprising more than 50% of the retail side of Uno Foods sales, the Brokers are an integral part of Uno Foods' sales efforts. If not paid on account of their prepetition commissions, the Brokers may refuse to garner business for Uno Foods on a going-forward basis and, at a minimum, their morale will be adversely impacted. Without the continued support of the Brokers, Uno Foods will not be in a position to take advantage of business opportunities in the marketplace, to the detriment of the Debtors and all stakeholders.

22.     The Debtors estimate that, as of the Commencement Date, they owed these Brokers approximately $30,000 in the aggregate for commissions earned in the prepetition period.

C.     **Uno Foods Essential Service Providers**

23.     In the ordinary course of business, Uno Foods engages a small group of essential service providers to repair and maintain their production equipment and other equipment in the Uno Foods Facility (the **"Uno Foods Essential Service Providers"**). These Uno Foods Essential Service Providers are intimately familiar with the equipment and the layout of the Uno Foods Facility and cannot be easily replaced. Moreover, these Uno Foods Essential Service Providers may hold valid mechanics liens on the Debtors' equipment but, regardless, the Debtors seek authorization to pay these Uno Foods Essential Service Providers if it appears they might not otherwise provide services to the Debtors going forward. The Debtors estimate that, as of the Commencement Date, the Uno Foods Essential Service Providers are owed $35,000 for services rendered at the Uno Foods Facility prior to the Commencement Date.

US_ACTIVE:\43268197\06\99980.2300

## Basis for Relief Requested

24.     The Debtors have carefully examined whether the payment of the Essential Vendor Claims is necessary.  In order to determine which of the Debtors' vendors are critical to their ability to operate the Restaurant Business and the Consumer Products Business without interruption, the Debtors' senior management undertook the following analysis:

- The Debtors first identified all vendors who supply good and services used in the Restaurant Business and Consumer Products Business.  Of this total universe of vendors, the Debtors then analyzed whether (a) the failure to pay the prepetition claims of such vendors would, in the Debtors' business judgment, result in a substantial risk that such vendors may refuse to provide goods or services to the Debtors during the postpetition period, (b) the enforcement of a contract with a vendor that refuses to ship product or provide services could be accomplished in a timely and cost-efficient manner without unduly disrupting the Debtors' operations in light of all relevant circumstances, and (c) the Debtors had received goods from such vendors in the ordinary course of business within the 503(b)(9) Period.

- The Debtors then identified which of the vendors are unique in that they (a) are the sole (or only feasible) source for the supply of goods or services used in the Restaurant Business or the Consumer Products Business, (b) meet certain quality requirements or other specifications of the Debtors that would prevent the Debtors from obtaining the goods or services from alternative sources, (c) provide materials that have been specially manufactured for use in the Restaurant Business or the Consumer Products Business, (d) are geographically located close to the Debtors' operations such that transportation and/or other cost savings associated with the Debtors' purchase of their goods or use of their services cannot be replicated by replacement vendors, (e) have so integrated their operations with those of the Debtors that it would be costly, impractical, disruptive, and imprudent for the Debtors to change vendors, or (f) provide significant cost savings or other advantageous terms to the Debtors if they purchase goods from such vendors or utilize such vendors' services.

25.     Applying the criteria set forth above, members of senior management determined that making payments on account of the Essential Vendor Claims, the sum of which may be small in comparison to the immediate and irreparable harm to the Debtors if not paid immediately, is essential to the continuation of the Restaurant Business and the Consumer

13

Products Business and critical to the Debtors' reorganization efforts. Absent payment of the Essential Vendor Claims, the Debtors believe that the Essential Vendors will likely refuse to provide goods or services or refuse to provide goods and services on reasonable credit terms. Without a seamless transition of the provision of goods and services by the Essential Vendors after the Commencement Date, the Debtors would experience an immediate shutdown of their Restaurant Business and Consumer Products Business. The payment of the Essential Vendor Claims as requested herein is intended to ensure there is no disruption in the Debtors' ability to obtain the goods and services necessary to the operation of the Restaurant Business and the Consumer Products Business.

26. Of course, while the Debtors seek authority to make payments on account of the Essential Vendor Claims, the Debtors will seek to make such payments only where nonpayment of such claims would put at risk the delivery of goods and/or the provision of services that are essential to the Debtors' operations and if the value to the Debtors' estates of a continued relationship with the Essential Vendors is equal to or greater than the amount owed to such vendors. Thus, the Debtors submit that the relief requested is narrowly tailored to facilitate the Debtors' reorganization process. Under these circumstances, the Debtors should be able to exercise their discretion and business judgment to pay the Essential Vendor Claims.

**Proposed Terms and Conditions of Payment of Essential Vendor Claims**

27. The Debtors propose to condition payment of any Essential Vendor Claim on that Essential Vendor's binding agreement to continue supplying its goods or rendering its services to the Debtors on Customary Trade Terms (as defined below). To facilitate this process, the Debtors propose that each Essential Vendor that the Debtors, in their sole discretion, elect to

pay in accordance with this Motion execute a simple letter agreement (the **"Essential Vendor Agreement"**) containing terms substantially similar to the following:

a.   in the Debtors' sole discretion, the Debtors will make all payments, in cash, due the Essential Vendor for pre-Commencement Date transactions, on the due date or as soon as reasonably practicable thereafter;

b.   the Essential Vendor agrees, through the effective date of a chapter 11 plan, to be bound by the Customary Trade Terms (as defined below), which shall include, but not be limited to, credit terms, historical pricing conventions, historical product volumes, cash discounts, payment terms, allowances, rebates, normal product mix and availability, and other applicable terms and programs acceptable to the Debtors, so long as the Debtors are not then in postpetition default;

c.   the **"Customary Trade Terms"** shall be defined as those trade terms with the Essential Vendor that were in effect the day prior to the Commencement Date;

d.   the Essential Vendor acknowledges that it has reviewed the terms and provisions of this Motion and the order approving this Motion and consents to be bound thereby;

e.   the Essential Vendor agrees that, to the extent it has received payment from the Debtors of its Essential Vendor Claim but subsequently refuses to supply goods or services to the Debtors on Customary Trade Terms, all payments made to such Essential Vendor with respect to its Essential Vendor Claim shall be deemed to have been made in payment of the Essential Vendor's then-outstanding postpetition claims; provided, however, that the Debtors reserve the right to require that the Essential Vendor immediately repay the Debtors the amount of any payment made to the Essential Vendor with respect to its Essential Vendor Claim in excess of the postpetition claim of such Essential Vendor, without giving effect to any rights of setoff, recoupment, reclamation, or otherwise; and

f.   the Essential Vendor (i) waives any right it might otherwise have to file or otherwise assert against any of the Debtors, their estates, their affiliates, or any other person or entity, or any of the respective assets or property of the foregoing (whether real or personal), any claim (including, but not limited to, any reclamation claim or similar claim, including any claim under section 503(b)(9) of the Bankruptcy Code), proof of claim, or lien (regardless of the statute or other legal authority upon which such claim, proof of claim, or lien is asserted) related in any way to any remaining prepetition amounts allegedly owed to such vendor by the Debtors arising from agreements or transactions entered into prior to the Commencement Date and (ii) where applicable, agrees to take (at its own expense) all necessary steps to withdraw, discharge, or remove any claim, proof of claim, or lien obtained prior to receipt of payment of the Essential Vendor

US_ACTIVE:\43268197\06\99980.2300

Claim if such vendor has taken steps to file or assert such a claim, proof of claim, or lien prior to payment of the Essential Vendor Claim.

28. By this Motion, the Debtors seek an order authorizing, but not directing, them to enter into Essential Vendor Agreements when they determine, in their business judgment, that payment of such Essential Vendor Claims is necessary and that such agreements are in the best interests of the Debtors and their estates. In connection therewith, the Debtors reserve the right, in their sole discretion, to negotiate new trade terms with any Essential Vendor as a condition to payment of any Essential Vendor Claim. In addition, the Debtors reserve the right to contest the invoice of an Essential Vendor on any grounds.

29. Moreover, notwithstanding the continuation of Customary Trade Terms, this Motion should not be construed as an assumption of any executory contract or unexpired lease between the Debtors and any of the Essential Vendors, nor should it be construed as a rejection of any executory contract or unexpired lease with any creditor. The Debtors are in the process of reviewing these matters and reserve all of their rights with respect to the assumption or rejection of all executory contracts and unexpired leases.

## **Applicable Authority**

30. The relief requested in this Motion is supported by established authority under sections 363 and 364 of the Bankruptcy Code, see, e.g., In re Tropical Sportswear Int'l Corp., 320 B.R. 15, 20 (Bankr. M.D. Fla. 2005), and under sections 1107(a) and 1108 of the Bankruptcy Code, which vest a debtor in possession with authority to continue operating its business during the pendency of a chapter 11 case. In addition, courts regularly have authorized payment of prepetition obligations under section 105(a) of the Bankruptcy Code, which allows the Court to enter any order "necessary or appropriate" to carry out the provisions of the Bankruptcy Code. In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989). The

US_ACTIVE:\43268197\06\99980.2300

relief requested in this Motion is further supported by the fact that the majority of the amounts owed to the Essential Vendors are in respect of goods received by the Debtors within the 503(b)(9) Period. Accordingly, these Essential Vendor Claims are entitled to administrative priority status under section 503(b)(9) of the Bankruptcy Code and must be paid in full on the effective date of a plan. As such, payment of such claims is only a matter of timing and not of right, and the Court has discretion to authorize payment of such administrative expense claims earlier than the effective date of a plan if payment is "necessary."

***The Court May Authorize Payment of the Essential Vendor***
***Claims Pursuant to Sections 363 and 364 of the Bankruptcy Code***

31.     The Court may grant the relief requested herein pursuant to sections 363 and 364 of the Bankruptcy Code. See, e.g., Tropical Sportswear Int'l Corp., 320 B.R. at 20 ("Bankruptcy courts recognize that section 363 is a source for authority to make critical vendor payments, and section 105 is used to fill in the blanks."); In re UAL Corp., Ch. 11 Case No. 02-48191 (ERW) (Bankr. N.D. Ill. Dec. 11, 2002) (pursuant to sections 363 and 364, court authorized the debtors to pay prepetition claims of essential trade creditors because the relief requested was "essential to the continued operation of the Debtors' businesses").

32.     The Debtors propose to pay certain Essential Vendor Claims on the condition that each Essential Vendor agrees to extend postpetition credit or provide other valuable consideration in exchange for payment. By providing value to the Debtors, principally in the form of postpetition credit extensions, these Essential Vendors may be compensated pursuant to section 364 of the Bankruptcy Code. The Essential Vendors' provision of "new value" in exchange for payment of their Essential Vendor Claims warrants approval of the relief requested in this Motion pursuant to section 363(b) of the Bankruptcy Code.

US_ACTIVE:\43268197\06\99980.2300

33.     Further, as discussed above, the continued flow of food, liquor, product, and supplies provided by the Essential Vendors is vital to the operations of the Restaurant Business and the Consumer Products Business.  Indeed, the consequences of not granting the relief requested herein would be devastating.

***Payment of the Essential Vendor Claims Is an***
***Appropriate Exercise of the Debtors' Fiduciary Duties***

34.     The Debtors, as debtors in possession, are fiduciaries operating their business for the benefit of creditors and other parties in interest.  As fiduciaries, the Debtors have a duty to protect and preserve their estates and maximize value for all stakeholders.

35.     In In re CoServe, LLC, 273 B.R. 487, 498 (Bankr. N.D. Tex. 2002), the court enunciated three considerations for determining whether payment of prepetition claims was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant.  Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim.  Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

Id.

36.     Here, all of these circumstances exist and clearly support the relief requested.  The Debtors undoubtedly must deal with the Essential Vendors and, as stated, the harm, loss of economic advantage, and loss of value that will be incurred in the absence of the relief sought herein far outweigh the amount of prepetition claims that may be paid.  Finally, it is patently clear that in view of the nature of the Debtors' vendor base, there is no practical alternative to the relief sought if business operations are to continue and a successful reorganization is to be achieved.

***The Court May Authorize Payment of the Essential Vendor***
***Claims Pursuant to Its General Equitable Powers Under Section***
***105(a) of the Bankruptcy Code and the "Necessity of Payment" Doctrine***

37.     The Debtors' proposed payment of the Essential Vendor Claims also should be authorized pursuant to section 105(a) of the Bankruptcy Code and the "doctrine of necessity."

38.     Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."  In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989).  "Under [Section] 105, the court can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor."  In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) (citing Ionosphere Clubs, 98 B.R. at 177); see In re Just for Feet, Inc., 242 B.R. 821, 825 (D. Del. 1999) (holding that court is authorized under section 105(a) to allow immediate payment of prepetition claims of vendors found to be critical to the debtor's reorganization) (citing In re Penn Central Transp. Co., 486 F.2d 519 (3d Cir. 1973)).

39.     In a long line of well-established cases, federal courts consistently have permitted postpetition payment of prepetition obligations where necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors.  See, e.g., Miltenberger v. Logansport Ry., 106 U.S. 286, 312 (1882) (payment of pre-receivership claim permitted to prevent "stoppage of [crucial] business relations"); In re Lehigh Co. & New Eng. Ry. Co., 657 F.2d 570, 581 (3d Cir. 1981) (holding that "if payment of a claim which arose prior to reorganization is essential to the continued operation of the . . . [business] during reorganization,

payment may be authorized even if it is made out of [the] corpus"); <u>Dudley v. Mealey</u>, 147 F.2d 268 (2d Cir. 1945), <u>cert. denied</u>, 325 U.S. 873 (1945) (Second Circuit extends doctrine for payment of prepetition claims beyond railroad reorganization cases).

        40.     The "doctrine of necessity" functions in a chapter 11 reorganization as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code. <u>See</u> <u>Just for Feet</u>, 242 B.R. at 825 (finding that "to invoke the necessity of payment doctrine, a debtor must show that payment of the prepetition claims is critical to the debtor's reorganization"); <u>In re Columbia Gas Sys., Inc.</u>, 136 B.R. 930, 939 (Bankr. D. Del. 1992) (recognizing that "[i]f payment of a pre-petition claim is essential to the continued operation of [the debtor], payment may be authorized"); <u>In re Boston & Me. Corp.</u>, 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing the existence of a judicial power to authorize trustees to pay claims for goods and services that are indispensably necessary to the debtors' continued operation). The doctrine is frequently invoked early in a reorganization, particularly in connection with those Bankruptcy Code sections that relate to payment of prepetition claims. In <u>In re Structurelite Plastics Corp.</u>, 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988), the court indicated its accord with "the principle that a bankruptcy court may exercise its equity powers under section 105(a) to authorize payment of prepetition claims where such payment is necessary 'to permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately.'" <u>Id.</u> The court stated that "a per se rule proscribing the payment of prepetition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code." <u>Id.</u> at 932. The rationale for the "doctrine of necessity" rule is consistent with the paramount goal of chapter 11 – "facilitating the continued operation and rehabilitation of the debtor." <u>Ionosphere Clubs</u>, 98 B.R. at 176.

US_ACTIVE:\43268197\06\99980.2300

41.     As stated above, the payment of the Essential Vendor Claims is critical. Without this relief, the Debtors' assets will permanently lose significant value. Under these circumstances, the exercise of the Court's equitable powers to grant the relief requested in this Motion is not only appropriate but also essential to the preservation of value for all stakeholders. Moreover, courts in this District have granted similar relief in other chapter 11 cases. See, e.g., In re Gen. Motors Corp., et al., Ch. 11 Case No. 09-50026 (REG) (Bankr. S.D.N.Y. June 25, 2009) [Docket No. 2533]; In re U.S. Shipping Partners L.P., et al., Ch. 11 Case No. 09-12711 (RDD) (Bankr. S.D.N.Y. June 17, 2009) [Docket No. 197]; In re Gen. Growth Props., Inc., et al., Ch. 11 Case No. 09-11977 (ALG) (Bankr. S.D.N.Y. May 11, 2009) [Docket No. 466]; In re Lyondell Chem. Co., et. al., Ch. 11 Case No. 09-10023 (REG) (Bankr. S.D.N.Y. Jan. 23, 2009) [Docket No. 360]; In re Bally Total Fitness of Greater New York, Inc., et. al., Ch. 11 Case No. 08-14818 (BRL) (Bankr. S.D.N.Y. Jan. 7, 2009) [Docket No. 388].[3] The Debtors submit that similar authorization is appropriate in these chapter 11 cases.

42.     Due to the nature of the Restaurant Business and the Consumer Products Business and the importance of the Essential Vendors to the Debtors, it is absolutely necessary that the Debtors be authorized to pay the Essential Vendor Claims. Failure to pay the Essential Vendor Claims will have a debilitating effect on the Debtors' ability to continue their businesses. If the Essential Vendors refuse to provide goods and services to the Debtors, or refuse to provide such goods or services on reasonable credit terms, the Debtors will face a major supply disruption and will be forced to incur significant costs to find alternative suppliers (and, in many instances, may not be able to find alternative suppliers) or will be forced to completely shut down their operations. Such a result would be detrimental to all parties in interest.

---

[3] Because of the voluminous nature of the unreported orders cited herein, such orders are not annexed to the Motion. Copies of these orders are available upon request of Debtors' counsel.

***The Court May Authorize Immediate Payment of Certain of the***
***Essential Vendor Claims Because Such Claims are Entitled to Administrative***
***Expense Priority Status Pursuant to Section 503(b)(9) of the Bankruptcy Code***

43.     Section 503(b)(9) of the Bankruptcy Code provides that claims for "the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business" are entitled to administrative expense priority status.  11 U.S.C. § 503(b)(9).  Section 1129(a)(9) of the Bankruptcy Code requires that administrative expense claims of a kind specified in section 507(a)(2) of the Bankruptcy Code must be satisfied in cash on the effective date of a plan.  11 U.S.C. §§ 1129(a)(2), 507(a)(2).

44.     The Court, however, has discretion to grant the Debtors authority to pay the administrative expense claims of the Essential Vendors at the outset of these chapter 11 cases under section 503(b)(9) of the Bankruptcy Code.  In two unpublished decisions following the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act, courts have held that the decision of whether to allow payment of section 503(b)(9) claims before confirmation of a debtor's plan is within the court's discretion.  In re Bookbinders' Rest., Inc., Ch. 11 Case No. 06-12302, 2006 WL 3858020, at *4 (Bankr. E.D. Pa. Dec. 28, 2006); In re Global Home Prods., LLC, Case No. 06-10340, 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006).  In both cases, the courts weighed the prejudice to the debtors of paying early in the case, the hardships to the 503(b)(9) claimant if the debtor did not pay, and the potential detriment to other creditors. Global Home Prods., 2006 WL 3791955, at *4 (citing In re Garden Ridge Corp., 323 B.R. 136, 143 (Bankr. D. Del. 2005)); Bookbinders' Restaurant, 2006 WL 3858020, at *4 (same).

45.     Because the majority of the Essential Vendor Claims are afforded administrative priority status under section 503(b)(9) of the Bankruptcy Code, it is merely a

22

question of timing, as prepetition unsecured creditors will not be prejudiced by the Debtors'

payment of those Essential Vendor Claims at the outset of these chapter 11 cases as opposed to

on the effective date of a plan.  Indeed, the stakeholders in these chapter 11 cases would be

prejudiced if the Debtors were <u>not</u> able to pay these claims and the Debtors were forced to accept

onerous trade terms or find alternate suppliers at a higher cost.  Further, payment of the Essential

Vendor Claims will not create an imbalance in the Debtors' cash flow because payment of these

claims will allow the Debtors to continue operating the Restaurant Business and the Consumer

Products Business, which, in turn, will generate additional revenues from which the Debtors and

their creditors will benefit.

46.     Similar priority vendor relief has been granted in other chapter 11 cases in

this District.  <u>See, e.g.</u>, <u>In re U.S. Shipping Partners L.P., et al.</u>, Ch. 11 Case No. 09-12711

(RDD) (Bankr. S.D.N.Y. June 17, 2009) [Docket No. 197]; <u>In re Lenox Sales, Inc., et al.</u>, Ch. 11

Case No. 08-14679 (MG) (Bankr. S.D.N.Y. Jan. 22, 2009) [Docket No. 240]; <u>In re Bally Total</u>

<u>Fitness of Greater New York, Inc., et. al.</u>, Ch. 11 Case No. 08-14818 (BRL) (Bankr. S.D.N.Y.

Jan. 7, 2009) [Docket No. 388]; <u>In re Dana Corp.</u>, Ch. 11 Case No. 06-10354 (BRL) (Bankr.

S.D.N.Y. Mar. 29, 2006) [Docket No. 722].

***Applicable Banks Should Be Directed to Honor and***
***Process Checks and Transfers Related to the Essential Vendors***

47.     In furtherance of the relief requested herein, the Debtors request that the

Court authorize and direct the Banks, at the Debtors' instruction, to receive, honor, process, and

pay, to the extent of funds on deposit, any and all Checks or Electronic Transfers requested or to

be requested by the Debtors relating to the Essential Vendor Claims, including those Checks or

Electronic Transfers that have not cleared the Banks as of the Commencement Date, without the

need for further Court approval.

US_ACTIVE:\43268197\06\99980.2300

48.     The Debtors also seek authority to replace any prepetition Checks or Electronic Transfers relating to the Essential Vendor Claims that may be dishonored or rejected. Each of the Checks or Electronic Transfers can be readily identified as relating directly to the authorized payment of the Essential Vendor Claims.  The Debtors believe that prepetition Checks and Electronic Transfers, other than for the Essential Vendor Claims, or those authorized by another order of the Court, will not be honored inadvertently.  The Debtors also request that the Banks be authorized and directed to rely on the representations of the Debtors as to which Checks and Electronic Transfers are in payment of the Essential Vendor Claims.

### The Debtors Have Satisfied Bankruptcy Rule 6003

49.     Bankruptcy Rule 6003 provides that to the extent "relief is necessary to avoid immediate and irreparable harm," a bankruptcy court may approve a motion to "pay all or part of a claim that arose before the filing of the petition" prior to 21 days after the Commencement Date.  Fed. R. Bankr. P. 6003.  As described herein and in the Psallidas Affidavit, the continuity and viability of the Debtors' business operations relies heavily on the uninterrupted delivery of food, liquor, product, supplies, and services provided by the Essential Vendors.  The failure of any Essential Vendor to deliver food, liquor, product, and supplies or to render necessary services to the Restaurant Business and the Consumer Products Business would have immediate and detrimental consequences to the Debtors' business operations and would decrease value to the detriment and prejudice of all stakeholders.  Accordingly, the Debtors submit that the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and, therefore, Bankruptcy Rule 6003 is satisfied.

US_ACTIVE:\43268197\06\99980.2300

## Waiver of Bankruptcy Rules 6004(a) and (h)

50.     To implement the foregoing immediately, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## Notice

51.     No trustee, examiner, or creditors' committee has been appointed in these chapter 11 cases.  The Debtors have served notice of this Motion on (a) the Office of the United States Trustee for the Southern District of New York, (b) counsel to the informal group of the Debtors' prepetition junior secured noteholders, (c) U.S. Bank National Association, as indenture trustee for the Debtors' prepetition junior secured noteholders, (d) Wells Fargo Foothill, Inc., as administrative agent for the Debtors' prepetition senior secured lenders and its counsel, (e) counsel to the proposed debtor in possession lenders, and (f) those creditors holding the thirty (30) largest unsecured claims against the Debtors' estates (on a consolidated basis) (collectively, the **"Notice Parties"**).  The Debtors submit that no other or further notice need be provided.

52.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

US_ACTIVE:\43268197\06\99980.2300

WHEREFORE the Debtors respectfully request entry of an order, substantially similar to the proposed form of order attached hereto as <u>Exhibit A</u>, granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: January 20, 2010
      New York, New York

/s/ Joseph H. Smolinsky
Jeffrey L. Tanenbaum
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile:  (212) 310-8007

*Proposed Attorneys for the*
*Debtors and Debtors in Possession*

US_ACTIVE:\43268197\06\99980.2300

**Exhibit A**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
                               :

In re                            :        **Chapter 11**
                                :

**UNO RESTAURANT HOLDINGS**     :        **Case No. 10-10209 (   )**
**CORPORATION,** *et al.*           :
                **Debtor.**     :        **(Jointly Administered)**
                                :
-----------------------------------------------------------------x

### INTERIM ORDER PURSUANT TO SECTIONS 105(a), 363(b), 364, 503(b)(9), 507(a)(2), AND 1107(a) OF THE BANKRUPTCY CODE AUTHORIZING THE DEBTORS TO PAY PREPETITION CLAIMS OF CERTAIN ESSENTIAL VENDORS

Upon the motion (the **"Motion"**)[1] of Uno Restaurant Holdings Corporation and

its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases

(collectively, **"Uno"** or the **"Debtors"**), for an order, pursuant to sections 105(a), 363(b), 364,

503(b)(9), 507(a)(2), and 1107(a) of chapter 11 of title 11 of the United States Code (the

**"Bankruptcy Code"**), (i) authorizing, but not directing, the Debtors to pay prepetition claims of

certain of their vendors that are essential to maintaining the going-concern value of the Debtors'

business enterprise (the **"Essential Vendors,"** whose prepetition claims shall be identified as

**"Essential Vendor Claims"**), (ii) authorizing banks and financial institutions (the **"Banks"**) at

which the Debtors maintain disbursement and other accounts (the **"Bank Accounts"**), at the

Debtors' instruction, to receive, honor, process, and pay, to the extent of funds on deposit, any

and all checks (the **"Checks"**) or electronic funds transfers (the **"Electronic Transfers"**)

relating to the Essential Vendor Claims, and (iii) scheduling a final hearing (the **"Final**

**Hearing"**) to consider the relief requested on a final basis, all as more fully described in the

Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to

Bankruptcy Judges for the Southern District of New York Any and All Proceedings Under Title

11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief

requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of

the Motion having been provided to the Notice Parties, and it appearing that no other or further

notice need be provided; and a hearing having been held to consider the relief requested in the

Motion (the **"Interim Hearing"**); and upon the record of the Interim Hearing and all of the

proceedings had before the Court; and upon the Psallidas Affidavit; and the Court having found

and determined that the relief sought in the Motion is in the best interests of the Debtors, their

estates and creditors, and all parties in interest and that the legal and factual bases set forth in the

Motion establish just cause for the relief granted herein; and after due deliberation and sufficient

cause appearing therefor, it is

ORDERED that the Motion is granted on an interim basis as provided herein; and

it is further

ORDERED that the Debtors are authorized, but not directed, in the reasonable

exercise of their business judgment, to pay all, or a portion, of the Essential Vendor Claims that

come due prior to the Final Hearing, upon such terms and to the extent of the amounts estimated

in the Motion; and it is further

ORDERED that the Debtors are authorized, but are not directed, in their sole

discretion, to seek to cause each Essential Vendor to enter into an Essential Vendor Agreement

with the Debtors as a condition to payment of its Essential Vendor Claim that includes terms

substantially similar to the following:

2

(a) in the Debtors' sole discretion, the Debtors will make all payments, in cash, due the Essential Vendor for pre-Commencement Date transactions, on the due date or as soon as reasonably practicable thereafter;

(b) the Essential Vendor agrees, through the effective date of a chapter 11 plan, to be bound by the Customary Trade Terms (as defined below), which shall include, but not be limited to, credit terms, historical pricing conventions, historical product volumes, cash discounts, payment terms, allowances, rebates, normal product mix and availability, and other applicable terms and programs acceptable to the Debtors, so long as the Debtors are not then in postpetition default;

(c) the **"Customary Trade Terms"** shall be defined as those trade terms with the Essential Vendor that were in effect the day prior to the Commencement Date;

(d) the Essential Vendor acknowledges that it has reviewed the terms and provisions of this Motion and the order approving this Motion and consents to be bound thereby;

(e) the Essential Vendor agrees that, to the extent it has received payment from the Debtors of its Essential Vendor Claim but subsequently refuses to supply goods or services to the Debtors on Customary Trade Terms, all payments made to such Essential Vendor with respect to its Essential Vendor Claim shall be deemed to have been made in payment of the Essential Vendor's then-outstanding postpetition claims; provided, however, that the Debtors reserve the right to require that the Essential Vendor immediately repay the Debtors the amount of any payment made to the Essential Vendor with respect to its Essential Vendor Claim in excess of the postpetition claim of such Essential Vendor, without giving effect to any rights of setoff, recoupment, reclamation, or otherwise; and

(f) the Essential Vendor (i) waives any right it might otherwise have to file or otherwise assert against any of the Debtors, their estates, their affiliates, or any other person or entity, or any of the respective assets or property of the foregoing (whether real or personal), any claim (including, but not limited to, any reclamation claim or similar claim, including any claim under section 503(b)(9) of the Bankruptcy Code), proof of claim, or lien (regardless of the statute or other legal authority upon which such claim, proof of claim, or lien is asserted) related in any way to any remaining prepetition amounts allegedly owed to such vendor by the Debtors arising from agreements or transactions entered into prior to the Commencement Date and (ii) where applicable, agrees to take (at its own expense) all necessary steps to withdraw, discharge, or remove any claim, proof of claim, or lien obtained prior to receipt of payment of the Essential Vendor Claim if such vendor has taken steps to file or assert such a claim, proof of claim, or lien prior to payment of the Essential Vendor Claim.

; and it is further

ORDERED that if the Essential Vendor refuses to supply goods and/or services to the Debtors on Customary Trade Terms (or such other terms as are agreed by the parties) following receipt of payment of its Essential Vendor Claim (regardless of whether such Essential Vendor has entered into an Essential Vendor Agreement), or fails to comply with any Essential Vendor Agreement entered into between such Essential Vendor and the Debtors, the Debtors are authorized to, in their discretion and without further order of the Court, declare that (a) any Essential Vendor Agreement between the Debtors and such Essential Vendor is terminated (if applicable) and (b) the payments made to such Essential Vendor on account of its Essential Vendor Claim, whether pursuant to an Essential Vendor Agreement or otherwise, shall be deemed to have been made in payment of then-outstanding postpetition claims of such Essential Vendor without further order of the Court or action by any person or entity.  In such event, the Essential Vendor shall immediately repay to the Debtors any payments made to it on account of its Essential Vendor Claim to the extent that any such payments exceed the postpetition claims of such Essential Vendor then outstanding without giving effect to any rights of setoff, claims, provision for payment of reclamation or trust fund claims, or otherwise.  In the event that an Essential Vendor Agreement is terminated or an Essential Vendor refuses to supply goods and/or services to the Debtors on Customary Trade Terms following receipt of payment on its Essential Vendor Claim (regardless of whether such Essential Vendor has entered into an Essential Vendor Agreement), the Debtors and such Essential Vendor are to be returned to their *status quo ante*, i.e., their respective positions immediately prior to entry of this Order; and it is further

ORDERED that nothing contained in this Order shall constitute a waiver of the Debtors' right to seek damages or other appropriate remedies against any breaching Essential Vendor; and it is further

4

ORDERED that, notwithstanding the foregoing, the Debtors, in their business judgment, may reinstate an Essential Vendor Agreement if the underlying default under the Essential Vendor Agreement is fully cured by the Essential Vendor not later than five (5) business days following the Debtors' notification to the Essential Vendor that such default occurred, or the Debtors, in their business judgment, reach a favorable alternative agreement with the Essential Vendor; and it is further

ORDERED that the Debtors' inability to enter into an Essential Vendor Agreement with a particular Essential Vendor shall not preclude them from paying an Essential Vendor Claim when, in the exercise of their reasonable business judgment, such payment is necessary to the Debtors' operations; and it is further

ORDERED that, notwithstanding the relief granted herein and any actions taken hereunder, nothing contained herein shall change the nature or priority of the underlying Essential Vendor Claims nor create, nor is intended to create, any rights in favor of, or enhance the status of any claim held by, any person; and it is further

ORDERED that nothing herein shall be construed (i) to limit, or in any way affect, the Debtors' ability to dispute or contest the amount of or basis for any Essential Vendor Claim or any claims against the Debtors arising in connection with or relating to the Essential Vendor Claims or (ii) as a waiver by any of the Debtors of their rights to contest any invoice or other claim of an Essential Vendor under applicable law; and it is further

ORDERED that nothing contained in the Motion or this Order shall be deemed (a) an assumption, adoption, authorization to assume, or rejection of any executory contract or agreement between the Debtors and any third party pursuant to section 365 of the Bankruptcy Code, (b) a requirement that the Debtors make any of the payments authorized herein, or (c) a

waiver of the Debtors' rights under the Bankruptcy Code or any other applicable law; and it is further

ORDERED that the authorization granted hereby to pay Essential Vendor Claims shall not create any obligation on the part of the Debtors or their officers, directors, attorneys, or agents to pay the Essential Vendor Claims, none of the foregoing persons shall have any liability on account of any decision by the Debtors not to pay an Essential Vendor Claim, and nothing contained in this Order shall be deemed to increase, reclassify, elevate to an administrative expense status (unless otherwise entitled to administrative expense status), or otherwise affect the Essential Vendor Claims to the extent they are not paid; and it is further

ORDERED that the amount of such Essential Vendor Claim set forth in an Essential Vendor Agreement shall be used only for purposes of determining such Essential Vendor's claim under this Order and shall not be deemed a claim allowed by the Court, and the rights of all interested persons to object to such claim shall be fully preserved until further order of the Court; and it is further

ORDERED that no claimant who receives payment on account of an Essential Vendor Claim is permitted to file or perfect a lien, reclamation claim, or a claim under section 503(b)(9) of the Bankruptcy Code on account of such Essential Vendor Claim, and any such claimant shall take at the claimant's expense all necessary actions to remove any existing lien or withdraw such reclamation claim or 503(b)(9) claim relating to such Essential Vendor Claim, even if the lien, reclamation claim, or 503(b)(9) claim is against property of a non-debtor; and it is further

US_ACTIVE:\43268197\06\99980.2300

ORDERED that nothing in this Order shall prohibit the Debtors from seeking Court authority to increase the prepetition amounts authorized to be paid hereunder; and it is further

ORDERED that the Banks are authorized and directed, at the Debtors' instruction, to receive, honor, process, and pay, to the extent of funds on deposit, any and all Checks or Electronic Transfers drawn on the Debtors' Bank Accounts relating to the Essential Vendor Claims, including those Checks or Electronic Transfers that have not cleared the Banks as of the Commencement Date; and it is further

ORDERED that the Debtors are authorized to replace any prepetition Checks or Electronic Transfers relating to the Essential Vendor Claims that may be dishonored or rejected; and it is further

ORDERED that the Banks may rely on the representations of the Debtors as to which Checks or Electronic Transfers are in payment of the Essential Vendor Claims; and it is further

ORDERED that the requirements of Bankruptcy Rule 6003(b) are satisfied; and it is further

ORDERED that the requirements of Bankruptcy Rule 6004(a) are waived; and it is further

ORDERED that notwithstanding the possible applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry; and it is further

ORDERED that the Final Hearing to consider entry of an order granting the relief requested in the Motion on a final basis shall be held on _____, 2010, at __:__ _.m.

(prevailing Eastern Time), and any objections to entry of such order shall be in writing, filed with the Court in accordance with General Order M-242, and served upon counsel to the Debtors, the Notice Parties, and any committee of unsecured creditors appointed in these chapter 11 cases, in each case so as to be received no later than 4:00 p.m. (prevailing Eastern Time) on _____, 2010; and it is further

ORDERED that, pending entry of an order following the conclusion of the Final Hearing, the relief granted herein shall remain in effect on an interim basis; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Order.

Dated: _____, 2010
      New York, New York

                    _____
                    UNITED STATES BANKRUPTCY JUDGE

US_ACTIVE:\43268197\06\99980.2300