WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jeffrey L. Tanenbaum
Joseph H. Smolinsky

Proposed Attorneys for the Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                    :
In re                               :        Chapter 11
                                    :
UNO RESTAURANT HOLDINGS             :        Case No. 10-10209 (    )
CORPORATION, et al.,                :
                    Debtors.        :        (Joint Administration Requested)
                                    :
------------------------------------------------------------x
```

## MOTION OF THE DEBTORS FOR AN INTERIM ORDER PURSUANT TO SECTIONS 105, 361, 362, 363, 364 AND 507 (1) APPROVING POSTPETITION FINANCING, (2) AUTHORIZING USE OF CASH COLLATERAL, (3) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (4) GRANTING ADEQUATE PROTECTION, (5) MODIFYING AUTOMATIC STAY, AND (6) SCHEDULING A FINAL HEARING

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Uno Restaurant Holdings Corporation (**"Uno"**) and its direct and indirect

subsidiaries as debtors and debtors in possession in the above-captioned chapter 11 cases

(collectively, **"Debtors"**), respectfully represent:

### Relief Requested

1. By this motion (the **"DIP Motion"**), the Debtors request entry of interim

(the **"Interim Order"**) and final orders (the **"Final Order"** and together with the Interim Order,

the **"DIP Orders"**) (i) authorizing the Debtors to obtain secured, superpriority postpetition

financing (the **"DIP Facility"**) pursuant to the terms and conditions of that certain Debtor in Possession Credit Agreement (as may be amended, supplemented, restated, or otherwise modified from time to time, the **"DIP Agreement"**) by and among the Borrowers, Wells Fargo Capital Finance, Inc. as Arranger and Administrative Agent (in such capacity, together with it successors in such capacity, the **"DIP Agent"**), for and on behalf of itself and the other lenders party thereto from time to time (collectively, including the DIP Agent, the **"DIP Lenders"**), substantially in the form of <u>Exhibit A</u> attached to this DIP Motion; (ii) authorizing the Debtors to execute and deliver the DIP Agreement and other related loan documents (collectively with all documents comprising the DIP Facility, the **"DIP Documents"**) and to perform such other acts as may be necessary or desirable in connection with the DIP Documents; (iii) granting to the DIP Agent and the DIP Lenders allowed superpriority administrative expense claims in each of these chapter 11 cases for the DIP Facility and all obligations owing thereunder and under the DIP Documents (collectively, and including all Obligations as defined in the DIP Agreement, the **"DIP Obligations"**); (iv) granting to the DIP Agent, for the benefit of itself and the DIP Lenders automatically perfected security interests in and liens on all of the DIP Collateral (as defined herein), including, without limitation, all property constituting "cash collateral" (as defined in section 363(a) of the Bankruptcy Code, **"Cash Collateral"**); (v) authorizing and directing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under each of the DIP Documents as they become due, including, without limitation, letter of credit fees (including issuance and other related charges), closing fees, extension fees, servicing fees, unused line fees, appraisal fees, administrative agent's fees, continuing commitment fees, the fees and disbursements of each DIP Agent's attorneys, advisers, accountants, and other consultants, and the legal expenses of the DIP Lenders, all to the extent provided by and in accordance with the

terms of the respective DIP Documents; (vi) authorizing the Debtors' use of the Cash Collateral of the Prepetition Agent, Prepetition Lenders, Indenture Trustee and Noteholders (each as defined herein); (vii) providing adequate protection to the Prepetition Agent and Prepetition Lenders (to the extent any Prepetition Obligations remain outstanding), and the Indenture Trustee and Noteholders for any Diminution in Value of their respective interests in the Prepetition Collateral (as defined herein), including the Cash Collateral; (viii) vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the DIP Orders; and (ix) scheduling a final hearing (the **"Final Hearing"**) to consider the relief requested in the DIP Motion and approving the form of notice with respect to the Final Hearing.

<u>**Bankruptcy Rule 4001 Concise Statement**</u>[1]

2.     Material provisions of the DIP Facility are set out at the following sections of the DIP Agreement and/or the Interim Order, pursuant to Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**) 4001(c)(1)(B)(i)-(xi) (relating to obtaining credit) and Bankruptcy Rule 4001(b)(1)(B)(i)-(iv) (relating to the use of cash collateral):

(a)     <u>Borrowers</u>.  Uno Restaurant Holdings Corporation and certain of its direct and indirect subsidiaries identified on the signature pages to the DIP Agreement (the **"Borrowers"**) (Bankruptcy Rule 4001(c)(1)(B); Interim Order¶ (i); 4, DIP Agreement Recitals and Schedule 1).

(b)     <u>DIP Lenders</u>.  Wells Fargo Capital Finance, Inc. as Arranger and Administrative Agent for and on behalf of itself and other lenders party to the DIP Agreement from time to time (Bankruptcy Rule 4001(c)(1)(B); Interim Order¶ (i); 4, DIP Agreement Recitals).

(c)     <u>Guarantors</u>.  (a) Uno Holdings II, (b) Uno Holdings, LLC, (c) Uno Acquisition Parent, Inc., (d) the entities listed on Schedule G-1 to the DIP Agreement, and (e) any other Person at any time providing a guaranty in

---

[1] Capitalized terms used in this DIP Motion have the meanings ascribed to them in the DIP Agreement, unless otherwise defined herein.

favor of DIP Agent, for the benefit of the DIP Lenders and the Bank Product Providers, with respect to the Obligations or whose assets are otherwise pledged as security for the repayment of the Obligations (the **"DIP Guarantors"**). (Bankruptcy Rule 4001(c)(1)(B); DIP Agreement Definitions, Schedule G-1).

(d)     <u>Borrowing Limits</u>.  The DIP Facility provides the Borrowers with (a) up to $25,000,000 in aggregate maximum principal amount of revolving commitments, including letter of credit and swingline loan commitments, with a sublimit for letters of credit of $20,000,000, and (b) up to $27,000,000 in aggregate principal amount of term loan commitments. (Bankruptcy Rule 4001(c)(1)(B); Interim Order¶ 4; DIP Agreement § 2).

(e)     <u>Use of DIP Facility</u>.  The proceeds of the DIP Facility may be used solely for: (1) payment in full of the Prepetition Obligations, (2) working capital, letters of credit, and other general corporate purposes, (3) permitted payment of costs of administration of the Cases (subject to the limitations of the Carve Out (as defined herein)), (4) payment of fees and expenses due under the DIP Facility, (5) payment of any authorized Adequate Protection Payments, and (6) payment of such prepetition expenses, in addition to the Prepetition Obligations permitted to be so paid in accordance with the consents required under the DIP Documents, and as approved by the Court (Bankruptcy Rule 4001(c)(1)(B); Interim Order¶ F.(iv); DIP Agreement § 6.14).

(f)     <u>Interest Rate</u>.  Revolving loans under the DIP Agreement will bear interest at a <u>per</u> <u>annum</u> rate equal to the LIBOR Rate plus the Applicable Margin. The Term Loan shall bear interest at a <u>per</u> <u>annum</u> rate equal to 15.00%. For purposes of the DIP Agreement, the term **"Applicable Margin"** means 5.50% <u>per</u> <u>annum</u> with respect to LIBOR Rate Loans, with a LIBOR floor of 3%.  (Bankruptcy Rule 4001(c)(1)(B); DIP Agreement § 2.6).

(g)     <u>Maturity</u>.  The earliest of (a) either (i) the date that is 6 months after the commencement date of these Chapter 11 cases (the **"Filing Date"**) of these chapter 11 cases (the **"Initial Term"**), or (ii) subject to the satisfaction of the Extension Conditions, the date that is 9 months after the Filing Date (the **"Extended Term"**), (b) the effective date with respect to any joint plan of reorganization (a **"Plan"**), and (c) the date a sale of all or substantially all of the DIP Borrowers' assets is consummated under Section 363 of the Bankruptcy Code (Bankruptcy Rule 4001(c)(1)(B); DIP Agreement § 3.3).

(h)     <u>Events of Default</u>.  Events of Default include provisions relating to (among others) (i) a failure to pay interest, principal, fees or expenses when due under the DIP Facility, (ii) payment of any pre-petition "Indebtedness" except as ordered by the Bankruptcy Court and consented

to by the DIP Agent and the DIP Lenders, (iii) conversion or dismissal of any of these chapter 11 cases (the **"Bankruptcy Cases"**), (iv) the appointment in any of the Bankruptcy Cases of a chapter 11 trustee or examiner with expanded powers, and (v) failure to timely achieve any Reorganization Milestone (as defined herein), as such may be extended with the consent of the DIP Agent and the Required Lenders (Rule 4001(c)(1)(B); Interim Order¶ 24; DIP Agreement § 7).

(i)     Liens.  The DIP Lenders will receive first priority perfected liens and security interests pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, with priority over all liens and security interests in or against the DIP Borrowers' and DIP Guarantors' respective now existing and hereafter acquired (whether before or after the Filing Date) property and assets, subject only to certain liens (to the extent any such permitted liens were valid, properly perfected, non-avoidable and senior in priority to the Prepetition Facility Liens as of the Filing Date, the **"Permitted Prior Liens"**) otherwise permitted by the Prepetition Facility (the **"DIP Liens"**).  (Rule 4001(c)(1)(B)(i); Interim Order¶ (vi), 3, 6; Security Agreement § 2).

(j)     Adequate Protection.  See "Adequate Protection" below (Rule 4001(c)(1)(B)(ii); Interim Order¶ 11; DIP Agreement § 4.24(b)).

(k)     Waiver of the Automatic Stay.  Subject to seven days' prior notice to Debtors and certain other parties, the automatic stay is vacated to permit the exercise of remedies by the DIP Lenders (Rule 4001(c)(1)(B)(iv); Interim Order¶ 25; DIP Agreement § 8.1(d)).

(l)     Case Milestones. The **"Reorganization Milestones"** include (i) February 25, 2010 (deadline for filing of the Plan and related disclosure statement, (ii) May 1, 2010 (deadline for approval by the Bankruptcy Court of the disclosure statement for the Plan, (iii) June 15, 2010 (deadline for confirmation of the Plan by the Bankruptcy Court, and (iv) July 15, 2010 (deadline for effectiveness of the Plan) (Rule 4001(c)(1)(B)(vi); DIP Agreement Schedule R-1).

(m)     A waiver or modification of the applicability of nonbankruptcy law relating to the perfection of a lien.  The Interim Order is (and the Final Order when entered will be) effective to create in favor of the DIP Lenders the DIP Liens (Rule 4001(c)(1)(B)(vii); Interim Order¶ (vi), 6).

(n)     Indemnification. The Debtors shall indemnify and hold harmless the DIP Agent and each DIP Lender and their respective shareholders, directors, agents, officers, subsidiaries and affiliates, successors and assigns, attorneys and professional advisors, in their respective capacities as such, from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions or causes of action, whether

groundless or otherwise, and reasonable costs and expenses incurred, suffered, sustained or required to be paid by an indemnified party of every nature and character arising out of or related to the DIP Facility or the transactions contemplated by the Interim Order, whether such indemnified party is party thereto, as provided in and pursuant to the terms of the DIP Facility and as further described therein and herein, except to the extent resulting from such indemnified party's gross negligence or willful misconduct as determined by a final non-appealable order of a court of competent jurisdiction (Rule 4001(c)(1)(B)(ix); Interim Order¶ 27; DIP Agreement § 10.3).

## Use of Cash Collateral

(o)     The name of each entity with an interest in the Cash Collateral.  The Prepetition Lenders, the Noteholders and the DIP Lenders (Rule 4001(b)(1)(B)(i); Interim Order¶ (vi), 11).

(p)     The purposes for the use of the cash collateral. The Debtors will use the cash collateral to address their working capital needs and fund their reorganization efforts as described further at section H below (Rule 4001(b)(1)(B)(ii); Interim Order¶ F(i)).

(q)     The material terms, including duration, of the use of the cash collateral. The Debtors are authorized to use cash collateral of the Prepetition Lenders and the Noteholders until notice is provided to the Debtors (i) that an Event of Default has occurred and is continuing, or (ii) of the termination of the DIP Facility.  (Rule 4001(b)(1)(B)(iii); Interim Order¶ H, 11-14).

>    (i)     Amount of Cash Collateral.  All cash in possession of the Debtors and all cash proceeds from the Prepetition Collateral (Rule 4001(b)(1)(B)(iii);  Interim Order¶ E.(iv)).

>    (ii)    Adequate Protection.

>>        a.      The Prepetition Lenders are granted (a) the Credit Facility Adequate Protection Liens; (b) the Credit Facility Superpriority Claims; and (c) the Credit Facility Adequate Protection Payments (each as defined in section H below).

>>        b.      The Noteholders are granted (a) the Indenture Adequate Protection Liens; (b) the Indenture Superpriority Claims; and (c) the Indenture Adequate Protection Payments (each as defined in section H below).

>>        See section H below for further information (Rule 4001(c)(1)(B)(ii); Rule 4001(b)(1)(B)(iv); Interim Order¶ H; DIP Agreement § 4.24(b)).

(iii)    <u>Adequate Protection Liens</u>.  See "Liens" above.  (Rule 4001(b)(1)(B)(iv); Interim Order¶ 12).

(iv)    <u>Super-Priority Administrative Status</u>.  The Prepetition Lenders and the Noteholders shall hold claims entitled to super-priority administrative status in accordance with Sections 364(c)(1) and 507(b) of the Bankruptcy Code, with priority in payment over any and all other administrative expenses in the Bankruptcy Cases of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code other than the Carve Out and certain Permitted Prior Liens (Rule 4001(c)(1)(B)(ii); Rule 4001(b)(1)(B)(iv); Interim Order¶ 13-14; DIP Agreement § 4.20).

**<u>Background</u>**

3.    On the Filing Date, each of the Debtors commenced with this Court a voluntary case under the Bankruptcy Code.  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Contemporaneously herewith, the Debtors have filed a motion seeking joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Bankruptcy Rules.

4.    Additional information regarding the Debtors' businesses, capital structure, and the circumstances leading to these chapter 11 filings is contained in the Affidavit of Louie Psallidas Pursuant to Local Bankruptcy Rule 1007-2 in Support of First Day Motions and Applications (the **"Psallidas Affidavit"**) filed contemporaneously herewith.

**<u>Jurisdiction and Venue</u>**

5.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Prepetition Funding of the Debtors' Operations

6.     The Debtors primary pre-petition funding consists of the Prepetition Facility and the Notes, as described further below.

## A.     The Prepetition Facility

7.     The Borrowers are parties to that certain Credit Agreement dated as of February 22, 2005 (as amended, supplemented, restated or otherwise modified prior to the Filing Date), among the Borrowers, Wells Fargo Foothill, Inc. as Arranger and Administrative Agent (the **"Prepetition Agent"**), and the other lenders that are parties thereto from time to time (collectively, together with the Prepetition Agent, the **"Prepetition Lenders"**), whereby the Prepetition Lenders provided credit and letter of credit facilities to the Borrowers and provided other financial accommodations to or for the benefit of the Borrowers (collectively, the **"Prepetition Facility"**).   The Prepetition Facility consists of (i) a revolving credit facility (the **"Prepetition Revolver"**) in the maximum aggregate amount of $32 million, including letters of credit not to exceed $20 million, and (ii) a term loan facility (the **"Prepetition Term Loan"**) in the aggregate principal amount of $14.25 million.  Obligations arising under the Prepetition Facility are obligations of each of the Borrowers and are guaranteed by Uno Holdings II LLC and other affiliates of the Borrowers party to that certain General Continuing Guaranty dated February 22, 2005 (as amended, supplemented, restated, or otherwise modified prior to the Petition Date).

8.     Prepetition, the amounts borrowed under the Prepetition Facility were used to provide, among other things, a portion of the funds required to consummate a merger transaction, pay fees and expenses incurred in connection therewith, and working capital and other general corporate purposes.  As of the Filing Date, approximately $33.9 million was

outstanding under the Prepetition Facility, with approximately $10.0 million in outstanding Letters of Credit.  The Prepetition Facility matures by its terms on February 22, 2010.

9.      Pursuant to certain security agreements dated as of February 22, 2005, the Borrowers granted security interests in and liens on, among other things, substantially all assets of the Borrowers (collectively, the **"Prepetition Collateral"**) to: (a) the Prepetition Agent, for itself and the Prepetition Lenders (the **"Prepetition Facility Liens"**); and (b) the Indenture Trustee, for the benefit of the Noteholders (the **"Indenture Liens"**, and together with the Prepetition Facility Liens, the **"Prepetition Liens"**).  The Indenture Liens on the Prepetition Collateral are subordinate to the Prepetition Facility Liens on the Prepetition Collateral in accordance with the Intercreditor Agreement (as defined herein and as described below).

10.      Specifically, the Prepetition Facility is secured by, among other things: (i) a first-priority security interest in substantially all of the Debtors' assets, including all receivables, contracts, contract rights, equipment, intellectual property, inventory and all other tangible and intangible assets and each of Uno's direct and indirect domestic subsidiaries (other than inactive subsidiaries), subject to certain customary exceptions; (ii) a pledge of (a) all of Uno's capital stock and that of any of its direct and indirect domestic subsidiaries; and (b) 65% of the capital stock of first-tier foreign subsidiaries; and (iii) a pledge by Uno Holdings II LLC of all of the capital stock of Uno.

**B.      Senior Secured Notes**

11.      Pursuant to that certain Indenture dated as of February 22, 2005 (as amended, supplemented, restated or otherwise modified prior to the Filing Date, the **"Indenture"**), among Uno, as issuer, certain of Uno's domestic subsidiaries and Uno Holdings II, LLC as guarantors (the **"Note Guarantors"**), and U.S. Bank National Association as

collateral agent and trustee (in such capacities, the **"Indenture Trustee"**), pursuant to which Uno incurred indebtedness to certain holders (collectively, the **"Noteholders"**) for certain notes issued pursuant to the Indenture in an initial aggregate principal amount at maturity of $142,000,000, bearing interest at the rate of 10% and due to mature on February 15, 2011 (the **"Notes"**).

12.     To secure the obligations under the Notes, Uno and each of the Note Guarantors granted to the Indenture Trustee, second priority security interests in and liens on substantially all of their assets (which also secure the Prepetition Facility), including: (i) substantially all of Uno's and each Note Guarantor's assets including, without limitation: inventory, accounts receivable, equipment, chattel paper, documents, instruments, copyrights, trademarks and patents and related rights, general intangibles, and investment property, and proceeds and products from any and all of the foregoing; and (ii) the capital stock of Uno and substantially all of the equity interests of Uno's domestic subsidiaries and 65% of the stock of Uno's first-tier foreign subsidiaries.

## C.     Intercreditor Agreement

13.     In connection with the issuance of the Notes, the Prepetition Agent, and the Indenture Trustee entered into that certain Intercreditor and Lien Subordination Agreement, dated as of February 22, 2005 (the **"Intercreditor Agreement"**), to govern their rights with respect to the priority of their respective security interests in and liens on the Debtors' collateral (the **"Prepetition Collateral"**).[2]

---

[2] Pursuant to the Intercreditor Agreement, the liens granted to the holders of the Notes are subordinated to the liens granted to the Prepetition Lenders pursuant to the Prepetition Facility up to a certain "Maximum Priority Debt Amount."

## Debtors' Proposed DIP Facility

### A.    Need for Postpetition Financing

14.    As described more fully in the Psallidas Affidavit, the Debtors have faced a number of challenges in recent years, which, taken together, have had a negative impact on their overall financial performance.  Recently, the Debtors have been challenged by declining revenues, the general economic environment, the current poor retail climate, increased structural costs due to an increase in the cost of key commodities, and a high level of debt, among other things.

15.    In response to the Debtors' deteriorating financial performance, management has taken decisive action in an effort to restructure its operations and reduce its overall cost structure.  Specifically, the Debtors have taken steps to, among other things, put in place stringent cost controls which have significantly reduced their general and administrative expenses.  A reduction in headcount and advertising budgets, along with lower travel, recruitment, and training costs and lower franchise store opening expenses were also implemented in 2008 and 2009.  Capital investments were also significantly reduced, limiting new restaurant expansion and upgrades.  Despite these improvements, the overall leverage of the Debtors was unsustainable, resulting in the commencement of these chapter 11 cases.

16.    To continue to operate their business in the ordinary course while in chapter 11, the Debtors determined, with the assistance of their financial advisors, Jefferies & Company, Inc. (**"Jefferies"**), that they require postpetition financing as described herein.

### B.    The Restructuring Support Agreement

17.    As noted in the Psallidas Affidavit, the Debtors' Plan contemplates an exchange of the Noteholders' debt for all of the equity in the reorganized Debtors.  The Debtors' pre-negotiated Plan is memorialized in that certain Restructuring Support Agreement by and

between Uno and the Noteholders, executed prior to the Filing Date, a copy of which is annexed

to the Psallidas Affidavit.  Implementing the debt-for-equity exchange contemplated in the

Restructuring Support Agreement will reduce the Debtors' outstanding debt from approximately

$175.9 million to approximately $33.9 million.  Additional financial support is necessary to

implement the Plan and preserve the going concern value of the Debtors' enterprise, and the

Debtors intend to use up to $5.0 million of the DIP Facility over and above the amount necessary

to satisfy the funded obligations under the Prepetition Credit Facility prior to the final hearing to

consider approval of the facility.

**C.    Background of the DIP Facility**

18.    Prior to the Filing Date, the Debtors and Jefferies surveyed various

sources of postpetition financing to fund the Debtors' operations and to fund the plan solicitation

process, including financing from the Prepetition Lenders and the Noteholders and unrelated

third parties.  In exploring those options, the Debtors recognized that the obligations owed to the

Prepetition Lenders and the Noteholders are secured by substantially all of the Debtors' real and

personal property, such that either (i) the liens of the Prepetition Lenders would have to be

primed to obtain postpetition financing, or (ii) the Debtors would have to find a postpetition

lender willing to extend credit that would be junior to the liens of the Prepetition Lenders and

Noteholders.  Borrowing from another postpetition lender or lending group that required security

interests senior to the Prepetition Lenders and Noteholders likely could only be accomplished

through an extended, contested hearing on whether the requirements of section 364(d) of the

Bankruptcy Code would be satisfied.  Moreover, given the general economic conditions and poor

retail climate, the Debtors determined after diligence that sources of new capital, if available at

all, were more expensive than obtaining postpetition financing from the DIP Lenders.  The

Debtors found that the principal amount, pricing, fee structure and certainty of closing of any alternative proposal would be, in the aggregate, less favorable than that offered by the DIP Lenders.

19.     In view of these circumstances, the DIP Lenders, who include a Prepetition Lender and certain of the Noteholders were willing to extend postpetition financing on the terms and conditions described herein.  Ultimately, the Debtors concluded that the DIP Agreement proposed by the DIP Lenders is desirable because, among other things, the DIP Agreement permits the Debtors to secure the postpetition financing required for their reorganization without having to prime the Prepetition Lenders through an extended, contested hearing - with an uncertain result - on whether the requirements of section 364(d) of the Bankruptcy Code have been satisfied.

20.     Consequently, the Debtors have determined that entering into the DIP Agreement with the DIP Lenders is appropriate and is necessary under the circumstances, addresses the Debtors' working capital and liquidity needs, and should be approved.

**D.      Implementation of the DIP Agreement**

21.     The Debtors and the DIP Lenders engaged in extensive, good faith, arm's-length negotiations with respect to the terms and conditions of the proposed DIP Facility.  These negotiations culminated in agreement upon the proposed financing, including the DIP Facility.  Significantly, the DIP Agreement allows the Debtors to draw on a $52 million commitment from the DIP Lenders, pending this Court's entry of the Final Order.  This commitment should allow the Debtors to meet all of their administrative obligations during these chapter 11 cases.

22.     The Debtors and the DIP Lenders have agreed upon an initial budget (as defined and described further below).  Every four weeks commencing February 21, 2010, within five business days after the end of such week, the Debtors will provide to the DIP Agent an

updated budget (collectively, including the initial budget, the **"Budget"**) depicting on a weekly basis cash revenue, receipts, expenses, disbursements, outstanding Advances and Letters of Credit and other information for the following 13 weeks.  The Debtors believe that the Budget is achievable and will allow the Debtors to operate without the accrual of unpaid administrative expenses.

## E.    Liens and Claims

23.    Pursuant to the Interim Order, and upon entry of the Final Order, all loans and obligations under the DIP Facility shall:

(a)    be secured by a first priority perfected lien and security interest pursuant to Sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, with priority over all Collateral subject to the existence of certain Permitted Prior Liens.  Permitted Prior Liens include valid, perfected, non-avoidable and senior prepetition security interests permitted under the Prepetition Facility.

(b)    constitute claims entitled to super-priority administrative status in accordance with Sections 364(c)(1) and 507(b) of the Bankruptcy Code, with priority in payment over any and all other administrative expenses in the Bankruptcy Cases of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code.

(c)    Notwithstanding the foregoing, the liens and security interests and the super-priority claims of the Agent and the DIP Lenders shall, in each case, be subject to the Carve Out.

The provisions of the foregoing paragraph are subject in each case only to permitted exceptions to be agreed or as set forth in the DIP Agreement and the DIP Orders.

## F.    The Roll-Up

24.    Upon the closing and funding of the DIP Facility under the Interim Order, certain proceeds from the DIP Facility shall be tendered to the Prepetition Agent for the benefit of the Prepetition Lenders, and applied against the obligations arising under and in connection with the Prepetition Facility (the **"Roll-Up"**).  This is not a traditional Roll-Up, however,

because the DIP Facility introduces new lenders and additional funds from that provided by the Prepetition Lenders. The Prepetition Lenders would not have agreed to be primed by the new lenders and therefore the Prepetition Facility needs to be paid off on the Filing Date.

25. The Roll-Up therefore, as a condition to approval of the DIP Facility, comports with the expectations held by the Debtors, the Prepetition Lenders and certain of the Noteholders prior to the Filing Date and is necessary to effectuate these pre-negotiated chapter 11 cases. The DIP Lenders would not have agreed to provide the DIP Facility without the Roll-Up and refinancing of the obligations due and owing to the Prepetition Lenders under the Prepetition Facility. It should be noted, however, that notwithstanding the Roll-Up, the Prepetition Facility is subject to a 60-day challenge period. Additionally, it is quite clear that the Prepetition Facility is oversecured as of the Filing Date.

**G.  Provisions to Be Highlighted Pursuant to Bankruptcy Rules 4001(b) and (c) and 4001-2 of the Local Bankruptcy Rules for the Southern District of New York**

26. The Debtors believe that the material provisions of the DIP Agreement identified above and the description below required by the Local Bankruptcy Rules of the United States Bankruptcy Court for the Southern District of New York (the **"Local Rules"**) summarize the salient terms of the DIP Facility:

(a) <u>Material Conditions to Closing and Borrowing</u>. Customary borrowing conditions, including: (i) entry of the Interim Order and Final Order and compliance therewith, and (ii) delivery of all documents comprising the DIP Facility; (iii) each DIP Lender having received its formal credit approval for the DIP Facility; (iv) payment of the Carve Out escrow (Local Rule 4001-2(a)(2); DIP Facility § 3.2).

(b) <u>Budget</u>. DIP Borrowers to provide to the DIP Agent a Budget depicting on a weekly basis cash revenue, receipts, expenses, disbursements, outstanding Advances and Letters of Credit and other information for the first 13 weeks from the Closing Date, and

shall be updated every four weeks from the Closing Date (Local Rule 4001-2(a)(2); DIP Agreement § 5.3).

(c)    <u>Fees</u>. Uno shall pay to the DIP Agent the following fees: (i) a closing fee of $500,000, for the benefit of the DIP Lenders in accordance with their Pro Rata Shares, which fee shall be fully earned and payable in full on the Closing Date; an extension fee of $500,000 if the Borrowers are able to extend the Maturity Date to the Extended Term in accordance with the DIP Agreement; (iii) a Servicing Fee of $10,000, payable quarterly in arrears to the DIP Agent; (iv) an unused line fee equal to 0.50% <u>per annum</u> on the used portion of the DIP Revolver, payable monthly in arrears; and (v) certain audit, appraisal and consulting fees and charges not to exceed $100,000 prior to an Event of Default (Local Rule 4001-2(a)(3); Wells Fargo Fee Letter).

(d)    <u>Revolver Buy-Out Option</u>.  The DIP Term Loan Lenders may at any time, in their sole discretion, purchase from the DIP Revolver Lender, and the DIP Revolver Lender shall be obligated to sell to the DIP Term Loan Lenders, all but not less than all of the obligations and commitments (including unfunded commitments) of the DIP Revolver Lender under the DIP Facility (the **"Buy-Out Option"**).  The Buy-Out Option may be exercised upon customary terms, including (a) irrevocable prior written notice to the Agent, for the benefit of the DIP Revolver Lender (the **"Buy-Out Notice"**), (b) payment in cash of 100% of the outstanding principal amount of the Advances and all accrued and unpaid interest and fees with respect thereto, (c) providing cash collateral for the outstanding Letters of Credit equal to 105% of the outstanding Letter of Credit usage, (d) providing cash collateral for outstanding Bank Products in an amount equal to the amount the Bank Product Providers reasonably determine to be the credit exposure of Borrowers and their respective Subsidiaries in respect of such Bank Products and (e) payment in cash of all unpaid expenses of the DIP Lenders and the DIP Agent (Local Rule 4001-2(a); DIP Agreement § 16.12).

(e)    <u>Reimbursement of Expenses</u>.  The Debtors are directed to reimburse reasonable fees and expenses of the DIP Agent and DIP Lenders on a current basis.  Such reimbursements are guaranteed by the Debtors under the DIP Facility and elevated to superpriority administrative expense status by operation of the DIP Lenders' superpriority administrative expense claim for all obligations under the DIP Facility (Local Rule 4001-2(a)(3); Interim Order ¶ 5, 30; DIP Agreement § 6.18).

(f)     Carve Out.  The **"Carve Out"** includes the payment, following the
        occurrence of a Triggering Event, of (i) allowed fees, and
        reimbursement for disbursements of professionals retained by the
        DIP Borrowers and/or a statutory committee of unsecured creditors
        (the **"Professional Fee Payments"**) in an aggregate amount for all
        such Professional Fee Payments incurred upon and after the
        occurrence of such Triggering Event not to exceed $1,500,000 (the
        **"Carve Out Amount"**); (ii) fees pursuant to 28 U.S.C. § 1930 and
        any fees payable to the clerk of the Bankruptcy Court; and (iii) fees
        payable to a chapter 7 trustee in an aggregate amount not to exceed
        $50,000; and (b) without reducing the Carve Out Amount, all
        Professional Fee Payments allowed, or subsequently allowed, and
        payable under Sections 330 and 331 of the Bankruptcy Code, to
        the extent incurred prior to such Triggering Event (Local Rule
        4001-2(a)(5); Interim Order¶ 30; DIP Agreement Definitions).

(g)     Payment of Certain Other Fees.  In the event that all or
        substantially all of the Borrowers' assets are sold under Section
        363 of the Bankruptcy Code pursuant to a transaction permitted
        under the definitive documentation for the DIP Facility or
        otherwise consented to by the applicable DIP Lenders and the
        Carve Out Amount is not sufficient to pay any restructuring or
        transaction fee (the "**Jefferies Fee**") due to Jefferies in connection
        with such sale as required under Jefferies' engagement letter with
        the Borrowers dated as of July 1, 2009, as amended and restated
        from time to time as permitted under the DIP Facility, then, so long
        as all obligations under the DIP Facility with respect to the DIP
        Revolver (including all Letters of Credit) have been paid in full in
        cash in accordance with the DIP Facility, then the DIP Term Loan
        Lenders shall consent to the Jefferies Fee being paid from the
        proceeds of such sale transaction prior to the application of such
        proceeds to the obligations under the DIP Facility with respect to
        the DIP Term Loan (Local Rule 4001-2(a)(3); Jefferies
        Agreement).

(h)     Section 506(c) Waiver.  Except as provided in the Carve Out, and
        subject to entry of the Final Order, no costs or expenses shall be
        charged against the DIP Agent, DIP Lenders, Prepetition Agent,
        Prepetition Lenders, Indenture Trustee or Noteholders, or any of
        their respective claims or the DIP Collateral or Prepetition
        Collateral or their property pursuant to section 506(c) (Interim
        Order¶ 35).

(i)     Restrictions on Investigations and Prosecution of Claims.  The
        Carve Out shall not be used for any fees or disbursements related
        to the investigation, commencement, or prosecution of any claims
        against the DIP Lenders or parties granted adequate protection

under the DIP Order, <u>provided</u>, <u>however</u>, that up to $50,000 of the Carve-Out Amount may be used by the statutory committee of unsecured creditors in these chapter 11 cases to investigate the validity of the Indebtedness and the validity and perfection of the Prepetition Liens within the earlier of: (1) sixty (60) calendar days following the formation of such statutory committee; and (2) five (5) Business Days before the scheduled hearing on the confirmation of the Plan (Local Rule 4001-2(a)(5); Interim Order ¶ 31; DIP Agreement Definitions, 6.14(b)).

(j)     <u>Roll-Up</u>. As described further above, the Roll-Up will result in application of the proceeds of postpetition financing to pay, in full, the obligations arising under the Prepetition Facility (Local Rule 4001-2(a)(7); Interim Order ¶ F(iv)).

(k)     <u>Optional Prepayments</u>. The DIP Borrowers may prepay the DIP Facility, in whole or in part, without premium or penalty with the Agent's prior written consent, which consent may be granted or withheld in the DIP Agent's sole discretion (Local Rule 4001-2(a)(13); DIP Agreement § 2.4(d)).

(l)     <u>Mandatory Prepayment</u>. Mandatory prepayment of the Advances and the DIP Term Loan are required in an amount equal to 100% of the net cash proceeds of asset sales, debt issuances, equity issuances by the Debtors, and 100% of proceeds of tax refunds, insurance and casualty receipts received by the Debtors. If mandatory prepayments relating to Dispositions and Extraordinary Receipts exceed, in the aggregate for all such prepayments, $750,000 (any such prepayments in excess of such amount being the **"Excess Prepayments"**), the Maximum Revolver Amount shall be permanently reduced on a dollar for dollar basis with respect to each such Excess Prepayment (Local Rule 4001-2(a)(13); DIP Agreement § 2.4(e)).

(m)     <u>Joint Liability</u>. The Borrowers are liable under the DIP Facility on a joint and several basis, and the Guarantors are liable for any unpaid obligations of the Borrowers (Interim Order ¶ 38; DIP Agreement § 2.15).

(n)     <u>Avoidance Actions</u>. The DIP Lenders' DIP Liens and the DIP Superpriority Claims include avoidance actions and claims arising under section 549 of the Bankruptcy Code and all proceeds thereof (Interim Order ¶ 6).

27.     As set forth herein, these provisions were thoroughly negotiated and are necessary for the Debtors to effectuate the DIP Facility and procure the financing made available under the DIP Facility in a sufficient amount and on a timely basis.

**H.     Use of Cash Collateral and Proposed Adequate Protection**

28.     In order to address their working capital needs and fund their reorganization efforts, the Debtors also require the use of the Cash Collateral.  The use of Cash Collateral will provide the Debtors with the additional necessary capital to operate their business, pay their employees, maximize value, and successfully reorganize under chapter 11.

29.     As noted above, the Prepetition Lenders and a majority of the Noteholders have consented or have been deemed to consent to the Debtors' use of Cash Collateral in the ordinary course of business in accordance with the Budget, subject to the adequate protection liens and payments discussed below and the other terms and conditions set forth in the Interim Order.

*Adequate Protection of the Prepetition Lenders*

30.     Pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition Agent and Prepetition Lenders in the Prepetition Collateral (to the extent any Prepetition Obligations remain outstanding) against any Diminution in Value of such interests in the Prepetition Collateral, the Debtors will grant to the Prepetition Agent, for the benefit of itself and the Prepetition Lenders, continuing valid, binding, enforceable, non-avoidable and automatically perfected postpetition security interests in and liens on the DIP Collateral (the "**Credit Facility Adequate Protection Liens**").  The Credit Facility Adequate Protection Liens shall be junior only to the: (A) Carve Out; (B) DIP Liens; (C) Prepetition Facility Liens; and (D) Permitted Prior Liens.  The Credit Facility Adequate

Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral.

31.      As further adequate protection of the interests of the Prepetition Agent and Prepetition Lenders in the Prepetition Collateral (to the extent any Prepetition Obligations remain outstanding) against any Diminution in Value of such interests in the Prepetition Collateral, the Prepetition Agent and Prepetition Lenders will each be granted as and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code an allowed superpriority administrative expense claim in each of these chapter 11 cases (the **"Credit Facility Superpriority Claims"**). The Credit Facility Superpriority Claims will be junior only to the Carve Out and DIP Superpriority Claims.

32.      As further adequate protection, to the extent any Prepetition Obligations remain outstanding, the Debtors will provide adequate protection to the Prepetition Agent and Prepetition Lenders, in the form of:  (i) monthly payments of interest, fees and other amounts due under the Prepetition Facility; and (ii) ongoing payment of the Prepetition Agent's and Prepetition Lenders' reasonable fees, costs and expenses, including, without limitation, legal and other professionals' fees and expenses (together, the **"Credit Facility Adequate Protection Payments"**).

*Adequate Protection of the Noteholders*

33.      Pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, as adequate protection of the interest of the Indenture Trustee, on behalf of the Noteholders, in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Debtors will grant to the Indenture Trustee, for the benefit of itself and the Noteholders, continuing valid, binding, enforceable, non-avoidable and automatically perfected

postpetition security interests in and liens on the DIP Collateral (the **"Indenture Adequate Protection Liens"**, and together with the Credit Facility Adequate Protection Liens, the **"Adequate Protection Liens"**).  The Indenture Adequate Protection Liens shall be junior only to the:  (A) Carve Out; (B) DIP Liens; (C) Prepetition Facility Liens; (D) Credit Facility Adequate Protection Liens; (E) Indenture Liens; and (F) Permitted Prior Liens.  The Indenture Adequate Protection Liens shall be senior to all other security interests in, liens on, or claims against any of the DIP Collateral.

        34.    As further adequate protection of the interests of the Indenture Trustee, on behalf of the Noteholders, in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Indenture Trustee, on behalf of itself and the Noteholders, will be granted as and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code an allowed superpriority administrative expense claim in each of these chapter 11 cases (the **"Indenture Superpriority Claims",** and together with the Credit Facility Superpriority Claim, the **"Adequate Protection Superpriority Claims"**).  The Indenture Superpriority Claims shall be junior only to the Carve Out, the DIP Superpriority Claims, and the Credit Facility Superpriority Claims.  The Adequate Protection Superpriority Claims shall have priority over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code.

        35.    As further adequate protection, and subject to the Intercreditor Agreement, the Debtors will provide adequate protection to the Indenture Trustee, for and on behalf of itself

and the Noteholders, in the form of: (i) ongoing payment of the reasonable fees and expenses of Akin Gump, counsel to the Noteholders; (ii) ongoing payment of the costs and expenses of the Indenture Trustee, including attorneys' and consultant's fees (together, the **"Indenture Adequate Protection Payments,"** and together with the Credit Facility Adequate Protection Payments, the **"Adequate Protection Payments"**). However, following a Triggering Event, the Indenture Adequate Protection Payments incurred in connection with these chapter 11 cases shall not exceed the aggregate amount of $200,000.

### The DIP Facility Should Be Authorized

36. Approval of the DIP Agreement will provide the Debtors with immediate and ongoing access to borrowing availability to pay their current and ongoing operating expenses, including postpetition wages and salaries and utility and vendor costs. Unless these expenditures are made, the Debtors could be forced to cease operation, which could result in irreparable harm to their businesses and substantial going concern value being destroyed and could jeopardize the Debtors' ability to reorganize. The credit provided under the DIP Facility and the use of Cash Collateral will enable the Debtors to continue to satisfy their customers' needs, pay their employees, and operate their business in the ordinary course and in an orderly and reasonable manner to preserve and enhance the value of their estates for the benefit of all parties in interest. The availability of credit under the DIP Facility will provide confidence to the Debtors' creditors that will enable and encourage them to continue their relationships with the Debtors. Finally, the implementation of the DIP Facility will be viewed favorably by the Debtors' employees and customers, thereby promoting a successful reorganization. Accordingly, the timely approval of the relief requested herein is imperative.

37. Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under

section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or incur debt (a) with priority over any and all administrative expenses as specified in section 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364(c). Section 364(d) of the Bankruptcy Code allows a debtor to obtain credit secured by a senior or equal lien on property of the estate that is subject to a lien, provided that (i) the debtor is unable to obtain such credit otherwise, and (ii) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. 11 U.S.C. § 364(d). The Debtors propose to obtain the financing set forth in the DIP Agreement by providing, _inter alia_, superpriority claims, security interests, and liens pursuant to sections 364(c)(1) – (3) and 364(d) of the Bankruptcy Code.

38. The Debtors' liquidity needs can be satisfied only if the Debtors are immediately authorized to borrow up to $52 million on an interim basis under the DIP Facility and to use such proceeds to fund their operations. Despite their best efforts, the Debtors have been unable to procure sufficient financing (i) in the form of unsecured credit allowable under section 503(b)(1), (ii) as an administrative expense under section 364(a) or (b), (iii) in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1), or (iv) without granting priming liens pursuant to section 364(d). The Debtors have not been able to obtain postpetition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein.

39. Having determined that financing is available only under sections 364(c) and (d) of the Bankruptcy Code, the Debtors negotiated with the DIP Lenders extensively, in good faith, and at arm's-length. Provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance therewith. See, e.g., In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986); see also In re Curlew Valley Assocs., 14 B.R. 506, 513-14 (Bankr. D. Utah 1981); In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985).

40. Furthermore, section 364(d) does not require that a debtor seek alternative financing from every possible lender; rather, the debtor simply must demonstrate sufficient efforts to obtain financing without the need to grant a senior lien. In re Snowshoe Co., 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); In re 495 Central Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most lend money only in return for a senior secured position").

41. Substantially all of the Debtors' assets are encumbered and the Debtors have been unable to procure the required funding absent the proposed superpriority claims and liens. The Debtors submit that the circumstances of these cases require the Debtors to obtain

financing under sections 364(c) and (d) of the Bankruptcy Code, and accordingly, the DIP

Facility reflects the exercise of their sound business judgment.

42.     The terms and conditions of the DIP Facility are fair and reasonable, and

were negotiated extensively by well-represented, independent parties in good faith and at arm's-

length.  Accordingly, the Postpetition Lenders and all obligations incurred under the DIP Facility

should be accorded the benefits of section 364(e) of the Bankruptcy Code.

## The Use of Cash Collateral Should Be Approved

43.     Under section 363(c)(2) of the Bankruptcy Code, a debtor may not use

cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or

(b) the court, after notice and a hearing, authorizes such use in accordance with the provisions of

this section."  11 U.S.C. § 363(c)(2).  The Debtors require the use of the Cash Collateral to fund

their day-to-day operations.  Indeed, absent such relief, the Debtors' business could be brought to

an immediate halt, with damaging consequences for the Debtors and their estates and creditors.

The interests of the Prepetition Lenders and the Noteholders in the Debtors' Cash Collateral will

be protected by the adequate protection set forth above.  The Prepetition Lenders have consented

to the use of the Cash Collateral on the terms set forth herein and in the Interim Order, and a

majority of the Noteholders have consented, or are deemed to consent, to the use of the Cash

Collateral on the terms set forth herein and in the Interim Order.  Accordingly, this Court should

approve the Debtors' request to use Cash Collateral in the operation of their business and

administration of the Chapter 11 Cases.

## The Proposed Adequate Protection Should Be Authorized

44.     Section 363(e) of the Bankruptcy Code provides that, "on request of an

entity that has an interest in property used . . . or proposed to be used by a debtor in possession,

the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate

protection of such interest." 11 U.S.C. § 363(e). Section 361 of the Bankruptcy Code delineates the permissible forms of adequate protection, which include periodic cash payments, additional liens, replacement liens and other forms of relief. 11 U.S.C. § 361. What constitutes adequate protection must be decided on a case-by-case basis. See In re O'Connor, 808 F.2d 1393, 1396 (10th Cir. 1987); In re Martin, 761 F.2d 472 (8th Cir. 1985). The focus of the requirement is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. See In re Kain, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988); Delbridge v. Production Credit Assoc. and Federal Land Bank, 104 B.R. 824 (E.D. Mich. 1989); In re Ledgemere Land Corp., 116 B.R. 338, 343 (Bankr. D. Mass. 1990).

45.     The Prepetition Lenders and the Noteholders have agreed to the Debtors' use of Cash Collateral and the Debtors' entry into the DIP Agreement in consideration for the adequate protection provided to each of them under the Interim Order. Moreover, the replacement liens, the payment of reasonable fees and expenses of the Prepetition Lenders' and Noteholders' professionals and other protections offered to the Prepetition Lenders and Noteholders will sufficiently protect their interest in any collateral taken as security under the DIP Facility. Accordingly, the adequate protection proposed here is fair and reasonable and sufficient to satisfy the requirements of Bankruptcy Code sections 363(c)(2) and (e).

**The Automatic Stay Should Be Modified on a Limited Basis**

46.     The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtors to (i) grant the security interests, liens, and superpriority claims described above with respect to the Prepetition Lenders and the Noteholders, as the case may be, and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens, (ii) permit the DIP Lenders to exercise, upon the occurrence and during the continuance of an Event of Default and after seven

26

days' notice thereof, all rights and remedies under the DIP Agreement, and (iii) implement the terms of the proposed DIP Orders.

47.     Stay modifications of this kind are ordinary and standard features of postpetition debtor financing facilities and, in the Debtors' business judgment, are reasonable and fair under the present circumstances.

## Notice

48.     No trustee, examiner, or creditors' committee has been appointed in these chapter 11 cases. The Debtors have served notice of this DIP Motion on (a) the Office of the United States Trustee for the Southern District of New York, (b) counsel to the informal group of the Debtors' prepetition junior secured noteholders, (c) U.S. Bank National Association, as indenture trustee for the Debtors' prepetition junior secured noteholders, (d) Wells Fargo Foothill, Inc., as administrative agent for the Debtors' prepetition senior secured lenders and its counsel, (e) counsel to the proposed debtor in possession lenders, and (f) those creditors holding the thirty (30) largest unsecured claims against the Debtors' estates (on a consolidated basis) (collectively, the **"Notice Parties"**). The Debtors submit that no other or further notice need be provided.

49.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request entry of an order, substantially similar to the proposed form of order attached hereto as Exhibit B, granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: January 20, 2010
       New York, New York

                                    Respectfully submitted,


                                    /s/ Joseph H. Smolinsky
                                    Jeffrey L. Tanenbaum
                                    Joseph H. Smolinsky
                                    WEIL, GOTSHAL & MANGES LLP
                                    767 Fifth Avenue
                                    New York, New York 10153
                                    Telephone: (212) 310-8000
                                    Facsimile:  (212) 310-8007

                                    *Proposed Attorneys for the Debtors
                                    and Debtors in Possession*

## EXHIBIT A

**DIP Agreement**

**DEBTOR IN POSSESSION CREDIT AGREEMENT**

**by and among**

**UNO RESTAURANT HOLDINGS CORPORATION,**
**as Debtor and Debtor-in-Possession**

**and**

**EACH OF ITS SUBSIDIARIES THAT ARE SIGNATORIES HERETO**
**each as a Debtor and Debtor-in-Possession,**
**as Borrowers,**

**THE LENDERS THAT ARE SIGNATORIES HERETO**
**as the Lenders,**

**and**

**WELLS FARGO CAPITAL FINANCE, INC.**
**as the Arranger and Administrative Agent**

**Dated as of January __, 2010**

# DEBTOR IN POSSESSION CREDIT AGREEMENT

**THIS DEBTOR IN POSSESSION CREDIT AGREEMENT** (this "Agreement"), is entered into as of January __, 2010, by and among the lenders identified on the signature pages hereof (such lenders, together with their respective successors and permitted assigns, are referred to hereinafter each individually as a "Lender" and collectively as the "Lenders"), and **WELLS FARGO CAPITAL FINANCE, INC.**, a California corporation, as the arranger and administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, "Agent"), **UNO RESTAURANT HOLDINGS CORPORATION**, a Delaware corporation, as debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code (as defined on Schedule 1.1 hereto) ("Parent"), and each of Parent's Subsidiaries identified on the signature pages hereof, each as a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code (such Subsidiaries, together with Parent, are referred to hereinafter each individually as a "Borrower," and individually and collectively, jointly and severally, as the "Borrowers").

**WHEREAS**, on January [__], 2010 (the "Filing Date"), the Borrowers and Guarantors (as defined in Schedule 1.1 hereto) each filed separate petitions under Chapter 11 of the Bankruptcy Code (the "Bankruptcy Cases") in the United States Bankruptcy Court for the Southern District of New York (together with any other court having proper jurisdiction over the Bankruptcy Cases, the "Bankruptcy Court");

**WHEREAS**, each of the Borrowers and Guarantors intend to continue to operate their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

**WHEREAS**, pursuant to that certain Credit Agreement, dated as of February 22, 2005 (as amended, modified or otherwise supplemented from time to time, the "Pre-Petition Credit Agreement"), among Parent and its subsidiaries identified on the signature pages thereto, as borrowers (collectively, the "Pre-Petition Borrowers"), the lenders party thereto from time to time (collectively, the "Pre-Petition Lenders"), and WFCF, as administrative agent and arranger for the Pre-Petition Lenders (in such capacity, together with its successors and assigns in such capacity, the "Pre-Petition Agent"), the Pre-Petition Lenders extended certain loans and other financial accommodations to the Pre-Petition Borrowers on the terms set forth therein;

**WHEREAS**, as of the date hereof, the Pre-Petition Lenders under the Pre-Petition Credit Agreement are owed $14,250,000 in term loan principal obligations and $19,650,000 in revolving loan principal obligations, including $9,775,000 in face amount of outstanding undrawn letters of credit, plus interest, fees, costs and expenses and all other "Obligations" under and as defined in the Pre-Petition Credit Agreement (the "Pre-Petition Obligations");

**WHEREAS**, the Pre-Petition Obligations are secured by a security interest in substantially all of the existing and after acquired assets of the Pre-Petition Borrowers, and such security interest is perfected and has priority over other security interests;

**WHEREAS**, the Borrowers have requested that the Lenders provide financing to the Borrowers consisting of a term loan, revolving credit loans and the issuance of letters of credit in an aggregate amount up to, subject to the terms set forth herein, $52,000,000 pursuant to Sections 364(c)(1), (2) and (3) and Section 364(d) of the Bankruptcy Code, the proceeds of which will be used to repay in full the Pre-Petition Obligations and for other purposes permitted under this Agreement;

**WHEREAS**, the Lenders have indicated their willingness to agree to lend such amounts pursuant to Sections 364(c)(1), (2), (3) and Section 364(d) of the Bankruptcy Code on the terms and conditions of this Agreement so long as such post-petition credit obligations are secured by Liens (as defined in Schedule 1.1 hereto) on all of the assets, property and interests, real and personal, tangible and intangible, of the Borrowers and the Guarantors, whether now owned or leased  or hereafter acquired or leased and given super-priority

status as provided in the Interim Order (as defined in <u>Schedule 1.1</u> hereto) and the Final Order (as defined in <u>Schedule 1.1</u> hereto); and

**WHEREAS**, the Borrowers and the Guarantors have agreed to provide such collateral as security and to provide such super-priority claims subject to the approval of the Bankruptcy Court.

**NOW THEREFORE**, the parties agree as follows:

**1. DEFINITIONS AND CONSTRUCTION.**

**1.1** **Definitions**. Capitalized terms used in this Agreement (including the preamble and recitals hereto) shall have the meanings specified therefor on <u>Schedule 1.1</u>.

**1.2** **Accounting Terms**. All accounting terms not specifically defined herein shall be construed in accordance with GAAP. When used herein, the term "financial statements" shall include the notes and schedules thereto. Whenever the term "Borrowers" or the term "Parent" is used in respect of a financial covenant or a related definition, it shall be understood to mean Parent and its Subsidiaries on a consolidated basis unless the context clearly requires otherwise.

**1.3** **Code**. Any terms used in this Agreement that are defined in the Code shall be construed and defined as set forth in the Code unless otherwise defined herein, provided, however, that to the extent that the Code is used to define any term herein and such term is defined differently in different Articles of the Code, the definition of such term contained in <u>Article 9</u> shall govern.

**1.4** **Construction**. Unless the context of this Agreement or any other Loan Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural and the terms "includes" and "including" are not limiting. The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document, as the case may be, as a whole and not to any particular provision of this Agreement or such other Loan Document, as the case may be. Section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified. Any reference in this Agreement or in the other Loan Documents to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein). Any reference herein to the satisfaction or repayment in full of the Obligations shall mean the repayment in full in cash (or cash collateralization in accordance with the terms hereof) of all Obligations other than unasserted contingent indemnification Obligations and other than any Bank Product Obligations that, at such time, are allowed by the applicable Bank Product Provider to remain outstanding and are not required to be repaid or cash collateralized pursuant to the provisions of this Agreement. Any reference herein to any Person shall be construed to include such Person's successors and assigns. Any requirement of a writing contained herein or in the other Loan Documents shall be satisfied by the transmission of a Record and any Record transmitted shall constitute a representation and warranty as to the accuracy and completeness of the information contained therein.

**1.5** **Schedules and Exhibits**. All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

## 2. LOAN AND TERMS OF PAYMENT.

### 2.1 Revolver Advances.

(a) Subject to the terms and conditions of this Agreement, and during the term of this Agreement, each Lender with a Revolver Commitment agrees (severally, not jointly or jointly and severally) to make advances ("Advances") to Borrowers in an amount at any one time outstanding not to exceed such Lender's Pro Rata Share of an amount equal *to the lesser of* (i) the Maximum Revolver Amount *less* the Letter of Credit Usage, or (ii) the Borrowing Base *less* the Letter of Credit Usage.

(b) Anything to the contrary in this Section 2.1 notwithstanding, Agent shall have the right to establish reserves against the Borrowing Base in such amounts, and with respect to such matters, as Agent in its Permitted Discretion shall deem necessary or appropriate, including reserves with respect to (i) sums that any Borrower or its Subsidiaries are required to pay under any Section of this Agreement or any other Loan Document (such as taxes, assessments, insurance premiums, or, in the case of leased assets, rents or other amounts payable under such leases) and has failed to pay, and (ii) amounts owing by any Borrower or its Subsidiaries to any Person to the extent secured by a Lien on, or trust over, any of the Collateral (other than Specified Permitted Liens), which Lien or trust, in the Permitted Discretion of Agent likely would have a priority superior to the Agent's Liens (such as Liens or trusts in favor of landlords, warehousemen, carriers, mechanics, materialmen, laborers, or suppliers, or Liens or trusts for *ad valorem*, excise, sales, or other taxes where given priority under applicable law) in and to such item of the Collateral; provided, however, unless a Default or Event of Default shall have occurred and be continuing, and other than in connection with any Tax Lien, Agent shall not implement any such reserves upon less than two (2) Business Days notice to Administrative Borrower.

(c) Amounts borrowed pursuant to this Section 2.1 may be repaid and, subject to the terms and conditions of this Agreement, reborrowed at any time during the term of this Agreement.

### 2.2 Term Loan. 
Subject to the terms and conditions of this Agreement, on the Closing Date each Lender with a Term Loan Commitment agrees (severally, not jointly or jointly and severally) to make term loans (collectively, the "Term Loan") to Borrowers in an amount equal to such Lender's Pro Rata Share of $27,000,000. Such Term Loan will be made by each Lender with a Term Loan Commitment wiring, for receipt by 10:00 a.m. (California time), immediately available funds equal to its Pro Rata Share of the Term Loan to Agent's Account on the Closing Date, which proceeds Agent shall remit to the Borrowers as provided in the Disbursement Letter. The outstanding unpaid principal balance and all accrued and unpaid interest under the Term Loan shall be due and payable on the date of termination of this Agreement, whether by its terms, by prepayment, or by acceleration. The Term Loan Commitments will terminate upon the making of such Term Loan in accordance with this Section 2.2. Except to the extent that any portion thereof shall be required to be paid prior to the Maturity Date in accordance with the terms hereof, the outstanding principal of the Term Loan shall be due and payable in full on the Maturity Date All amounts outstanding under the Term Loan shall constitute Obligations. Any principal amount of the Term Loan repaid or prepaid may not be reborrowed.

### 2.3 Borrowing Procedures and Settlements.

(a) **Procedure for Borrowing.** Each Borrowing shall be made by an irrevocable written request by an Authorized Person delivered to Agent. Such notice must be received by Agent prior to 10:00 a.m. (California time) on a Business Day and must specify (i) the amount of such Borrowing, and (ii) the requested Funding Date, which shall be a Business Day and, unless such Borrowing is requested as a Swing Loan pursuant to Section 2.3(b) below, must be no sooner than the Business Day following the date such notice is received. Borrowing notices received after 10:00 a.m. (California time) on a Business Day shall be deemed received on the following Business Day. At Agent's election, in lieu of delivering the above-described written request, any Authorized Person may give Agent telephonic notice of such request by the

required time. In such circumstances, Borrowers agree that any such telephonic notice will be confirmed in writing within 24 hours of the giving of such telephonic notice, but the failure to provide such written confirmation shall not affect the validity of the request.

(b) **Making of Swing Loans.** In the case of a request for an Advance and so long as either (i) the aggregate amount of Swing Loans made since the last Settlement Date that are outstanding *plus* the amount of the requested Advance does not exceed $3,000,000, or (ii) Swing Lender, in its sole discretion, shall agree to make a Swing Loan notwithstanding the foregoing limitation, Swing Lender, as a Lender, shall make an Advance in the amount of such Borrowing (any such Advance made solely by Swing Lender as a Lender pursuant to this Section 2.3(b) being referred to as a "Swing Loan" and such Advances being referred to collectively as "Swing Loans") available to Administrative Borrower on the Funding Date applicable thereto by transferring immediately available funds to Administrative Borrower's Designated Account. Each Swing Loan shall be deemed to be an Advance hereunder and shall be subject to all the terms and conditions applicable to other Advances, except that all payments on any Swing Loan shall be payable to Swing Lender as a Lender solely for its own account. Subject to the provisions of Section 2.3(d)(ii), Swing Lender as a Lender shall not make and shall not be obligated to make any Swing Loan if Swing Lender has actual knowledge that (i) one or more of the applicable conditions precedent set forth in Section 3 will not be satisfied on the requested Funding Date for the applicable Borrowing, or (ii) the requested Borrowing would exceed the Availability on such Funding Date. Swing Lender as a Lender shall not otherwise be required to determine whether the applicable conditions precedent set forth in Section 3 have been satisfied on the Funding Date applicable thereto prior to making any Swing Loan. The Swing Loans shall be secured by the Agent's Liens, constitute Obligations hereunder, and bear interest at the rate applicable from time to time to Advances that are Base Rate Loans, provided, that, upon Settlement of any Swing Loan pursuant to Section 2.3(e), such Swing Loan shall constitute an Advance and, upon Administrative Borrower's election of the LIBOR Election pursuant to the terms of this Agreement, may be converted to a LIBOR Rate Loan.

(c) **Making of Loans.**

(i) In the event that Swing Lender is not obligated to make a Swing Loan, then promptly after receipt of a request for a Borrowing pursuant to Section 2.3(a), Agent shall notify the Lenders, not later than 1:00 p.m. (California time) on the Business Day immediately preceding the Funding Date applicable thereto, by telecopy, telephone, or other similar form of transmission, of the requested Borrowing. Each Lender shall make the amount of such Lender's Pro Rata Share of the requested Borrowing available to Agent in immediately available funds, to Agent's Account, not later than 10:00 a.m. (California time) on the Funding Date applicable thereto. After Agent's receipt of the proceeds of such Advances, Agent shall make the proceeds thereof available to Administrative Borrower on the applicable Funding Date by transferring immediately available funds equal to such proceeds received by Agent to Administrative Borrower's Designated Account; provided, however, that, subject to the provisions of Section 2.3(d)(ii), Agent shall not request any Lender to make, and no Lender shall have the obligation to make, any Advance if Agent shall have actual knowledge that (1) one or more of the applicable conditions precedent set forth in Section 3 will not be satisfied on the requested Funding Date for the applicable Borrowing unless such condition has been waived, or (2) the requested Borrowing would exceed the Availability on such Funding Date.

(ii) Unless Agent receives notice from a Lender prior to 9:00 a.m. (California time) on the date of a Borrowing, that such Lender will not make available as and when required hereunder to Agent for the account of Borrowers the amount of that Lender's Pro Rata Share of the Borrowing, Agent may assume that each Lender has made or will make such amount available to Agent in immediately available funds on the Funding Date and Agent may (but shall not be so required), in reliance upon such assumption, make available to Borrowers on such date a corresponding amount. If and to the extent any Lender shall not have made its full amount available to Agent in immediately available funds and Agent in such circumstances has made available to Borrowers such amount, that Lender shall on the Business Day following such Funding Date make such amount available to Agent, together with interest at the Defaulting Lender Rate for each day during such period. A notice submitted by Agent to any Lender with respect to amounts owing under this

subsection shall be conclusive, absent manifest error.  If such amount is so made available, such payment to Agent shall constitute such Lender's Advance on the date of Borrowing for all purposes of this Agreement.  If such amount is not made available to Agent on the Business Day following the Funding Date, Agent will notify Administrative Borrower of such failure to fund and, upon demand by Agent, Borrowers shall pay such amount to Agent for Agent's account, together with interest thereon for each day elapsed since the date of such Borrowing, at a rate per annum equal to the interest rate applicable at the time to the Advances composing such Borrowing.  The failure of any Lender to make any Advance on any Funding Date shall not relieve any other Lender of any obligation hereunder to make an Advance on such Funding Date, but no Lender shall be responsible for the failure of any other Lender to make the Advance to be made by such other Lender on any Funding Date.

(iii)　　　Agent shall not be obligated to transfer to a Defaulting Lender any payments made by Borrowers to Agent for the Defaulting Lender's benefit, and, in the absence of such transfer to the Defaulting Lender, Agent shall transfer any such payments to each other non-Defaulting Lender member of the Lender Group ratably in accordance with their Commitments (but only to the extent that such Defaulting Lender's Advance was funded by the other members of the Lender Group) or, if so directed by Administrative Borrower and if no Default or Event of Default had occurred and is continuing (and to the extent such Defaulting Lender's Advance was not funded by the Lender Group), retain same to be re-advanced to Borrowers as if such Defaulting Lender had made Advances to Borrowers.  Subject to the foregoing, Agent may hold and, in its Permitted Discretion, re-lend to Borrowers for the account of such Defaulting Lender the amount of all such payments received and retained by Agent for the account of such Defaulting Lender.  Solely for the purposes of voting or consenting to matters with respect to the Loan Documents, such Defaulting Lender shall be deemed not to be a "Lender" and such Lender's Commitment shall be deemed to be zero.  This Section shall remain effective with respect to such Lender until (x) the Obligations under this Agreement shall have been declared or shall have become immediately due and payable, (y) the non-Defaulting Lenders, Agent, and Administrative Borrower shall have waived such Defaulting Lender's default in writing, or (z) the Defaulting Lender makes its Pro Rata Share of the applicable Advance and pays to Agent all amounts owing by Defaulting Lender in respect thereof.  The operation of this Section shall not be construed to increase or otherwise affect the Commitment of any Lender, to relieve or excuse the performance by such Defaulting Lender or any other Lender of its duties and obligations hereunder, or to relieve or excuse the performance by Borrowers of their duties and obligations hereunder to Agent or to the Lenders other than such Defaulting Lender.  Any such failure to fund by any Defaulting Lender shall constitute a material breach by such Defaulting Lender of this Agreement and shall entitle Administrative Borrower at its option, upon written notice to Agent, to arrange for a substitute Lender to assume the Commitment of such Defaulting Lender, such substitute Lender to be acceptable to Agent.  In connection with the arrangement of such a substitute Lender, the Defaulting Lender shall have no right to refuse to be replaced hereunder, and agrees to execute and deliver a completed form of Assignment and Acceptance in favor of the substitute Lender (and agrees that it shall be deemed to have executed and delivered such document if it fails to do so) subject only to being repaid its share of the outstanding Obligations (other than Bank Product Obligations, but including an assumption of its Pro Rata Share of the Risk Participation Liability) without any premium or penalty of any kind whatsoever; provided however, that any such assumption of the Commitment of such Defaulting Lender shall not be deemed to constitute a waiver of any of the Lender Groups' or Borrowers' rights or remedies against any such Defaulting Lender arising out of or in relation to such failure to fund.

**(d)　　　Protective Advances and Optional Overadvances.**

(i)　　　Agent hereby is authorized by Borrowers and the Lenders, from time to time in Agent's sole discretion, (A) after the occurrence and during the continuance of a Default or an Event of Default, or (B) at any time that any of the other applicable conditions precedent set forth in Section 3 are not satisfied, to make Advances to Borrowers on behalf of the Lenders that Agent, in its Permitted Discretion deems necessary or desirable (1) to preserve or protect the Collateral, or any portion thereof, (2) to enhance the likelihood of repayment of the Obligations (other than the Bank Product Obligations), or (3) to pay any other amount chargeable to Borrowers pursuant to the terms of this Agreement, including Lender Group Expenses

and the costs, fees, and expenses described in <u>Section 9</u> (any of the Advances described in this <u>Section 2.3(d)(i)</u> shall be referred to as "<u>Protective Advances</u>").

(ii)     Any contrary provision of this Agreement notwithstanding, the Lenders hereby authorize Agent or Swing Lender, as applicable, and either Agent or Swing Lender, as applicable, may, but is not obligated to, knowingly and intentionally, continue to make Advances (including Swing Loans) to Borrowers notwithstanding that an Overadvance exists or thereby would be created, so long as (A) after giving effect to such Advances, the outstanding Revolver Usage does not exceed the Borrowing Base by more than $5,000,000, and (B) after giving effect to such Advances, the outstanding Revolver Usage (except for and excluding amounts charged to the Loan Account for interest, fees, or Lender Group Expenses) does not exceed the Maximum Revolver Amount.  In the event Agent obtains actual knowledge that the Revolver Usage exceeds the amounts permitted by the immediately foregoing provisions, regardless of the amount of, or reason for, such excess, Agent shall notify the Lenders as soon as practicable (and prior to making any (or any additional) intentional Overadvances (except for and excluding amounts charged to the Loan Account for interest, fees, or Lender Group Expenses) unless Agent determines that prior notice would result in imminent harm to the Collateral or its value), and the Lenders with Revolver Commitments thereupon shall, together with Agent, jointly determine the terms of arrangements that shall be implemented with Borrowers intended to reduce, within a reasonable time, the outstanding principal amount of the Advances to Borrowers to an amount permitted by the preceding paragraph.  In such circumstances, if any Lender with a Revolver Commitment disagrees over the proposed terms of reduction or repayment of any Overadvance, the terms of reduction or repayment thereof shall be implemented according to the determination of the Required Lenders.  Each Lender with a Revolver Commitment shall be obligated to settle with Agent as provided in <u>Section 2.3(e)</u> for the amount of such Lender's Pro Rata Share of any unintentional Overadvances by Agent reported to such Lender, any intentional Overadvances made as permitted under this <u>Section 2.3(d)(ii)</u>, and any Overadvances resulting from the charging to the Loan Account of interest, fees, or Lender Group Expenses.

(iii)     Each Protective Advance and each Overadvance shall be deemed to be an Advance hereunder, except that no Protective Advance or Overadvance shall be eligible to be a LIBOR Rate Loan and all payments on the Protective Advances shall be payable to Agent solely for its own account.  The Protective Advances and Overadvances shall be repayable on demand, secured by the Agent's Liens, constitute Obligations hereunder, and bear interest at the rate applicable from time to time to Advances that are Base Rate Loans.  The provisions of this <u>Section 2.3(d)</u> are for the exclusive benefit of Agent, Swing Lender, and the Lenders and are not intended to benefit any Borrower in any way.

(e)     <u>Settlement.</u>  It is agreed that each Lender's funded portion of the Advances is intended by the Lenders to equal, at all times, such Lender's Pro Rata Share of the outstanding Advances.  Such agreement notwithstanding, Agent, Swing Lender, and the other Lenders agree (which agreement shall not be for the benefit of any Borrower) that in order to facilitate the administration of this Agreement and the other Loan Documents, settlement among the Lenders as to the Advances, the Swing Loans, and the Protective Advances shall take place on a periodic basis in accordance with the following provisions:

(i)     Agent shall request settlement ("<u>Settlement</u>") with the Lenders on a weekly basis, or on a more frequent basis if so determined by Agent, (1) on behalf of Swing Lender, with respect to each outstanding Swing Loan, (2) for itself, with respect to the outstanding Protective Advances, and (3) with respect to Borrowers' or their Subsidiaries' Collections received by Agent in the Agent's Account in accordance with the terms of this Agreement or other payments with respect to the Obligations received by Agent, as to each by notifying the Lenders by telecopy, telephone, or other similar form of transmission, of such requested Settlement, no later than 2:00 p.m. (California time) on the Business Day immediately prior to the date of such requested Settlement (the date of such requested Settlement being the "<u>Settlement Date</u>").  Such notice of a Settlement Date shall include a summary statement of the amount of outstanding Advances, Swing Loans, and Protective Advances for the period since the prior Settlement Date.  Subject to the terms and conditions contained herein (including <u>Section 2.3(b)(iii)</u>):  (y) if a Lender's balance of the Advances (including Swing Loans and Protective Advances) exceeds such Lender's Pro Rata Share of the Advances

(including Swing Loans and Protective Advances) as of a Settlement Date, then Agent shall, by no later than 12:00 p.m. (California time) on the Settlement Date, transfer in immediately available funds to a Deposit Account of such Lender (as such Lender may designate), an amount such that each such Lender shall, upon receipt of such amount, have as of the Settlement Date, its Pro Rata Share of the Advances (including Swing Loans and Protective Advances), and (z) if a Lender's balance of the Advances (including Swing Loans and Protective Advances) is *less* than such Lender's Pro Rata Share of the Advances (including Swing Loans and Protective Advances) as of a Settlement Date, such Lender shall no later than 12:00 p.m. (California time) on the Settlement Date transfer in immediately available funds to the Agent's Account, an amount such that each such Lender shall, upon transfer of such amount, have as of the Settlement Date, its Pro Rata Share of the Advances (including Swing Loans and Protective Advances). Such amounts made available to Agent under clause (z) of the immediately preceding sentence shall be applied against the amounts of the applicable Swing Loans or Protective Advances and, together with the portion of such Swing Loans or Protective Advances representing Swing Lender's Pro Rata Share thereof, shall constitute Advances of such Lenders. If any such amount is not made available to Agent by any Lender on the Settlement Date applicable thereto to the extent required by the terms hereof, Agent shall be entitled to recover for its account such amount on demand from such Lender together with interest thereon at the Defaulting Lender Rate.

(ii) In determining whether a Lender's balance of the Advances, Swing Loans, and Protective Advances is *less* than, equal to, or greater than such Lender's Pro Rata Share of the Advances, Swing Loans, and Protective Advances as of a Settlement Date, Agent shall, as part of the relevant Settlement, apply to such balance the portion of payments actually received in good funds by Agent with respect to principal, interest, fees payable by Borrowers and allocable to the Lenders hereunder, and proceeds of Collateral. To the extent that a net amount is owed to any such Lender after such application, such net amount shall be distributed by Agent to that Lender as part of such next Settlement.

(iii) Between Settlement Dates, Agent, to the extent no Protective Advances or Swing Loans are outstanding, may pay over to Swing Lender any payments received by Agent, that in accordance with the terms of this Agreement would be applied to the reduction of the Advances, for application to Swing Lender's Pro Rata Share of the Advances. If, as of any Settlement Date, Collections of Borrowers or their Subsidiaries received by Agent in the Agent's Account in accordance with the terms of this Agreement or other payments with respect to the Obligations received by Agent since the then immediately preceding Settlement Date have been applied to Swing Lender's Pro Rata Share of the Advances other than to Swing Loans, as provided for in the previous sentence, Swing Lender shall pay to Agent for the accounts of the Lenders, and Agent shall pay to the Lenders, to be applied to the outstanding Advances of such Lenders, an amount such that each Lender shall, upon receipt of such amount, have, as of such Settlement Date, its Pro Rata Share of the Advances. With respect to Swing Loans and/or Advances that are outstanding during the period between Settlement Dates, Swing Lender with respect to Swing Loans, Agent with respect to Protective Advances, and each Lender with respect to the Advances other than Swing Loans and Protective Advances, shall be entitled to any interest paid, at the applicable rate or rates under this Agreement, on the daily amount of funds employed by Swing Lender, Agent, or the Lenders, as applicable.

(f) **Notation.** Agent shall record on its books the principal amount of the Advances owing to each Lender, including the Swing Loans owing to Swing Lender, and Protective Advances owing to Agent, and the interests therein of each Lender, from time to time and such records shall, absent manifest error, conclusively be presumed to be correct and accurate.

(g) **Lenders' Failure to Perform.** All Advances (other than Swing Loans and Protective Advances) shall be made by the Lenders contemporaneously and in accordance with their Pro Rata Shares. It is understood that (i) no Lender shall be responsible for any failure by any other Lender to perform its obligation to make any Advance (or other extension of credit) hereunder, nor shall any Commitment of any Lender be increased or decreased as a result of any failure by any other Lender to perform its obligations hereunder, and (ii) no failure by any Lender to perform its obligations hereunder shall excuse any other Lender from its obligations hereunder.

## 2.4 Payments.

### (a) Payments by Borrowers.

(i) Except as otherwise expressly provided herein, all payments by Borrowers shall be made to Agent's Account for the account of the Lender Group and shall be made in immediately available funds, no later than 11:00 a.m. (California time) on the date specified herein. Any payment received by Agent later than 11:00 a.m. (California time), shall be deemed to have been received on the following Business Day and any applicable interest or fee shall continue to accrue until such following Business Day.

(ii) Unless Agent receives notice from Administrative Borrower prior to the date on which any payment is due to the Lenders that Borrowers will not make such payment in full as and when required, Agent may assume that Borrowers have made (or will make) such payment in full to Agent on such date in immediately available funds and Agent may (but shall not be so required), in reliance upon such assumption, distribute to each Lender on such due date an amount equal to the amount then due such Lender. If and to the extent Borrowers do not make such payment in full to Agent on the date when due, each Lender severally shall repay to Agent on demand such amount distributed to such Lender, together with interest thereon at the Defaulting Lender Rate for each day from the date such amount is distributed to such Lender until the date repaid.

### (b) Apportionment and Application.

(i) Except as otherwise provided with respect to Defaulting Lenders and subject to any agreements among the Lenders (if any), aggregate principal and interest payments shall be apportioned ratably among the Lenders (according to the unpaid principal balance of the Obligations to which such payments relate held by each Lender) and payments of fees and expenses (other than fees or expenses that are for Agent's separate account) shall be apportioned ratably among the Lenders having a Pro Rata Share of the type of Commitment or Obligation to which a particular fee relates. All payments shall be remitted to Agent and all such payments, subject to Section 2.4(b)(iii) hereof, and all proceeds of Collateral received by Agent, subject to Section 2.4(b)(iii) hereof, shall be applied as follows, subject to any agreements among the Lenders (if any):

(A) so long as no Event of Default has occurred and is continuing:

(1) first, ratably to pay any Lender Group Expenses then due to Agent or any of the Lenders under the Loan Documents, until paid in full,

(2) second, ratably to pay any fees or premiums then due to Agent (for its separate account) or any of the Lenders under the Loan Documents until paid in full,

(3) third, to pay interest due in respect of all Protective Advances until paid in full,

(4) fourth, to pay the principal of all Protective Advances until paid in full,

(5) fifth, ratably to pay interest due in respect of the Advances (other than Protective Advances), the Swing Loans, and the Term Loan until paid in full,

(6) sixth, to pay the principal of all Swing Loans until paid in full,

(7)     seventh, at Agent's election (which election Agent agrees will not be made if an Overadvance would be created thereby), to pay any Bank Product Obligations then due and owing, until paid in full,

(8)     eighth, to pay the principal of all Advances until paid in full,

(9)     ninth, to pay the principal of the Term Loan (to the extent then permitted or required to be paid under the terms of this Agreement) until paid in full, and

(10)     tenth, to Borrowers (to be wired to the Designated Account) or such other Person entitled thereto under applicable law; and

(B)     if an Event of Default has occurred and is continuing:

(1)     first, ratably to pay (I) any Lender Group Expenses then due to Agent under the Loan Documents and (II) any fees or premiums then due to Agent (for its separate account) under the Loan Documents until paid in full,

(2)     second, to pay interest due in respect of all Protective Advances until paid in full,

(3)     third, to pay the principal of all Protective Advances until paid in full,

(4)     fourth, ratably to pay (I) any Lender Group Expenses then due under the Loan Documents to any Lender holding a Revolver Commitment and (II) any fees or premiums then due under the Loan Documents to any Lender holding a Revolver Commitment until paid in full,

(5)     fifth, ratably to pay interest due in respect of the Advances (other than Protective Advances) and the Swing Loans until paid in full,

(6)     sixth, to pay the principal of all Swing Loans until paid in full,

(7)     seventh, ratably, (I) to pay the principal of the Advances until paid in full, (II) to Agent, to be held by Agent, for the ratable benefit of Issuing Lender and those Lenders having a Revolver Commitment, as cash collateral in an amount up to 105% of the Letter of Credit Usage until paid in full and (III) to Agent, to be held by Agent, for the benefit of the Bank Product Providers, as cash collateral in an amount up to the amount the Bank Product Providers reasonably determine to be the credit exposure of Borrowers and their Subsidiaries in respect of Bank Products, but in any event, not in excess of the Bank Product Reserve established prior to the occurrence of, and not in contemplation of, the subject Event of Default,

(8)     eighth, ratably to pay (I) any Lender Group Expenses then due under the Loan Documents to any Lender holding the Term Loan and (II) any fees or premiums then due under the Loan Documents to any Lender holding the Term Loan until paid in full,

(9)     ninth, to pay interest then due and payable in respect of the Term Loan until paid in full,

(10)     tenth, to pay the principal of the Term Loan until paid in full,

(11)     eleventh, to pay any other Obligations (including the provision of amounts to Agent, to be held by Agent, for the benefit of the Bank Product Providers, as cash collateral in an amount up to the amount determined by Agent in its Permitted Discretion as the amount necessary to secure the Bank Product Obligations),

(12)     twelfth, to Borrowers (to be wired to the Designated Account) or such other Person entitled thereto under applicable law.

(ii)     Agent promptly shall distribute to each Lender, pursuant to the applicable wire instructions received from each Lender in writing, such funds as it may be entitled to receive, subject to a Settlement delay as provided in Section 2.3(e).

(iii)     In each instance, so long as no Event of Default has occurred and is continuing, this Section 2.4(b) shall not apply to any payment made by Borrowers to Agent and specified by Borrowers to be for the payment of specific Obligations then due and payable (or prepayable) under any provision of this Agreement.

(iv)     For purposes of the foregoing Section 2.4(b), "paid in full" means payment of all amounts owing under the Loan Documents according to the terms thereof, including loan fees, service fees, professional fees, interest. default interest, interest on interest, and expense reimbursements.

(v)     In the event of a direct conflict between the priority provisions of this Section 2.4 and other provisions contained in any other Loan Document, it is the intention of the parties hereto that such priority provisions in such documents shall be read together and construed, to the fullest extent possible, to be in concert with each other.  In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 2.4 shall control and govern.

**(c)     [Reserved].**

**(d)     Optional Prepayments of Term Loan.**  With the Agent's prior written consent, which consent may be granted or withheld in the Agent's sole discretion, the Borrowers may prepay the Term Loan, in whole or in part, without premium or penalty.

**(e)     Mandatory Prepayments.**

(i)     Dispositions.  Within 1 Business Day of the date of receipt by any Borrower, Guarantor or any of their respective Subsidiaries of the Net Cash Proceeds of any voluntary or involuntary sale or disposition by any Borrower, Guarantor or any of its respective Subsidiaries of assets (including casualty losses or condemnations but excluding sales or dispositions which qualify as Permitted Dispositions under clauses (a), (b), (c), or (d) of the definition of Permitted Dispositions), the Borrowers shall prepay the outstanding principal amount of the Obligations in accordance with Section 2.4(e)(v)(A) in an amount equal to 100% of such Net Cash Proceeds (including condemnation awards and payments in lieu thereof) received by such Person in connection with such sales or dispositions.  Nothing contained in this Section 2.4(e)(i) shall permit any Borrower or any of its Subsidiaries to sell or otherwise dispose of any assets other than in accordance with Section 6.4.

(ii)     Extraordinary Receipts.  Within 1 Business Day of the date of receipt by any Borrower, any Guarantor or any of their respective Subsidiaries of any Extraordinary Receipts, the Borrowers shall prepay the outstanding principal amount of the Obligations in accordance with Section 2.4(e)(v)(B) in an amount equal to 100% of the Net Cash Proceeds  of such Extraordinary Receipts.

(iii)     Indebtedness.  Within 1 Business Day of the date of incurrence by any Borrower, any Gurantor or any of their respective Subsidiaries of any Indebtedness (other than Permitted

Indebtedness), the Borrowers shall prepay the outstanding principal amount of the Obligations in accordance with Section 2.4(e)(v)(B) in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection with such incurrence.  The provisions of this Section 2.4(e)(iii) shall not be deemed to be implied consent to any such incurrence otherwise prohibited by the terms and conditions of this Agreement.

          (iv)     Equity.  Within 1 Business Day of the date of the issuance by any Borrower, any Guarantor or any of their respective Subsidiaries of any shares of its or their Stock, the Borrowers shall prepay the outstanding principal amount of the Obligations in accordance with Section 2.4(e)(v)(B) in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection with such issuance. The provisions of this Section 2.4(e)(iv) shall not be deemed to be implied consent to any such issuance otherwise prohibited by the terms and conditions of this Agreement.

          (v)     Application of Payments.

          (A)     Each prepayment pursuant to Section 2.4(e)(i) or Section 2.4(e)(ii) shall (1) so long as no Event of Default shall have occurred and be continuing, be applied, *first*, to the outstanding principal amount of the Advances until paid in full, *second*, to cash collateralize the Letters of Credit in an amount equal to 105% of the then extant Letter of Credit Usage, *third*, to the outstanding principal amount of the Term Loan until paid in full and *fourth*, to the remaining outstanding Obligations then due and payable until paid in full; provided, however, if prepayments pursuant to Sections 2.4(e)(i) and 2.4(e)(ii) exceed, in the aggregate for all such prepayments, $750,000 (any such prepayments in excess of such amount being the "Excess Prepayments"), the Maximum Revolver Amount shall be permanently reduced on a dollar for dollar basis with respect to each such Excess Prepayment, and (2) if an Event of Default shall have occurred and be continuing, be applied in the manner set forth in Section 2.4(b)(i)(B).

          (B)     Each prepayment pursuant to Section 2.4(e)(iii) or Section 2.4(e)(iv) shall (1) so long as no Event of Default shall have occurred and be continuing, be applied, *first*, to the outstanding principal amount of the Advances (with a corresponding permanent reduction in the Maximum Revolver Amount), until paid in full, *second*, to cash collateralize the Letters of Credit in an amount equal to 105% of the then extant Letter of Credit Usage (with a corresponding permanent reduction in the Maximum Revolver Amount), *third*, to the outstanding principal amount of the Term Loan until paid in full and *fourth*, to the remaining outstanding Obligations then due and payable until paid in full, and (2) if an Event of Default shall have occurred and be continuing, be applied in the manner set forth in Section 2.4(b)(i)(B).

     **2.5**     **Overadvances**.  If, at any time or for any reason, the amount of Obligations owed by Borrowers to the Lender Group pursuant to Section 2.1 or Section 2.12 is greater than any of the limitations set forth in Section 2.1 or Section 2.12, as applicable (an "Overadvance"), Borrowers immediately shall pay to Agent, in cash, the amount of such excess, which amount shall be used by Agent to reduce the Obligations by the amount of such excess and applied in accordance with the priorities set forth in Section 2.4(b).  In addition, Borrowers hereby promise to pay the Obligations (including principal, interest, fees, costs, and expenses) in Dollars in full as and when due and payable under the terms of this Agreement and the other Loan Documents.

     **2.6**     **Interest Rates and Letter of Credit Fee:  Rates, Payments, and Calculations**.

     **(a)**     **Interest Rates.**  Except as provided in Section 2.6(c), all Obligations (except for undrawn Letters of Credit and except for Bank Product Obligations) that have been charged to the Loan Account pursuant to the terms hereof shall bear interest on the Daily Balance thereof as follows:

          (i)     if the relevant Obligation is an Advance that is a LIBOR Rate Loan, at a per annum rate equal to the LIBOR Rate *plus* the LIBOR Rate Margin;

          (ii)     if the relevant Obligation is the Term Loan or any portion thereof, at a per annum rate equal to 15.00%; and

(iii)     otherwise, at a per annum rate equal to the Base Rate *plus* the Base Rate Margin applicable to Advances.

**(b)     Letter of Credit Fee.**  Borrowers shall pay Agent (for the ratable benefit of the Lenders with a Revolver Commitment), a Letter of Credit fee (in addition to the charges, commissions, fees, and costs set forth in Section 2.12(e)) which shall accrue at a per annum rate equal to the LIBOR Rate Margin times the average Daily Balance of the undrawn amount of all outstanding Letters of Credit.

**(c)     Default Rate.**  Upon the occurrence and during the continuation of an Event of Default, at the election of Agent or the Required Lenders:

(i)     all Obligations (except for undrawn Letters of Credit and except for Bank Product Obligations) that have been charged to the Loan Account pursuant to the terms hereof shall bear interest on the Daily Balance thereof at a per annum rate equal to 2 percentage points above the per annum rate otherwise applicable hereunder; and

(ii)     the Letter of Credit fee provided for above shall be increased to 2 percentage points above the per annum rate otherwise applicable hereunder.

**(d)     Payment.**  Except as provided to the contrary in Section 2.11 or Section 2.13(a), interest, Letter of Credit fees, and all other fees payable hereunder shall be due and payable, in arrears, on the first day of each month at any time that Obligations or Commitments are outstanding.  Borrowers hereby authorize Agent, from time to time, without prior notice to Borrowers, to charge all interest and fees (when due and payable), all Lender Group Expenses (as and when incurred), all charges, commissions, fees, and costs provided for in Section 2.12(e) (as and when accrued or incurred), all fees and costs provided for in Section 2.11 (as and when accrued or incurred), and all other payments as and when due and payable under any Loan Document (including the amounts due and payable with respect to the Term Loan and including any amounts due and payable to the Bank Product Providers in respect of Bank Products up to the amount of the Bank Product Reserve) to Borrowers' Loan Account, which amounts thereafter shall constitute Advances hereunder and shall accrue interest at the rate then applicable to Advances hereunder.  Any interest not paid when due shall be charged to Borrowers' Loan Account and shall thereafter constitute Advances hereunder and shall accrue interest at the rate then applicable to Advances that are Base Rate Loans hereunder.

**(e)     Computation.**  All interest and fees chargeable under the Loan Documents shall be computed on the basis of a 360 day year for the actual number of days elapsed.  In the event the Base Rate is changed from time to time hereafter, the rates of interest hereunder based upon the Base Rate automatically and immediately shall be increased or decreased by an amount equal to such change in the Base Rate.

**(f)     Intent to Limit Charges to Maximum Lawful Rate.**  In no event shall the interest rate or rates payable under this Agreement, *plus* any other amounts paid in connection herewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable.  Borrowers and the Lender Group, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and manner of payment stated within it; provided, however, that, anything contained herein to the contrary notwithstanding, if said rate or rates of interest or manner of payment exceeds the maximum allowable under applicable law, then, ipso facto, as of the date of this Agreement, Borrowers are and shall be liable only for the payment of such maximum as allowed by law, and payment received from Borrowers in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the Obligations to the extent of such excess.

**2.7     Cash Management**.

**(a)**     After the entry of the Interim Order (or the Final Order, when applicable) and the Cash Management Order, as applicable, and pursuant to and to the extent permitted in the Interim Order, the

Final Order or the Cash Management Order, as applicable, the cash management and treasury arrangements in existence on the Filing Date shall continue in effect (unless otherwise consented to by the Agent) and the Borrowers and Guarantors hereby agree to comply with all Control Agreements in favor of Pre-Petition Agent as if such Control Agreements were made in favor of Agent. The Agent shall, pursuant to the Interim Order, the Final Order or the Cash Management Order, as applicable, be deemed to be the successor in interest to the Pre-Petition Agent with respect to any and all Credit Card Agreements, Cash Management Agreements and Control Agreements executed and delivered in connection with the Pre-Petition Credit Agreement. The Borrowers and Guarantors shall and shall cause each of their respective Subsidiaries to, subject to Section 6.12:

(i)     establish and maintain cash management services of a type and on terms satisfactory to Agent at the bank set forth on Schedule 2.7 (the "Cash Management Bank") with respect to the bank accounts set forth on Schedule 2.7 (each a "Cash Management Account");

(ii)    with respect to all Collections received or receivable from their and their Subsidiaries' Account Debtors that are franchisees, (A) request in writing and otherwise take such reasonable steps to ensure that such Account Debtors who remit payments on Accounts by wire transfer or other similar method, forward such payments directly to the Cash Management Account identified on Schedule 2.7 as the "franchisee account" (the "Franchisee Account"), (B) deposit or cause to be deposited promptly, and in any event no later than the third Business Day after the date of receipt thereof, all other such Collections received by them directly from such Account Debtors into the Franchisee Account, (C) instruct the Cash Management Bank to automatically sweep all available funds from the Franchisee Account to the Cash Management Account identified on Schedule 2.7 as the "main deposit account" (the "Main Deposit Account") at the end of each business day of such Cash Management Bank and (D) not rescind or alter such instruction without the prior written consent of Agent;

(iii)   with respect to all Collections received or receivable from their and their Subsidiaries' Account Debtors that are consumer products customers, (A) request in writing and otherwise take such reasonable steps to ensure that such Account Debtors who remit payments on such Accounts by wire transfer or other similar method, forward such payments directly to the Cash Management Account identified on Schedule 2.7 as the "consumer products account" (the "Consumer Products Account"), (B) deposit or cause to be deposited promptly, and in any event no later than the third Business Day after the date of receipt thereof, all other such Collections received by them directly from such Account Debtors into the Consumer Products Account, (C) instruct the Cash Management Bank to automatically sweep all available funds from the Consumer Products Account to the Designated Account at the end of each business day of such Cash Management Bank and (D) not rescind or alter such instruction without the prior written consent of Agent;

(iv)    with respect to all Collections received from Restaurant customers or otherwise received at any Restaurant, deposit or cause to be deposited promptly, and in any event no later than the fourth Business Day after the date of receipt thereof, all such Collections into either (A) the Main Deposit Account or (B) a deposit account of a Borrower with respect to which all available funds in such deposit account are remitted, no later than the third Business Day following deposit of such funds by a Borrower, to the Main Deposit Account; and

(v)     with respect to all Collections received or receivable from their and their Subsidiaries' Account Debtors that are not referred to in Sections 2.7(a)(ii), (iii) or (iv) above, (A) request in writing and otherwise take such reasonable steps to ensure that such Account Debtors who remit payments on Accounts by wire transfer or other similar method, forward such payments directly to the Main Deposit Account, and (B) deposit or cause to be deposited promptly, and in any event no later than the third Business Day after the date of receipt thereof, all other such Collections received by them directly from such Account Debtors into the Main Deposit Account.

(b)       Subject to Section 6.12, the Cash Management Bank shall establish and maintain Cash Management Agreements with Agent, the Borrowers and the Guarantors (as applicable), in form and substance reasonably acceptable to Agent.  Each such Cash Management Agreement shall provide, among other things, that (i) the Cash Management Bank will comply with any instructions originated by Agent directing the disposition of the funds in such Cash Management Account without further consent by Borrowers or their Subsidiaries, as applicable, (ii) the Cash Management Bank has no rights of setoff or recoupment or any other claim against the applicable Cash Management Account, other than for payment of its service fees and other charges directly related to the administration of such Cash Management Account and for returned checks or other items of payment, and (iii) all available funds in the Main Deposit Account are remitted, at the close of each Business Day, to the Designated Account, provided, that, at any time after which the Agent so instructs the Cash Management Bank (a "Cash Sweep Instruction"), it immediately will cease remitting such funds to the Designated Account and thereafter forward by daily sweep all amounts in the Main Deposit Account and any other applicable Cash Management Accounts to the Agent's Account until such time (if any) as Agent notifies it that the Cash Sweep Instruction is terminated pursuant to the last sentence of this Section 2.7(b).  Agent may issue a Cash Sweep Instruction on or after any date that an Event of Default, other than an Event of Default arising solely due to the failure to timely deliver any financial or collateral reports required to be delivered under this Agreement, shall have occurred and be continuing.  Agent agrees to rescind such Cash Sweep Instruction if (x) all Events of Default pursuant to which such Cash Sweep Instruction was implemented have been cured to Agent's satisfaction or waived by the applicable Lenders in accordance with this Agreement and (y) for no less than three (3) consecutive months after the occurrence of such Event(s) of Default, no other Events of Default have occurred or are continuing.

(c)       Borrowers and Guarantors shall, and shall cause each of their respective Subsidiaries that receives Collections through credit card charges to, establish and maintain Credit Card Agreements with Agent and each Credit Card Processor.  Each such Credit Card Agreement shall provide, among other things, that each such Credit Card Processor shall transfer all proceeds of credit card charges for sales by such Borrower, such Guarantor or such Subsidiary, as applicable, received by it (or other amounts payable by such Credit Card Processor) into the Main Deposit Account on a daily basis.  No Borrower, Guarantor or Subsidiary thereof may change any direction or designation set forth in the Credit Card Agreements regarding payment of charges without the prior written consent of Agent.  Without limiting the foregoing or any other provision of this Agreement, in the event a Credit Card Agreement is not in effect with respect to any credit card charge processing arrangement of any Borrower, any Guarantor or any of their respective Subsidiaries (as applicable) shall, (i) instruct such Credit Card Processor to remit all proceeds of credit card charges or sales processed by such processor to the Designated Account and, except as set forth in the following clause (ii), shall not rescind or alter such instruction without the prior written consent of Agent and (ii) within 30 days after the Closing Date, pursuant to a joint notice from the applicable Borrower, Guarantor or Subsidiary, and, Agent, instruct such Credit Card Processor to remit all proceeds of credit card charges or sales processed by such processor to the Main Deposit Account and shall not rescind or alter such instruction without the prior written consent of Agent.

(d)       So long as no Default or Event of Default has occurred and is continuing, and subject to the Cash Management Order providing the Agent, on behalf of the Lenders, with a first priority priming security interest in such Cash Management Accounts consistent with the provisions of this Section 2.7 and otherwise satisfactory to the Agent, Administrative Borrower may amend Schedule 2.7 to add an additional Cash Management Bank or replace any Cash Management Bank or Cash Management Account; provided, however, that (i) such prospective Cash Management Bank shall be reasonably satisfactory to Agent, and (ii) prior to the time of the opening of such Cash Management Account, a Borrower, a Guarantor or a Subsidiary thereof, as applicable, and such prospective Cash Management Bank shall have executed and delivered to Agent a Cash Management Agreement.  Borrowers, Guarantors or their respective Subsidiaries, as applicable, shall close any of their Cash Management Accounts (and establish replacement cash management accounts in accordance with the foregoing sentence) promptly and in any event within 60 days of notice from Agent that the creditworthiness of any Cash Management Bank is no longer acceptable in Agent's reasonable judgment, or as promptly as practicable and in any event within 60 days of notice from Agent that the

operating performance, funds transfer, or availability procedures or performance of the Cash Management Bank with respect to Cash Management Accounts or Agent's liability under any Cash Management Agreement with such Cash Management Bank is no longer acceptable in Agent's reasonable judgment.

(e) The Cash Management Accounts shall be cash collateral accounts, with all cash, checks and similar items of payment in such accounts securing payment of the Obligations, and in which Borrowers and Guarantors are hereby deemed to have granted a Lien to Agent.

**2.8** **Crediting Payments; Clearance Charge**. The receipt of any payment item by Agent (whether from transfers to Agent by the Cash Management Bank pursuant to the Cash Management Agreements or otherwise) shall not be considered a payment on account unless such payment item is a wire transfer of immediately available federal funds made to the Agent's Account or unless and until such payment item is honored when presented for payment. Should any payment item not be honored when presented for payment, then Borrowers shall be deemed not to have made such payment and interest shall be calculated accordingly. Anything to the contrary contained herein notwithstanding, any payment item shall be deemed received by Agent only if it is received into the Agent's Account on a Business Day on or before 11:00 a.m. (California time). If any payment item is received into the Agent's Account on a non-Business Day or after 11:00 a.m. (California time) on a Business Day, it shall be deemed to have been received by Agent as of the opening of business on the immediately following Business Day.

**2.9** **Designated Account**. Agent is authorized to make the Advances and the Term Loan, and Issuing Lender is authorized to issue the Letters of Credit, under this Agreement based upon telephonic or other instructions received from anyone purporting to be an Authorized Person or, without instructions, if pursuant to Section 2.6(d). Administrative Borrower agrees to establish and maintain the Designated Account with the Designated Account Bank for the purpose of receiving the proceeds of the Advances requested by Borrowers and made by Agent or the Lenders. Unless otherwise agreed by Agent and Administrative Borrower, any Advance, Protective Advance, or Swing Loan requested by Borrowers and made by Agent or the Lenders hereunder shall be made to the Designated Account.

**2.10** **Maintenance of Loan Account; Statements of Obligations**. Agent shall maintain an account on its books in the name of Borrowers (the "Loan Account") on which Borrowers will be charged with the Term Loan, all Advances (including Protective Advances and Swing Loans) made by Agent, Swing Lender, or the Lenders to Borrowers or for Borrowers' account, the Letters of Credit issued by Issuing Lender for Borrowers' account, and with all other payment Obligations hereunder or under the other Loan Documents (except for Bank Product Obligations), including, accrued interest, fees and expenses, and Lender Group Expenses. In accordance with Section 2.8, the Loan Account will be credited with all payments received by Agent from Borrowers or for Borrowers' account, including all amounts received in the Agent's Account from any Cash Management Bank. Agent shall render statements regarding the Loan Account to Administrative Borrower, including principal, interest, fees, and including an itemization of all charges and expenses constituting Lender Group Expenses owing, and such statements, absent manifest error, shall be conclusively presumed to be correct and accurate and constitute an account stated between Borrowers and the Lender Group unless, within 30 days after receipt thereof by Administrative Borrower, Administrative Borrower shall deliver to Agent written objection thereto describing the error or errors contained in any such statements.

**2.11** **Fees**. Borrowers shall pay to Agent, as and when due and payable under the terms of the Fee Letter, the fees set forth in the Fee Letter.

**2.12** **Letters of Credit**.

(a) Subject to the terms and conditions of this Agreement, the Issuing Lender agrees to issue letters of credit for the account of Borrowers (each, an "L/C") or to purchase participations or execute indemnities or reimbursement obligations (each such undertaking, an "L/C Undertaking") with respect to letters of credit issued by an Underlying Issuer (as of the Closing Date, the prospective Underlying Issuer is to

be Wells Fargo) for the account of Borrowers. Concurrent with the issuance of the initial extensions of credit under this Agreement on the Closing Date, each L/C issued under the Pre-Petition Credit Agreement shall constitute an L/C issued under this Agreement. Each request for the issuance of a Letter of Credit or the amendment, renewal, or extension of any outstanding Letter of Credit shall be made in writing by an Authorized Person and delivered to the Issuing Lender and Agent via hand delivery, telefacsimile, or other electronic method of transmission reasonably in advance of the requested date of issuance, amendment, renewal, or extension. Each such request shall be in form and substance satisfactory to the Issuing Lender in its Permitted Discretion and shall specify (i) the amount of such Letter of Credit, (ii) the date of issuance, amendment, renewal, or extension of such Letter of Credit, (iii) the expiration date of such Letter of Credit, (iv) the name and address of the beneficiary thereof (or the beneficiary of the Underlying Letter of Credit, as applicable), and (v) such other information (including, in the case of an amendment, renewal, or extension, identification of the outstanding Letter of Credit to be so amended, renewed, or extended) as shall be necessary to prepare, amend, renew, or extend such Letter of Credit. If requested by the Issuing Lender, Borrowers also shall be an applicant under the application with respect to any Underlying Letter of Credit that is to be the subject of an L/C Undertaking. The Issuing Lender shall have no obligation to issue a Letter of Credit if any of the following would result after giving effect to the issuance of such requested Letter of Credit:

(i) the Letter of Credit Usage would exceed the Borrowing Base *less* the outstanding amount of Advances, or

(ii) the Letter of Credit Usage would exceed $20,000,000 (the "L/C Sublimit"), or such lesser amount as may be in effect upon a reduction to the aggregate Revolver Commitments pursuant to Section 2.4(c), or

(iii) the Letter of Credit Usage would exceed the Maximum Revolver Amount *less* the outstanding amount of Advances.

Borrowers and the Lender Group acknowledge and agree that certain Underlying Letters of Credit may be issued to support letters of credit that already are outstanding as of the Closing Date. Each Letter of Credit (and corresponding Underlying Letter of Credit) shall be in form and substance acceptable to the Issuing Lender (in the exercise of its Permitted Discretion), including the requirement that the amounts payable thereunder must be payable in Dollars. If Issuing Lender is obligated to advance funds under a Letter of Credit, Borrowers immediately shall reimburse such L/C Disbursement to Issuing Lender by paying to Agent an amount equal to such L/C Disbursement not later than 11:00 a.m., California time, on the date that such L/C Disbursement is made, if Administrative Borrower shall have received written or telephonic notice of such L/C Disbursement prior to 10:00 a.m., California time, on such date, or, if such notice has not been received by Administrative Borrower prior to such time on such date, then not later than 11:00 a.m., California time, on the Business Day following the date that Administrative Borrower receives such notice, and, in the absence of such reimbursement, the L/C Disbursement immediately and automatically shall be deemed to be an Advance hereunder and, thereafter, shall bear interest at the rate then applicable to Advances that are Base Rate Loans under Section 2.6. To the extent an L/C Disbursement is deemed to be an Advance hereunder, Borrowers' obligation to reimburse such L/C Disbursement shall be discharged and replaced by the resulting Advance. Promptly following receipt by Agent of any payment from Borrowers pursuant to this paragraph, Agent shall distribute such payment to the Issuing Lender or, to the extent that Lenders have made payments pursuant to Section 2.12(c) to reimburse the Issuing Lender, then to such Lenders and the Issuing Lender as their interests may appear.

**(b)** Promptly following receipt of a notice of L/C Disbursement pursuant to Section 2.12(a), each Lender with a Revolver Commitment agrees to fund its Pro Rata Share of any Advance deemed made pursuant to the foregoing subsection on the same terms and conditions as if Borrowers had requested such Advance and Agent shall promptly pay to Issuing Lender the amounts so received by it from the Lenders. By the issuance of a Letter of Credit (or an amendment to a Letter of Credit increasing the amount thereof) and without any further action on the part of the Issuing Lender or the Lenders with Revolver

Commitments, the Issuing Lender shall be deemed to have granted to each Lender with a Revolver Commitment, and each Lender with a Revolver Commitment shall be deemed to have purchased, a participation in each Letter of Credit, in an amount equal to its Pro Rata Share of the Risk Participation Liability of such Letter of Credit, and each such Lender agrees to pay to Agent, for the account of the Issuing Lender, such Lender's Pro Rata Share of any payments made by the Issuing Lender under such Letter of Credit. In consideration and in furtherance of the foregoing, each Lender with a Revolver Commitment hereby absolutely and unconditionally agrees to pay to Agent, for the account of the Issuing Lender, such Lender's Pro Rata Share of each L/C Disbursement made by the Issuing Lender and not reimbursed by Borrowers on the date due as provided in clause (a) of this Section, or of any reimbursement payment required to be refunded to Borrowers for any reason. Each Lender with a Revolver Commitment acknowledges and agrees that its obligation to deliver to Agent, for the account of the Issuing Lender, an amount equal to its respective Pro Rata Share of each L/C Disbursement made by the Issuing Lender pursuant to this Section 2.12(b) shall be absolute and unconditional and such remittance shall be made notwithstanding the occurrence or continuation of an Event of Default or Default or the failure to satisfy any condition set forth in Section 3 hereof. If any such Lender fails to make available to Agent the amount of such Lender's Pro Rata Share of each L/C Disbursement made by the Issuing Lender in respect of such Letter of Credit as provided in this Section, such Lender shall be deemed to be a Defaulting Lender and Agent (for the account of the Issuing Lender) shall be entitled to recover such amount on demand from such Lender together with interest thereon at the Defaulting Lender Rate until paid in full.

(c) Each Borrower hereby agrees to indemnify, save, defend, and hold the Lender Group harmless from any loss, cost, expense, or liability, and reasonable attorneys fees incurred by the Lender Group arising out of or in connection with any Letter of Credit; provided, however, that no Borrower shall be obligated hereunder to indemnify for any loss, cost, expense, or liability to the extent that it is caused by the gross negligence or willful misconduct of the Issuing Lender or any other member of the Lender Group. Each Borrower agrees to be bound by the Underlying Issuer's regulations and interpretations of any Underlying Letter of Credit or by Issuing Lender's interpretations of any L/C issued by Issuing Lender to or for such Borrower's account, even though this interpretation may be different from such Borrower's own, and each Borrower understands and agrees that the Lender Group shall not be liable for any error, negligence, or mistake, whether of omission or commission, in following Borrowers' instructions or those contained in the Letter of Credit or any modifications, amendments, or supplements thereto. Each Borrower understands that the L/C Undertakings may require Issuing Lender to indemnify the Underlying Issuer for certain costs or liabilities arising out of claims by Borrowers against such Underlying Issuer. Each Borrower hereby agrees to indemnify, save, defend, and hold the Lender Group harmless with respect to any loss, cost, expense (including reasonable attorneys fees), or liability incurred by the Lender Group under any L/C Undertaking as a result of the Lender Group's indemnification of any Underlying Issuer; provided, however, that no Borrower shall be obligated hereunder to indemnify for any loss, cost, expense, or liability to the extent that it is caused by the gross negligence or willful misconduct of the Issuing Lender or any other member of the Lender Group. Each Borrower hereby acknowledges and agrees that neither the Lender Group nor the Issuing Lender shall be responsible for delays, errors, or omissions resulting from the malfunction of equipment in connection with any Letter of Credit.

(d) Each Borrower hereby authorizes and directs any Underlying Issuer to deliver to the Issuing Lender all instruments, documents, and other writings and property received by such Underlying Issuer pursuant to such Underlying Letter of Credit and to accept and rely upon the Issuing Lender's instructions with respect to all matters arising in connection with such Underlying Letter of Credit and the related application.

(e) Any and all issuance charges, commissions, fees, and costs incurred by the Issuing Lender relating to Underlying Letters of Credit shall be Lender Group Expenses for purposes of this Agreement and immediately shall be reimbursable by Borrowers to Agent for the account of the Issuing Lender; it being acknowledged and agreed by each Borrower that, as of the Closing Date, the issuance charge imposed by the prospective Underlying Issuer is .825% per annum times the face amount of each Underlying

Letter of Credit, that such issuance charge may be changed from time to time, and that the Underlying Issuer also imposes a schedule of charges for amendments, extensions, drawings, and renewals.

(f)     If by reason of (i) any change after the Closing Date in any applicable law, treaty, rule, or regulation or any change in the interpretation or application thereof by any Governmental Authority, or (ii) compliance by the Underlying Issuer or the Lender Group with any direction, request, or requirement (irrespective of whether having the force of law) of any Governmental Authority or monetary authority including, Regulation D of the Federal Reserve Board as from time to time in effect (and any successor thereto):

(i)     any reserve, deposit, or similar requirement is or shall be imposed or modified in respect of any Letter of Credit issued hereunder, or

(ii)     there shall be imposed on the Underlying Issuer or the Lender Group any other condition regarding any Underlying Letter of Credit or any Letter of Credit issued pursuant hereto;

and the result of the foregoing is to increase, directly or indirectly, the cost to the Lender Group of issuing, making, guaranteeing, or maintaining any Letter of Credit or to reduce the amount receivable in respect thereof by the Lender Group, then, and in any such case, Agent may, at any time within a reasonable period after the additional cost is incurred or the amount received is reduced, notify Administrative Borrower, and Borrowers shall pay on demand such amounts as Agent may specify to be necessary to compensate the Lender Group for such additional cost or reduced receipt, together with interest on such amount from the date of such demand until payment in full thereof at the rate then applicable to Base Rate Loans hereunder.  The determination by Agent of any amount due pursuant to this Section, as set forth in a certificate setting forth the calculation thereof in reasonable detail, shall, in the absence of manifest or demonstrable error, be final and conclusive and binding on all of the parties hereto.

**2.13     LIBOR Option**.

(a)     **Interest and Interest Payment Dates.**  In lieu of having interest charged at the rate based upon the Base Rate, Borrowers shall have the option (the "LIBOR Option") to have interest on all or a portion of the Advances be charged at a rate of interest based upon the LIBOR Rate.  Interest on LIBOR Rate Loans shall be payable on the earliest of (i) the last day of the Interest Period applicable thereto, (ii) the occurrence of an Event of Default in consequence of which the Required Lenders or Agent on behalf thereof have elected to accelerate the maturity of all or any portion of the Obligations, or (iii) termination of this Agreement pursuant to the terms hereof.  On the last day of each applicable Interest Period, unless Administrative Borrower properly has exercised the LIBOR Option with respect thereto, the interest rate applicable to such LIBOR Rate Loan automatically shall convert to the rate of interest then applicable to Base Rate Loans of the same type hereunder.  At any time that an Event of Default has occurred and is continuing, at the election of Agent or the Required Lenders, Borrowers no longer shall have the option to request that Advances bear interest at a rate based upon the LIBOR Rate and Agent shall have the right to convert the interest rate on all outstanding LIBOR Rate Loans to the rate then applicable to Base Rate Loans hereunder.

(b)     **LIBOR Election.**

(i)     Administrative Borrower may, at any time and from time to time, so long as no Event of Default has occurred and is continuing, elect to exercise the LIBOR Option by notifying Agent prior to 11:00 a.m. (California time) at least 3 Business Days prior to the commencement of the proposed Interest Period (the "LIBOR Deadline").  Notice of Administrative Borrower's election of the LIBOR Option for a permitted portion of the Advances and an Interest Period pursuant to this Section shall be made by delivery to Agent of a LIBOR Notice received by Agent before the LIBOR Deadline, or by telephonic notice received by Agent before the LIBOR Deadline (to be confirmed by delivery to Agent of a LIBOR Notice received by Agent prior to 5:00 p.m. (California time) on the same day).  Promptly upon its receipt of each

such LIBOR Notice, Agent shall provide a copy thereof to each of the affected Lenders and notify the Administrative Borrower of the LIBOR Rate for the applicable Interest Period.

(ii)    Each LIBOR Notice shall be irrevocable and binding on Borrowers. In connection with each LIBOR Rate Loan, each Borrower shall indemnify, defend, and hold Agent and the Lenders harmless against any loss, cost, or expense incurred by Agent or any Lender as a result of (A) the payment of any principal of any LIBOR Rate Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (B) the conversion of any LIBOR Rate Loan other than on the last day of the Interest Period applicable thereto, or (C) the failure to borrow, convert, continue or prepay any LIBOR Rate Loan on the date specified in any LIBOR Notice delivered pursuant hereto (such losses, costs, and expenses, collectively, "Funding Losses"). Funding Losses shall, with respect to Agent or any Lender, be deemed to equal the amount determined by Agent or such Lender to be the excess, if any, of (1) the amount of interest that would have accrued on the principal amount of such LIBOR Rate Loan had such event not occurred, at the LIBOR Rate that would have been applicable thereto, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period therefor), *minus* (2) the amount of interest that would accrue on such principal amount for such period at the interest rate which Agent or such Lender would be offered were it to be offered, at the commencement of such period, Dollar deposits of a comparable amount and period in the London interbank market. A certificate of Agent or a Lender delivered to Administrative Borrower setting forth any amount or amounts that Agent or such Lender is entitled to receive pursuant to this Section 2.13 shall be conclusive absent manifest error.

(iii)    Borrowers shall have not more than 5 LIBOR Rate Loans in effect at any given time. Borrowers only may exercise the LIBOR Option for LIBOR Rate Loans of at least $300,000 and integral multiples of $100,000 in excess thereof.

(c)    **Prepayments.** Borrowers may prepay LIBOR Rate Loans at any time; provided, however, that in the event that LIBOR Rate Loans are prepaid on any date that is not the last day of the Interest Period applicable thereto, including as a result of any automatic prepayment through the required application by Agent of proceeds of Borrowers' and their Subsidiaries' Collections in accordance with Section 2.4(b) (if applicable) or for any other reason, including early termination of the term of this Agreement or acceleration of all or any portion of the Obligations pursuant to the terms hereof, each Borrower shall indemnify, defend, and hold Agent and the Lenders and their Participants harmless against any and all Funding Losses in accordance with clause (b)(ii) above.

(d)    **Special Provisions Applicable to LIBOR Rate.**

(i)    The LIBOR Rate may be adjusted by Agent with respect to any Lender on a prospective basis to take into account any additional or increased costs to such Lender of maintaining or obtaining any Eurodollar deposits or increased costs, in each case, due to changes in applicable law occurring subsequent to the commencement of the then applicable Interest Period, including changes in tax laws (except changes of general applicability in corporate income tax laws) and changes in the reserve requirements imposed by the Board of Governors of the Federal Reserve System (or any successor), excluding the Reserve Percentage, which additional or increased costs would increase the cost of funding loans bearing interest at the LIBOR Rate. In any such event, the affected Lender shall give Administrative Borrower and Agent notice of such a determination and adjustment and Agent promptly shall transmit the notice to each other Lender and, upon its receipt of the notice from the affected Lender, Administrative Borrower may, by notice to such affected Lender (y) require such Lender to furnish to Administrative Borrower a statement setting forth the basis for adjusting such LIBOR Rate and the method for determining the amount of such adjustment, or (z) repay the LIBOR Rate Loans with respect to which such adjustment is made (together with any amounts due under clause (b)(ii) above).

(ii)    In the event that any change in market conditions or any law, regulation, treaty, or directive, or any change therein or in the interpretation of application thereof, shall at any time after the date hereof, in the reasonable opinion of any Lender, make it unlawful or impractical for such Lender to fund or maintain LIBOR Rate Loans or to continue such funding or maintaining, or to determine or charge interest rates at the LIBOR Rate, such Lender shall give notice of such changed circumstances to Agent and Administrative Borrower and Agent promptly shall transmit the notice to each other Lender and (y) in the case of any LIBOR Rate Loans of such Lender that are outstanding, the date specified in such Lender's notice shall be deemed to be the last day of the Interest Period of such LIBOR Rate Loans, and interest upon the LIBOR Rate Loans of such Lender thereafter shall accrue interest at the rate then applicable to Base Rate Loans, and (z) Borrowers shall not be entitled to elect the LIBOR Option until such Lender determines that it would no longer be unlawful or impractical to do so.

(e)    **No Requirement of Matched Funding.**  Anything to the contrary contained herein notwithstanding, neither Agent, nor any Lender, nor any of their Participants, is required actually to acquire Eurodollar deposits to fund or otherwise match fund any Obligation as to which interest accrues at the LIBOR Rate.  The provisions of this Section shall apply as if each Lender or its Participants had match funded any Obligation as to which interest is accruing at the LIBOR Rate by acquiring Eurodollar deposits for each Interest Period in the amount of the LIBOR Rate Loans.

2.14    <u>Capital Requirements</u>.  If, after the date hereof, any Lender determines that (i) the adoption of or change in any law, rule, regulation or guideline regarding capital requirements for banks or bank holding companies, or any change in the interpretation or application thereof by any Governmental Authority charged with the administration thereof, or (ii) compliance by such Lender or, if applicable, its parent bank holding company with any guideline, request or directive of any such entity regarding capital adequacy (whether or not having the force of law), has the effect of reducing the return on such Lender's or such holding company's capital as a consequence of such Lender's Commitments hereunder to a level below that which such Lender or such holding company could have achieved but for such adoption, change, or compliance (taking into consideration such Lender's or such holding company's then existing policies with respect to capital adequacy and assuming the full utilization of such entity's capital) by any amount deemed by such Lender to be material, then such Lender may notify Administrative Borrower and Agent thereof.  Following receipt of such notice, Borrowers agree to pay such Lender on demand the amount of such reduction of return of capital as and when such reduction is determined, payable within 90 days after presentation by such Lender of a statement in the amount and setting forth in reasonable detail such Lender's calculation thereof and the assumptions upon which such calculation was based (which statement shall be deemed true and correct absent manifest error).  In determining such amount, such Lender may use any reasonable averaging and attribution methods.

2.15    <u>Joint and Several Liability of Borrowers</u>.

(a)    Each Borrower is accepting joint and several liability hereunder and under the other Loan Documents in consideration of the financial accommodations to be provided by the Lender Group under this Agreement, for the mutual benefit, directly and indirectly, of each Borrower and in consideration of the undertakings of the other Borrowers to accept joint and several liability for the Obligations.

(b)    Each Borrower, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrowers, with respect to the payment and performance of all of the Obligations (including, without limitation, any Obligations arising under this <u>Section 2.15</u>), it being the intention of the parties hereto that all the Obligations shall be the joint and several obligations of each Borrower without preferences or distinction among them.

(c)    If and to the extent that any Borrower shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event the other Borrowers will make such payment with respect to, or perform, such Obligation.

(d)    The Obligations of each Borrower under the provisions of this Section 2.15 constitute the absolute and unconditional, full recourse Obligations of each Borrower enforceable against each Borrower to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of this Agreement or any other circumstances whatsoever.

(e)    Except as otherwise expressly provided in this Agreement, each Borrower hereby waives notice of acceptance of its joint and several liability, notice of any Advances, the Term Loan or Letters of Credit issued under or pursuant to this Agreement, notice of the occurrence of any Default, Event of Default, or of any demand for any payment under this Agreement, notice of any action at any time taken or omitted by Agent or Lenders under or in respect of any of the Obligations, any requirement of diligence or to mitigate damages and, generally, to the extent permitted by applicable law, all demands, notices and other formalities of every kind in connection with this Agreement (except as otherwise provided in this Agreement). Each Borrower hereby assents to, and waives notice of, any extension or postponement of the time for the payment of any of the Obligations, the acceptance of any payment of any of the Obligations, the acceptance of any partial payment thereon, any waiver, consent or other action or acquiescence by Agent or Lenders at any time or times in respect of any default by any Borrower in the performance or satisfaction of any term, covenant, condition or provision of this Agreement, any and all other indulgences whatsoever by Agent or Lenders in respect of any of the Obligations, and the taking, addition, substitution or release, in whole or in part, at any time or times, of any security for any of the Obligations or the addition, substitution or release, in whole or in part, of any Borrower. Without limiting the generality of the foregoing, each Borrower assents to any other action or delay in acting or failure to act on the part of any Agent or Lender with respect to the failure by any Borrower to comply with any of its respective Obligations, including, without limitation, any failure strictly or diligently to assert any right or to pursue any remedy or to comply fully with applicable laws or regulations thereunder, which might, but for the provisions of this Section 2.15 afford grounds for terminating, discharging or relieving any Borrower, in whole or in part, from any of its Obligations under this Section 2.15, it being the intention of each Borrower that, so long as any of the Obligations hereunder remain unsatisfied, the Obligations of each Borrower under this Section 2.15 shall not be discharged except by performance and then only to the extent of such performance. The Obligations of each Borrower under this Section 2.15 shall not be diminished or rendered unenforceable by any winding up, reorganization, arrangement, liquidation, reconstruction or similar proceeding with respect to any Borrower or any Agent or Lender.

(f)    Each Borrower represents and warrants to Agent and Lenders that such Borrower is currently informed of the financial condition of Borrowers and of all other circumstances which a diligent inquiry would reveal and which bear upon the risk of nonpayment of the Obligations. Each Borrower further represents and warrants to Agent and Lenders that such Borrower has read and understands the terms and conditions of the Loan Documents. Each Borrower hereby covenants that such Borrower will continue to keep informed of Borrowers' financial condition, the financial condition of other guarantors, if any, and of all other circumstances which bear upon the risk of nonpayment or nonperformance of the Obligations.

(g)    Each Borrower waives all rights and defenses arising out of an election of remedies by Agent or any Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed Agent's or such Lender's rights of subrogation and reimbursement against such Borrower by the operation of Section 580(d) of the California Code of Civil Procedure, any comparable statute or otherwise:

(h)    Each Borrower waives all rights and defenses that such Borrower may have because the Obligations are secured by Real Property. This means, among other things:

(i)    Agent and Lenders may collect from such Borrower without first foreclosing on any Real or Personal Property Collateral pledged by Borrowers.

(ii)     If Agent or any Lender forecloses on any Real Property Collateral pledged by Borrowers:

(A)     The amount of the Obligations may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price.

(B)     Agent and Lenders may collect from such Borrower even if Agent or Lenders, by foreclosing on the Real Property Collateral, has destroyed any right such Borrower may have to collect from the other Borrowers.

This is an unconditional and irrevocable waiver of any rights and defenses such Borrower may have because the Obligations are secured by Real Property. These rights and defenses include, but are not limited to, any rights or defenses based upon Section 580a, 580b, 580d or 726 of the California Code of Civil Procedure or any comparable statutes. As provided in Section 12(a), this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York. The foregoing provisions are included solely out of an abundance of caution and shall not be construed to mean that any of the above referenced provisions of California law are in any way applicable to this Agreement or the Obligations.

(i)     The provisions of this Section 2.15 are made for the benefit of Agent, Lenders and their respective successors and assigns, and may be enforced by it or them from time to time against any or all Borrowers as often as occasion therefor may arise and without requirement on the part of any such Agent, Lender, successor or assign first to marshal any of its or their claims or to exercise any of its or their rights against any Borrower or to exhaust any remedies available to it or them against any Borrower or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy. The provisions of this Section 2.15 shall remain in effect until all of the Obligations shall have been paid in full or otherwise fully satisfied. If at any time, any payment, or any part thereof, made in respect of any of the Obligations, is rescinded or must otherwise be restored or returned by any Agent or Lender upon the insolvency, bankruptcy or reorganization of any Borrower, or otherwise, the provisions of this Section 2.15 will forthwith be reinstated in effect, as though such payment had not been made.

(j)     Each Borrower hereby agrees that it will not enforce any of its rights of contribution or subrogation against any other Borrower with respect to any liability incurred by it hereunder or under any of the other Loan Documents, any payments made by it to Agent or Lenders with respect to any of the Obligations or any collateral security therefor until such time as all of the Obligations have been paid in full in cash. Any claim which any Borrower may have against any other Borrower with respect to any payments to any Agent or Lender hereunder or under any other Loan Documents are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in cash of the Obligations and, in the event of any insolvency, bankruptcy, receivership, liquidation, reorganization or other similar proceeding under the laws of any jurisdiction relating to any Borrower, its debts or its assets, whether voluntary or involuntary, all such Obligations shall be paid in full in cash before any payment or distribution of any character, whether in cash, securities or other property, shall be made to any other Borrower therefor.

(k)     Each Borrower hereby agrees that, after the occurrence and during the continuance of any Default or Event of Default, the payment of any amounts due with respect to the indebtedness owing by any Borrower to any other Borrower is hereby subordinated to the prior payment in full in cash of the Obligations. Each Borrower hereby agrees that after the occurrence and during the continuance of any Default or Event of Default, such Borrower will not demand, sue for or otherwise attempt to collect any indebtedness of any other Borrower owing to such Borrower until the Obligations shall have been paid in full in cash. If, notwithstanding the foregoing sentence, such Borrower shall collect, enforce or receive any amounts in respect of such indebtedness, such amounts shall be collected, enforced and received by such Borrower as trustee for Agent, and such Borrower shall deliver any such amounts to Agent for application to the Obligations in accordance with Section 2.4(b).

**3.    CONDITIONS; TERM OF AGREEMENT.**

**3.1    Conditions Precedent to the Initial Extension of Credit**.  The obligation of each Revolver Lender to make its initial extension of credit provided for hereunder and the obligation of each Term Loan Lender hereunder, is subject to the fulfillment, to the satisfaction of Agent and each Lender of each of the conditions precedent set forth on Schedule 3.1.

**3.2    Conditions Precedent to all Extensions of Credit**.  The obligation of the Lender Group (or any member thereof) to make any Advances hereunder at any time (or to extend any other credit hereunder) shall be subject to the following conditions precedent:

(a)    the representations and warranties contained in this Agreement or in the other Loan Documents shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that are already qualified by materiality in the text thereof) on and as of the date of such extension of credit, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date);

(b)    no Default or Event of Default shall have occurred and be continuing on the date of such extension of credit, nor shall either result from the making thereof;

(c)    no injunction, writ, restraining order, or other order of any nature restricting or prohibiting, directly or indirectly, the extending of such credit shall have been issued and remain in force by any Governmental Authority against any Borrower, Guarantor, their respective Affiliates, Agent or any Lender; and

(d)    no Material Adverse Change shall have occurred.

**3.3    Term**.  This Agreement shall continue in full force and effect for a term ending on the earliest of (a) either (i) the date that is 6 months after the Filing Date (the "Initial Term") or (ii) subject to the satisfaction of the Extension Conditions, the date that is 9 months after the Filing Date (the "Extended Term"), (b) the effective date with respect to any Plan of Reorganization, and (c) the date a sale of all or substantially all of the Borrowers' assets is consummated under Section 363 of the Bankruptcy Code, the foregoing in each case, subject to the earlier termination due to declaration of an Event of Default or otherwise as set forth in this Agreement (such earliest date, the "Maturity Date").  The foregoing notwithstanding, the Lender Group, upon the election of the Required Lenders, shall have the right to terminate its remaining obligations under this Agreement immediately upon the occurrence and during the continuation of an Event of Default.

**3.4    Effect of Termination**.  On the date of termination of this Agreement, all Obligations (including contingent reimbursement obligations of Borrowers with respect to outstanding Letters of Credit and including all Bank Product Obligations) immediately shall become due and payable without notice or demand (including (a) either (i) providing cash collateral to be held by Agent for the benefit of those Lenders with a Revolver Commitment in an amount equal to 105% of the Letter of Credit Usage, or (ii) causing the original Letters of Credit to be returned to the Issuing Lender, and (b) providing cash collateral (in an amount determined by Agent as sufficient to satisfy the reasonably estimated credit exposure) to be held by Agent for the benefit of the Bank Product Providers with respect to the Bank Product Obligations); provided, however, if any such cash collateral is subject to the Carve-Out, then the amount thereof shall be increased by the amount of the Carve-Out to which it is subject.  No termination of this Agreement, however, shall relieve or discharge Borrowers or their Subsidiaries of their duties, Obligations, or covenants hereunder or under any other Loan Document and the Agent's Liens in the Collateral shall remain in effect until all Obligations have been paid in full and the Lender Group's obligations to provide additional credit hereunder have been terminated.  When this Agreement has been terminated and all of the Obligations have been paid in full and the Lender Group's obligations to provide additional credit under the Loan Documents have been terminated irrevocably, Agent will, at Borrowers' sole expense, execute and deliver any termination statements, lien releases, mortgage

releases, re-assignments of trademarks, discharges of security interests, and other similar discharge or release documents (and, if applicable, in recordable form) as are reasonably necessary to release, as of record, the Agent's Liens and all notices of security interests and liens previously filed by Agent with respect to the Obligations.

**3.5** **Early Termination by Borrowers**. Borrowers have the option, at any time upon 20 days prior written notice by Administrative Borrower to Agent, to terminate this Agreement by paying to Agent, in cash, the Obligations (including (a) either (i) providing cash collateral to be held by Agent for the benefit of those Lenders with a Revolver Commitment in an amount equal to 105% of the Letter of Credit Usage, or (ii) causing the original Letters of Credit to be returned to the Issuing Lender, and (b) providing cash collateral (in an amount determined by Agent as sufficient to satisfy the reasonably estimated credit exposure) to be held by Agent for the benefit of the Bank Product Providers with respect to the Bank Product Obligations); provided, however, if any such cash collateral is subject to the Carve-Out, then the amount thereof shall be increased by the amount of the Carve-Out to which it is subject), in full. If Administrative Borrower has sent a notice of termination pursuant to the provisions of this Section, then the Commitments shall terminate and Borrowers shall be obligated to repay the Obligations (including (a) either (i) providing cash collateral to be held by Agent for the benefit of those Lenders with a Revolver Commitment in an amount equal to 105% of the Letter of Credit Usage, or (ii) causing the original Letters of Credit to be returned to the Issuing Lender, and (b) providing cash collateral (in an amount determined by Agent as sufficient to satisfy the reasonably estimated credit exposure) to be held by Agent for the benefit of the Bank Product Providers with respect to the Bank Product Obligations); provided, however, if any such cash collateral is subject to the Carve-Out, then the amount thereof shall be increased by the amount of the Carve-Out to which it is subject), in full on the date set forth as the date of termination of this Agreement in such notice.

# 4. REPRESENTATIONS AND WARRANTIES.

In order to induce the Lender Group to enter into this Agreement, each Borrower makes the following representations and warranties to the Lender Group which shall be true, correct, and complete, in all material respects, as of the date hereof, and shall be true, correct, and complete, in all material respects, as of the Closing Date, and at and as of the date of the making of each Advance (or other extension of credit hereunder) made thereafter, as though made on and as of the date of such Advance (or other extension of credit hereunder) (except to the extent that such representations and warranties relate solely to an earlier date) and such representations and warranties shall survive the execution and delivery of this Agreement:

**4.1** **No Encumbrances**. Each Borrower and its Subsidiaries has good and marketable title to, or a valid leasehold interest in, their personal property assets and good and marketable title to, or a valid leasehold interest in, their Real Property, in each case, free and clear of Liens except for Permitted Liens.

**4.2** **[Reserved]**

**4.3** **[Reserved]**

**4.4** **Equipment**. Each material item of Equipment of Borrowers and their Subsidiaries is used or held for use in their business and is in good working order, ordinary wear and tear and damage by casualty excepted.

**4.5** **Location of Inventory and Equipment**. Except as set forth on Schedule 4.5 (as such Schedule may be updated pursuant to Section 5.9), the Inventory and Equipment (other than vehicles or Equipment out for repair) of Borrowers and their Subsidiaries are not stored with a bailee, warehouseman, or similar party and are located only at, or in-transit between, the locations identified on Schedule 4.5 (as such Schedule may be updated pursuant to Section 5.9).

**4.6** **Inventory Records**. Each Borrower keeps correct and accurate records itemizing and describing the type, quality, and quantity of its and its Subsidiaries' Inventory and the book value thereof.

**4.7** **State of Incorporation; Location of Chief Executive Office; Organizational Identification Number; Commercial Tort Claims**.

(a) The jurisdiction of organization of each Borrower and each of its Subsidiaries is set forth on Schedule 4.7(a) (as such schedule may be updated from time to time pursuant to the terms of this Agreement).

(b) The chief executive office of each Borrower and each of its Subsidiaries is located at the address indicated on Schedule 4.7(b) (as such Schedule may be updated pursuant to Section 5.9).

(c) Each Borrower's and each of its Subsidiaries' organizational identification number, if any, are identified on Schedule 4.7(c) (as such schedule may be updated from time to time pursuant to the terms of this Agreement).

(d) As of the Closing Date, Borrowers and their Subsidiaries do not hold any commercial tort claims in excess of $250,000, except as set forth on Schedule 4.7(d).

**4.8** **Due Organization and Qualification; Subsidiaries**.

(a) Each Borrower is duly organized and existing and in good standing under the laws of the jurisdiction of its organization and qualified to do business in any state where the failure to be so qualified reasonably could be expected to result in a Material Adverse Change.

(b) Except as set forth on Schedule 4.8(b), (i) there are no subscriptions, options, warrants, or calls relating to any shares of each Borrower's or any Borrower's Subsidiary's capital Stock, including any right of conversion or exchange under any outstanding security or other instrument and (ii) no Borrower nor any of its Subsidiaries is subject to any obligation (contingent or otherwise) to repurchase or otherwise acquire or retire any shares of its capital Stock or any security convertible into or exchangeable for any of its capital Stock.

(c) Set forth on Schedule 4.8(c) (as such schedule may be updated from time to time pursuant to the terms of this Agreement) is a complete and accurate list of each Borrower's and each Borrower's direct and indirect Subsidiaries': (i) jurisdiction of organization, and (ii) percentage of the outstanding shares of each such class owned directly or indirectly by the applicable Borrower. All of the outstanding capital Stock of each Borrower and each such Subsidiary has been validly issued and is fully paid and non-assessable.

**4.9** **Due Authorization; No Conflict**.

(a) As to each Borrower, the execution, delivery, and performance by such Borrower of this Agreement and the other Loan Documents, to which it is a party have been duly authorized by the Bankruptcy Court pursuant to the Interim Order (or the Final Order when applicable) and by all other necessary action on the part of such Borrower.

(b) The execution, delivery, and performance by such Borrower of this Agreement and the other Loan Documents to which it is a party do not and will not (i) violate any provision of federal, state, or local law or regulation applicable to any Borrower, the Governing Documents of any Borrower, or any order, judgment, or decree of any court or other Governmental Authority binding on any Borrower, (ii) except to the extent applicable bankruptcy law negates the effect of any such breach or default, conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual

obligation of any Borrower, (iii) result in or require the creation or imposition of any Lien of any nature whatsoever upon any properties or assets of any Borrower, other than Permitted Liens, (iv) except to the extent applicable bankruptcy law negates such requirement, require any approval or consent of any Person under any material contractual obligation of any Borrower, other than consents or approvals that have been obtained and that are still in force and effect or (v) require any approval of any Borrower's interestholders, other than approvals that have been obtained and that are still in effect.

(c)     Other than entry of the Orders and the giving of notices in connection therewith and the taking of any other action expressly required under this Agreement or the other Loan Documents, the execution, delivery, and performance by each Borrower of this Agreement and the other Loan Documents to which such Borrower is a party do not and will not require any registration with, consent, or approval of, or notice to, or other action with or by, any Governmental Authority or any other Person.

(d)     As to each Borrower, this Agreement and the other Loan Documents to which such Borrower is a party, and all other documents contemplated hereby and thereby have been approved by the Bankruptcy Court pursuant to the Interim Order (or the Final Order when applicable) and when executed and delivered by such Borrower will be the legally valid and binding obligations of such Borrower, enforceable against such Borrower in accordance with their respective terms.

(e)     The Liens granted by the Borrowers to Agent in the Collateral pursuant to the Loan Documents are validly created, perfected and first priority Liens subject, as to priority, only to the Carve-Out and Specified Permitted Liens.

(f)     As to each Guarantor, the execution, delivery, and performance by such Guarantor of this Agreement and the other Loan Documents, to which it is a party have been duly authorized by the Bankruptcy Court pursuant to the Interim Order (or the Final Order when applicable) and by all other necessary action on the part of such Guarantor.

(g)     The execution, delivery, and performance by each Guarantor of the Loan Documents to which it is a party do not and will not (i) violate any provision of federal, state, or local law or regulation applicable to such Guarantor, the Governing Documents of such Guarantor, or any order, judgment, or decree of any court or other Governmental Authority binding on such Guarantor, (ii) except to the extent applicable bankruptcy law negates the effect of any such breach or default, conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation of such Guarantor, (iii) result in or require the creation or imposition of any Lien of any nature whatsoever upon any properties or assets of such Guarantor, other than Permitted Liens, (iv) except to the extent applicable bankruptcy law negates such requirement, require any approval or consent of any Person under any material contractual obligation of any Guarantor, other than consents or approvals that have been obtained and that are still in force and effect or (v) require any approval of any Guarantor's interestholders, other than approvals that have been obtained and that are still in effect.

(h)     Other than entry of the Orders and the giving of notices in connection therewith and the taking of any other action expressly required under this Agreement or the other Loan Documents, the execution, delivery, and performance by each Guarantor of this Agreement and the other Loan Documents to which such Guarantor is a party do not and will not require any registration with, consent, or approval of, or notice to, or other action with or by, any Governmental Authority or any other Person.

(i)     As to each Guarantor, this Agreement and the other Loan Documents to which such Guarantor is a party, and all other documents contemplated hereby and thereby have been approved by the Bankruptcy Court pursuant to the Interim Order (or the Final Order when applicable) and when executed and delivered by such Guarantor will be the legally valid and binding obligations of such Guarantor, enforceable against such Guarantor in accordance with their respective terms, except as enforcement may be limited by

equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

      **(j)**      The Liens granted by the Guarantors to Agent in and to their properties and assets pursuant to the Loan Documents are validly created, perfected and first priority Liens subject, as to priority, only to the Carve-Out and the Specified Permitted Liens.

      **4.10**      **Litigation**.  Other than the Bankruptcy Cases and those matters disclosed to Agent in writing after the Closing Date, there are no actions, suits, or proceedings pending or, to the best knowledge of each Borrower, threatened against any Borrower or any of its Subsidiaries which could reasonably be expected to result in a Material Adverse Change.

      **4.11**      **No Material Adverse Change**.  All financial statements relating to Borrowers and their Subsidiaries or Guarantors that have been delivered by Borrowers to the Lender Group have been prepared in accordance with GAAP (except, in the case of unaudited financial statements, for the lack of footnotes and being subject to year-end audit adjustments) and present fairly in all material respects, Borrowers' and their Subsidiaries' (or any Guarantor's, as applicable) financial condition as of the date thereof and results of operations for the period then ended.  There has not been a Material Adverse Change with respect to Borrowers and their Subsidiaries (or any Guarantor, as applicable) since the date of the latest financial statements submitted to Agent on or before the Closing Date.

      **4.12**      **[Reserved]**.

      **4.13**      **Employee Benefits**.

      **(a)**      Set forth on Schedule 4.13(a) is a complete and accurate list of (i) all Plans that meet the definition of an "employee pension benefit plan" under Section 3(2) of ERISA and that are currently maintained or contributed to by any Borrower or any of their respective Subsidiaries, and (ii) all Pension Plans and Multiemployer Plans that are currently maintained or contributed to by any Borrower or any of their respective Subsidiaries or ERISA Affiliates as of the Closing Date.  As of the date hereof and for the prior six years from the date hereof, none of the Borrowers, nor any of their Subsidiaries or ERISA Affiliates has maintained or has been required to make contributions to any Pension Plan.  None of the Borrowers, any of their respective Subsidiaries or any of their respective ERISA Affiliates has any liability, whether actual or contingent, with respect to any Pension Plan which constitutes, or could reasonably be expected to give rise to, an Event of Default.

      **(b)**      Except as would not reasonably be expected to result in a Material Adverse Change, each Borrower, their respective Subsidiaries, and their respective ERISA Affiliates are in compliance in all material respects with all applicable provisions and requirements of ERISA and the regulations thereunder with respect to each Plan.

      **(c)**      Except as would not reasonably be expected to result in a Material Adverse Change, no ERISA Event has occurred or is reasonably expected to occur.

      **(d)**      All material liabilities under each Plan are provided for or recognized in the financial statements delivered to Agent to the extent required under Section 4.11 or Section 5.3.

      **4.14**      **Environmental Condition**.  Except as set forth on Schedule 4.14 and other than matters that could not reasonably be expected to cause a Material Adverse Change or result in any Borrower or Subsidiary of a Borrower incurring material Environmental Liabilities, (a) to Borrowers' knowledge, none of Borrowers' or their Subsidiaries' properties or assets has ever been used by Borrowers, their Subsidiaries, or by previous owners or operators in the disposal of, or to produce, store, handle, treat, release, or transport, any Hazardous Materials, where such use, production, storage, handling, treatment, release or transport was in violation, in

any material respect, of any applicable Environmental Law, (b) to Borrowers' knowledge, none of Borrowers' nor their Subsidiaries' properties or assets has ever been designated or identified pursuant to any environmental protection statute as a site requiring investigation or remediation as a result of the disposal or release of Hazardous Materials, (c) none of Borrowers nor any of their Subsidiaries have received notice that a Lien arising under any Environmental Law has attached to any revenues or to any Real Property owned or, to the best knowledge of Borrowers, operated by Borrowers or their Subsidiaries, and (d) none of Borrowers nor any of their Subsidiaries have received a summons, citation, notice, or directive from the United States Environmental Protection Agency or any other federal or state governmental agency concerning liability as a result of the release or disposal of Hazardous Materials into the environment which has caused or reasonably could be expected to cause a Material Adverse Change.

       **4.15**     **Intellectual Property**.  Each Borrower and each Subsidiary of a Borrower owns, or holds licenses in, all trademarks, trade names, copyrights, patents, patent rights, and licenses that are necessary to the conduct of its business as currently conducted, and attached hereto as Schedule 4.15 (as updated from time to time) is a true, correct, and complete listing of all material patents, patent applications, trademarks, trademark applications, copyrights, and copyright registrations as to which each Borrower or one of its Subsidiaries is the owner or is an exclusive licensee.

       **4.16**     **Leases**.  Borrowers and their Subsidiaries hold actual and exclusive (in all material respects) possession of the premises leased pursuant to all leases assumed or entered into by such Borrowers or Subsidiaries after the Filing Date and, upon such assumption, all such assumed leases, and all such new leases are valid and subsisting and no material default by Borrowers or their Subsidiaries exists under any of them.

       **4.17**     **Deposit Accounts and Securities Accounts**.  Set forth on Schedule 4.17 (as such schedule may be updated from time to time pursuant to the terms of this Agreement) is a listing of all of Borrowers' and their Subsidiaries' Deposit Accounts and Securities Accounts, including, with respect to each bank or securities intermediary (a) the name and address of such Person, and (b) the account numbers of the Deposit Accounts or Securities Accounts maintained with such Person.

       **4.18**     **Complete Disclosure**.  All factual information (taken as a whole) furnished by or on behalf of Borrowers or their Subsidiaries in writing to Agent or any Lender (including all information contained in the Schedules hereto or in the other Loan Documents) for purposes of or in connection with this Agreement, the other Loan Documents or any transaction contemplated herein or therein is, and all other such factual information (taken as a whole) hereafter furnished by or on behalf of Borrowers or their Subsidiaries in writing to Agent or any Lender will be, true and accurate in all material respects on the date as of which such information is dated or certified and not incomplete by omitting to state any fact necessary to make such information (taken as a whole) not misleading in any material respect at such time in light of the circumstances under which such information was provided.  The Budget delivered to Agent as of the Closing Date represents, and as of the date on which any update thereto is delivered to Agent, such updated Budget represents the Borrowers' good faith reasonable estimate of their future performance for the periods covered thereby.

       **4.19**     **Indebtedness**.  Set forth on Schedule 4.19 is a true and complete list of all Indebtedness of each Borrower and each Subsidiary of a Borrower outstanding immediately prior to the Closing Date that is to remain outstanding immediately after the Closing Date and such Schedule accurately reflects the aggregate principal amount of such Indebtedness as of the Closing Date.

       **4.20**     **Administrative Priority**.  The Obligations constitute claims entitled to super-priority administrative status in the Bankruptcy Cases in accordance with Sections 364(c)(1) and 507(b) of the Bankruptcy Code with priority in payment over any and all other administrative expenses in the Bankruptcy Cases of the Borrowers and the Guarantors of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code subject, as to priority, only to the Carve-Out and the Specified Permitted Liens.

**4.21**    __Appointment of Trustee or Examiner; Liquidation__.  No order has been entered in any Bankruptcy Case (a) for the appointment of a Chapter 11 trustee, (b) for the appointment of an examiner with expanded powers (beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1104 of the Bankruptcy Code, (c) to convert any Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code or (d) to dismiss any Bankruptcy Case.

**4.22**    __Permits, Licenses, Etc.__  Each Borrower and (if applicable) Guarantor is in compliance in all material respects with all governmental permits, licenses, authorizations, approvals, entitlements and accreditations required and material for such Person lawfully to own, lease, manage or operate, or to acquire, each business currently owned, leased, managed or operated, or previously acquired, by such Person.  To the best knowledge of the Borrowers, no condition exists or event has occurred which could reasonably be expected to result in the suspension, revocation, impairment, forfeiture or non-renewal of any such permit, license, authorization, approval, entitlement or accreditation, and there is no outstanding claim that any thereof is not in full force and effect.  Schedule 4.22 sets forth a complete and accurate list, as of the Closing Date, listed by Restaurant, of all licenses, approvals, permits, privileges or other such rights permitting Borrowers and (if applicable) Guarantors to sell and dispense alcoholic beverages within each of the Restaurants for on-premises consumption (the "__Liquor Licenses__").  Each Borrower and (if applicable) Guarantor is in compliance in all material respects with all applicable state, municipal and other governmental laws, regulations and rules with respect to the sale of liquor and all alcoholic beverages and has the right to sell liquor at retail for consumption within the Restaurants, subject to and in accordance with all applicable provisions of the Liquor Licenses.

**4.23**    __Reorganization Matters.__

**(a)**    The Bankruptcy Cases were commenced on the Filing Date in accordance with Applicable Law and proper notice thereof and the proper notice for (i) the motion seeking approval of this Agreement, the other Loan Documents, the Interim Order and Final Order, (ii) the hearing for the approval of the Interim Order and (iii) the hearing for the approval of the Final Order has been or will be given.  The Borrowers and Guarantors have given, on a timely basis as specified in the Interim Order or the Final Order, as applicable, all notices required to be given to all parties specified in the Interim Order or Final Order, as applicable.

**(b)**    After the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute allowed administrative expense claims in the Bankruptcy Cases having priority over all administrative expense claims and unsecured claims against the Borrowers and Guarantors now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 726 (to the extent permitted by law), 1113, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(l) of the Bankruptcy Code subject only to the Carve-Out and Specified Permitted Liens.

**(c)**    The Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect has not been reversed, stayed, modified or amended.

**(d)**    Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Interim Order or Final Order and __Section 8.1__ hereof, as the case may be, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the Agent and Lenders shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder or under applicable law, without further application to or order by the Bankruptcy Court.

**5.      AFFIRMATIVE COVENANTS.**

Each Borrower covenants and agrees that, until termination of all of the Commitments and payment in full of the Obligations, Borrowers and Guarantors shall and shall cause each of their respective Subsidiaries to do all of the following:

**5.1      Accounting System**.  Maintain a system of accounting that enables Borrowers to produce financial statements in accordance with GAAP and maintain records pertaining to the Collateral that contain information as from time to time reasonably may be requested by Agent.  Borrowers also shall keep a reporting system that shows all additions, sales, claims, returns, and allowances with respect to their and their Subsidiaries' sales.

**5.2      Collateral Reporting**.  Provide Agent with each of the reports set forth on Schedule 5.2 at the times specified therein.

**5.3      Financial Statements, Reports, Certificates**.  Deliver to Agent each of the financial statements, reports, or other items set forth on Schedule 5.3 at the time specified herein.  In addition, Parent agrees that no Subsidiary of Parent will have a fiscal year different from that of Parent.

**5.4      [Reserved]**.

**5.5      Inspection; Consultant**.

**(a)**      Cause the Bankruptcy Court to provide access, pursuant to court order, to and permit Agent, each Lender, and each of their duly authorized representatives or agents to visit any of its properties and inspect any of its assets or books and records, to examine and make copies of its books and records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers, employees and financial advisors at such reasonable times and intervals as Agent or any such Lender may designate and, so long as no Default or Event of Default exists, with reasonable prior notice to Administrative Borrower. Without limiting the foregoing, on a periodic basis as reasonably designated by Agent, the Borrowers shall participate in telephone or in-person (as designated by Agent) meetings with Agent and the Lenders and present on and discuss the business and operations of the Borrowers and their Subsidiaries and the status of the completion of the Reorganization Milestones.

**(b)**      If a Consultant is retained by or on behalf of Agent and/or the Lenders, provide the Consultant with all assistance and cooperation necessary to fully perform its duties on behalf of Agent and the Lenders, and meet with Agent, the Lenders and the Consultant at such times as Agent, the Lenders or the Consultant may reasonably request and furnish to Agent, the Lenders and the Consultant, promptly after request therefor, any reports or other information reasonably requested by Agent, any Lender or the Consultant with respect thereto.

**5.6      Maintenance of Properties**.  Maintain and preserve all of their properties which are necessary or useful in the proper conduct of their business in good working order and condition, ordinary wear, tear, and casualty excepted (and except where the failure to do so could not reasonably be expected to result in a Material Adverse Change), and comply in all material respects with the provisions of all material leases to which it is a party as lessee, so as to prevent any loss or forfeiture thereof or thereunder, except where such loss or forfeiture could not reasonably be expected to cause a Material Adverse Change.

**5.7      Taxes**.  Subject to entry of appropriate orders of the Bankruptcy Court, cause all assessments and taxes, whether real, personal, or otherwise, due or payable by, or imposed, levied, or assessed against Borrowers, Guarantors, their respective Subsidiaries, or any of their respective assets to be paid in full, before delinquency or before the expiration of any extension period, except (i) to the extent that the validity of such assessment or tax shall be the subject of a Permitted Protest or (ii) to the extent (A) fully covered by insurance

(subject to any applicable deductible) with respect to which the insurer has not denied or disputed coverage therefor in writing and (B) paid promptly out of proceeds of such insurance. Subject to entry of appropriate orders of the Bankruptcy Court, Borrowers will and will cause Guarantors and all Subsidiaries of any Borrower or Guarantor to make timely payment or deposit of all tax payments and withholding taxes required of them by applicable laws, including those laws concerning F.I.C.A., F.U.T.A., state disability, and local, state, and federal income taxes, and will, upon request, furnish Agent with proof satisfactory to Agent indicating that the applicable Person has made such payments or deposits.

**5.8** **Insurance**.

(a) Subject to entry of appropriate orders of the Bankruptcy Court, at Borrowers' (or, if applicable, Guarantors') expense, maintain: (i) insurance respecting Borrowers', Guarantors' and their respective Subsidiaries' assets wherever located, covering loss or damage by fire, theft, explosion, and all other hazards and risks as ordinarily are insured against by other Persons engaged in the same or similar businesses; and (ii) business interruption, public liability, and product liability insurance, as well as insurance against larceny, embezzlement, and criminal misappropriation. All such policies of insurance shall be in such amounts and with such insurance companies as are reasonably satisfactory to Agent. To the extent not previously provided to Agent or otherwise provided for by appropriate order of the Bankruptcy Court, Borrowers shall deliver copies of all such policies to Agent with an endorsement naming Agent as the sole loss payee (under a satisfactory lender's loss payable endorsement) or additional insured, as appropriate. Each policy of insurance or endorsement shall contain a clause requiring the insurer to give not *less* than 30 days prior written notice to Agent in the event of cancellation of the policy for any reason whatsoever.

(b) Administrative Borrower shall give Agent prompt notice of any loss exceeding $100,000 covered by such insurance. So long as no Event of Default has occurred and is continuing, Borrowers shall have the exclusive right to adjust any losses payable under any such insurance policies which are *less* than $500,000. Following the occurrence and during the continuation of an Event of Default, or in the case of any losses payable under such insurance equal to or exceeding $500,000, Agent shall have the exclusive right to adjust any losses payable under any such insurance policies, without any liability to Borrowers whatsoever in respect of such adjustments. Any monies received as payment for any loss under any insurance policy mentioned above (other than liability insurance policies) or as payment of any award or compensation for condemnation or taking by eminent domain, shall be paid over to Agent to be applied to the prepayment of the Obligations as set forth in Section 2.4(e)(ii).

(c) Borrowers will not, and will not suffer or permit any Guarantor or any Subsidiary of a Borrower or Guarantor to, take out separate insurance concurrent in form or contributing in the event of loss with that required to be maintained under this Section 5.8, unless Agent is included thereon as an additional insured or loss payee under a lender's loss payable endorsement. Administrative Borrower promptly shall notify Agent whenever such separate insurance is taken out, specifying the insurer thereunder and full particulars as to the policies evidencing the same, and copies of such policies promptly shall be provided to Agent.

**5.9** **Location of Inventory and Equipment**. Keep Borrowers', Guarantors' and their respective Subsidiaries' Inventory and Equipment, including any Inventory or Equipment being stored with any bailee, warehouseman or other such Person but excluding vehicles and Equipment out for repair, only at or in-transit to the locations identified on Schedule 4.5 and their chief executive offices only at the locations identified on Schedule 4.7(b); provided, however, that Administrative Borrower may amend Schedule 4.5 or Schedule 4.7 so long as such amendment occurs by written notice to Agent at the time of delivery of the quarterly financial statements required to be delivered pursuant to Section 5.3 with respect to the fiscal quarter ended immediately following the date on which such Inventory or Equipment is moved to such new location or such chief executive office is relocated, so long as such new location is within the continental United States; provided, however, up to $2,500,000 of Inventory may be stored or otherwise located outside the United States.

**5.10** **Compliance with Laws**.  Comply with the requirements of all applicable laws, rules, regulations, and orders of any Governmental Authority, other than laws, rules, regulations, and orders the non-compliance with which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Change (it being understood that a Material Adverse Change could not reasonably be expected where the Bankruptcy Code prohibits any adverse consequences as a result of such non-compliance).

**5.11** **Leases**.  Subject to entry of appropriate orders of the Bankruptcy Court and otherwise in accordance with the Bankruptcy Code, pay when due all rents and other amounts payable under any leases assumed or entered into by a Borrower after the Filing Date, unless such payments are the subject of a Permitted Protest.

**5.12** **Existence**.  At all times preserve and keep in full force and effect each Borrower's, Guarantor's and each of their respective Subsidiaries' valid existence and good standing and any rights and franchises material to their businesses except as otherwise expressly permitted herein.

**5.13** **Environmental**.  (a) To the extent any Environmental Lien would materially and adversely affect any Borrower's, Guarantor's or any of their respective Subsidiary's property rights with respect thereto, keep any property either owned or operated by any such Person free of any Environmental Liens or post bonds or other financial assurances sufficient to satisfy the obligations or liability evidenced by such Environmental Liens, (b) comply, in all material respects, with Environmental Laws and provide to Agent documentation of such compliance which Agent reasonably requests, (c) promptly notify Agent of any release of a Hazardous Material in any reportable quantity from or onto property owned or operated by any Borrower, Guarantor or any of their respective Subsidiaries and take any Remedial Actions required to abate said release to come into material compliance with applicable Environmental Law, and (d) promptly, but in any event within 5 Business Days of its receipt thereof, provide Agent with written notice of any of the following:  (i) receipt of notice that an Environmental Lien has been filed against any of the real or personal property of any Borrower, Guarantor or any of their respective Subsidiaries, (ii) commencement of any Environmental Action or notice that an Environmental Action will be filed against any Borrower, Guarantor or any of their respective Subsidiaries which could reasonably be expected to cause a Material Adverse Change or result in any such Person incurring material Environmental Liabilities, and (iii) notice of a violation, citation, or other administrative order which reasonably could be expected to result in a Material Adverse Change.

**5.14** **Disclosure Updates**.  Promptly and in no event later than 5 Business Days after obtaining knowledge thereof, notify Agent if any written information, exhibit, or report furnished to the Lender Group contained, at the time it was furnished, any untrue statement of a material fact or omitted to state any material fact necessary to make the statements contained therein not misleading in light of the circumstances in which made.  The foregoing to the contrary notwithstanding, any notification pursuant to the foregoing provision will not cure or remedy the effect of the prior untrue statement of a material fact or omission of any material fact nor shall any such notification have the effect of amending or modifying this Agreement or any of the Schedules hereto.

**5.15** **Control Agreements**.  Take all reasonable steps in order for Agent to obtain control in accordance with Sections 8-06, 9-104, 9-105, 9-106, and 9-107 of the Code with respect to (subject to the proviso contained in Section 6.12) all of its (a) Securities Accounts, (b) Deposit Accounts, (c) electronic chattel paper and letter of credit rights to the extent that the aggregate amount receivable by Borrowers thereunder exceeds $250,000, and (d) investment property.

**5.16** **Formation of Subsidiaries**.  At the time that Borrower or any Guarantor forms any direct or indirect Subsidiary or acquires any direct or indirect Subsidiary after the Closing Date, in each case at the time of delivery of the quarterly financial statements required to be delivered to Agent pursuant to Section 5.3 with respect to the fiscal quarter ended immediately following such formation or acquisition, such Borrower or Guarantor (as applicable) shall (a) cause such new Subsidiary to provide to Agent a joinder to (as requested by Agent), this Agreement, the Guaranty and the Security Agreement, together with such other security

documents and joinders to such other Loan Documents as Agent may request, as well as appropriate financing statements, all in form and substance satisfactory to Agent (including being sufficient to grant Agent a first priority Lien (subject, as to priority, only to the Carve-Out and Specified Permitted Liens) in and to the assets of such newly formed or acquired Subsidiary, as the case may be), (b) provide to Agent a pledge agreement and appropriate certificates and powers or financing statements, hypothecating all of the direct or beneficial ownership interest in such new Subsidiary, in form and substance satisfactory to Agent, and (c) provide to Agent all other documentation, including one or more opinions of counsel satisfactory to Agent, which in its opinion is appropriate with respect to the execution and delivery of the applicable documentation referred to above. Any document, agreement, or instrument executed or issued pursuant to this Section 5.16 shall be a Loan Document. Notwithstanding the foregoing, if a Subsidiary that is so formed or acquired is a Controlled Foreign Corporation, then clause (a) of the immediately preceding sentence shall not be applicable and, with respect to clause (b) of the immediately preceding sentence, such pledge shall be limited to 65% of the voting power of all classes of capital Stock of such Subsidiary entitled to vote; provided, that immediately upon any amendment of the IRC that would allow the pledge of a greater percentage of the voting power of capital Stock in such Subsidiary without adverse tax consequences, such pledge shall include such greater percentage of capital Stock of such Subsidiary from that time forward.

5.17 **Notes**. Promptly provide Agent with true and complete copies of any and all material documents delivered to any Person pursuant to or in connection with the Indenture Documents on or after the Closing Date.

5.18 **Obtaining Permits, Etc.** Except where failure to do so could not reasonably be expected to result in a Material Adverse Change, obtain, maintain and preserve and take all necessary action to timely renew all governmental permits, licenses (including Liquor Licenses), authorizations, approvals, entitlements and accreditations which are necessary or useful in the proper conduct of their businesses.

5.19 **ERISA Compliance.**

(a) Each Borrower shall do, and shall cause each of their respective Subsidiaries and ERISA Affiliates to do, each of the following: (i) maintain each Plan in compliance in all material respects with the applicable provisions of ERISA, the IRC and each other applicable federal or state law; (ii) cause each Qualified Plan to maintain its qualified status under Section 401(a) of the IRC; (iii) make all required contributions to each Plan and Multiemployer Plan; (iv) ensure that all material liabilities under each Plan are provided for or recognized in the financial statements delivered to Agent in accordance with the requirements of Section 4.11 and Section 5.3; and (v) ensure that the contributions or premium payments to or in respect of each Plan, if applicable, are and continue to be promptly paid, except in each case under Section 5.19(a)(i), (ii), (iii) or (v) above, as would not individually or in the aggregate reasonably be expected to result in a Material Adverse Change.

(b) Promptly notify Agent of any ERISA Event (but in no event more than ten (10) days after such event), together with a copy of each notice with respect to such event that may be required to be filed with a Governmental Authority and each notice delivered by a Governmental Authority to any Borrower, any of their respective Subsidiaries or any ERISA Affiliates with respect to such event.

(c) Promptly deliver to Agent, upon request, copies of (i) all notices received by any Borrower, any of their respective Subsidiaries or any of their respective ERISA Affiliates from a Multiemployer Plan sponsor concerning an ERISA Event with respect to the Multiemployer Plan; and (ii) such other documents or governmental compliance reports or filings relating to any Plan as Agent shall reasonably request.

5.20 **Further Assurances.** At any time upon the request of Agent, the Borrowers shall execute or deliver to Agent, and shall cause their Subsidiaries to execute or deliver to Agent, any and all financing statements, fixture filings, security agreements, pledges, assignments, endorsements of certificates of title, mortgages, deeds of trust, opinions of counsel, and all other documents (collectively, the "Additional

Documents") and take such further actions that Agent may reasonably request in form and substance reasonably satisfactory to Agent, to create, perfect, and continue perfected or to better perfect the Agent's Liens in all of the properties and assets of such Borrowers and their Subsidiaries (whether now owned or hereafter arising or acquired, tangible or intangible, real or personal), to create and perfect Liens in favor of Agent in any Real Property acquired by any Borrower or its Subsidiaries after the Closing Date, in order to fully consummate all of the transactions contemplated hereby and under the other Loan Documents and/or to otherwise carry out more effectively the purposes of this Agreement and the other Loan Documents. To the maximum extent permitted by applicable law, the Borrowers authorize Agent to execute any such Additional Documents in such Borrower's or its Subsidiaries' names, as applicable, and authorizes Agent to file such executed Additional Documents in any appropriate filing office.

## 6. NEGATIVE COVENANTS.

Each Borrower covenants and agrees that, until termination of all of the Commitments and payment in full of the Obligations, Borrowers will not and will not permit any of their respective Subsidiaries to do any of the following:

**6.1** **Indebtedness**. Create, incur, assume, suffer to exist, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any Indebtedness, except:

**(a)** Indebtedness evidenced by this Agreement and the other Loan Documents, together with Indebtedness owed to Underlying Issuers with respect to Underlying Letters of Credit,

**(b)** Indebtedness set forth on Schedule 4.19,

**(c)** refinancings, renewals, or extensions of Indebtedness permitted under clauses (b), (c) or (g) of this Section 6.1 (and continuance or renewal of any Permitted Liens associated therewith) so long as: (i) the terms and conditions of such refinancings, renewals, or extensions do not, in Agent's reasonable judgment, materially impair the prospects of repayment of the Obligations by Borrowers or Guarantors or materially impair Borrowers' or Guarantor's creditworthiness, (ii) such refinancings, renewals, or extensions do not (A) result in an increase in the principal amount of (other than any increase arising from the inclusion of fees, premiums and other financing costs related thereto) the Indebtedness so refinanced, renewed, or extended, (B) with respect to Indebtedness permitted under clause (g) of this Section 6.1, result in an increase in interest rate with respect to the Indebtedness so refinanced, renewed, or extended, (C) with respect to Indebtedness permitted under clauses (b) and (c) of this Section 6.1, result in the interest rate applicable thereto being higher than the prevailing market rates at the time of such refinancing, renewal or extension, or (D) add one or more Borrowers, Guarantors or their respective Subsidiaries as liable with respect thereto if such Persons were not liable with respect to the original Indebtedness, (iii) such refinancings, renewals, or extensions do not result in a shortening of the average weighted maturity of the Indebtedness so refinanced, renewed, or extended, nor are they on terms or conditions, that, taken as a whole, are materially more burdensome or restrictive to the applicable Borrower, Guarantor or Subsidiary, (iv) if the Indebtedness that is refinanced, renewed, or extended was subordinated in right of payment to the Obligations and/or the Permitted Liens securing such Indebtedness were subordinated to Agent's Liens, then the terms and conditions of the refinancing, renewal, or extension Indebtedness must include subordination terms and conditions that are at least as favorable to the Lender Group as those that were applicable to the refinanced, renewed, or extended Indebtedness, and (v) the Indebtedness that is refinanced, renewed, or extended is not recourse to any Person that is liable on account of the Obligations other than those Persons which were obligated with respect to the Indebtedness that was refinanced, renewed, or extended,

**(d)** endorsement of instruments or other payment items for deposit,

**(e)** Indebtedness comprising Permitted Investments,

(f) to the extent the Liens securing such Indebtedness are subordinated pursuant to the Intercreditor Agreement, Indebtedness under the Indenture Documents in an aggregate principal amount outstanding at any one time not in excess of $142,000,000,

(g) other unsecured Indebtedness, incurred in the ordinary course of business, in an aggregate amount not to exceed $500,000 at any one time outstanding,

(h) Indebtedness of any Borrower to any other Borrower or any of its Subsidiaries and of any wholly-owned Subsidiary of any Borrower to any Borrower or any of its Subsidiaries, in each case, to the extent all such Persons are parties to the Intercompany Subordination Agreement;

(i) Indebtedness under Hedge Agreements entered into in the ordinary course of business for non-speculative purposes;

(j) Indebtedness under any performance, surety or similar bonds entered into in the ordinary course of business;

(k) unsecured guaranties by any Borrower or any Subsidiary of any Borrower of Indebtedness of any other Borrower or any of their Subsidiaries which is permitted hereunder; and

(l) Indebtedness of any Borrower or any Subsidiary of any Borrower arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (except in the case of daylight overdrafts) drawn against insufficient funds in the ordinary course of business; provided, however, that such Indebtedness is extinguished within 3 Business Days of its incurrence.

**6.2** **Liens**. Create, incur, assume, or suffer to exist, directly or indirectly, any Lien on or with respect to any of its assets, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for Permitted Liens (including Liens that are replacements of Permitted Liens to the extent that the original Indebtedness is refinanced, renewed, or extended under Section 6.1(c) and so long as the replacement Liens only encumber those assets that secured the refinanced, renewed, or extended Indebtedness).

**6.3** **Restrictions on Fundamental Changes**. Except as expressly provided in the Plan of Reorganization:

(a) enter into any merger, consolidation, reorganization (except as expressly provided in the Plan of Reorganization), or recapitalization, or reclassify its Stock,

(b) liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution),

(c) convey, sell, lease, license, assign, transfer, or otherwise dispose of, in one transaction or a series of transactions, all or any substantial part of its assets, or

(d) suspend or go out of a substantial portion of its or their business;

provided, however, that (x) any Borrower or any Subsidiary of a Borrower may be merged or consolidated with or into a Borrower (provided that (i) a Borrower shall be the continuing or surviving corporation or (ii) simultaneously with such transaction, the continuing or surviving corporation shall become a Borrower and such Borrower shall comply with Section 5.16 in connection therewith), (y) any Borrower or any Subsidiary of a Borrower may dispose of any or all of its assets (upon voluntary liquidation or otherwise) to any Borrower and (z) any Borrower or any Subsidiary of a Borrower may enter into transactions permitted by Section 6.4.

**6.4** **Disposal of Assets**.  Other than Permitted Dispositions, convey, sell, lease, license, assign, transfer, or otherwise dispose of any of the assets of any Borrower, Guarantor or any of their respective Subsidiaries.

**6.5** **Change Name**.  Change any Borrower's or Guarantor's name, organizational identification number, state of organization, or organizational identity; provided, however, that (a) a Borrower or Guarantor may change its name upon at least 5 Business Days prior written notice by Administrative Borrower to Agent of such change, so long as (i) at the time of such written notification, such Borrower or Guarantor (as applicable) provides any financing statements necessary to perfect and continue perfected the Agent's Liens and (ii) immediately after such name change, Administrative Borrower provides Agent with evidence of such name change (including copies of any related public filings) and (b) a Borrower or Guarantor may change its organizational identification number, state of organization or organizational identity so long as (i) prior to any such change being effected, all steps necessary to protect and preserve the perfection and priority of Agent's Liens with respect to any applicable Borrower or Guarantor have been taken, as determined by Agent in its Permitted Discretion and (ii) as a result of such change the applicable Borrower or Guarantor is (A) not organized under a jurisdiction outside of the United States or (B) a type of organization approved by Agent in its Permitted Discretion.

**6.6** **Nature of Business**.  Engage in any businesses other than (a) owning and operating a chain of full-service casual dining restaurants, (b) manufacturing and selling consumer foods from or related to such restaurants' menu offerings and (c) extensions of such businesses that are complimentary and reasonably related thereto.

**6.7** **Payments and Amendments**.  Except as provided in the Plan of Reorganization:

**(a)** except in connection with a refinancing permitted by Section 6.1(c) and except as set forth in subsection (b) below, pay, prepay, redeem, defease, purchase, acquire or otherwise make any payment on account of any Indebtedness of any Borrower, Guarantor or any of their respective Subsidiaries incurred prior to the Filing Date unless allowed or approved by the Bankruptcy Court pursuant to the Orders, made in compliance with Section 6.16 and consented to by the Agent and the Required Lenders; provided, however, to the extent permitted under the Orders, the Borrowers may make the Pre-Petition Adequate Protection Payments and the Indenture Adequate Protection Payments;

**(b)** make any payment on account of Indebtedness that has been contractually subordinated in right of payment if such payment is not permitted at such time under the subordination terms and conditions; and

**(c)** except in connection with a refinancing permitted by Section 6.1(c), directly or indirectly, amend, modify, alter, increase, or change any of the terms or conditions of any Indenture Document, the Jefferies Agreement or any other material contractual obligation of any Borrower or Guarantor or of any Governing Document of any Borrower in any manner materially adverse to any Borrower, Guarantor, any of their respective Subsidiaries or the Lender Group.

**6.8** **[Reserved]**.

**6.9** **[Reserved]**.

**6.10** **Distributions**.  Make any distribution or declare or pay any dividends (in cash or other property) on, or purchase, acquire, redeem, or retire any of such Person's Stock, of any class, whether now or hereafter outstanding, or make payments to any members of the Board of Directors other than: (a) distributions or dividends by a Borrower or any Subsidiary of a Borrower to another Borrower; (b) distributions or dividends payable solely in common Stock; (c) payments permitted by Section 6.13; (d) any payment of dividends, other distributions or other amounts or the making of loans or advances by the Parent to any direct

or indirect parent of the Parent to pay franchise taxes and to pay federal, state, local and foreign income taxes to the extent such taxes are attributable to the income of the Parent and its Subsidiaries (and, to the extent of the amounts actually received from its Subsidiaries, in amounts required to pay such taxes to the extent attributable to the income of such Subsidiaries) and so long as the Administrative Borrower has provided to Agent a certificate, in form and substance satisfactory to Agent, as to the amount of such tax liabilities; (e) any payment of dividends, other distributions or other amounts or the making of loans or advances by the Parent to any direct or indirect parent of the Parent to pay accounting, legal and other fees required to maintain its corporate (or equivalent) existence and to provide for other operating costs incurred in the ordinary course of its business as a holding company, in each case related to the Parent and its Subsidiaries and so long as all such amounts do not exceed $250,000 in the aggregate per fiscal year; provided, however, any amount not permitted to be paid as set forth above because an Event of Default then exists or would result shall be permitted to accrue and may be paid only if such Event of Default has been waived pursuant to the terms of this Agreement or cured as determined by Agent; and (f) any payment of dividends, other distributions or other amounts or the making of loans or advances by the Parent to any direct or indirect parent of the Parent to pay fees and expenses payable in connection with the administration of the Bankruptcy Cases to the extent such payments are otherwise permitted under this Agreement and the Orders.

**6.11** **Accounting Methods**. Modify or change their fiscal year or their method of accounting (other than as may be required to conform to GAAP) or enter into or modify any agreement currently existing, or at any time hereafter entered into with any third party accounting firm or service bureau for the preparation or storage of Borrowers', Guarantors' or their respective Subsidiaries' accounting records that prohibits or restricts said accounting firm or service bureau from providing to Agent information regarding such Person's financial condition; provided, however, that Borrowers, Guarantors and their respective Subsidiaries' shall instruct said accounting firm or service bureau to provide to Agent any financial information concerning such Persons in said accounting firm or service bureau's possession which Agent may request.

**6.12** **Investments**. Except for Permitted Investments, directly or indirectly, make or acquire any Investment, or incur any liabilities (including contingent obligations) for or in connection with any Investment; provided, however, that Borrowers and Guarantors shall not have Permitted Investments, cash or Cash Equivalents (other than in the Cash Management Accounts) in Deposit Accounts or Securities Accounts in an amount in excess of $500,000 in the aggregate at any one time with respect to all such accounts unless such Borrower or Guarantor, as applicable, and the applicable securities intermediary or bank have entered into Control Agreements governing such Permitted Investments, cash or Cash Equivalents in order to perfect (and further establish) the Agent's Liens in such Permitted Investments, cash or Cash Equivalents; provided, further, however, that notwithstanding the foregoing, Borrowers and Guarantors shall not have Permitted Investments, cash or Cash Equivalents in Deposit Accounts or Securities Accounts maintained with any Specified Institution unless such Deposit Accounts or Securities Accounts are subject to a Control Agreement. Subject to the foregoing proviso, and Section 2.7, Borrowers and Guarantors shall not establish or maintain any Deposit Account or Securities Account unless Agent shall have received a Control Agreement in respect of such Deposit Account or Securities Account.

**6.13** **Transactions with Affiliates**. Directly or indirectly enter into or permit to exist any transaction with any Affiliate of any Borrower (other than another Borrower or Guarantor) except for: (a) transactions that (i) are in the ordinary course of Borrowers' business, (ii) if they involve payments by any Borrower, Guarantor or any of their respective Subsidiaries in excess of $250,000 in the aggregate during any year, are fully disclosed to Agent, and (iii) are no *less* favorable to such Borrower, Guarantor or Subsidiary, as applicable, than would be obtained in an arm's length transaction with a non-Affiliate; (b) transactions with Aaron Spencer, his Affiliates or his family that (i) are no *less* favorable to Borrowers, Guarantors or their respective Subsidiaries, as applicable, than would be obtained in an arm's length transaction with a non-Affiliate, and (ii) do not involve payments by any Borrower, Guarantor or any of their respective Subsidiaries in excess of the applicable amount set forth on Schedule 6.13, unless such payments have been approved by Agent (such approval not to be unreasonably withheld); (c) accounts payable incurred in the ordinary course of

business based upon Borrowers' and their respective Affiliates' historical practices as disclosed to Agent and the Lenders on the Closing Date; and (d) transactions permitted pursuant to Section 6.10.

**6.14**    **Use of Proceeds**.

(a)    Use the proceeds of the Advances and the Term Loan for any purpose other than to (i) repay the Pre-Petition Obligations, (ii) pay all fees due to Agent and Lenders as provided under this Agreement and the other Loan Documents, including, without limitation, all professional fees and expenses (including legal, financial advisor, appraisal and valuation-related fees and expenses) incurred by Agent and/or any Lender in connection with the preparation, negotiation, documentation and court approval of this Agreement and the other Loan Documents (whether incurred before or after the Filing Date), (iii) finance ongoing debtor-in-possession working capital needs, general corporate purposes relating to post-Filing Date operations and related costs, fees and expenses of the Bankruptcy Cases (including Allowed Fees subject to the limitations of the Carve-Out and the other restrictions set forth in this Agreement and to the extent paid in compliance with Section 6.16), (iv) pay the costs of administration of the Bankruptcy Cases, (v) pay the Pre-Petition Adequate Protection Payments and (v) pay the Indenture Adequate Protection Payments; in each case, to the extent paid in compliance with Section 6.16 and subject to the terms and conditions described in this Agreement (including, without limitation, Section 6.7).

(b)    Notwithstanding anything to the contrary set forth herein or in any other Loan Document, no portion of the Advances, the Collateral, the Carve-Out Amount or cash collateral of the Pre-Petition Agent and/or Pre-Petition Lenders may be used in connection with, and no withdrawal shall be made from the Carve-Out Escrow Account to fund any Account to: (i) preventing, hindering, or delaying any of the Agent's, the Lenders', the Pre-Petition Agent's or the Pre-Petition Lenders' enforcement or realization upon any of the Collateral once an Event of Default has occurred; (ii) using or seeking to use cash collateral or selling or otherwise disposing of any of the Collateral without the consent of the Agent and the Required Lenders; (iii) using or seeking to use any insurance proceeds constituting Collateral without the consent of the Agent and the Required Lenders; (iv) except as permitted under Section 6.1, incurring Indebtedness without the prior consent of the Agent and the Required Lenders; (v) objecting or challenging in any way any claims, Liens, Collateral (including cash collateral) or, as the case may be, "Collateral" (as defined in the Pre-Petition Credit Agreement or Indenture (including cash collateral), held by or on behalf of any of the Agent, the Lenders, the Pre-Petition Agent, the Pre-Petition Lenders, the Trustee or the Note holders, respectively; (vi) asserting any claims or causes of action, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against any of the Agent, the Lenders, the Pre-Petition Agent, the Pre-Petition Lenders, the Trustee, the Note holders or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees; (vii) prosecuting an objection to, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the Obligations, the Liens of Agent securing the Obligations, the Pre-Petition Obligations, the Liens securing the Pre-Petition Obligations, the Indebtedness under the Indenture Documents, the Liens securing the Indebtedness under the Indenture Documents or any other rights or interests of any of the Agent, the Lenders, the Pre-Petition Agent, the Pre-Petition Lenders, the Trustee or the Note holders; or (viii) taking any action which (A) has or could have the effect of materially and adversely modifying or compromising the rights and remedies of the Agent, the Lenders, the Pre-Petition Agent, the Pre-Petition Lenders, the Trustee and/or the Note holders, (B) is contrary, in a manner that is material and adverse to the Agent, the Lenders, the Pre-Petition Agent, the Pre-Petition Lenders, the Trustee and/or the Note holders, to any term or condition set forth in any of the Loan Documents, the Indenture Documents or the Orders, or (C) results in the occurrence of an Event of Default; provided, however, that up to $50,000 of the Carve-Out Amount may be used by the statutory committee of unsecured creditors in the Bankruptcy Cases to investigate the validity of the Indebtedness and the validity and perfection of the Liens created by the Pre-Petition Credit Agreement, this Credit Agreement, and the Indenture within sixty (60) calendar days following the date of entry of the Final Order or, if no Final Order is entered, within seventy-five (75) calendar days following the date of entry of the Interim Order.

(c)     The Borrowers shall not withdraw any funds from the Carve-Out Escrow Account or use any proceeds thereof except for payment of Allowed Fees in accordance with the terms of this Agreement.

**6.15    [Reserved]**.

**6.16    Budget Compliance**.

(a)     **Minimum Cash Receipts**.  Fail to receive, when measured on the last day of each fiscal week, commencing with the fiscal week ending February 21, 2010, aggregate cash receipts of at least 85% of the amount of aggregate cash receipts set forth in the Budget for the period commencing on January 18, 2010 and ending on such date of measurement.

(b)     **Maximum Disbursements**. Allow aggregate disbursements, when measured on the last day of each fiscal week, commencing with the fiscal week ending February 21, 2010, to exceed 115% of the amount of aggregate disbursements set forth in the Budget for the period commencing on January 18, 2010 and ending on such date of measurement.

(c)     **Maximum Aggregate Variance**.  Permit, when measured on the last day of each fiscal week, commencing with the fiscal week ending February 21, 2010, for the period commencing on January 18, 2010 and ending on such date of measurement (i) the percentage by which aggregate cash receipts for such period was less than 100% of the amount of aggregate cash receipts set forth in the Budget for such period, if any, plus (ii) the percentage by which aggregate disbursements for such period exceeded 100% of the amount of aggregate disbursements set forth in the Budget for such period, if any, to exceed an aggregate of 20%.

**6.17    Interim Order; Final Order; Administrative Expense Priority; Lien Priority; Payments**.

(a)     Seek, consent to or suffer to exist at any time any modification, stay, vacation or amendment of the Interim Order or the Final Order, as the case may be, except for modifications and amendments joined in or agreed to in writing by Agent.

(b)     Suffer to exist at any time a priority for any administrative expense or unsecured claim against any Borrower or Guarantor (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code) equal or superior to the priority of Agent and the Lenders in respect of the Obligations, except for the Carve-Out and the Specified Permitted Liens.

(c)     Prior to the date on which the Obligations have been indefeasibly paid in full, all in accordance with the terms of this Agreement, and this Agreement has been terminated, (i) pay any administrative expenses, except administrative expenses incurred in the ordinary course of the business of the Borrowers or approved by order of the Bankruptcy Court or (ii) permit or seek to permit the granting of adequate protection in favor of any Person other than the Pre-Petition Adequate Protection or the Indenture Adequate Protection.

(d)     Except as provided in the Orders, waive any claims under Section 506(c) of the Bankruptcy Code or take any other action adverse to Agent or the Lenders or their rights and remedies under the Loan Documents.

Notwithstanding the foregoing, the Borrowers shall be permitted to pay as the same may become due and payable and to the extent permitted under the Orders: (x) administrative expenses of the kind specified in Section 503(b) of the Bankruptcy Code incurred in the ordinary course of business and (y) Allowed Fees payable under Sections 330 and 331 of the Bankruptcy Code; provided, however, (i) so long as no Triggering Event has occurred, the Borrowers shall be permitted to pay Allowed Fees payable under Sections 330 and 331

of the Bankruptcy Code, and the same shall not be required to be paid out of the Carve-Out Escrow Account and (ii) if a Triggering Event has occurred, (A) Allowed Fees payable under Sections 330 and 331 of the Bankruptcy Code incurred and unpaid as of the date such Triggering Event has occurred may be paid and shall not be required to be paid out of the Carve-Out Escrow Account and (B) Allowed Fees payable under Sections 330 and 331 of the Bankruptcy Code and incurred upon and after such Triggering Event may be paid solely from the Carve-Out Escrow Account, in an amount not to exceed $1,500,000 in the aggregate.

**7.     EVENTS OF DEFAULT.**

Any one or more of the following events shall constitute an event of default (each, an "Event of Default") under this Agreement:

**7.1**     If any Borrower fails to pay when due and payable, or when declared due and payable, (a) all or any portion of the Obligations consisting of interest, fees, or charges due the Lender Group, reimbursement of Lender Group Expenses, or other amounts (other than any portion thereof constituting principal) constituting Obligations (including any portion thereof that accrues after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), and such failure continues for a period of 3 Business Days, or (b) all or any portion of the principal of the Obligations;

**7.2**     If any Borrower, Guarantor or any of their respective Subsidiaries:

**(a)**     fails to perform or observe any covenant or other agreement contained in any of Sections 2.7, 5.2, 5.3, 5.4, 5.5, 5.8, 5.12, 5.14, 5.16, 5.17, 5.18 and 6.1 through 6.17 of this Agreement or Section 7 of the Security Agreement;

**(b)**     fails to perform or observe any covenant or other agreement contained in any of Sections 5.6, 5.7, 5.9, 5.10, 5.11, 5.15 and 5.20 of this Agreement and such failure continues for a period of 10 days after the earlier of (i) the date on which such failure shall first become known to any officer of any Borrower or Guarantor or (ii) written notice thereof is given to Administrative Borrower by Agent; or

**(c)**     fails to perform or observe any covenant or other agreement contained in this Agreement, or in any of the other Loan Documents; in each case, other than any such covenant or agreement that is the subject of another provision of this Section 7 (in which event such other provision of this Section 7 shall govern), and such failure continues for a period of 20 days after the earlier of (i) the date on which such failure shall first become known to any officer of any Borrower or Guarantor or (ii) written notice thereof is given to Administrative Borrower by Agent;

**7.3**     If any judgment is imposed, any liability is incurred or any other event occurs which could reasonably be expected to result in a Material Adverse Change;

**7.4**     If any warranty, representation, statement, or Record made herein or in any other Loan Document or delivered to Agent or any Lender in connection with this Agreement or any other Loan Document proves to be untrue in any material respect (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified by materiality in the text thereof) as of the date of issuance or making or deemed making thereof;

**7.5**     Except as expressly permitted in the Orders, if any Borrower, Guarantor or any of their respective Subsidiaries makes any payment on account of Indebtedness that has been contractually subordinated in right of payment to the payment of the Obligations, except to the extent such payment is permitted by the terms of the subordination provisions applicable to such Indebtedness;

**7.6**     If the obligation of any Guarantor under the Guaranty is limited or terminated by operation of law or by such Guarantor;

**7.7**     If (a) the Security Agreement or any other Loan Document that purports to create a Lien in favor of Agent, shall, for any reason, fail or cease to create a valid and perfected Lien having the priority set forth in such Loan Document, except to the extent permitted by the terms thereof, on the Collateral purported to be covered thereby, except as a result of a disposition of the applicable Collateral in a transaction permitted under this Agreement, (b) any Borrower or Guarantor shall attempt to contest the validity, perfection, priority or enforceability of or otherwise invalidate, reduce or otherwise impair the liens or security interests of Agent or any Lender, Agent's or any Lender's claims or rights against the Borrowers or Guarantors or attempt to subject any Collateral to assessment pursuant to Section 506(c) of the Bankruptcy Code, (c) any lien or security interest created by the Interim Order or the Final Order shall, for any reason, cease to be valid, senior, perfected and enforceable, (d) any action is commenced by any Person (other than the statutory committee of unsecured creditors with respect to the Bankruptcy Cases to the extent permitted under this Agreement) which contests the validity, perfection, priority or enforceability of any of the claims, liens and security interests of Agent and the Lenders created by this Agreement, the other Loan Documents or the Orders securing any portion of the Obligations in excess of the amount of the Pre-Petition Obligations unless (i) such action is subject to a protest by the applicable Borrower or Guarantor, which protest is instituted and diligently prosecuted by such Borrower or Guarantor in good faith and (ii) Agent and the Required Lenders are satisfied that, while any such protest is pending, there will be no impairment of the enforceability, validity, or priority of any of Agent's liens in and to the Collateral or (e) the validity, perfection, priority or enforceability of any of the claims, liens or security interests of Agent and the Required Lenders created by this Agreement, the other Loan Documents or the Orders securing any portion of the Obligations in excess of the amount of the Pre-Petition Obligations is impaired;

**7.8**     If (a) any provision of any of this Agreement or any other Loan Document shall at any time for any reason be declared to be null and void or the validity or enforceability thereof shall be contested by any Borrower or any Guarantor, or a proceeding shall be commenced by any Borrower or any Guarantor seeking to establish the invalidity or unenforceability thereof, or any Borrower or any Guarantor shall deny that it has any liability or obligation purported to be created under this Agreement or any other Loan Document or (b) a proceeding shall be commenced by any Governmental Authority having jurisdiction over any Borrower or any Guarantor seeking to establish the invalidity or unenforceability under this Agreement or any other Loan Document unless (i) such action is subject to a protest by the applicable Borrower or Guarantor, which protest is instituted and diligently prosecuted by such Borrower or Guarantor in good faith and (ii) Agent and the Required Lenders are satisfied that, while any such protest is pending, there will be no impairment of the enforceability, validity, or priority of any of Agent's Liens in and to the Collateral;

**7.9**     If any Change of Control shall have occurred;

**7.10**     If (a) any of the Obligations for any reason shall cease to be "Credit Agreement Secured Obligations" (or any comparable terms) under, and as defined in the Intercreditor Agreement, any other document evidencing or governing secured Indebtedness with respect to which the Liens securing such Indebtedness have been subordinated to Agent's Liens or any document evidencing or governing any Indebtedness that has been contractually subordinated in right of payment to the Obligations, (b) any holder of any Note, holder or beneficiary of any Lien securing any Note, other holder or beneficiary of any Lien which has been contractually subordinated to Agent's Liens or any holder of any Indebtedness that has been contractually subordinated in right of payment to the Obligations shall fail to perform or comply with any of the subordination (whether with regard to Liens or Indebtedness) provisions of (as applicable) contained in any document governing or evidencing such Indebtedness or Liens, the Intercreditor Agreement or any other subordination or intercreditor agreement entered into by Agent with respect to any other Liens that have been subordinated to Agent's Liens or any Indebtedness that has been contractually subordinated in right of payment to the Obligations, or (c) the subordination provisions of the Intercreditor Agreement or any other subordination or intercreditor agreement entered into by Agent with respect to any other Liens that have been

subordinated to Agent's Liens or any Indebtedness that has been contractually subordinated in right of payment to the Obligations shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of such Indebtedness or holder or beneficiary of such Liens;

**7.11**    If there occurs one or more ERISA Events which results in or otherwise is associated with liability of any Borrower, any of its Subsidiaries, or any of their respective ERISA Affiliates in excess of $500,000 in the aggregate during the term of this Agreement;

**7.12**    If (a) any of the Bankruptcy Cases is converted to a case under Chapter 7 of the Bankruptcy Code, or (b) any of the Bankruptcy Cases is dismissed;

**7.13**    If a Chapter 11 trustee or an examiner with enlarged powers relating to the operations of the Borrowers' business (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) is appointed pursuant to Section 1104 of the Bankruptcy Code in any of the Bankruptcy Cases;

**7.14**    Except with respect to the Carve-Out and the Specified Permitted Liens, if any super-priority administrative expense claim or any Lien that is pari passu with or senior to those of the Agent and the Lenders is granted to any Person other than Agent, or the authorization to use cash collateral without the consent of Agent and the Required Lenders is granted to any Person other than Agent;

**7.15**    If any Person other than Agent is granted relief from the automatic stay provided for in the Bankruptcy Cases, or such automatic stay is otherwise modified, to permit enforcement of rights by such Person with respect to any assets of any Borrower or Guarantor having a fair market value in excess of $50,000 unless otherwise consented to in writing by Agent; provided, however, it shall not be an Event of Default under this Section 7.15 if a Person is granted relief from the automatic stay in order to recover on a claim against any Borrower or Guarantor that is fully covered by insurance so long as such recovery is sought solely from, and such relief from stay is granted solely with respect to, such insurance proceeds and without payment by any Borrower or Guarantor of any deductible with respect thereto;

**7.16**    If any Borrower's or Guarantor's Board of Directors shall authorize the liquidation of such Borrower's or Guarantor's business pursuant to one or more Section 363 sales or otherwise or shall file any motion under Section 363 of the Bankruptcy Code, other than as consented to by Agent and the Required Lenders;

**7.17**    If any Borrower or Guarantor shall fail to comply with or perform any of the terms, conditions, covenants or other obligations under the Interim Order and/or the Final Order; provided, that, any such failure arising solely from the failure to deliver to Agent or any Lender any report or document set forth in any Order which is not also the subject of a covenant set forth in this Agreement or any other Loan Document shall not give rise to an Event of Default unless such report or document is not delivered to Agent and the Lenders within 5 Business Days of the specified date of delivery;

**7.18**    The failure of the Closing Date to occur within one (1) Business Day after entry of the Interim Order.

**7.19**    If the Final Order has not been entered within 30 days after the Filing Date;

**7.20**    If the Borrowers fail to achieve any Reorganization Milestone as and when required pursuant to Schedule R-1; provided, that the due date for any such Reorganization Milestone may be extended for up to but not exceeding 90 days, with the prior written consent of the Agent and the Required Lenders;

**7.21**    The amendment, modification, reversal, revocation, issuance of a stay or order to vacate or supplement the (a) Interim Order, the Final Order, or any other order of the Bankruptcy Court affecting the this Agreement, any other Loan Document or the transactions contemplated hereby or thereby, in each case, in any

manner not acceptable to Agent and the Required Lenders or (b) the Plan of Reorganization to the extent such amendment, modification, reversal, revocation, issuance or supplement results in the Pre-Petition Obligations and the Obligations not being paid in full in cash on or before the effective date of the Plan of Reorganization or reflects that the Pre-Petition Obligations or the Obligations will not be paid in full in cash on or before the effective date of the Plan or Reorganization;

**7.22** If the Borrowers fail to pay in full in cash, on the Closing Date, the Pre-Petition Obligations in accordance with the terms of the Pre-Petition Credit Agreement or if the Confirmation Order shall fail to provide for the payment in full, in cash of all Pre-Petition Obligations (to the extent not already paid in full in cash with the proceeds of the Obligations) and all Obligations on or before the effective date of the Plan of Reorganization;

**7.23** The circulation or distribution by or on behalf of the Borrowers of any plan of reorganization and/or disclosure statement, or draft thereof (or term sheet or similar indicative statements of terms thereof) that does not provide for repayment in full, in cash of all Pre-Petition Obligations (to the extent not already paid in full in cash with the proceeds of the Obligations) and all Obligations before or at the effective date of such plan of reorganization;

**7.24** If any Plan Documentation is executed, filed, delivered, or any confirmation order is entered which does not provide for repayment in full, in cash of all Pre-Petition Obligations (to the extent not already paid in full in cash with the proceed of the Obligations) and all Obligations before or at the effective date of the Plan of Reorganization;

**7.25** If the Plan Support Agreement ceases to be in full force and effect or if it is amended, modified or supplemented such that the provisions thereof do not provide for repayment in full in cash of all Pre-Petition Obligations (to the extent not already paid in full in cash with the proceeds of the Obligations) and all Obligations before or at the time of the effective date of the Plan of Reorganization, or any party thereto shall have withdrawn its support for the restructuring described therein or refused to abide by the terms thereof; or

**7.26** If there is a stay or injunction of the Confirmation Order in effect precluding the consummation of the transactions contemplated thereby.

## 8. THE LENDER GROUP'S RIGHTS AND REMEDIES.

**8.1** <u>Rights and Remedies</u>.  Notwithstanding the provisions of Section 362 of the Bankruptcy Code and subject to the terms of the Orders, upon the occurrence, and during the continuation, of an Event of Default, the Required Lenders (at their election but without notice of their election and without demand) may, except to the extent expressly required below or to the extent expressly required by the Orders, authorize and instruct Agent to do any one or more of the following on behalf of the Lender Group (and Agent, acting upon the instructions of the Required Lenders, shall do the same on behalf of the Lender Group), all of which are authorized by Borrowers:

      **(a)** declare all or any portion of the Obligations, whether evidenced by this Agreement, by any of the other Loan Documents, or otherwise, immediately due and payable;

      **(b)** cease advancing money or extending credit to or for the benefit of Borrowers under this Agreement, under any of the Loan Documents;

      **(c)** terminate this Agreement and any of the other Loan Documents as to any future liability or obligation of the Lender Group, but without affecting any of the Agent's Liens in the Collateral and without affecting the Obligations; and

(d) upon 7 days (the "Notice Period") notice to Administrative Borrower, the statutory committee of unsecured creditors in the Bankruptcy Cases, the United States Trustee, the Trustee and the Noteholder Group (an "Enforcement Notice"), obtain any one or more of the following forms of relief: (i) relief from the automatic stay, without further notice or order, to foreclose on all or any portion of the Collateral or otherwise exercise remedies against the Collateral permitted by the Loan Documents and other non-bankruptcy law, including, without limitation, the exercise of rights of setoff and the maintenance of cash collateral with respect to the Letters of Credit and Bank Product Obligations, or (ii) the cessation of the Borrowers' right, if any, to use cash collateral.

Each Borrower and each Guarantor hereby expressly agrees that 7 days notice shall be adequate notice for the requesting of the foregoing specified forms of relief in the event of the occurrence and continuation of an Event of Default hereunder, and each Borrower and each Guarantor expressly waives any right to object to the adequacy of notice in connection with a request for any of the foregoing specified forms of relief if such 7 days notice is given and an Event of Default is found to exist; provided, however, nothing in this paragraph shall limit the right of Agent and/or the Lender Group and Bank Product Providers to apply to the Bankruptcy Court for such other or further relief as may be justified and appropriate (including, without limitation, the right to have the Bankruptcy Court retain jurisdiction to consider a judicial foreclosure action, assumption and assignment of any lease under Section 365 of the Bankruptcy Code, or any other matter), and nothing in this paragraph shall limit the other rights and remedies of Agent, the Lender Group or Bank Product Providers provided for elsewhere in this Agreement or in any other Loan Documents.

Without limitation of any of the foregoing remedies, upon the occurrence and during the continuance of any Event of Default, or upon the maturity of the Obligations, no Borrower or Guarantor shall have any right to use or seek to use any cash collateral (as that term is defined in Section 363(a) of the Bankruptcy Code) in which Agent, any member of the Lender Group or any Bank Product Provider has an interest; provided, however, during such 7 day notice period, the Borrowers and Guarantors shall be entitled to an emergency hearing with the Bankruptcy Court to challenge whether an Event of Default has occurred and unless during such period the Borrowers and Guarantors obtain an order from the Bankruptcy Court to the effect that the Lenders and Agent remain subject to the automatic stay, the automatic stay as to the Lenders and Agent shall be automatically terminated at the end of such 7 day notice period without further notice or order. In addition to the foregoing remedies, the Lender Group and Bank Product Providers shall have all other rights and remedies available at law or in equity or pursuant to any other Loan Document. Notwithstanding the foregoing, upon the occurrence of any Event of Default described in Section 7.12 or Section 7.13, in addition to the remedies set forth above, without any notice to Borrowers or any other Person or any act by the Lender Group, the Commitments shall automatically terminate and the Obligations then outstanding, together with all accrued and unpaid interest thereon and all fees and all other amounts due under this Agreement and the other Loan Documents, shall automatically and immediately become due and payable, without presentment, demand, protest, or notice of any kind, all of which are expressly waived by the Borrowers and Guarantors.

**8.2** **Remedies Cumulative**. The rights and remedies of the Lender Group under this Agreement, the other Loan Documents, and all other agreements shall be cumulative. The Lender Group shall have all other rights and remedies not inconsistent herewith as provided under the Code, the Bankruptcy Code or otherwise by law, or in equity. No exercise by the Lender Group of one right or remedy shall be deemed an election, and no waiver by the Lender Group of any Event of Default shall be deemed a continuing waiver. No delay by the Lender Group shall constitute a waiver, election, or acquiescence by it.

# 9. TAXES AND EXPENSES.

If any Borrower fails to pay any monies (whether taxes, assessments, insurance premiums, or, in the case of leased properties or assets, rents or other amounts payable under such leases) due to third Persons, or fails to make any deposits or furnish any required proof of payment or deposit, all as required under the terms of this Agreement, then, Agent, in its sole discretion and without prior notice to any Borrower, may do any or all of the following: (a) except with respect to payments that are the subject of a Permitted Protest or are fully-

covered (subject to any applicable deductible) by insurance policies pursuant to which the insurer has not denied or disputed coverage therefore in writing and so long as such taxes are in fact timely paid (whether out of proceeds of such insurance policies or by Borrowers directly), make payment of the same or any part thereof, (b) in accordance with Section 2.1(c), set up such reserves against the Borrowing Base or the Maximum Revolver Amount as Agent deems necessary to protect the Lender Group from the exposure created by such failure, or (c) in the case of the failure to comply with Section 5.8 hereof, obtain and maintain insurance policies of the type described in Section 5.8 and take any action with respect to such policies as Agent deems prudent.  Any such amounts paid by Agent shall constitute Lender Group Expenses and any such payments shall not constitute an agreement by the Lender Group to make similar payments in the future or a waiver by the Lender Group of any Event of Default under this Agreement.  Agent need not inquire as to, or contest the validity of, any such expense, tax, or Lien and the receipt of the usual official notice for the payment thereof shall be conclusive evidence that the same was validly due and owing.

## 10.   WAIVERS; INDEMNIFICATION.

**10.1   Demand; Protest, Etc**.  Each Borrower waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, nonpayment at maturity, release, compromise, settlement, extension, or renewal of the Obligations on which any such Borrower may in any way be liable.

**10.2   The Lender Group's Liability for Collateral**.  Each Borrower hereby agrees that:  (a) so long as Agent complies with its obligations, if any, under the Code or other applicable law (including the Bankruptcy Code), the Lender Group shall not in any way or manner be liable or responsible for:  (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other Person, and (b) all risk of loss, damage, or destruction of the Collateral shall be borne by Borrowers.

**10.3   Indemnification**.  Each Borrower shall pay, indemnify, defend, and hold the Agent-Related Persons, the Lender-Related Persons, and each Participant (each, an "Indemnified Person") harmless (to the fullest extent permitted by law) from and against any and all claims, demands, suits, actions, investigations, proceedings, and damages, and all reasonable attorneys fees and disbursements and other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), at any time asserted against, imposed upon, or incurred by any of them (a) in connection with or as a result of or related to the execution, delivery, enforcement, performance, or administration (including any restructuring or workout with respect hereto) of this Agreement, any of the other Loan Documents, or the transactions contemplated hereby or thereby or the monitoring of Borrowers' and their Subsidiaries' compliance with the terms of the Loan Documents, (b) with respect to any investigation, litigation, or proceeding related to this Agreement, any other Loan Document, or the use of the proceeds of the credit provided hereunder (irrespective of whether any Indemnified Person is a party thereto), or any act, omission, event, or circumstance in any manner related thereto, and (c) in connection with or arising out of any presence or release of Hazardous Materials at, on, under, to or from any assets or properties owned, leased or operated by any Borrower or any of its Subsidiaries or any Environmental Actions, Environmental Liabilities and Costs or Remedial Actions related in any way to any such assets or properties of any Borrower or any of its Subsidiaries (all the foregoing, collectively, the "Indemnified Liabilities").  The foregoing to the contrary notwithstanding, Borrowers shall have no obligation to any Indemnified Person under this Section 10.3 with respect to any Indemnified Liability that a court of competent jurisdiction finally determines to have resulted from the gross negligence or willful misconduct of such Indemnified Person.  This provision shall survive the termination of this Agreement and the repayment of the Obligations.  If any Indemnified Person makes any payment to any other Indemnified Person with respect to an Indemnified Liability as to which Borrowers were required to indemnify the Indemnified Person receiving such payment, the Indemnified Person making such payment is entitled to be indemnified and reimbursed by Borrowers with respect thereto.  **WITHOUT LIMITATION, THE FOREGOING INDEMNITY SHALL APPLY TO EACH INDEMNIFIED PERSON WITH RESPECT TO INDEMNIFIED LIABILITIES WHICH IN**

**WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF ANY NEGLIGENT ACT OR OMISSION OF SUCH INDEMNIFIED PERSON OR OF ANY OTHER PERSON.**

**10.4** **Waiver of Consequential Damages, Etc**. To the fullest extent permitted by applicable law, no Borrower shall assert, and each Borrower hereby waives, any claim against any Indemnified Person, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Advance, Term Loan or Letter of Credit or the use of the proceeds thereof. No Indemnified Person shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

**11.** **NOTICES.**

Unless otherwise provided in this Agreement, all notices or demands by Borrowers or Agent to the other relating to this Agreement or any other Loan Document shall be in writing and (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by registered or certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as Administrative Borrower or Agent, as applicable, may designate to each other in accordance herewith), or telefacsimile to Borrowers in care of Administrative Borrower or to Agent, as the case may be, at its address set forth below:

|  |  |
|---|---|
| If to Administrative Borrower: | **UNO RESTAURANT HOLDING CORPORATION**<br>100 Charles Park Road<br>West Roxbury, MA 02132<br>Attn: Louie Psallidas<br>Fax No.: (617) 218-5375 |
| with copies to: | **WEIL, GOTSHAL & MANGES LLP**<br>767 Fifth Avenue<br>New York, NY 10153<br>Attn: Andrew J. Yoon<br>Fax No.: (212) 310-8007 |
| If to Agent: | **WELLS FARGO CAPITAL FINANCE, INC**.<br>2450 Colorado Avenue, Suite 3000 West<br>Santa Monica, CA 90404<br>Attn: Specialty Finance Division Manager<br>Fax No.: (310) 453-7442 |
| with copies to: | **BINGHAM MCCUTCHEN LLP**<br>399 Park Avenue<br>New York, NY 10022<br>Attn: Katherine G Weinstein<br>Fax No. (212) 702-3691 |

|                    |                                                      |
|--------------------|------------------------------------------------------|
| and to:            | **BINGHAM MCCUTCHEN LLP**                            |
|                    | 150 Federal Street                                   |
|                    | Boston, MA  02110-1726                               |
|                    | Attn:  Julia Frost-Davies                            |
|                    | Fax No.: (617) 951-8736                              |
|                    |                                                      |
| If to Twin Haven:  | **TWIN HAVEN SPECIAL OPPORTUNITIES FUND III, L.P.**  |
|                    | c/o Twin Haven Capital Partners, LLC                 |
|                    | 33 Riverside Avenue, 3rd Floor                       |
|                    | Westport, CT 06880                                   |
|                    | Attn:  Michael Vinci, COO and CFO                    |
|                    | Fax No.:  (203) 293.1853                             |
|                    |                                                      |
| with copies to:    | **AKIN GUMP STRAUSS HAUER & FELD LLP**               |
|                    | One Bryant Park                                      |
|                    | New York, NY 10036                                   |
|                    | Attn:  Philip C. Dublin                              |
|                    | Kristina Wesch                                       |
|                    | Fax No.:  (212) 872-1002                             |

Any party may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other parties.  All notices or demands sent in accordance with this <u>Section 11</u>, shall be deemed received on the earlier of the date of actual receipt or 3 Business Days after the deposit thereof in the mail.

**12.**     **CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER.**

**(a)     THE VALIDITY OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT), THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF AND THEREOF, AND THE RIGHTS OF THE PARTIES HERETO AND THERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA (INCLUDING THE BANKRUPTCY CODE).**

**(b)     THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE TRIED AND LITIGATED ONLY IN THE BANKRUPTCY COURT; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT UPON APPROVAL OF THE BANKRUPTCY COURT, ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT AGENT'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE AGENT ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND.  BORROWERS AND EACH MEMBER OF THE LENDER GROUP WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS <u>SECTION 12(b)</u>.**

**(c)** BORROWERS AND EACH MEMBER OF THE LENDER GROUP HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. BORROWERS AND EACH MEMBER OF THE LENDER GROUP REPRESENT THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

**13.    ASSIGNMENTS AND PARTICIPATIONS; SUCCESSORS.**

**13.1    <u>Assignments and Participations</u>.**

**(a)** Any Lender may, with the consent of Agent, assign and delegate to one or more assignees (each an "<u>Assignee</u>") that are Eligible Transferees all, or any part of all, of the Obligations, the Commitments and the other rights and obligations of such Lender hereunder and under the other Loan Documents, in a minimum amount of $5,000,000 (provided that, (i) no such consent of Agent shall be required with respect to an assignment to another Lender or an Affiliate of a Lender, (ii) Agent may waive such minimum amount in its sole discretion during the existence of an Event of Default and (iii) such minimum amount shall not apply to (A) an assignment made to a member of an affiliated group of Lenders so long as the aggregate amount of the assignment being made to such affiliated group of Lenders meets or exceeds such minimum and (B) an assignment and delegation by any Lender to a Lender, an Affiliate of a Lender, or to any Related Fund); <u>provided</u>, <u>however</u>, that, Borrowers and Agent may continue to deal solely and directly with such Lender in connection with the interest so assigned to an Assignee until (x) written notice (pursuant to an Assignment and Acceptance) of such assignment, together with payment instructions, addresses, and related information with respect to the Assignee, have been given to Agent (and Administrative Borrower, if required under this Agreement) by such Lender and the Assignee, (y) such Lender and its Assignee have delivered to Agent (and Administrative Borrower, if required under this Agreement) an Assignment and Acceptance, and (z) the assigning Lender or Assignee has paid to Agent for Agent's separate account a processing fee in the amount of $3,500 (provided that, (i) Agent may waive the payment of such fee in its sole discretion and (ii) such fee shall not be payable in connection with an assignment and delegation by any Lender to a Lender, an Affiliate of a Lender, or to any Related Fund). Anything contained herein to the contrary notwithstanding, such minimum assignment amount shall not apply, the payment of any fees shall not be required and the Assignee need not be an Eligible Transferee if such assignment is in connection with any merger, consolidation, sale, transfer, or other disposition of all or any substantial portion of the business or loan portfolio of the assigning Lender.

**(b)** Except as otherwise provided in <u>Section 13.1(c)</u>, from and after the date that Agent notifies the assigning Lender (with a copy to Administrative Borrower) that it has received an executed Assignment and Acceptance and payment of the above-referenced processing fee (if required), (i) the Assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance, shall have the rights and obligations of a Lender under the Loan Documents, and (ii) the assigning Lender shall, to the extent that rights and obligations hereunder and under the other Loan Documents have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights (except with respect to <u>Section 10.3</u> hereof) and be released from any future obligations under this Agreement (and in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement and the other Loan Documents, such Lender shall cease to be a party hereto and thereto), and such assignment shall effect a novation between Borrowers and the Assignee; <u>provided</u>, <u>however</u>, that nothing contained herein shall release any assigning Lender from such Assigning Lender's obligations that survive the termination of this Agreement, including such assigning Lender's obligations under <u>Article 15</u> and <u>Section 16.7</u> of this Agreement.

(c)     Notwithstanding anything contained in this Section 13.1 to the contrary: (i) a Lender may assign any or all of its rights hereunder to an Affiliate of such Lender or a Related Fund without paying any fees required under Section 13.1(a) and (ii) a Lender may assign any or all of its rights hereunder to an Affiliate of such Lender or a Related Fund without (A) providing any notice thereof required under Section 13.1(a) or (B) delivering an executed Assignment and Acceptance to Agent as required under Section 13.1(a); provided, however, (x) Borrowers and Agent may continue to deal solely and directly with the assigning Lender until an Assignment and Acceptance has been delivered to Agent, (y) the failure of such assigning Lender to deliver an Assignment and Acceptance to Agent shall not affect the legality, validity or binding effect of such assignment and (z) an Assignment and Acceptance between an assigning Lender and its Affiliate or Related Fund shall be effective as of the date specified in such Assignment and Acceptance and recorded on the Related Party Register.

(d)     By executing and delivering an Assignment and Acceptance, the assigning Lender thereunder and the Assignee thereunder confirm to and agree with each other and the other parties hereto as follows:  (1) other than as provided in such Assignment and Acceptance, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or any other Loan Document furnished pursuant hereto, (2) such assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Borrower, any Guarantor or their respective Subsidiaries or the performance or observance by any Borrower, any Guarantor or their respective Subsidiaries of any of its obligations under this Agreement or any other Loan Document furnished pursuant hereto, (3) such Assignee confirms that it has received a copy of this Agreement and the other Loan Documents, together with such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance, (4) such Assignee will, independently and without reliance upon Agent, such assigning Lender or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement, (5) such Assignee appoints and authorizes Agent to take such actions and to exercise such powers under this Agreement and the other Loan Documents as are delegated to Agent, by the terms hereof, together with such powers as are reasonably incidental thereto, (6) such Assignee agrees that it will perform all of the obligations which by the terms of this Agreement are required to be performed by it as a Lender, and (7) such Assignee expressly assumes all duties (if any) of such assigning Lender and shall be the beneficiary of all rights (if any) of such assigning Lender under the Intercreditor Agreement and agrees to be bound by the terms thereof.

(e)     Immediately upon Agent's receipt of the processing fee payment (if required) and the fully executed Assignment and Acceptance (or, pursuant to Section 13.1(c), in the case of an assignment from a Lender to one or more of its Affiliates or Related Funds as to which the assigning Lender has not delivered an Assignment and Acceptance to Agent, upon such assigning Lender's receipt of a fully executed Assignment and Acceptance and recordation on the Related Party Register), this Agreement, subject to Section 13.1(c) and 13.1(i), shall be deemed to be amended to the extent, but only to the extent, necessary to reflect the addition of the Assignee and the resulting adjustment of the Commitments arising therefrom.  The Commitment allocated to each Assignee shall reduce such Commitments of the assigning Lender pro tanto.

(f)     Any Lender may at any time sell to one or more commercial banks, financial institutions, or other Persons (a "Participant") participating interests in all or any of its Obligations, the Commitment, and the other rights and interests of that Lender (the "Originating Lender") hereunder and under the other Loan Documents; provided, however, that (i) the Originating Lender shall remain a "Lender" for all purposes of this Agreement and the other Loan Documents and the Participant receiving the participating interest in the Obligations, the Commitments, and the other rights and interests of the Originating Lender hereunder shall not constitute a "Lender" hereunder or under the other Loan Documents and the Originating Lender's obligations under this Agreement shall remain unchanged, (ii) the Originating Lender shall remain solely responsible for the performance of such obligations, (iii) Borrowers, Agent, and the Lenders shall

continue to deal solely and directly with the Originating Lender in connection with the Originating Lender's rights and obligations under this Agreement and the other Loan Documents, (iv) no Originating Lender shall transfer or grant any participating interest under which the Participant has the right to approve any amendment to, or any consent or waiver with respect to, this Agreement or any other Loan Document, except to the extent such amendment to, or consent or waiver with respect to this Agreement or of any other Loan Document would (A) extend the final maturity date of the Obligations hereunder in which such Participant is participating, (B) reduce the interest rate applicable to the Obligations hereunder in which such Participant is participating, (C) release all or substantially all of the Collateral or guaranties (except to the extent expressly provided herein or in any of the Loan Documents) supporting the Obligations hereunder in which such Participant is participating, (D) postpone the payment of, or reduce the amount of, the interest or fees payable to such Participant through such Lender, or (E) change the amount or due dates of scheduled principal repayments or prepayments or premiums, (v) all amounts payable by Borrowers hereunder shall be determined as if such Lender had not sold such participation, except that, if amounts outstanding under this Agreement are due and unpaid, or shall have been declared or shall have become due and payable upon the occurrence of an Event of Default, to the extent permitted by law, each Participant shall be deemed to have the right of set off in respect of its participating interest in amounts owing under this Agreement to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement and (vi) such Lender shall deliver to Agent and the Administrative Borrower such tax documentation as may be required pursuant to Section 15.11. The rights of any Participant only shall be derivative through the Originating Lender with whom such Participant participates and no Participant shall have any rights under this Agreement or the other Loan Documents or any direct rights as to the other Lenders, Agent, Borrowers, the Collections of Borrowers or their Subsidiaries, the Collateral, or otherwise in respect of the Obligations. Anything contained herein to the contrary notwithstanding, the Borrowers agree that each Participant shall be entitled to the benefits of Section 2.14 and Section 15.11 with respect to its participation in any portion of the Commitments and the Loans as if it was a Lender, provided, that, except for participations to an Affiliate of a Lender or any Related Fund, no Participant shall be entitled to any greater amount pursuant to Section 2.14 or Section 15.11 than the applicable Originating Lender. No Participant shall have the right to participate directly in the making of decisions by the Lenders among themselves. The provisions of this Section 13.1(f) are solely for the benefit of the Lender Group and, unless expressly provided in such provision, Borrowers shall not have any rights as third party beneficiaries of any such provisions.

(g)    In connection with any such assignment or participation or proposed assignment or participation, a Lender may, subject to the provisions of Section 16.7, disclose all documents and information which it now or hereafter may have relating to the Borrowers, Guarantors and their respective Subsidiaries and their respective businesses.

(h)    Any other provision in this Agreement notwithstanding, any Lender may at any time create a security interest in, or pledge, all or any portion of its rights under and interest in this Agreement in favor of any Federal Reserve Bank in accordance with Regulation A of the Federal Reserve Bank or U.S. Treasury Regulation 31 CFR § 203.24 or any other Person, in each case without the consent of any party hereto, and such Person may enforce such pledge or security interest in any manner permitted under applicable law; provided, that, no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee (or any transferee thereof) for such Lender as a party hereto unless such pledgee or secured party (or transferee) becomes a Lender hereunder in accordance with the terms hereof.

(i)    The Agent shall, acting solely for this purpose as a non-fiduciary agent of Borrowers, maintain, or cause to be maintained, a register (the "Register") on which it shall enter the names and addresses of the Lenders and the Commitments of, and the principal amount of each Loan held by such (and stated interest thereon) and Obligations with respect to Letters of Credit owing to, each Lender from time to time (each a "Registered Loan"). Subject to the last sentence of this Section 13.1(i), the entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and Borrowers, Agent and Lenders may treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement.

In the case of an assignment to an Affiliate or a Related Fund pursuant to Section 13.1(c) as to which an Assignment and Acceptance is not delivered to Agent, the assigning Lender shall, acting solely for this purpose as a non-fiduciary agent of Borrowers, maintain a register (the "Related Party Register") comparable to the Register on behalf of Borrowers. The Register and the Related Party Register shall be available for inspection by Administrative Borrower and the Agent at any reasonable time and from time to time upon reasonable notice.

**(j)**     Each Registered Loan may not be evidenced by promissory notes other than Registered Notes (as defined below). Upon the registration of each Loan on the Register or the Related Party Register, each Borrower agrees, at the request of any Lender shown on the Register as the registered owner of such Loan, to execute and deliver to such Lender a promissory note, in conformity with the terms of this Agreement, in registered form to evidence such Registered Loan, in form and substance reasonably satisfactory to such Lender, and registered as provided in Section 13.1(i) (a "Registered Note"), payable to such Lender or registered assigns and otherwise duly completed. Unless in connection with an assignment or sale in accordance with this Section 13.1(j), once recorded on the Register or the Related Party Register, each Loan may not be removed from the Register or the Related Party Register so long as it or they remain outstanding, and a Registered Note may not be exchanged for a promissory note that is not a Registered Note. A Registered Loan (and the Registered Note, if any, evidencing the same) may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register or the Related Party Register (and each Registered Note shall expressly so provide). Any assignment or sale of all or part of such Registered Loan (and the Registered Note, if any, evidencing the same) may be effected only by registration of such assignment or sale on the Register or the Related Party Register, together with the surrender of the Registered Note, if any, evidencing the same duly endorsed by (or accompanied by a written instrument of assignment or sale duly executed by) the holder of such Registered Note, whereupon, at the request of the designated assignee(s) or transferee(s), one or more new Registered Notes in the same aggregate principal amount shall be issued to the designated assignee(s) or transferee(s). Prior to the registration of assignment or sale of any Registered Loan (and the Registered Note, if any evidencing the same) on the Register, Borrowers and Agent shall treat the Person in whose name such Registered Loan (and the Registered Note, if any, evidencing the same) is registered as the owner thereof for the purpose of receiving all payments thereon and for all other purposes, notwithstanding notice to the contrary.

**(k)**     In the event that a Lender sells participations in any Registered Loan, such Lender, as a non-fiduciary agent of Borrowers, shall maintain a register on which it enters the name of all Participants in the Registered Loans held by it and the principal amount (with stated interest thereon) of the portion of the Registered Loans that are subject of the participation (the "Participant Register"). A Registered Loan (and the Registered Note, if any, evidencing the same) may be participated in whole or in part only by registration of such participation on the Participant Register (and each Registered Note shall expressly so provide). Any participation of such Registered Loan (and the Registered Note, if any, evidencing the same) may be effected only by the registration of such participation on the Participant Register. The Participant Register shall be available for inspection by Administrative Borrower and the Agent at any reasonable time and from time to time upon reasonable notice.

**(l)**     Notwithstanding anything contained in this Section 13.1 to the contrary, in the event WFCF desires to assign all or any portion of its Commitments or Obligations under this Agreement to any Person that is not an Affiliate or Related Fund of WFCF (a "Third Party Buyer"), WFCF shall first offer to make such assignment to the Term Loan Lenders on a ratable basis by giving notice to Twin Haven and on the same terms and conditions as initially offered by WFCF to such Third Party Buyer. The Term Loan Lenders shall, within 5 Business Days after such offer is first made to them, accept or reject such right of first offer, and, if accepted, each such accepting Term Loan Lender shall, in accordance with the other provisions of this Section 13.1, promptly close such assignment within 10 Business Days of the date such offer is first made to them. If all of the Term Loan Lenders reject such right of first offer then WFCF shall be free to consummate such assignment to such Third Party Buyer in accordance with the other provisions of this Section 13.1. If any applicable Term Loan Lender shall fail to close on its ratable portion of such assignment from WFCF within

the 10 Business Day period set forth in the prior sentence, then WFCF shall be free to assign such Term Loan Lender's portion to such Third Party Buyer in accordance with the other provisions of this Section 13.1.

**13.2** **Successors**. This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, however, that, except as permitted under Section 6.3, Borrowers may not assign this Agreement or any rights or duties hereunder without the Lenders' prior written consent and any prohibited assignment shall be absolutely void ab initio. No consent to assignment by the Lenders shall release any Borrower from its Obligations unless such consent expressly provides for such a release. A Lender may assign this Agreement and the other Loan Documents and its rights and duties hereunder and thereunder pursuant to Section 13.1 hereof and, except as expressly required pursuant to Section 13.1 hereof, no consent or approval by any Borrower is required in connection with any such assignment.

## 14. AMENDMENTS; WAIVERS.

**14.1** **Amendments and Waivers.** No amendment or waiver of any provision of this Agreement or any other Loan Document (other than Bank Product Agreements), and no consent with respect to any departure by Borrowers therefrom, shall be effective unless the same shall be in writing and signed by the Required Lenders (or by Agent at the written request of the Required Lenders) and Administrative Borrower (on behalf of all Borrowers) and then any such waiver or consent shall be effective, but only in the specific instance and for the specific purpose for which given; provided, however, that no such waiver, amendment, or consent shall, unless in writing and signed by all of the Lenders affected thereby and Administrative Borrower (on behalf of all Borrowers), do any of the following:

      **(a)** increase or extend any Commitment of any Lender,

      **(b)** postpone or delay any date fixed by this Agreement or any other Loan Document for any payment of principal, interest, fees, or other amounts due hereunder or under any other Loan Document,

      **(c)** reduce the principal of, or the rate of interest on, any loan or other extension of credit hereunder, or reduce any fees or other amounts payable hereunder or under any other Loan Document,

      **(d)** amend or modify this Section or any provision of this Agreement providing for consent or other action by all Lenders,

      **(e)** release Agent's Lien in and to all or substantially all of the Collateral other than (i) as permitted under this Agreement (including Section 15.12) or the other Loan Documents or (ii) in connection with a disposition of Collateral permitted under an order of the Bankruptcy Court so long as Agent's Liens attach to the proceeds of such disposition,

      **(f)** change the definition of "Required Lenders," "Pro Rata Share" or "Specified Permitted Liens,"

      **(g)** contractually subordinate any of the Agent's Liens,

      **(h)** modify, waive, release or subordinate the superpriority claim status of the Obligations except (i) as permitted under this Agreement or the other Loan Documents and (ii) except as provided in Sections 14.1(e) or (i),

      **(i)** release any Borrower or Guarantor from or with respect to the Obligations other than (i) as permitted under this Agreement or the other Loan Documents or (ii) in connection with a disposition of Collateral constituting equity of such Borrower or Guarantor which is permitted under an order of the Bankruptcy Court, or

**(j)** amend any of the provisions of Section 15;

provided further, however, that no amendment, waiver or consent shall, unless in writing and signed by Agent, Issuing Lender, or Swing Lender, as applicable, affect the rights or duties of Agent, Issuing Lender, or Swing Lender, as applicable, under this Agreement or any other Loan Document. The foregoing notwithstanding, any amendment, modification, waiver, consent, termination, or release of, or with respect to, any provision of this Agreement or any other Loan Document that relates only to the relationship of the Lender Group among themselves, and that does not affect the rights or obligations of Borrowers, shall not require consent by or the agreement of Borrowers.

**14.2    Replacement of Holdout Lender.**

**(a)**    If any action to be taken by the Lender Group or Agent hereunder requires the unanimous consent, authorization, or agreement of all Lenders, and a Lender ("Holdout Lender") fails to give its consent, authorization, or agreement, then Agent, upon at least 5 Business Days prior irrevocable notice to the Holdout Lender, may permanently replace the Holdout Lender with one or more substitute Lenders (each, a "Replacement Lender"), and the Holdout Lender shall have no right to refuse to be replaced hereunder. Such notice to replace the Holdout Lender shall specify an effective date for such replacement, which date shall not be later than 15 Business Days after the date such notice is given.

**(b)**    Prior to the effective date of such replacement, the Holdout Lender and each Replacement Lender shall execute and deliver an Assignment and Acceptance, subject only to the Holdout Lender being repaid its share of the outstanding Obligations (including an assumption of its Pro Rata Share of the Risk Participation Liability) without any premium or penalty of any kind whatsoever. If the Holdout Lender shall refuse or fail to execute and deliver any such Assignment and Acceptance prior to the effective date of such replacement, the Holdout Lender shall be deemed to have executed and delivered such Assignment and Acceptance. The replacement of any Holdout Lender shall be made in accordance with the terms of Section 13.1. Until such time as the Replacement Lenders shall have acquired all of the Obligations, the Commitments, and the other rights and obligations of the Holdout Lender hereunder and under the other Loan Documents, the Holdout Lender shall remain obligated to make the Holdout Lender's Pro Rata Share of Advances and to purchase a participation in each Letter of Credit, in an amount equal to its Pro Rata Share of the Risk Participation Liability of such Letter of Credit.

**14.3    No Waivers; Cumulative Remedies.** No failure by Agent or any Lender to exercise any right, remedy, or option under this Agreement or any other Loan Document, or delay by Agent or any Lender in exercising the same, will operate as a waiver thereof. No waiver by Agent or any Lender will be effective unless it is in writing, and then only to the extent specifically stated. No waiver by Agent or any Lender on any occasion shall affect or diminish Agent's and each Lender's rights thereafter to require strict performance by Borrowers of any provision of this Agreement. Agent's and each Lender's rights under this Agreement and the other Loan Documents will be cumulative and not exclusive of any other right or remedy that Agent or any Lender may have.

**15.    AGENT; THE LENDER GROUP.**

**15.1    Appointment and Authorization of Agent.** Each Lender hereby designates and appoints WFCF as its representative under this Agreement and the other Loan Documents and each Lender hereby irrevocably authorizes Agent to execute and deliver each of the other Loan Documents on its behalf and to take such other action on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to Agent by the terms of this Agreement or any other Loan Document, together with such powers as are reasonably incidental thereto. Agent agrees to act as such on the express conditions contained in this Section 15. The provisions of this Section 15 (other than Sections 15.11 and 15.12(a)) are solely for the benefit of Agent, and the Lenders, and Borrowers and their Subsidiaries shall have no rights as a third party beneficiary of any of the provisions

contained herein. Any provision to the contrary contained elsewhere in this Agreement or in any other Loan Document notwithstanding, Agent shall not have any duties or responsibilities, except those expressly set forth herein, nor shall Agent have or be deemed to have any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against Agent; it being expressly understood and agreed that the use of the word "Agent" is for convenience only, that WFCF is merely the representative of the Lenders, and only has the contractual duties set forth herein. Except as expressly otherwise provided in this Agreement, Agent shall have and may use its sole discretion with respect to exercising or refraining from exercising any discretionary rights or taking or refraining from taking any actions that Agent expressly is entitled to take or assert under or pursuant to this Agreement and the other Loan Documents. Without limiting the generality of the foregoing, or of any other provision of the Loan Documents that provides rights or powers to Agent, Lenders agree that Agent shall have the right to exercise the following powers as long as this Agreement remains in effect: (a) maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Collateral, the Collections of Borrowers and their Subsidiaries, and related matters, (b) execute or file any and all financing or similar statements or notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to the Loan Documents, (c) make Advances, for itself or on behalf of Lenders as provided in the Loan Documents, (d) exclusively receive, apply, and distribute the Collections of Borrowers and their Subsidiaries as provided in the Loan Documents, (e) open and maintain such bank accounts and cash management arrangements as Agent deems necessary and appropriate in accordance with the Loan Documents for the foregoing purposes with respect to the Collateral and the Collections of Borrowers and their Subsidiaries, (f) perform, exercise, and enforce any and all other rights and remedies of the Lender Group with respect to Borrowers, the Obligations, the Collateral, the Collections of Borrowers and their Subsidiaries, or otherwise related to any of same as provided in the Loan Documents, and (g) incur and pay such Lender Group Expenses as Agent may deem necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to the Loan Documents.

**15.2** **Delegation of Duties**. Agent may execute any of its duties under this Agreement or any other Loan Document by or through agents, employees or attorneys in fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. Agent shall not be responsible for the negligence or misconduct of any agent or attorney in fact that it selects as long as such selection was made without gross negligence or willful misconduct.

**15.3** **Liability of Agent**. None of the Agent Related Persons shall (a) be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby (except for its own gross negligence or willful misconduct), or (b) be responsible in any manner to any of the Lenders for any recital, statement, representation or warranty made by any Borrower or any Subsidiary or Affiliate of any Borrower, or any officer or director thereof, contained in this Agreement or in any other Loan Document, or in any certificate, report, statement or other document referred to or provided for in, or received by Agent under or in connection with, this Agreement or any other Loan Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document, or for any failure of any Borrower or any other party to any Loan Document to perform its obligations hereunder or thereunder. No Agent Related Person shall be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the books and records or properties of Borrowers or the books or records or properties of any of Borrowers' Subsidiaries or Affiliates.

**15.4** **Reliance by Agent**. Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telegram, telefacsimile or other electronic method of transmission, telex or telephone message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent, or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to Borrowers or counsel to any

Lender), independent accountants and other experts selected by Agent. Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless Agent shall first receive such advice or concurrence of the Lenders as it deems appropriate and until such instructions are received, Agent shall act, or refrain from acting, as it deems advisable. If Agent so requests, it shall first be indemnified to its reasonable satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the requisite Lenders and such request and any action taken or failure to act pursuant thereto shall be binding upon all of the Lenders.

**15.5** **Notice of Default or Event of Default**. Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, except with respect to defaults in the payment of principal, interest, fees, and expenses required to be paid to Agent for the account of the Lenders and, except with respect to Events of Default of which Agent has actual knowledge, unless Agent shall have received written notice from a Lender or Administrative Borrower referring to this Agreement, describing such Default or Event of Default, and stating that such notice is a "notice of default." Agent promptly will notify the Lenders of its receipt of any such notice or of any Event of Default of which Agent has actual knowledge. If any Lender obtains actual knowledge of any Event of Default, such Lender promptly shall notify the other Lenders and Agent of such Event of Default. Each Lender shall be solely responsible for giving any notices to its Participants, if any. Subject to Section 15.4, Agent shall take such action with respect to such Default or Event of Default as may be requested by the Required Lenders in accordance with Section 8; provided, however, that unless and until Agent has received any such request, Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable.

**15.6** **Credit Decision**. Each Lender acknowledges that none of the Agent Related Persons has made any representation or warranty to it, and that no act by Agent hereinafter taken, including any review of the affairs of Borrowers and their Subsidiaries or Affiliates, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Lender. Each Lender represents to Agent that it has, independently and without reliance upon any Agent-Related Person and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of Borrowers and any other Person party to a Loan Document, and all applicable bank regulatory laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to Borrowers. Each Lender also represents that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of Borrowers and any other Person party to a Loan Document. Except for notices, reports, and other documents expressly herein required to be furnished to the Lenders by Agent, Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of Borrowers and any other Person party to a Loan Document that may come into the possession of any of the Agent Related Persons.

**15.7** **Costs and Expenses; Indemnification**. Agent may incur and pay Lender Group Expenses to the extent Agent reasonably deems necessary or appropriate for the performance and fulfillment of its functions, powers, and obligations pursuant to the Loan Documents, including court costs, attorneys fees and expenses, fees and expenses of financial accountants, advisors, consultants, and appraisers, costs of collection by outside collection agencies, auctioneer fees and expenses, and costs of security guards or insurance premiums paid to maintain the Collateral, whether or not Borrowers are obligated to reimburse Agent or Lenders for such expenses pursuant to this Agreement or otherwise. Agent is authorized and directed to deduct and retain sufficient amounts from the Collections of Borrowers and their Subsidiaries received by

Agent to reimburse Agent for such out-of-pocket costs and expenses prior to the distribution of any amounts to Lenders. In the event Agent is not reimbursed for such costs and expenses from the Collections of Borrowers and their Subsidiaries received by Agent, each Lender hereby agrees that it is and shall be obligated to pay to or reimburse Agent for the amount of such Lender's Pro Rata Share thereof. Whether or not the transactions contemplated hereby are consummated, the Lenders shall indemnify upon demand the Agent Related Persons (to the extent not reimbursed by or on behalf of Borrowers and without limiting the obligation of Borrowers to do so), according to their Pro Rata Shares, from and against any and all Indemnified Liabilities; provided, however, that no Lender shall be liable for the payment to any Agent Related Person of any portion of such Indemnified Liabilities resulting solely from such Person's gross negligence or willful misconduct nor shall any Lender be liable for the obligations of any Defaulting Lender in failing to make an Advance or other extension of credit hereunder. Without limitation of the foregoing, each Lender shall reimburse Agent upon demand for such Lender's Pro Rata Share of any costs or out of pocket expenses (including attorneys, accountants, advisors, and consultants fees and expenses) incurred by Agent in connection with the preparation, execution, delivery, administration, modification, amendment, or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that Agent is not reimbursed for such expenses by or on behalf of Borrowers. The undertaking in this Section shall survive the payment of all Obligations hereunder and the resignation or replacement of Agent.

15.8 **Agent in Individual Capacity**. WFCF and its Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire equity interests in, and generally engage in any kind of banking, trust, financial advisory, underwriting, or other business with Borrowers and their Subsidiaries and Affiliates and any other Person party to any Loan Documents as though WFCF were not Agent hereunder, and, in each case, without notice to or consent of the other members of the Lender Group. The other members of the Lender Group acknowledge that, pursuant to such activities, WFCF or its Affiliates may receive information regarding Borrowers or their Affiliates and any other Person party to any Loan Documents that is subject to confidentiality obligations in favor of Borrowers or such other Person and that prohibit the disclosure of such information to the Lenders, and the Lenders acknowledge that, in such circumstances (and in the absence of a waiver of such confidentiality obligations, which waiver Agent will use its reasonable best efforts to obtain), Agent shall not be under any obligation to provide such information to them. The terms "Lender" and "Lenders" include WFCF in its individual capacity.

15.9 **Successor Agent**. Subject to Section 16.12, Agent may resign as Agent upon 45 days notice to the Lenders. If Agent resigns under this Agreement, the Required Lenders shall, with the consent of Administrative Borrower, which consent shall not be unreasonably withheld, conditioned or delayed, appoint a successor Agent for the Lenders. If no successor Agent is appointed prior to the effective date of the resignation of Agent, Agent may appoint, after consulting with the Lenders and with the consent of Administrative Borrower, which consent shall not be unreasonably withheld, conditioned or delayed, a successor Agent. If Agent has materially breached or failed to perform any material provision of this Agreement or of applicable law, the Required Lenders may agree in writing to remove and replace Agent with a successor Agent from among the Lenders. In any such event, upon the acceptance of its appointment as successor Agent hereunder, such successor Agent shall succeed to all the rights, powers, and duties of the retiring Agent and the term "Agent" shall mean such successor Agent and the retiring Agent's appointment, powers, and duties as Agent shall be terminated. After any retiring Agent's resignation hereunder as Agent, the provisions of this Section 15 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement. Subject to Section 16.12, if no successor Agent has accepted appointment as Agent by the date which is 45 days following a retiring Agent's notice of resignation, the retiring Agent's resignation shall nevertheless thereupon become effective and the Lenders shall perform all of the duties of Agent hereunder until such time, if any, as the Lenders appoint a successor Agent as provided for above. Anything contained herein to the contrary notwithstanding, no consent by Administrative Borrower shall be required with respect to any appointment of a successor Agent if such appointment is made (a) in connection with any merger, consolidation, sale, transfer, or other disposition of all or any substantial portion

of the business or loan portfolio of the predecessor Agent or (b) after the occurrence and during the continuance of a Default or Event of Default.

**15.10    Lender in Individual Capacity**.  Any Lender and its respective Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire equity interests in and generally engage in any kind of banking, trust, financial advisory, underwriting or other business with Borrowers and their Subsidiaries and Affiliates and any other Person party to any Loan Documents as though such Lender were not a Lender hereunder without notice to or consent of the other members of the Lender Group.  The other members of the Lender Group acknowledge that, pursuant to such activities, such Lender and its respective Affiliates may receive information regarding Borrowers or their Affiliates and any other Person party to any Loan Documents that is subject to confidentiality obligations in favor of Borrowers or such other Person and that prohibit the disclosure of such information to the Lenders, and the Lenders acknowledge that, in such circumstances (and in the absence of a waiver of such confidentiality obligations, which waiver such Lender will use its reasonable best efforts to obtain), such Lender shall not be under any obligation to provide such information to them.  With respect to the Swing Loans and Protective Advances, Swing Lender shall have the same rights and powers under this Agreement as any other Lender and may exercise the same as though it were not the sub-agent of Agent.

**15.11    Withholding Taxes**.

(a)    All payments made by any Borrower hereunder or under any note or other Loan Document will be made without setoff, counterclaim, or other defense.  In addition, all such payments will be made free and clear of, and without deduction or withholding for, any present or future Indemnified Taxes, and in the event any deduction or withholding of Indemnified Taxes is required, each Borrower shall comply with the penultimate sentence of this Section 15.11(a).  "Indemnified Taxes" shall mean, any taxes, levies, imposts, duties, fees, assessments or other charges of whatever nature now or hereafter imposed by any jurisdiction or by any political subdivision or taxing authority thereof or therein with respect to such payments (but excluding any tax imposed by any jurisdiction or by any political subdivision or taxing authority thereof or therein measured by or based on the net income or net profits of any applicable Lender) and all interest, penalties or similar liabilities with respect thereto.  If any Indemnified Taxes are so levied or imposed, each Borrower agrees to pay the full amount of such Indemnified Taxes and such additional amounts as may be necessary so that every payment of all amounts due under this Agreement, any note, or Loan Document, including any amount paid pursuant to this Section 15.11(a) after withholding or deduction for or on account of any Indemnified Taxes, will not be less than the amount provided for herein; provided, however, that Borrowers shall not be required to increase any such amounts if either the increase in such amount payable results from Agent's or such Lender's own willful misconduct or gross negligence (as finally determined by a court of competent jurisdiction).  Each Borrower will furnish to Agent (with copies for each Lender) as promptly as possible after the date the payment of any Indemnified Tax is due pursuant to applicable law certified copies of tax receipts evidencing such payment by any Borrower.  The Borrowers shall not be required to indemnify any Lender or the Agents, or pay any additional amounts to any Lender or the Agent, in respect of United States withholding tax pursuant to this Section 15.11 to the extent that the obligation to withhold amounts with respect to United States withholding tax existed on the date such Lender became a party to this Agreement (or, in the case of a participant, on the date such participant became a participant hereunder), provided, however, that the foregoing shall not apply to the extent the indemnity payment or additional amounts any assignee or transferee of a Lender would be entitled to receive (without regard to this provision of Section 15.11(a)) do not exceed the indemnity payment or additional amounts that the Person making the assignment, participation or transfer to such assignee or transferee would have been entitled to receive in the absence of such assignment, participation, or transfer.

(b)    (i) If a Lender is entitled to an exemption from United States withholding tax, such Lender shall deliver to Agent (or, in the case of an assignee of a Lender which is (x) an Affiliate or Related Fund of such Lender, and (y) for which an Assignment and Acceptance is not delivered to the Agent pursuant

to Section 13.1(c), to the assigning Lender only, and in the case of a Participant, to the Lender granting the participation only):

(A)     if such Lender is entitled to an exemption from, or a reduction of, withholding tax under a United States tax treaty, properly completed and executed IRS Form W-8BEN before receiving its first payment under this Agreement and at any other time reasonably requested in writing by Agent or the assigning Lender, as applicable;

(B)     if such Lender is entitled to that interest paid under this Agreement is exempt from United States withholding tax because it is effectively connected with a United States trade or business of such Lender, two properly completed and executed copies of IRS Form W-8ECI before receiving its first payment under this Agreement and at any other time reasonably requested in writing by Agent or the assigning Lender, as applicable; or

(C)     such other form or forms, including IRS Form W-9, as may be required under the IRC or other laws of the United States as a condition to exemption from, or reduction of, United States withholding or backup withholding tax before receiving its first payment under this Agreement and at any other time reasonably requested in writing by Agent (whether on its own behalf or at the reasonable request of Administrative Borrower) or the assigning Lender, as applicable.

(ii)     If a Lender claims an exemption from United States withholding tax pursuant to the portfolio interest exemption, such Lender represents that such Lender is not (x) a "bank" as described in Section 881(c)(3)(A) of the IRC, (y) a 10% shareholder of any Borrower within the meaning of Section 871(h)(3)(B) of the IRC, or (z) a controlled foreign corporation related to any Borrower within the meaning of Section 864(d)(4) of the IRC and such Lender shall deliver to Agent (or, in the case of an assignment to an Affiliate or Related Fund that is made pursuant to Section 13.1(c), to the assigning Lender) a properly completed IRS Form W-8BEN, before receiving its first payment under this Agreement and at any other time reasonably requested in writing by Agent or the assigning Lender, as applicable.

Notwithstanding the foregoing, such Lender may provide a form W-8IMY with appropriate forms attached thereto in place of any of the delivery requirements set forth in this Section 15.11(b), as applicable.

Each Lender agrees promptly to notify Agent or the assigning Lender, as applicable, and the Administrative Borrower of any change in circumstances which would modify or render invalid any claimed exemption or reduction.  Notwithstanding any other provision of this Section 15.11, no Lender shall be required to deliver any form that such Lender is not legally able to deliver.

(c)     If a Lender is entitled to an exemption from withholding tax in a jurisdiction other than the United States that is applicable to the withholding tax obligations of one of the applicable Borrowers, Lender shall deliver to Agent (or, in the case of an assignee of a Lender which is (x) an Affiliate or Related Fund of such Lender, and (y) for which an Assignment and Acceptance is not delivered to the Agent pursuant to Section 13.1(c), to the assigning Lender only, and in the case of a participant, to the Lender granting the participation only) any such form or forms, as may be required under the laws of such jurisdiction as a condition to exemption from, or reduction of, foreign withholding or backup withholding tax before receiving its first payment under this Agreement and at any other time reasonably requested in writing by Administrative Borrower, Agent or the assigning Lender, as applicable.

(d)     If any Lender is entitled to a reduction in the applicable withholding tax, Agent may withhold from any interest payment to such Lender an amount equivalent to the applicable withholding tax after taking into account such reduction.  If the forms or other documentation required by Sections 15.11(b) or (c) (as applicable) are not delivered in accordance therewith, then Agent or the assigning Lender, as applicable,

may withhold from any interest payment to such Lender not providing such forms or other documentation an amount equivalent to the applicable withholding tax.

(e)     If the IRS or any other Governmental Authority of the United States or other jurisdiction asserts a claim that Agent did not properly withhold tax from amounts paid to or for the account of any Lender due to a failure on the part of any Lender (because the appropriate form was not delivered, was not properly executed, or because such Lender failed to notify the proper Person of a change in circumstances which rendered the exemption from, or reduction of, withholding tax ineffective, or for any other reason) such Lender shall indemnify and hold Agent or the assigning Lender, as applicable, harmless for all amounts paid, directly or indirectly, by Agent or the assigning Lender, as applicable, as tax or otherwise, including penalties and interest, and including any taxes imposed by any jurisdiction on the amounts payable to Agent or the assigning Lender, as applicable, under this Section 15.11, together with all costs and expenses (including attorneys fees and expenses). The obligation of the Lenders under this subsection shall survive the payment of all Obligations and the resignation or replacement of Agent.

(f)     Any Lender who makes an assignment pursuant to Section 13.1 where the Assignment and Acceptance is not delivered to the Agent or the Borrowers hereby indemnifies and agrees to hold the Agent and the Borrowers harmless from and against any U.S. Federal withholding tax that would not have been imposed but for (i) the failure of the Affiliate or the Related Fund that received such assignment to comply with Section 15.11(b), or (ii) the failure of such Lender to withhold such tax at the proper rate in the event such Affiliate or Related Fund does not comply with Section 15.11(b).

(g)     For any period with respect to which a Lender has failed to deliver the appropriate form described in subsections (b) or (c) above (other than if such failure is due to a change in Laws (including any statute, treaty or regulation) occurring after the date on which a form originally was required to be provided or if such form otherwise is not required under such subsections), such Lender shall not be entitled to indemnification under subsection (a) above with respect to any Indemnified Taxes; provided, however, that should a Lender become subject to Indemnified Taxes because of its failure to deliver a form required hereunder, the Borrowers shall take reasonable steps as such Lender shall reasonably request to assist such Lender to recover such Indemnified Taxes.

(h)     Any Lender claiming any additional amounts payable pursuant to this Section 15.11 agrees to use commercially reasonable efforts (consistent with legal and regulatory restrictions) to file any certificate or document reasonably requested by the Administrative Borrower or to change the jurisdiction of its lending office if the making of such a change would avoid the need for, or reduce the amount of, any such additional amounts that may thereafter accrue and would not, in the judgment of such Lender, be otherwise disadvantageous to such Lender. Each Lender and the Agent agrees to notify the Administrative Borrower promptly upon its becoming aware that circumstances exist that would cause the Borrowers to become obligated to pay additional amounts to such Lender or the Agent (as the case may be) pursuant to this Section 15.11. In the event that, notwithstanding the foregoing, the Borrowers continue to be obligated for additional amounts under this Section 15.11, then the Borrowers may, at their option, upon five Business Days' notice to such Lender and the Agent, require such Lender to transfer and assign without recourse all its interests, rights and obligations under this Agreement to another financial institution located by the Borrowers and acceptable to the Agent, which shall assume such obligations; provided, that (i) no such termination or assignment shall conflict with any law, rule or regulation or order of any governmental authority and (ii) such Lender shall have received payment of an amount equal to the outstanding principal of the Obligations owed to such Lender (including accrued interest thereon, accrued fees and all other amounts payable to it hereunder) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts) and such Lender shall be released from all obligations hereunder.

(i)     Notwithstanding anything herein to the contrary, any indemnification with respect to Indemnified Taxes shall be governed solely and exclusively by this Section 15.11.

### 15.12  Collateral Matters.

(a)  The Lenders hereby irrevocably authorize Agent, at its option and in its sole discretion, to release any Lien on any Collateral (i) upon the termination of the Commitments and payment and satisfaction in full by Borrowers of all Obligations, (ii) constituting property being sold or disposed of if a release is required or desirable in connection therewith and if Administrative Borrower certifies to Agent that the sale or disposition is permitted under Section 6.4 of this Agreement or the other Loan Documents (and Agent may rely conclusively on any such certificate, without further inquiry), (iii) constituting property in which no Borrower or its Subsidiaries owned any interest at the time the Agent's Lien was granted nor at any time thereafter, or (iv) constituting property leased to a Borrower or its Subsidiaries under a lease that has expired or is terminated in a transaction permitted under this Agreement.  Except as provided above, Agent will not execute and deliver a release of any Lien on any Collateral without the prior written authorization of (y) if the release is of all or substantially all of the Collateral, all of the Lenders, or (z) otherwise, the Required Lenders.  Upon request by Agent or Administrative Borrower at any time, the Lenders will confirm in writing Agent's authority to release any such Liens on particular types or items of Collateral pursuant to this Section 15.12; provided, however, that (1) Agent shall not be required to execute any document necessary to evidence such release on terms that, in Agent's opinion, would expose Agent to liability or create any obligation or entail any consequence other than the release of such Lien without recourse, representation, or warranty, and (2) such release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those expressly being released) upon (or obligations of Borrowers in respect of) all interests retained by Borrowers, including, the proceeds of any sale, all of which shall continue to constitute part of the Collateral.

(b)  Agent shall have no obligation whatsoever to any of the Lenders to assure that the Collateral exists or is owned by Borrowers or is cared for, protected, or insured or has been encumbered, or that the Agent's Liens have been properly or sufficiently or lawfully created, perfected, protected, or enforced or are entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to Agent pursuant to any of the Loan Documents, it being understood and agreed that in respect of the Collateral, or any act, omission, or event related thereto, subject to the terms and conditions contained herein, Agent may act in any manner it may deem appropriate, in its sole discretion given Agent's own interest in the Collateral in its capacity as one of the Lenders and that Agent shall have no other duty or liability whatsoever to any Lender as to any of the foregoing, except as otherwise provided herein.

### 15.13  Restrictions on Actions by Lenders; Sharing of Payments.

(a)  Each of the Lenders agrees that it shall not, without the express written consent of Agent, and that it shall, to the extent it is lawfully entitled to do so, upon the written request of Agent, set off against the Obligations, any amounts owing by such Lender to Borrowers or any deposit accounts of Borrowers now or hereafter maintained with such Lender.  Each of the Lenders further agrees that it shall not, unless specifically requested to do so in writing by Agent, take or cause to be taken any action, including, the commencement of any legal or equitable proceedings, to foreclose any Lien on, or otherwise enforce any security interest in, any of the Collateral.

(b)  If, at any time or times any Lender shall receive (i) by payment, foreclosure, setoff, or otherwise, any proceeds of Collateral or any payments with respect to the Obligations, except for any such proceeds or payments received by such Lender from Agent pursuant to the terms of this Agreement, or (ii) payments from Agent in excess of such Lender's ratable portion of all such distributions by Agent, such Lender promptly shall (1) turn the same over to Agent, in kind, and with such endorsements as may be required to negotiate the same to Agent, or in immediately available funds, as applicable, for the account of all of the Lenders and for application to the Obligations in accordance with the applicable provisions of this Agreement, or (2) purchase, without recourse or warranty, an undivided interest and participation in the Obligations owed to the other Lenders so that such excess payment received shall be applied ratably as among

the Lenders in accordance with their Pro Rata Shares; provided, however, that to the extent that such excess payment received by the purchasing party is thereafter recovered from it, those purchases of participations shall be rescinded in whole or in part, as applicable, and the applicable portion of the purchase price paid therefor shall be returned to such purchasing party, but without interest except to the extent that such purchasing party is required to pay interest in connection with the recovery of the excess payment.

**15.14    Agency for Perfection**.  Agent hereby appoints each other Lender as its agent (and each Lender hereby accepts such appointment) for the purpose of perfecting the Agent's Liens in assets which, in accordance with Article 8 or Article 9, as applicable, of the Code can be perfected only by possession or control.  Should any Lender obtain possession or control of any such Collateral, such Lender shall notify Agent thereof, and, promptly upon Agent's request therefor shall deliver possession or control of such Collateral to Agent or in accordance with Agent's instructions.

**15.15    Payments by Agent to the Lenders**.  All payments to be made by Agent to the Lenders shall be made by bank wire transfer of immediately available funds pursuant to such wire transfer instructions as each party may designate for itself by written notice to Agent.  Concurrently with each such payment, Agent shall identify whether such payment (or any portion thereof) represents principal, premium, fees, or interest of the Obligations.

**15.16    Concerning the Collateral and Related Loan Documents**.  Each member of the Lender Group authorizes and directs Agent to enter into this Agreement and the other Loan Documents.  Each member of the Lender Group agrees that any action taken by Agent in accordance with the terms of this Agreement or the other Loan Documents relating to the Collateral and the exercise by Agent of its powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Lenders.

**15.17    Field Audits and Examination Reports; Confidentiality; Disclaimers by Lenders; Other Reports and Information**.  By becoming a party to this Agreement, each Lender:

**(a)**    is deemed to have requested that Agent furnish such Lender, promptly after it becomes available, a copy of each field audit or examination report (each a "Report" and collectively, "Reports") prepared by or at the request of Agent, and Agent shall so furnish each Lender with such Reports,

**(b)**    expressly agrees and acknowledges that Agent does not (i) make any representation or warranty as to the accuracy of any Report, and (ii) shall not be liable for any information contained in any Report,

**(c)**    expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that Agent or other party performing any audit or examination will inspect only specific information regarding Borrowers and will rely significantly upon the books and records of Borrowers and their Subsidiaries, as well as on representations of Borrowers' personnel,

**(d)**    agrees to keep all Reports and other material, non-public information regarding Borrowers and their Subsidiaries and their operations, assets, and existing and contemplated business plans in a confidential manner in accordance with Section 16.7, and

**(e)**    without limiting the generality of any other indemnification provision contained in this Agreement, agrees:  (i) to hold Agent and any such other Lender preparing a Report harmless from any action the indemnifying Lender may take or fail to take or any conclusion the indemnifying Lender may reach or draw from any Report in connection with any loans or other credit accommodations that the indemnifying Lender has made or may make to Borrowers, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a loan or loans of Borrowers; and (ii) to pay and protect, and indemnify, defend and hold Agent, and any such other Lender preparing a Report harmless from and against, the claims,

actions, proceedings, damages, costs, expenses, and other amounts (including, attorneys fees and costs) incurred by Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

Any Lender may from time to time request of Agent in writing that Agent provide to such Lender a copy of any report or document provided by Borrowers to Agent that has not been contemporaneously provided by Borrowers to such Lender, and, upon receipt of such request, Agent promptly shall provide a copy of same to such Lender. To the extent that Agent is entitled, under any provision of the Loan Documents, to request additional reports or information from Borrowers, any Lender may, from time to time, reasonably request Agent to exercise such right as specified in such Lender's notice to Agent, whereupon Agent promptly shall request of Administrative Borrower the additional reports or information reasonably specified by such Lender, and, upon receipt thereof from Administrative Borrower, Agent promptly shall provide a copy of same to such Lender. In addition, any time that Agent renders to Administrative Borrower a statement regarding the Loan Account, Agent shall send a copy of such statement to each Lender.

**15.18** **Several Obligations; No Liability**. Notwithstanding that certain of the Loan Documents now or hereafter may have been or will be executed only by or in favor of Agent in its capacity as such, and not by or in favor of the Lenders, any and all obligations on the part of Agent (if any) to make any credit available hereunder shall constitute the several (and not joint) obligations of the respective Lenders on a ratable basis, according to their respective Commitments, to make an amount of such credit not to exceed, in principal amount, at any one time outstanding, the amount of their respective Commitments. Nothing contained herein shall confer upon any Lender any interest in, or subject any Lender to any liability for, or in respect of, the business, assets, profits, losses, or liabilities of any other Lender. Each Lender shall be solely responsible for notifying its Participants of any matters relating to the Loan Documents to the extent any such notice may be required, and no Lender shall have any obligation, duty, or liability to any Participant of any other Lender. Except as provided in <u>Section 15.7</u>, no member of the Lender Group shall have any liability for the acts of any other member of the Lender Group. No Lender shall be responsible to any Borrower or any other Person for any failure by any other Lender to fulfill its obligations to make credit available hereunder, nor to advance for it or on its behalf in connection with its Commitment, nor to take any other action on its behalf hereunder or in connection with the financing contemplated herein.

**15.19** **Bank Product Providers**. Each Bank Product Provider shall be deemed a party hereto for purposes of any reference in a Loan Document to the parties for whom Agent is acting; it being understood and agreed that the rights and benefits of such Bank Product Provider under the Loan Documents consist exclusively of such Bank Product Provider's right to share in payments and collections out of the Collateral as more fully set forth herein. In connection with any such distribution of payments and collections, Agent shall be entitled to assume no amounts are due to any Bank Product Provider unless such Bank Product Provider has notified Agent in writing of the amount of any such liability owed to it prior to such distribution.

# 16. GENERAL PROVISIONS.

**16.1** **Effectiveness**. This Agreement shall be binding and deemed effective when executed by Borrowers, Agent, and each Lender whose signature is provided for on the signature pages hereof.

**16.2** **Section Headings**. Headings and numbers have been set forth herein for convenience only. Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Agreement.

**16.3** **Interpretation**. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against the Lender Group or Borrowers, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

**16.4    Severability of Provisions**.  Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

**16.5    Counterparts; Electronic Execution**.  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.  Delivery of an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement. The foregoing shall apply to each other Loan Document mutatis mutandis.

**16.6    Revival and Reinstatement of Obligations**.  If the incurrence or payment of the Obligations by any Borrower or Guarantor or the transfer to the Lender Group of any property should for any reason subsequently be declared to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent conveyances, preferences, or other voidable or recoverable payments of money or transfers of property (collectively, a "Voidable Transfer"), and if the Lender Group is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the reasonable advice of its counsel, then, as to any such Voidable Transfer, or the amount thereof that the Lender Group is required or elects to repay or restore, and as to all reasonable costs, expenses, and attorneys fees of the Lender Group related thereto, the liability of Borrowers and Guarantors automatically shall be revived, reinstated, and restored and shall exist as though such Voidable Transfer had never been made.

**16.7    Confidentiality**.  Agent and Lenders each individually (and not jointly or jointly and severally) agree that material, non-public information regarding Borrowers, Guarantors and their respective Subsidiaries, their operations, assets, and existing and contemplated business plans shall be treated by Agent and the Lenders in a confidential manner, and shall not be disclosed by Agent and the Lenders to Persons who are not parties to this Agreement, except:  (a) to attorneys for and other advisors, accountants, auditors, and consultants to any member of the Lender Group, (b) to Subsidiaries and Affiliates of any member of the Lender Group (including the Bank Product Providers), provided that any such Subsidiary or Affiliate shall have agreed to receive such information hereunder subject to the terms of this Section 16.7, (c) as may be required by statute, decision, or judicial or administrative order, rule, or regulation, (d) as may be agreed to in advance by Administrative Borrower or as requested or required by any Governmental Authority pursuant to any subpoena or other legal process, (e) as to any such information that is or becomes generally available to the public (other than as a result of prohibited disclosure by Agent or the Lenders), (f) in connection with any assignment, prospective assignment, sale, prospective sale, participation or prospective participations, or pledge or prospective pledge of any Lender's interest under this Agreement, provided that any such assignee, prospective assignee, purchaser, prospective purchaser, participant, prospective participant, pledgee, or prospective pledgee shall have agreed in writing to receive such information hereunder subject to the terms of this Section, (g) in connection with any litigation or other adversary proceeding involving parties hereto which such litigation or adversary proceeding involves claims related to the rights or duties of such parties under this Agreement or the other Loan Documents and (h) as may otherwise be required under the Bankruptcy Code in connection with the Bankruptcy Cases.  The provisions of this Section 16.7 shall survive for 5 years after the payment in full of the Obligations.

**16.8    Integration**.  This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

**16.9    Parent as Agent for Borrowers**.  Each Borrower hereby irrevocably appoints Parent as the borrowing agent and attorney-in-fact for all Borrowers (the "Administrative Borrower") which appointment shall remain in full force and effect unless and until Agent shall have received prior written notice signed by each Borrower that such appointment has been revoked and that another Borrower has been appointed Administrative Borrower.  Each Borrower hereby irrevocably appoints and authorizes the Administrative Borrower (i) to provide Agent with all notices with respect to Advances and Letters of Credit obtained for the benefit of any Borrower and all other notices and instructions under this Agreement and (ii) to take such action as the Administrative Borrower deems appropriate on its behalf to obtain Advances and Letters of Credit and to exercise such other powers as are reasonably incidental thereto to carry out the purposes of this Agreement. It is understood that the handling of the Loan Account and Collateral of Borrowers in a combined fashion, as more fully set forth herein, is done solely as an accommodation to Borrowers in order to utilize the collective borrowing powers of Borrowers in the most efficient and economical manner and at their request, and that Lender Group shall not incur liability to any Borrower as a result hereof.  Each Borrower expects to derive benefit, directly or indirectly, from the handling of the Loan Account and the Collateral in a combined fashion since the successful operation of each Borrower is dependent on the continued successful performance of the integrated group.  To induce the Lender Group to do so, and in consideration thereof, each Borrower hereby jointly and severally agrees to indemnify each member of the Lender Group and hold each member of the Lender Group harmless against any and all liability, expense, loss or claim of damage or injury, made against the Lender Group by any Borrower or by any third party whosoever, arising from or incurred by reason of (a) the handling of the Loan Account and Collateral of Borrowers as herein provided, (b) the Lender Group's relying on any instructions of the Administrative Borrower, or (c) any other action taken by the Lender Group hereunder or under the other Loan Documents, except that Borrowers will have no liability to the relevant Agent-Related Person or Lender-Related Person under this Section 16.9 with respect to any liability that has been finally determined by a court of competent jurisdiction to have resulted solely from the gross negligence or willful misconduct of such Agent-Related Person or Lender-Related Person, as the case may be.

**16.10    Party in Interest**.  Each Borrower and each Guarantor hereby stipulates and agrees that Agent, the Lender Group and the Bank Product Providers are and shall remain parties in interest in the Bankruptcy Cases and shall have the right to participate, object and be heard in any motion or proceeding in connection therewith.  Without limitation of the foregoing, Agent shall have the right to make any motion or raise any objection it deems to be in its, the Lender Group's or the Bank Product Providers' interest (specifically including but not limited to objections to use of proceeds of the Advances, Letters of Credit or the Term Loan, to payment of professional fees and expenses or the amount thereof, to sales or other transactions outside the ordinary course of business or to assumption or rejection of any executory contract or lease).

**16.11    Specified Permitted Liens**.  Notwithstanding anything to the contrary in this Agreement or any other Loan Document, Agent reserves the right to challenge the validity, perfection, priority and extent of all Specified Permitted Liens and neither the definition of Specified Permitted Liens set forth herein nor any reference to any Specified Permitted Lien herein or in any other Loan Document shall prejudice any rights or claims of Agent and/or the Lenders in any manner whatsoever.

**16.12    Buy-Out Option**.

**(a)**    The Term Loan Lenders may at any time, in their sole discretion, elect to purchase from the Revolver Lenders, and the Revolver Lenders shall be obligated to sell to the Term Loan Lenders, all (but not less than all) of the Revolver Commitments (including unfunded Revolver Commitments) and Obligations in respect of the Revolver Usage of the Revolver Lenders under this Agreement (the "Buy-Out Option").  The Buy-Out Option may be exercised by the Term Loan Lenders, or any of them, by delivering an irrevocable written notice to the Agent, for the benefit of the Revolver Lenders (the "Buy-Out Notice"), of their election to exercise the Buy-Out Option.  The assignment of the Revolver Commitments and Obligations in respect of the Revolver Usage shall be consummated within (x) if an Enforcement Notice has not been issued and is still outstanding, then 7 Business Days after Agent's receipt of the Buy-Out Notice or (y) if an Enforcement Notice has been issued and is still outstanding, then 10 Business Days after the issuance by Agent

of such Enforcement Notice; in each case, by the applicable Term Loan Lenders executing and delivering Assignment and Acceptance Agreements in accordance with <u>Section 13.1</u> and providing to Agent, for the benefit of the Revolver Lenders, a cash purchase price, by wire transfer of immediately available funds, in an amount equal to (i) 100% of the outstanding principal balance of the Advances together with all interest accrued and unpaid thereon, and any unpaid fees to the extent earned or due and payable in accordance with the Loan Documents, (ii) 105% of the Letter of Credit Usage (which amount shall be held by Agent as cash collateral for the Letter of Credit and (A) to the extent such amounts are not reimbursed or paid by the Borrowers, used to reimburse the Issuing Bank or the Revolver Lenders for any drawings on issued and outstanding Letters of Credit or in respect of fees and costs chargeable under the Credit Agreement in respect thereof, and (B) returned to Twin Haven on behalf of the Term Loan Lenders, to the extent of any unused portion thereof upon the return for cancellation, expiration or termination of all of such Letters of Credit), (iii) 100% of the amount reasonably determined by the Bank Product Providers to be the credit exposure of Borrowers and their Subsidiaries in respect of Bank Products, but in any event, not in excess of the Bank Product Reserve (which amount shall be held by Agent as cash collateral for the Bank Product Obligations and (A) to the extent such amounts are not reimbursed or paid by the Borrowers, used to reimburse the Bank Product Providers with respect to any amounts that become due and payable in connection with the Bank Products, and (B) returned to Twin Haven on behalf of the Term Loan Lenders, to the extent of any unused portion thereof upon the termination of all Bank Product Agreements) and (A) used to reimburse the Bank Product Providers for any amounts due under the Bank Product Agreements in respect thereof, and (B) returned to Twin Haven on behalf of the Term Loan Lenders, to the extent of any unused portion thereof upon the termination of all Bank Product Agreements), and (iv) 100% of all Lender Group Expenses then due and owing to the Revolver Lenders or the Agent under the terms of the Loan Documents.

**(b)**     Notwithstanding anything to the contrary in this Agreement or any other Loan Document, if the Term Loan Lenders have elected to exercise the Buy-Out Option, then (i) Agent shall have the right, but not the obligation, to immediately resign as Agent under <u>Section 15.9</u> and (ii) WFCF shall have the right, but not the obligation, to immediately resign as Issuing Lender, which resignations shall, if elected by Agent or WFCF, as applicable, be effective upon the consummation of the assignment contemplated by the Buy-Out.

**(c)**     If an Event of Default has occurred and is continuing and Agent shall have issued an Enforcement Notice, then Agent agrees, solely for the benefit of the Term Loan Lenders, that if the Term Loan Lenders (or any of them) shall have issued the Buy-Out Notice during the Notice Period, then Agent shall not exercise its remedies pursuant to such Enforcement Notice until the expiration of the 10th Business Day following the issuance of such Enforcement Notice.

**16.13     <u>Payment of Certain Fees</u>**.  In the event that all or substantially all of the Borrowers' and Guarantor's assets are sold under Section 363 of the Bankruptcy Code pursuant to a transaction permitted under the Loan Documents or otherwise consented to by the applicable Lenders and the Carve-Out Amount is not sufficient to pay any restructuring or transaction fee (the "<u>Jefferies Fee</u>") due to Jefferies in connection with such sale as required under the Jefferies Agreement, then, so long as all Obligations owing to the Agent and the Revolver Lenders have been paid in full in cash in accordance with the terms of the Loan Documents, then the Term Loan Lenders shall consent to the Jefferies Fee being paid from the proceeds of such sale transaction prior to the application of such proceeds to the Obligations owing to the Term Loan Lenders under the Loan Documents.

[Signature pages follow.]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

**8250 INTERNATIONAL DRIVE CORPORATION**, a Florida corporation,
**AURORA UNO, INC.**, a Colorado corporation,
**B.S. OF WOODBRIDGE, INC.**, a New Jersey corporation,
**FAIRFAX UNO, INC.**, a Virginia corporation,
**KISSIMMEE UNO, INC.**, a Florida corporation,
**MARKETING SERVICES GROUP, INC.**, a Massachusetts corporation,
**NEWPORT NEWS UNO, INC.**, a Virginia corporation,
**NEWTON TAKERY, INC.**, a Massachusetts corporation,
**PARAMUS UNO, INC.**, a New Jersey corporation,
**PIZZERIA UNO CORPORATION**, a Delaware corporation,
**PIZZERIA UNO OF 86TH STREET, INC.**, a New York corporation,
**PIZZERIA UNO OF ALBANY INC.**, a New York corporation,
**PIZZERIA UNO OF BAY RIDGE, INC.**, a New York corporation,
**PIZZERIA UNO OF BAYSIDE, INC.**, a New York corporation,
**PIZZERIA UNO OF BETHESDA, INC.**, a Maryland corporation,
**PIZZERIA UNO OF BROCKTON, INC.**, a Massachusetts corporation,
**PIZZERIA UNO OF COLUMBUS AVENUE, INC.**, a New York corporation,
**PIZZERIA UNO OF EAST VILLAGE INC.**, a New York corporation,
**PIZZERIA UNO OF FAIR OAKS, INC.**, a Virginia corporation,
**PIZZERIA UNO OF FAIRFIELD, INC.**, a Missouri corporation,
**PIZZERIA UNO OF FOREST HILLS, INC.**, a New York corporation,
**PIZZERIA UNO OF KINGSTON, INC.**, a Massachusetts corporation,
**PIZZERIA UNO OF LYNBROOK INC.**, a New York corporation,
**PIZZERIA UNO OF RESTON, INC.**, a Virginia corporation,
**PIZZERIA UNO OF SOUTH STREET SEAPORT, INC.**, a New York corporation,
**PIZZERIA UNO OF SPRINGFIELD, INC.**, a Massachusetts corporation,
**PIZZERIA UNO OF SYRACUSE, INC.**, a New York corporation,
**PIZZERIA UNO OF UNION STATION, INC.**, a District of Columbia corporation,
**PLIZZETTAS OF CONCORD, INC.**, a New Hampshire corporation,
**SL PROPERTIES, INC.**, a Massachusetts corporation,
**SL UNO BURLINGTON, INC.**, a Vermont corporation,
**SL UNO ELLICOTT CITY, INC.**, a Maryland corporation,
**SL UNO FRANKLIN MILLS, INC.**, a Pennsylvania corporation,
**SL UNO FREDERICK, INC.**, a Maryland corporation,
**SL UNO GREECE, INC.**, a New York corporation,
**SL UNO GURNEE MILLS, INC.**, an Illinois corporation,
**SL UNO HYANNIS, INC.**, a Massachusetts corporation,
**SL UNO MARYVILLE, INC.**, a Tennessee corporation,
**SL UNO PORTLAND, INC.**, a Maine corporation,
**SL UNO POTOMAC MILLS, INC.**, a Virginia corporation,
**SL UNO UNIVERSITY BLVD., INC.**, a Florida corporation,
**SL UNO WATERFRONT, INC.**, a Pennsylvania corporation,
**SLA BROCKTON, INC.**, a Massachusetts corporation,
**SLA DUE, INC.**, an Illinois corporation,
**SLA LAKE MARY, INC.**, a Florida corporation
**SLA MAIL II, INC.**, a Massachusetts corporation,
**SLA MAIL, INC.**, a Massachusetts corporation,
**SLA NORFOLK, INC.**, a Virginia corporation,
**SLA SU CASA, INC.**, an Illinois corporation,

*(continued on next page)*

**SLA UNO, INC.**, an Illinois corporation,
**SAXET CORPORATION,** a Delaware corporation,
**UR OF BEL AIR MD, INC.**, a Maryland corporation,
**UR OF BOWIE MD, INC.**, a Maryland corporation,
**UR OF COLUMBIA MD, INC.**, a Maryland corporation,
**UR OF DANBURY CT, INC.**, a Connecticut corporation,
**UR OF DOVER NH, INC.**, a New Hampshire corporation,
**UR OF FAIRFIELD CT, INC.**, a Connecticut corporation,
**UR OF INNER HARBOR MD, INC.**, a Maryland corporation,
**UR OF KEENE NH, INC.**, a New Hampshire corporation,
**UR OF LANDOVER MD, INC.**, a Maryland corporation,
**UR OF METHUEN MA, INC.**, a Massachusetts corporation,
**UR OF MILFORD CT, INC.**, a Connecticut corporation,
**UR OF PAOLI PA, INC.**, a Pennsylvania corporation,
**UR OF WRENTHAM MA, INC.**, a Massachusetts corporation,
**UNO ENTERPRISES, INC.**, a Virginia corporation,
**UNO FOODS INC.**, a Massachusetts corporation,
**UNO RESTAURANT HOLDINGS CORPORATION,** a Delaware corporation,
**UNO RESTAURANT OF COLUMBUS, INC.**, an Ohio corporation,
**UNO RESTAURANT OF ST. CHARLES, INC.**, a Maryland corporation,
**UNO RESTAURANT OF WOBURN, INC.**, a Massachusetts corporation,
**UNO OF AMERICA, INC.**, a Massachusetts corporation,
**UNO OF ASTORIA, INC.**, a New York corporation,
**UNO OF AURORA, INC.**, an Illinois corporation,
**UNO OF BANGOR, INC.**, a Maine corporation,
**UNO OF CONCORD MILLS, INC.**, a North Carolina corporation,
**UNO OF CRESTWOOD, INC.**, an Illinois corporation,
**UNO OF DAYTONA, INC.**, a Florida corporation,
**UNO OF DULLES, INC.**, a Virginia corporation,
**UNO OF FALLS CHURCH, INC.**, a Virginia corporation,
**UNO OF GEORGESVILLE, INC.**, an Ohio corporation,
**UNO OF HAGERSTOWN, INC.**, a Maryland corporation,
**UNO OF HAVERHILL, INC.**, a Massachusetts corporation,
**UNO OF HENRIETTA, INC.**, a New York corporation,
**UNO OF INDIANA, INC.**, an Indiana corporation,
**UNO OF KINGSTOWNE, INC.**, a Virginia corporation,
**UNO OF KIRKWOOD, INC.**, a Missouri corporation,
**UNO OF LOMBARD, INC.**, an Illinois corporation,
**UNO OF MANASSAS, INC.**, a Virginia corporation,
**UNO OF MANCHESTER, INC.**, a Connecticut corporation,
**UNO OF MASSACHUSETTS, INC.**, a Massachusetts corporation,
**UNO OF NEW YORK, INC.**, a New York corporation,
**UNO OF PROVIDENCE, INC.**, a Rhode Island corporation,
**UNO OF SCHAUMBURG, INC.**, an Illinois corporation,
**UNO OF SMITHTOWN, INC.**, a New York corporation,
**UNO OF VICTOR, INC.**, a New York corporation,
**WALTHAM UNO, INC.**, a Massachusetts corporation, and
**WESTMINSTER UNO, INC.**, a Colorado corporation,
each as a debtor and debtor-in-possession

By: _____
Name: _____
Its: _____

**UR OF ATTLEBORO MA, LLC**, a Delaware limited liability company,
**UR OF CLAY NY, LLC**, a Delaware limited liability company,
**UR OF FAYETTEVILLE NY, LLC**, a Delaware limited liability company,
**UR OF GAINESVILLE VA, LLC**, a Delaware limited liability company,
**UR OF MERRITT ISLAND FL, LLC**, a Delaware limited liability company,
**UR OF MELBOURNE FL, LLC**, a Delaware limited liability company,
**UR OF MILLBURY MA, LLC**, a Delaware limited liability company,
**UR OF NASHUA NH, LLC**, a Delaware limited liability company,
**UR OF NEW HARTFORD NY, LLC**, a Delaware limited liability company,
**UR OF NEWINGTON NH, LLC**, a Delaware limited liability company,
**UR OF PLYMOUTH MA, LLC**, a Delaware limited liability company,
**UR OF TAUNTON MA, LLC**, a Delaware limited liability company,
**UR OF TILTON NH, LLC**, a Delaware limited liability company,
**UR OF VIRGINIA BEACH VA, LLC**, a Delaware limited liability company,
**UR OF WEBSTER NY, LLC**, a Delaware limited liability company,
**UR OF FREDERICKSBURG VA, LLC**, a Delaware limited liability company,
**UR OF WINTER GARDEN FL, LLC**, a Delaware limited liability company,
**UR OF SWAMPSCOTT MA, LLC**, a Delaware limited liability company, and
**UNO RESTAURANTS II, LLC**, a Delaware limited liability company,
each as a debtor and debtor-in-possession

By: **UNO RESTAURANTS, LLC**, a Delaware limited liability company
Its: Sole Member, as a debtor and debtor-in-possession

By: **UNO RESTAURANT HOLDINGS CORPORATION**, a Delaware corporation
Its: Sole Member, as a debtor and debtor-in-possession

By: _____
Name: _____
Its: _____

**URC, LLC,** a Delaware limited liability company and
**UNO RESTAURANTS, LLC,** a Delaware limited liability company,
each as a debtor and debtor-in-possession

By: **UNO RESTAURANT HOLDINGS CORPORATION**, a Delaware corporation
Its: Sole Member, as a debtor and debtor-in-possession

By: _____
Name: _____
Its: _____

**URC II, LLC**
a Delaware limited liability company,
as a debtor and debtor-in-possession

By: **URC, LLC**, a Delaware limited liability company
Its: Sole Member, as a debtor and debtor-in-possession

By: **UNO RESTAURANT HOLDINGS CORPORATION**, a Delaware corporation
Its: Sole Member, as a debtor and debtor-in-possession

By: _____
Name: _____
Its: _____

**PIZZERIA UNO OF WESTFARMS, LLC**,
a Delaware limited liability company,
as a debtor and debtor-in-possession

By: **URC II, LLC,** a Delaware limited liability company
Its: Sole Member, as a debtor and debtor-in-possession

By: **URC, LLC**, a Delaware limited liability company
Its: Sole Member, as a debtor and debtor-in-possession

By: **UNO RESTAURANT HOLDINGS CORPORATION**, a Delaware corporation
Its: Sole Member, as a debtor and debtor-in-possession

By: _____
Name: _____
Its: _____

**UNO FOODS INTERNATIONAL, LLC**,
a Delaware limited liability company,
as a debtor and debtor-in-possession

By: **UNO FOODS INC.**, a Delaware corporation
Its: Sole Member, as a debtor and debtor-in-possession

By: _____
Name: _____
Its: _____

**WELLS FARGO CAPITAL FINANCE, INC.,**
a California corporation,
as Agent and as a Lender


By: _____
Name: _____
Its: _____

**TWIN HAVEN SPECIAL OPPORTUNITIES FUND III, L.P.,**
a Delaware limited partnership,
as a Lender


By: _____
Name: _____
Its: _____

**COLISEUM CAPITAL PARTNERS, L.P.,**
a Delaware limited partnership,
as a Lender


By: _____
Name: _____
Its: _____

**BLACKWELL PARTNERS, LLC,**
a Delaware limited liability company,
as a Lender


By: _____
Name: _____
Its: _____

# TABLE OF CONTENTS

1. DEFINITIONS AND CONSTRUCTION ...................................................................................2

    1.1    Definitions .....................................................................................................................2

    1.2    Accounting Terms .........................................................................................................2

    1.3    Code ..............................................................................................................................2

    1.4    Construction ..................................................................................................................2

    1.5    Schedules and Exhibits .................................................................................................2

2. LOAN AND TERMS OF PAYMENT .....................................................................................3

    2.1    Revolver Advances ........................................................................................................3

    2.2    Term Loan .....................................................................................................................3

    2.3    Borrowing Procedures and Settlements ........................................................................3

    2.4    Payments .......................................................................................................................8

    2.5    Overadvances ..............................................................................................................11

    2.6    Interest Rates and Letter of Credit Fee:  Rates, Payments, and Calculations .........11

    2.7    Cash Management .......................................................................................................12

    2.8    Crediting Payments; Clearance Charge ......................................................................15

    2.9    Designated Account .....................................................................................................15

    2.10    Maintenance of Loan Account; Statements of Obligations .......................................15

    2.11    Fees .............................................................................................................................15

    2.12    Letters of Credit ..........................................................................................................15

    2.13    LIBOR Option ............................................................................................................18

    2.14    Capital Requirements .................................................................................................20

3. CONDITIONS; TERM OF AGREEMENT ..........................................................................23

    3.1    Conditions Precedent to the Initial Extension of Credit .............................................23

    3.2    Conditions Precedent to all Extensions of Credit ......................................................23

    3.3    Term ............................................................................................................................23

    3.4    Effect of Termination ..................................................................................................23

    3.5    Early Termination by Borrowers ................................................................................24

4. REPRESENTATIONS AND WARRANTIES .......................................................................24

    4.1    No Encumbrances ........................................................................................................24

    4.2    [Reserved] ...................................................................................................................24

    4.3    [Reserved] ...................................................................................................................24

    4.4    Equipment ...................................................................................................................24

    4.5    Location of Inventory and Equipment ........................................................................24

| | | | |
|---|---|---|---|
| 4.6 | Inventory Records | 25 |
| 4.7 | State of Incorporation; Location of Chief Executive Office; Organizational Identification Number; Commercial Tort Claims | 25 |
| 4.8 | Due Organization and Qualification; Subsidiaries | 25 |
| 4.9 | Due Authorization; No Conflict | 25 |
| 4.10 | Litigation | 27 |
| 4.11 | No Material Adverse Change | 27 |
| 4.12 | [Reserved] | 27 |
| 4.13 | Employee Benefits | 27 |
| 4.14 | Environmental Condition | 27 |
| 4.15 | Intellectual Property | 28 |
| 4.16 | Leases | 28 |
| 4.17 | Deposit Accounts and Securities Accounts | 28 |
| 4.18 | Complete Disclosure | 28 |
| 4.19 | Indebtedness | 28 |
| 4.20 | Administrative Priority | 28 |
| 4.21 | Appointment of Trustee or Examiner; Liquidation | 29 |
| 4.22 | Permits, Licenses, Etc. | 29 |
| 4.23 | Reorganization Matters | 29 |
| 5. | AFFIRMATIVE COVENANTS | 30 |
| 5.1 | Accounting System | 30 |
| 5.2 | Collateral Reporting | 30 |
| 5.3 | Financial Statements, Reports, Certificates | 30 |
| 5.4 | [Reserved] | 30 |
| 5.5 | Inspection; Consultant | 30 |
| 5.6 | Maintenance of Properties | 30 |
| 5.7 | Taxes | 30 |
| 5.8 | Insurance | 31 |
| 5.9 | Location of Inventory and Equipment | 31 |
| 5.10 | Compliance with Laws | 32 |
| 5.11 | Leases | 32 |
| 5.12 | Existence | 32 |
| 5.13 | Environmental | 32 |
| 5.14 | Disclosure Updates | 32 |

| | | |
|---|---|---|
| 5.15 | Control Agreements | 32 |
| 5.16 | Formation of Subsidiaries | 32 |
| 5.17 | Notes | 33 |
| 5.18 | Obtaining Permits, Etc | 33 |
| 5.19 | ERISA Compliance | 33 |
| 5.20 | Further Assurances | 33 |
| 6. | NEGATIVE COVENANTS | 34 |
| 6.1 | Indebtedness | 34 |
| 6.2 | Liens | 35 |
| 6.3 | Restrictions on Fundamental Changes | 35 |
| 6.4 | Disposal of Assets | 36 |
| 6.5 | Change Name | 36 |
| 6.6 | Nature of Business | 36 |
| 6.7 | Payments and Amendments | 36 |
| 6.8 | [Reserved] | 36 |
| 6.9 | [Reserved] | 36 |
| 6.10 | Distributions | 36 |
| 6.11 | Accounting Methods | 37 |
| 6.12 | Investments | 37 |
| 6.13 | Transactions with Affiliates | 37 |
| 6.14 | Use of Proceeds | 38 |
| 6.15 | [Reserved] | 39 |
| 6.16 | Budget Compliance | 39 |
| 6.17 | Interim Order; Final Order; Administrative Expense Priority; Lien Priority; Payments | 39 |
| 7. | EVENTS OF DEFAULT | 40 |
| 8. | THE LENDER GROUP'S RIGHTS AND REMEDIES | 43 |
| 8.1 | Rights and Remedies | 43 |
| 8.2 | Remedies Cumulative | 44 |
| 9. | TAXES AND EXPENSES | 44 |
| 10. | WAIVERS; INDEMNIFICATION | 45 |
| 10.1 | Demand; Protest, Etc | 45 |
| 10.2 | The Lender Group's Liability for Collateral | 45 |
| 10.3 | Indemnification | 45 |

|  | 10.4 | Waiver of Consequential Damages, Etc | 46 |
| 11. | NOTICES | | 46 |
| 12. | CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER | | 47 |
| 13. | ASSIGNMENTS AND PARTICIPATIONS; SUCCESSORS | | 48 |
|  | 13.1 | Assignments and Participations | 48 |
|  | 13.2 | Successors | 52 |
| 14. | AMENDMENTS; WAIVERS | | 52 |
|  | 14.1 | Amendments and Waivers | 52 |
|  | 14.2 | Replacement of Holdout Lender | 53 |
|  | 14.3 | No Waivers; Cumulative Remedies | 53 |
| 15. | AGENT; THE LENDER GROUP | | 53 |
|  | 15.1 | Appointment and Authorization of Agent | 53 |
|  | 15.2 | Delegation of Duties | 54 |
|  | 15.3 | Liability of Agent | 54 |
|  | 15.4 | Reliance by Agent | 54 |
|  | 15.5 | Notice of Default or Event of Default | 55 |
|  | 15.6 | Credit Decision | 55 |
|  | 15.7 | Costs and Expenses; Indemnification | 55 |
|  | 15.8 | Agent in Individual Capacity | 56 |
|  | 15.9 | Successor Agent | 56 |
|  | 15.10 | Lender in Individual Capacity | 57 |
|  | 15.11 | Withholding Taxes | 57 |
|  | 15.12 | Collateral Matters | 60 |
|  | 15.13 | Restrictions on Actions by Lenders; Sharing of Payments | 60 |
|  | 15.14 | Agency for Perfection | 61 |
|  | 15.15 | Payments by Agent to the Lenders | 61 |
|  | 15.16 | Concerning the Collateral and Related Loan Documents | 61 |
|  | 15.17 | Field Audits and Examination Reports; Confidentiality; Disclaimers by Lenders; Other Reports and Information | 61 |
|  | 15.18 | Several Obligations; No Liability | 62 |
|  | 15.19 | Bank Product Providers | 62 |
| 16. | GENERAL PROVISIONS | | 62 |
|  | 16.1 | Effectiveness | 62 |
|  | 16.2 | Section Headings | 62 |

-iv-

16.3    Interpretation ............................................................................................................62

16.4    Severability of Provisions.........................................................................................63

16.5    Counterparts; Electronic Execution..........................................................................63

16.6    Revival and Reinstatement of Obligations ...............................................................63

16.7    Confidentiality...........................................................................................................63

16.8    Integration.................................................................................................................63

16.9    Parent as Agent for Borrowers .................................................................................64

16.10   Party in Interest.........................................................................................................64

16.11   Specified Permitted Liens.........................................................................................64

16.12   Buy-Out Option ........................................................................................................64

16.13   Payment of Certain Fees...........................................................................................65

# EXHIBITS AND SCHEDULES

Exhibit A-1                 Form of Assignment and Acceptance
Exhibit B-1                 Form of Borrowing Base Certificate
Exhibit B-2                 Initial Budget
Exhibit C-1                 Form of Compliance Certificate
Exhibit L-1                 Form of LIBOR Notice

Schedule A-1             Agent's Account
Schedule C-1             Commitments
Schedule D-1             Designated Account
Schedule G-1             Additional Guarantors
Schedule P-1             Permitted Holders
Schedule R-1             Reorganization Milestones
Schedule 1.1             Definitions
Schedule 2.7             Cash Management Bank and Cash Management Accounts
Schedule 3.1             Conditions Precedent
Schedule 4.5             Locations of Inventory and Equipment
Schedule 4.7(a)        States of Organization
Schedule 4.7(b)        Chief Executive Offices
Schedule 4.7(c)        Organizational Identification Numbers
Schedule 4.7(d)        Commercial Tort Claims
Schedule 4.8(c)        Capitalization of Borrowers and each Borrower's Subsidiaries
Schedule 4.10           Litigation
Schedule 4.13(a)      Employee Pension Benefit Plans
Schedule 4.14           Environmental Matters
Schedule 4.15           Intellectual Property
Schedule 4.17           Deposit Accounts and Securities Accounts
Schedule 4.19           Permitted Indebtedness
Schedule 4.22           Liquor Licenses
Schedule 5.2             Collateral Reporting
Schedule 5.3             Financial Statements, Reports, Certificates
Schedule 6.13           Affiliate Payment Amounts

A/73262114.9/3004422-0000318600

As used in the Agreement, the following terms shall have the following definitions:

"<u>Account</u>" means an account as that term is defined in the Code.

"<u>Account Debtor</u>" means any Person who is obligated on an Account, chattel paper, or a general intangible.

"<u>ACH Transactions</u>" means any cash management or related services (including the Automated Clearing House processing of electronic fund transfers through the direct Federal Reserve Fedline system) provided by a Bank Product Provider for the account of Administrative Borrower or its Subsidiaries.

"<u>Acquisition Parent</u>" means Uno Acquisition Parent, Inc., a Delaware corporation, as a debtor and debtor-in-possession.

"<u>Administrative Borrower</u>" has the meaning specified therefor in <u>Section 16.9</u>.

"<u>Advances</u>" has the meaning specified therefor in <u>Section 2.1</u>.

"<u>Affiliate</u>" means, as applied to any Person, any other Person who controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" means the possession, directly or indirectly through one or more intermediaries, of the power to direct the management and policies of a Person, whether through the ownership of Stock, by contract, or otherwise; <u>provided</u>, <u>however</u>, that, for purposes of <u>Section 6.13</u> hereof: (a) any Person which owns directly or indirectly 10% or more of the Stock having ordinary voting power for the election of directors or other members of the governing body of a Person or 10% or more of the partnership or other ownership interests of a Person (other than as a limited partner of such Person) shall be deemed an Affiliate of such Person, (b) each director (or comparable manager) of a Person shall be deemed to be an Affiliate of such Person, and (c) each partnership or joint venture in which a Person is a general partner or joint venturer shall be deemed an Affiliate of such Person.

"<u>Agent</u>" has the meaning specified therefor in the preamble to the Agreement.

"<u>Agent-Related Persons</u>" means Agent, together with its Affiliates, officers, directors, employees, attorneys, and agents.

"<u>Agent's Account</u>" means the Deposit Account of Agent identified on <u>Schedule A-1</u>.

"<u>Agent's Liens</u>" means the Liens granted by Borrowers, Guarantors and their respective Subsidiaries to Agent under the Loan Documents.

"<u>Agreement</u>" means the Debtor-in-Possession Credit Agreement to which this <u>Schedule 1.1</u> is attached.

"<u>Allowed Fees</u>" means, in each case with respect to the Bankruptcy Cases, fees and reimbursement for disbursements of professionals retained by the Borrowers and the Guarantors and/or a statutory committee of unsecured creditors allowed pursuant to an order of the Bankruptcy Court, including, without limitation, pursuant to monthly fee statements, that has not been vacated, stayed or appealed, under Section 327, 328 or 1103 of the Bankruptcy Code, as applicable.

"<u>Assignee</u>" has the meaning specified therefor in <u>Section 13.1(a)</u>.

"Assignment and Acceptance" means an Assignment and Acceptance Agreement substantially in the form of Exhibit A-1.

"Authorized Person" means any officer or employee of Administrative Borrower.

"Availability" means, as of any date of determination, the amount that Borrowers are entitled to borrow as Advances hereunder (after giving effect to all then outstanding Obligations (other than Bank Product Obligations) and all sublimits and reserves then applicable hereunder).

"Bank Product" means any financial accommodation extended to Administrative Borrower or its Subsidiaries by a Bank Product Provider (other than pursuant to the Agreement) including: (a) credit cards, (b) credit card processing services, (c) debit cards, (d) purchase cards, (e) ACH Transactions, (f) cash management, including controlled disbursement, accounts or services, or (g) transactions under Hedge Agreements.

"Bank Product Agreements" means those agreements entered into from time to time by Administrative Borrower or its Subsidiaries with a Bank Product Provider in connection with the obtaining of any of the Bank Products.

"Bank Product Obligations" means all obligations, liabilities, contingent reimbursement obligations, fees, and expenses owing by Administrative Borrower or its Subsidiaries to any Bank Product Provider pursuant to or evidenced by the Bank Product Agreements, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all such amounts that Administrative Borrower or its Subsidiaries are obligated to reimburse to Agent or any member of the Lender Group as a result of Agent or such member of the Lender Group purchasing participations from, or executing indemnities or reimbursement obligations to, a Bank Product Provider with respect to the Bank Products provided by such Bank Product Provider to Administrative Borrower or its Subsidiaries.

"Bank Product Provider" means Wells Fargo or any of its Affiliates.

"Bank Product Reserve" means, as of any date of determination, the amount of reserves that Agent has established (based upon the Bank Product Providers' reasonable determination of the credit exposure of Administrative Borrower and its Subsidiaries in respect of Bank Products) in respect of Bank Products then provided or outstanding; provided, however, that in order to qualify as a Bank Product Reserve such reserve must be established on or prior to the date when the Bank Product Provider first provides the applicable Bank Product.

"Bankruptcy Cases" has the meaning specified therefor in the recitals to the Agreement.

"Bankruptcy Code" means Title 11 of the United States Code, as in effect from time to time.

"Bankruptcy Court" has the meaning specified therefor in the recitals to the Agreement.

"Base LIBOR Rate" means, as of any date of determination, the rate per annum, determined by Agent in accordance with its customary procedures, and utilizing such electronic or other quotation sources as it considers appropriate (rounded upwards, if necessary, to the next 1/100%), to be the rate at which Dollar deposits (for delivery on the first day of the requested Interest Period) are offered to major banks in the London interbank market 2 Business Days prior to the commencement of the requested Interest Period, for a term and in an amount comparable to the Interest Period and the amount of the LIBOR Rate Loan requested (whether as an initial LIBOR Rate Loan or as a continuation of a LIBOR Rate Loan or as a conversion of a Base Rate Loan to a LIBOR Rate Loan) by Administrative Borrower in accordance with the Agreement, which determination shall be conclusive in the absence of manifest error.

-2-

"Base Rate" means, as of any date of determination, the greatest of (a) five percent (5.00%) per annum, (b) the Federal Funds Rate plus ½%, (c) the rate of interest announced, from time to time, within Wells Fargo at its principal office in San Francisco as its "prime rate", with the understanding that the "prime rate" is one of Wells Fargo's base rates (not necessarily the lowest of such rates) and serves as the basis upon which effective rates of interest are calculated for those loans making reference thereto and is evidenced by the recording thereof after its announcement in such internal publications as Wells Fargo may designate and (d) the LIBOR Rate, as of such date, for a LIBOR Rate Loan with an Interest Period of 1 month commencing on such date.

"Base Rate Loan" means the portion of the Advances that bears interest at a rate determined by reference to the Base Rate.

"Base Rate Margin" means 3.50 percentage points.

"Benefit Plan" means a "defined benefit plan" (as defined in Section 3(35) of ERISA) for which any Borrower, Guarantor or any Subsidiary or ERISA Affiliate of any Borrower or Guarantor has been an "employer" (as defined in Section 3(5) of ERISA) within the past six years.

"Board of Directors" means the board of directors (or comparable managers) of Parent or any committee thereof duly authorized to act on behalf of the board of directors (or comparable managers).

"Borrower" and "Borrowers" have the respective meanings specified therefor in the preamble to the Agreement.

"Borrowing" means a borrowing hereunder consisting of Advances made on the same day by the Lenders (or Agent on behalf thereof), or by Swing Lender in the case of a Swing Loan, or by Agent in the case of a Protective Advance, in each case, to Administrative Borrower.

"Borrowing Base" means, as of any date of determination: (a) 1.50 *times* EBITDA for the immediately preceding 12-fiscal month period (for which financial statements have been (or are required to be) delivered to Agent pursuant to Section 5.3) *less* (b) the sum (i) the Bank Product Reserve *plus* (ii) the aggregate amount of other reserves, if any, established by Agent under Section 2.1(b).

"Borrowing Base Certificate" means a certificate in the form of Exhibit B-1.

"Budget" means the budget attached hereto as Exhibit B-2, depicting on a weekly basis cash revenue, receipts, expenses, disbursements, outstanding Advances and Letters of Credit and other information for the 13 fiscal week period following the Closing Date, together with the updates thereto, in form and substance reasonably satisfactory to Agent and the Lenders, delivered to Agent and the Lenders pursuant to Section5.3 and the terms of the definition "Extension Conditions".

"Business Day" means any day that is not a Saturday, Sunday, or other day on which banks are authorized or required to close in the state of New York, except that, if a determination of a Business Day shall relate to a LIBOR Rate Loan, the term "Business Day" also shall exclude any day on which banks are closed for dealings in Dollar deposits in the London interbank market.

"Capital Expenditures" means, with respect to any Person for any period, the aggregate of all expenditures by such Person and its Subsidiaries during such period that are capital expenditures as determined in accordance with GAAP, whether such expenditures are paid in cash or financed.

"Capitalized Lease Obligation" means that portion of the obligations under a Capital Lease that is required to be capitalized in accordance with GAAP.

-3-

"Capital Lease" means a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"Carve-Out" means a carve-out to the Liens and super-priority claims granted to Agent for the benefit of the Lenders pursuant to the Orders, for the payment, in connection with the Bankruptcy Cases, of (a) following the occurrence of a Triggering Event of (i) the Allowed Fees in an aggregate amount not to exceed the Carve-Out Amount, (ii) fees pursuant to 28 U.S.C. § 1930 and any fees payable to the clerk of the Bankruptcy Court and (iii) fees payable to a chapter 7 trustee in an aggregate amount not to exceed $50,000 and (b) without reducing the Carve-Out Amount, all Allowed Fees allowed, or subsequently allowed, and payable under Sections 330 and 331 of the Bankruptcy Code, to the extent incurred prior to such Triggering Event (the "Pipeline Period").

"Carve-Out Amount" means $1,500,000.

"Carve-Out Escrow Account" means Deposit Account number 4122019326 established by Administrative Borrower with Wells Fargo.

"Cash Equivalents" means (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within 1 year from the date of acquisition thereof, (b) marketable direct obligations issued by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within 1 year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either Standard & Poor's Rating Group ("S&P") or Moody's Investors Service, Inc. ("Moody's"), (c) commercial paper maturing no more than 270 days from the date of creation thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's, (d) certificates of deposit or bankers' acceptances maturing within 1 year from the date of acquisition thereof issued by any bank organized under the laws of the United States or any state thereof having at the date of acquisition thereof combined capital and surplus of not less than $250,000,000, (e) Deposit Accounts maintained with (i) any bank that satisfies the criteria described in clause (d) above, or (ii) any other bank organized under the laws of the United States or any state thereof so long as the amount maintained with any such other bank is less than or equal to $100,000 and is insured by the Federal Deposit Insurance Corporation, and (f) Investments in money market funds substantially all of whose assets are invested in the types of assets described in clauses (a) through (e) above.

"Cash Management Account" has the meaning specified therefor in Section 2.7(a).

"Cash Management Agreements" means those certain cash management agreements, in form and substance reasonably satisfactory to Agent, each of which is among Administrative Borrower or one of its Subsidiaries, Agent, and one of the Cash Management Banks.

"Cash Management Bank" has the meaning specified therefor in Section 2.7(a).

"Cash Management Order" means, collectively, the order of the Bankruptcy Court entered in the Bankruptcy Cases after the "first day" hearings, together with all extensions, modifications and amendments thereto, in form and substance reasonably satisfactory to the Agent and the Lenders, which among other matters authorizes the Borrowers and Guarantors to maintain their existing cash management and treasury arrangements or such other arrangements as shall be acceptable to the Agent.

"Cash Sweep Instruction" has the meaning specified therefor in Section 2.7(b).

"Change of Control" means that (a) Permitted Holders fail to own and control directly or indirectly, more than 50% of the Stock of Parent having the right to vote for the election of members of the Board of Directors, (b) a majority of the members of the Board of Directors do not constitute Continuing Directors or (c)

any Borrower or Guarantor fails to own and control, directly or indirectly, 100% of the Stock of each of its Subsidiaries except (i) as otherwise permitted under the terms of the Agreement and (ii) for non-voting Stock of any Borrower issued to officers, directors or agents of such Borrower pursuant to the requirements of any applicable law in connection with the issuance of a Liquor License to such Borrower.

"<u>Closing Date</u>" means the date of the making of the initial Advance (or other extension of credit) hereunder.

"<u>Code</u>" means the New York Uniform Commercial Code, as in effect from time to time.

"<u>Collateral</u>" means all assets and interests in assets and proceeds thereof now owned or hereafter acquired by any Borrower, Guarantor or their respective Subsidiaries in or upon which a Lien is granted under any of the Loan Documents.

"<u>Collections</u>" means all cash, checks, notes, instruments, and other items of payment (including insurance proceeds, proceeds of cash sales, rental proceeds, and tax refunds).

"<u>Commitment</u>" means, with respect to each Lender, its Revolver Commitment, its Term Loan Commitment, or its Total Commitment, as the context requires, and, with respect to all Lenders, their Revolver Commitments, their Term Loan Commitments, or their Total Commitments, as the context requires, in each case as such Dollar amounts are set forth beside such Lender's name under the applicable heading on <u>Schedule C-1</u> or in the Assignment and Acceptance pursuant to which such Lender became a Lender hereunder, as such amounts may be reduced or increased from time to time pursuant to assignments made in accordance with the provisions of <u>Section 13.1</u>.

"<u>Compliance Certificate</u>" means a certificate substantially in the form of <u>Exhibit C-1</u> delivered by the chief financial officer of Parent to Agent.

"<u>Confirmation Date</u>" means the date on which the Confirmation Order is entered in the docket of the Bankruptcy Court.

"<u>Confirmation Order</u>" means an order of the Bankruptcy Court, in form and substance satisfactory to the Agent, confirming the Plan of Reorganization.

"<u>Consultant</u>" means any consultant retained by Agent and/or the Lenders (or counsel on their behalf) to assist Agent and the Lenders with respect to, among other things, an operational assessment of the Borrowers and their business.

"<u>Consumer Products Account</u>" has the meaning specified therefor in <u>Section 2.7(a)(iii)</u>.

"<u>Continuing Director</u>" means (a) any member of the Board of Directors who was a director (or comparable manager) of Parent on the Closing Date, and (b) any individual who becomes a member of the Board of Directors after the Closing Date if such individual was appointed or nominated for election to the Board of Directors by a majority of the Continuing Directors, but excluding any such individual originally proposed for election in opposition to the Board of Directors in office at the Closing Date in an actual or threatened election contest relating to the election of the directors (or comparable managers) of Parent and whose initial assumption of office resulted from such contest or the settlement thereof.

"<u>Control Agreement</u>" means a control agreement, in form and substance reasonably satisfactory to Agent, executed and delivered by a Borrower or Guarantor, Agent, and the applicable securities intermediary (with respect to a Securities Account of such Borrower or Guarantor) or bank (with respect to a Deposit Account of such Borrower or Guarantor).

-5-

"Controlled Foreign Corporation" means a "controlled foreign corporation" as defined in the IRC.

"Copyright Security Agreement" has the meaning specified therefor in the Security Agreement.

"Credit Card Agreements" means those certain credit card receipts agreements, each in form and substance reasonably satisfactory to Agent, executed and delivered by any Borrower, Agent and the applicable Credit Card Processor.

"Credit Card Processor" means any Person (including an issuer of a credit card) that acts as a credit card clearinghouse or remits payments due to a Borrower or any Guarantor with respect to credit card charges accepted by such Borrower or Guarantor.

"Daily Balance" means, as of any date of determination and with respect to any Obligation, the amount of such Obligation owed at the end of such day.

"Default" means an event, condition, or default that, with the giving of notice, the passage of time, or both, would be an Event of Default.

"Defaulting Lender" means any Lender that fails to make any Advance (or other extension of credit) that it is required to make hereunder on the date that it is required to do so hereunder.

"Defaulting Lender Rate" means (a) for the first 3 days from and after the date the relevant payment is due, the Base Rate, and (b) thereafter, the interest rate then applicable to Advances that are Base Rate Loans (inclusive of the Base Rate Margin applicable thereto).

"Deposit Account" means any deposit account as that term is defined in the Code.

"Designated Account" means the Deposit Account of Administrative Borrower identified on Schedule D-1, as such schedule may be amended by Administrative Borrower from time to time upon no less than five Business Days' notice to Agent.

"Designated Account Bank" has the meaning specified therefor in Schedule D-1.

"Disbursement Letter" means that certain disbursement letter executed and delivered by Administrative Borrower to Agent regarding the extensions of credit to be made on the Closing Date, the form and substance of which is satisfactory to Agent.

"Dollars" or "$" means United States dollars.

"EBITDA" means, with respect to any fiscal period, Parent's and its Subsidiaries' (if such Subsidiaries are Borrowers or Guarantors): (a) consolidated net earnings (or loss) for such period; provided, that, any losses which are covered by insurance shall be calculated net of any insurance proceeds received by the applicable Persons during such period, minus (b) the sum of (i) extraordinary gains, (ii) interest income and (iii) the amount of cash rental expense actually paid in excess of the deferred rental expense for such period, plus (c) the sum of (i) interest expense, (ii) income taxes, (iii) depreciation and amortization, (iv) cash expenses, in an aggregate amount not to exceed $2,500,000 per fiscal year, paid with respect to closures of Restaurant locations during such period, (v) non-cash stock compensation paid to executives during such period, (vi) non-cash extraordinary losses, (vii) any non-cash charges related to the write-off of goodwill, intangibles or assets as a result of impairment, in each case as required by the application of Statement of Financial Accounting Standards No. 142, "Goodwill and other Intangible Assets," or No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets," (viii) deferred rental expense which is in excess of the amount of cash rental expense actually paid during such period, (ix) non-cash expenses associated with Parent's and its Subsidiaries management retention plan, (x) fees and expenses paid during such period

-6-

incurred with respect to the negotiation of the seventh amendment to the Pre-Petition Credit Agreement, (xi) up to $300,000 in non-cash expenses associated with the termination of an insurance policy during fiscal year 2009, (xii) during any period occurring after July 1, 2009, costs of up to $13,500,000 in the aggregate for all such periods incurred with respect to the restructuring of Parent's and its Subsidiaries' obligations and operations, (xiii) with respect to each Restaurant closed during such period, subject to Agent's receipt and satisfactory review of supporting documentation as to the pro forma EBITDA of such closed Restaurant for such period, the pro forma EBITDA for such Restaurant for such period, (xiv) during any period ending after the Filing Date, up to $2,000,000 in payments (whether by direct payment or drawing on a letter of credit) made to landlords in connection with lease restructurings or terminations and (xv) management fees paid to Centre Partners Management LLC during such period to the extent the payment of such fees was permitted under the terms of the Pre-Petition Credit Agreement; in each case, as determined in accordance with GAAP.

"Eligible Transferee" means (a) a commercial bank organized under the laws of the United States, or any state thereof, and having total assets in excess of $250,000,000, (b) so long as no Event of Default has occurred and is continuing, a commercial bank organized under the laws of any other country which is a member of the Organization for Economic Cooperation and Development or a political subdivision of any such country and which has total assets in excess of $250,000,000, provided that such bank is acting through a branch or agency located in the United States, in each case who has been approved by Agent and Administrative Borrower (which approval of Administrative Borrower shall not be unreasonably withheld, delayed or conditioned), (c) so long as no Event of Default has occurred and is continuing, a finance company, insurance company, financial institution or fund that is engaged in making, purchasing, or otherwise investing in commercial loans in the ordinary course of its business and having (together with its Affiliates) total assets in excess of $250,000,000, in each case who has been approved by Agent and Administrative Borrower (which approval of Administrative Borrower shall not be unreasonably withheld, delayed or conditioned), (d) any Lender or Affiliate (other than individuals) of a Lender or any Lender's Related Fund, (e) so long as no Event of Default has occurred and is continuing, any other Person approved by Agent and Administrative Borrower (which approval of Administrative Borrower shall not be unreasonably withheld, delayed or conditioned), and (f) during the continuation of an Event of Default, any other Person approved by Agent.

"Enforcement Notice" has the meaning specified therefor in Section 8.1(d) of the Agreement.

"Environmental Actions" means any complaint, summons, citation, notice, directive, order, claim, litigation, investigation, judicial or administrative proceeding, judgment, letter, or other communication from any Governmental Authority, or any third party alleging violations of Environmental Laws or liability under Environmental Laws as a result of releases of Hazardous Materials from (a) any assets, properties, or businesses of any Borrower, Guarantor, any of their respective Subsidiaries, or any of their respective predecessors in interest, (b) from adjoining properties or businesses, or (c) from or onto any facilities which received Hazardous Materials generated by any Borrower, Guarantor, any of their respective Subsidiaries, or any of their respective predecessors in interest.

"Environmental Law" means any applicable federal, state, provincial, foreign or local statute, law, rule, regulation, ordinance, code, binding and enforceable guideline, binding and enforceable written policy or rule of common law now or hereafter in effect and in each case as amended, or any binding and enforceable judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, in each case, to the extent binding on any Borrower, Guarantor or any of their respective Subsidiaries, relating to the environment, the effect of the environment on employee health, or Hazardous Materials, in each case as amended from time to time.

"Environmental Liabilities" means all liabilities, monetary obligations, losses, damages, punitive damages, consequential damages, treble damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts, or consultants, and costs of investigation and feasibility studies), fines, penalties, sanctions, and interest incurred as a result of any claim or demand, or Remedial

Action required, by any Governmental Authority or any third party, and which relate to any Environmental Action.

"Environmental Lien" means any Lien in favor of any Governmental Authority for Environmental Liabilities.

"Equipment" means equipment (as that term is defined in the Code).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, from time to time, and the regulations promulgated thereunder.

"ERISA Affiliate" means each business or entity which is a member of a "controlled group of corporations", under "common control" or an "affiliated service group" with any Borrower or any of its Subsidiaries within the meaning of Section 414(b), (c) or (m) of the IRC, required to be aggregated with any Borrower or any of its Subsidiaries under Section 414(o) of the IRC, or is under "common control" with any Borrower or any of its Subsidiaries, within the meaning of Section 4001(a)(14) of ERISA.

"ERISA Event" means (a) a reportable event as defined in Section 4043 of ERISA and the regulations issued under such Section with respect to a Pension Plan, excluding, however, such events as to which the PBGC by regulation has waived the requirement of Section 4043(a) of ERISA that it be notified within 30 days of the occurrence of such event; (b) a withdrawal by any Borrower, any of their respective Subsidiaries, or any ERISA Affiliate from a Pension Plan or the termination of any Pension Plan resulting in liability under Sections 4063 or 4064 of ERISA; (c) the withdrawal of any Borrower, any of their respective Subsidiaries, or ERISA Affiliate in a complete or partial withdrawal (within the meaning of Section 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any potential liability therefor, or the receipt by any Borrower, any of their respective Subsidiaries, or ERISA Affiliate of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA; (d) the filing of a notice of intent to terminate, the treatment of a plan amendment as a termination under Section 4041(c) of ERISA, or the treatment of a plan amendment as a termination under Section 4041(e) of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan; (e) the imposition of liability on any Borrower, any of their respective Subsidiaries, or any ERISA Affiliate pursuant to Sections 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (f) the failure by any Borrower, any of their respective Subsidiaries, or any ERISA Affiliate to make any required contribution to a Pension Plan, or the failure to meet the minimum funding standard of Section 412 of the IRC with respect to any Pension Plan (whether or not waived in accordance with Section 412(d) of the IRC) or the failure to make by its due date a required installment under Section 412(m) of the IRC with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (g) an event or condition which might reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (h) the imposition of any material liability under Title IV of ERISA, other than PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Borrower, any of their respective Subsidiaries or any ERISA Affiliate; (i) an application for a funding waiver under Section 303 of ERISA or an extension of any amortization period pursuant to Section 412 of the IRC with respect to any Pension Plan; (j) the occurrence of a non-exempt prohibited transaction under Sections 406 or 407 of ERISA for which any Borrower, or any of their respective Subsidiaries, may be directly or indirectly liable and which is reasonably expected to result in a material liability to any Borrower or any of its Subsidiaries; (k) the occurrence of an act or omission which could give rise to the imposition on any Borrower, any of their respective Subsidiaries, or any ERISA Affiliate of material fines, material penalties, material taxes or material related charges under Chapter 43 of the IRC or under Sections 409, 502(c), (i) or (1) or 4071 of ERISA; (l) the assertion of a material claim (other than routine claims for benefits) against any Plan or the assets thereof, or against any Borrower or any of its Subsidiaries in connection with any such Plan; (m) receipt from the Internal Revenue Service of notice of the failure of any Qualified Plan to qualify under Section 401(a) of the IRC, or the failure of any trust forming part of any Qualified Plan to fail to qualify for exemption from taxation under Section 501(a) of the IRC; or (n) the imposition of any lien on any of the rights, properties or

assets of any Borrower, any of their respective Subsidiaries, or any ERISA Affiliate, in either case pursuant to Section 302(f) of ERISA or Title IV of ERISA or to the penalty or excise tax provisions of the IRC or to Section 401(a)(29) or 412(n) of the IRC, which, in each case, individually or in the aggregate would reasonably be expected to result in a Material Adverse Change.

"Event of Default" has the meaning specified therefor in Section 7.

"Exchange Act" means the Securities Exchange Act of 1934, as in effect from time to time.

"Extended Term" has the meaning specified therefor in Section 3.3.

"Extension Conditions" shall mean, as of the date the Initial Term expires, (a) no Default or Event of Default shall exist as of such date, (b) the Borrowers shall have delivered to Agent and the Lenders an updated Budget for the three-month period following such date up to and including the date the Extended Term expires, which (i) is in form substantially similar to the Budget approved by the Agent and the Lenders as of the Closing Date, (ii) is in substance reasonably acceptable to Agent and the Lenders and (iii) does not show that there will be a Default or Event of Default during the period from the expiration of the Initial Term through the date the Extended Term expires and (c) the Agent shall have received, for the benefit of the Lenders, in immediately available funds by wire transfer, the Extension Fee (as defined in the Fee Letter).

"Extraordinary Receipts" means any cash received by any Borrower, any Guarantor or any of their respective Subsidiaries not in the ordinary course of business (and not consisting of proceeds described in Section 2.4(e)(i) of the Agreement), including without limitation: (a) proceeds of judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (b) indemnity payments, (c) tax refunds, (d) insurance proceeds and (e) any purchase price adjustment received in connection with any purchase or sale agreement.

"Fee Letter" means that certain fee letter between Borrowers and Agent, dated the date hereof, in form and substance satisfactory to Agent.

"Filing Date" has the meaning specified therefor in the recitals to the Agreement.

"Final Order" means an order of the Bankruptcy Court in the Bankruptcy Cases which approves the transactions contemplated by this Agreement and the other Loan Documents on a final basis and is in form and substance acceptable to Agent and the Lenders, as the same may be amended, modified or otherwise supplemented from time to time in compliance with this Agreement.

"Franchisee Account" has the meaning specified therefor in Section 2.7(a)(ii).

"Funding Date" means the date on which a Borrowing occurs.

"Funding Losses" has the meaning specified therefor in Section 2.13(b)(ii).

"GAAP" means generally accepted accounting principles as in effect from time to time in the United States, consistently applied.

"Governing Documents" means, with respect to any Person, the certificate or articles of incorporation, by-laws, or other organizational documents of such Person.

"Governmental Authority" means any federal, state, local, or other governmental or administrative body, instrumentality, board, department, or agency or any court, tribunal, administrative hearing body, arbitration panel, commission, or other similar dispute-resolving panel or body.

"Guarantors" means (a) Uno Holdings II LLC, a Delaware limited liability company, as a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code, (b) Uno Holdings LLC, a Delaware limited liability company, as a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code, (c) Uno Acquisition Parent, Inc., a Delaware corporation, as a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code, (d) the entities listed on Schedule G-1 hereto and (e) any other Person at any time providing a guaranty in favor of Agent, for the benefit of the Lender Group and the Bank Product Providers, with respect to the Obligations or whose assets are otherwise pledged as security for the repayment of the Obligations; and "Guarantor" means any one of them.

"Guaranty" means (a) that certain general continuing guaranty executed and delivered by each Guarantor in favor of Agent, for the benefit of the Lender Group and the Bank Product Providers, in form and substance satisfactory to Agent and (b) any other guaranty at any time executed and delivered by any other Guarantor in favor of Agent, for the benefit of the Lender Group and the Bank Product Providers, whether by execution of a joinder to the guaranty described in the foregoing clause (a) or otherwise.

"Hazardous Materials" means (a) substances that are defined or listed in, or otherwise classified pursuant to, any applicable Environmental Laws as "hazardous substances," "hazardous materials," "hazardous wastes," "toxic substances," or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity, or "EP toxicity", (b) oil, petroleum, or petroleum derived substances, natural gas, natural gas liquids, synthetic gas, drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil, natural gas, or geothermal resources, (c) any flammable substances or explosives or any radioactive materials, and (d) asbestos in any form or electrical equipment that contains any oil or dielectric fluid containing levels of polychlorinated biphenyls in excess of 50 parts per million.

"Hedge Agreement" means any and all agreements, or documents now existing or hereafter entered into by Administrative Borrower or any of its Subsidiaries that provide for an interest rate, credit, commodity or equity swap, cap, floor, collar, forward foreign exchange transaction, currency swap, cross currency rate swap, currency option, or any combination of, or option with respect to, these or similar transactions, for the purpose of hedging Administrative Borrower's or any of its Subsidiaries' exposure to fluctuations in interest or exchange rates, loan, credit exchange, security or currency valuations or commodity prices.

"Holdout Lender" has the meaning specified therefor in Section 14.2(a).

"Indebtedness" means (a) all obligations for borrowed money, (b) all obligations evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, bankers acceptances, interest rate swaps, or other financial products, (c) all obligations as a lessee under Capital Leases, (d) all obligations or liabilities of others secured by a Lien on any asset of a Person or its Subsidiaries, irrespective of whether such obligation or liability is assumed, (e) all obligations to pay the deferred purchase price of assets (other than trade payables incurred in the ordinary course of business and repayable in accordance with customary trade practices), (f) all obligations owing under Hedge Agreements, and (g) any obligation guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any of clauses (a) through (f) above.

"Indemnified Liabilities" has the meaning specified therefor in Section 10.3.

"Indemnified Person" has the meaning specified therefor in Section 10.3.

"Indemnified Taxes" has the meaning specified therefor in Section 15.11(a).

"Indenture" means the Indenture, dated as of February 22, 2005, by and among Parent, the Subsidiaries of the Parent party thereto and Trustee.

-10-

"Indenture Adequate Protection" has the meaning specified therefor in item (b) on Schedule 3.1.

"Indenture Adequate Protection Payments" means, to the extent paid in compliance with Section 6.16 and not exceeding $200,000 in the aggregate with respect to such payments incurred after the occurrence of a Triggering Event (a) reimbursement, on a current basis, of the reasonable fees and expenses of Akin Gump Strauss Hauer & Feld LLP, counsel to the Noteholder Group, incurred in connection with the Bankruptcy Cases, and (b) reimbursement, on a current basis, of the reasonable fees and expenses of counsel to the Trustee incurred in connection with the Bankruptcy Cases.

"Indenture Documents" means the Indenture, the Notes and all documents, agreements, instruments and certificates from time to time entered into in connection therewith.

"Initial Term" has the meaning specified therefor in Section 3.3.

"Insolvency Proceeding" means any proceeding commenced by or against any Person under any provision of the Bankruptcy Code or under any other state or federal bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"Intercompany Subordination Agreement" means a subordination agreement executed and delivered by Borrowers, Guarantors and each of their Subsidiaries and Agent, the form and substance of which is satisfactory to Agent.

"Intercreditor Agreement" means that certain Intercreditor Agreement, dated February 22, 2005, by and between the Trustee, on behalf of the Noteholders, and Pre-Petition Agent with respect to the Indebtedness and other obligations arising under the Indenture Documents, as reaffirmed in connection with this Agreement.

"Interest Period" means, with respect to each LIBOR Rate Loan, a period commencing on the date of the making of such LIBOR Rate Loan (or the continuation of a LIBOR Rate Loan or the conversion of a Base Rate Loan to a LIBOR Rate Loan) and ending 1, 2 or 3 months thereafter; provided, however, that (a) if any Interest Period would end on a day that is not a Business Day, such Interest Period shall be extended (subject to clauses (c)-(e) below) to the next succeeding Business Day, (b) interest shall accrue at the applicable rate based upon the LIBOR Rate from and including the first day of each Interest Period to, but excluding, the day on which any Interest Period expires, (c) any Interest Period that would end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day, (d) with respect to an Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period), the Interest Period shall end on the last Business Day of the calendar month that is 1, 2 or 3 months after the date on which the Interest Period began, as applicable, and (e) Borrowers (or Administrative Borrower on behalf thereof) may not elect an Interest Period which will end after the Maturity Date.

"Interim Order" means the interim order of the Bankruptcy Court in the Bankruptcy Cases, in form and substance satisfactory to Agent, approving the transactions and fees outlined in the Term Sheet and granting the priority Liens and administrative expense claims referred to therein as the same may be amended, modified or supplemented from time to time in compliance with this Agreement.

"Inventory" means inventory as that term is defined in the Code.

"Investment" means, with respect to any Person, any investment by such Person in any other Person (including Affiliates) in the form of loans, guarantees, advances, or capital contributions (excluding (a) commission, travel and similar loans and advances to officers and employees of such Person made in the ordinary course of business, and (b) bona fide Accounts arising in the ordinary course of business), purchases

-11-

or other acquisitions of Indebtedness, Stock, or all or substantially all of the assets of such other Person (or of any division or business line of such other Person), and any other items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP.

"IRC" means the Internal Revenue Code of 1986, as in effect from time to time, and the regulations promulgated thereunder.

"Issuing Lender" means WFCF or any other Lender that, at the request of Administrative Borrower and with the consent of Agent, agrees, in such Lender's sole discretion, to become an Issuing Lender for the purpose of issuing L/Cs or L/C Undertakings pursuant to Section 2.12.

"Jefferies" means Jefferies & Company, Inc.

"Jefferies Agreement" means the engagement letter between Jefferies and the Borrowers, dated as of July 1, 2009, as amended and restated from time to time as permitted under this Agreement.

"L/C" has the meaning specified therefor in Section 2.12(a).

"L/C Disbursement" means a payment made by the Issuing Lender pursuant to a Letter of Credit.

"L/C Sublimit" has the meaning specified therefor in Section 2.12(a)(ii).

"L/C Undertaking" has the meaning specified therefor in Section 2.12(a).

"Lender" and "Lenders" have the respective meanings set forth in the preamble to the Agreement, and shall include any other Person made a party to the Agreement in accordance with the provisions of Section 13.1.

"Lender Group" means, individually and collectively, each of the Lenders (including the Issuing Lender) and Agent.

"Lender Group Expenses" means all (a) costs or expenses (including taxes, and insurance premiums) required to be paid by a Borrower, Guarantor or their respective Subsidiaries under any of the Loan Documents that are paid, advanced, or incurred by the Lender Group, (b) fees or charges paid or incurred by Agent in connection with the Lender Group's transactions with Borrowers, Guarantors or their respective Subsidiaries, including, fees or charges for photocopying, notarization, couriers and messengers, telecommunication, public record searches (including tax lien, litigation, and UCC searches and including searches with the patent and trademark office, the copyright office, or the department of motor vehicles), filing, recording, publication, appraisal (including periodic collateral appraisals or business valuations to the extent of the fees and charges (and up to the amount of any limitation) contained in the Agreement, real estate surveys, real estate title policies and endorsements, and environmental audits (if any), (c) costs and expenses incurred by Agent in the disbursement of funds to Borrowers or other members of the Lender Group (by wire transfer or otherwise), (d) charges paid or incurred by Agent resulting from the dishonor of checks, (e) reasonable costs and expenses paid or incurred by the Lender Group to correct any default or enforce any provision of the Loan Documents, or in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, or any portion thereof, irrespective of whether a sale is consummated, (f) audit fees and expenses of Agent related to any inspections or audits permitted under the terms of the Loan Documents, (g) reasonable costs and expenses of third party claims or any other suit paid or incurred by the Lender Group in enforcing or defending the Loan Documents or in connection with the transactions contemplated by the Loan Documents or the Lender Group's relationship with any Borrower, Guarantor or their respective Subsidiaries, (h) Agent's and each Lender's reasonable costs and expenses (including attorneys fees) incurred in advising, structuring, drafting, reviewing, administering, syndicating, terminating or amending the Loan Documents, (i) Agent's and each Lender's reasonable costs and

-12-

expenses (including attorneys, accountants, consultants, and other advisors fees and expenses) incurred in enforcing (including attorneys, accountants, consultants, and other advisors fees and expenses incurred in connection with the Bankruptcy Cases or any "workout," "restructuring," or other Insolvency Proceeding concerning any Borrower, Guarantor or any of their respective Subsidiaries or in exercising rights or remedies under the Loan Documents), or defending the Loan Documents, irrespective of whether suit is brought, or in taking any Remedial Action concerning the Collateral and (j) the actual charges paid or incurred by Agent if it elects to employ the services of the Consultant or one or more third Persons to assess Borrowers' or their Subsidiaries' business valuation; provided, however, unless an Event of Default shall have occurred and be continuing, the Borrowers shall not be required to reimburse the Agent for more than $100,000 in respect of costs and expenses in connection with the retention of the Consultant with respect to this Agreement.

"Lender-Related Person" means, with respect to any Lender, such Lender, together with such Lender's Affiliates, Related Funds, officers, directors, employees, attorneys, and agents.

"Letter of Credit" means an L/C or an L/C Undertaking, as the context requires.

"Letter of Credit Usage" means, as of any date of determination, the aggregate undrawn amount of all outstanding Letters of Credit.

"LIBOR Deadline" has the meaning specified therefor in Section 2.13(b)(i).

"LIBOR Notice" means a written notice in the form of Exhibit L-1.

"LIBOR Option" has the meaning specified therefor in Section 2.13(a).

"LIBOR Rate" means, for each Interest Period for each LIBOR Rate Loan, the greater of (a) 3.00% or (b) the rate per annum determined by Agent (rounded upwards, if necessary, to the next 1/100%) by dividing (i) the Base LIBOR Rate for such Interest Period, by (ii) 100% *minus* the Reserve Percentage. The LIBOR Rate shall be adjusted on and as of the effective day of any change in the Reserve Percentage.

"LIBOR Rate Loan" means each portion of an Advance that bears interest at a rate determined by reference to the LIBOR Rate.

"LIBOR Rate Margin" means 5.50 percentage points.

"Lien" means any interest in an asset securing an obligation owed to, or a claim by, any Person other than the owner of the asset, irrespective of whether (a) such interest is based on the common law, statute, or contract, (b) such interest is recorded or perfected, and (c) such interest is contingent upon the occurrence of some future event or events or the existence of some future circumstance or circumstances. Without limiting the generality of the foregoing, the term "Lien" includes the lien or security interest arising from a mortgage, deed of trust, encumbrance, notice of Lien, levy or assessment, pledge, hypothecation, assignment, deposit arrangement, security agreement, conditional sale or trust receipt, or from a lease, consignment, or bailment for security purposes and also includes reservations, exceptions, encroachments, easements, rights-of-way, covenants, conditions, restrictions, leases, and other title exceptions and encumbrances affecting Real Property.

"Liquor License" has the meaning set forth in Section 4.22.

"Loan" means an Advance or portion of the Term Loan.

"Loan Account" has the meaning specified therefor in Section 2.10.

"Loan Documents" means the Agreement, the Bank Product Agreements, the Cash Management Agreements, the Control Agreements, the Copyright Security Agreement, the Fee Letter, the Guaranty, the

-13-

Intercompany Subordination Agreement, the Letters of Credit, the Mortgages, the Orders, the Patent Security Agreement, the Security Agreement, the Trademark Security Agreement, any note or notes executed by a Borrower in connection with the Agreement and payable to a member of the Lender Group, and any other agreement entered into, now or in the future, by any Borrower or Guarantor and any member of the Lender Group in connection with the Agreement.

"Main Deposit Account" has the meaning specified therefor in Section 2.7(a)(ii).

"Material Adverse Change" means (a) a material adverse change in the business, prospects, operations, results of operations, assets, liabilities or condition (financial or otherwise) of Borrowers and their Subsidiaries, taken as a whole, (b) a material impairment of a Borrower's or any of its Subsidiaries' ability to perform its obligations under the Loan Documents to which it is a party or of the Lender Group's ability to enforce the Obligations or realize upon the Collateral, or (c) a material impairment of the enforceability or priority of the Agent's Liens with respect to the Collateral as a result of an action or failure to act on the part of a Borrower or a Subsidiary of a Borrower; provided, that, the filing of any of the Bankruptcy Cases shall not, in an of itself, constitute a Material Adverse Change.

"Maturity Date" has the meaning specified therefor in Section 3.3.

"Maximum Revolver Amount" means $25,000,000 or such lesser amount as may be in effect upon a reduction of the aggregate Revolver Commitments pursuant to Section 2.4(e).

"Moody's" has the meaning specified therefore in the definition of Cash Equivalents.

"Mortgage Policy" means a mortgagee title insurance policy (or marked commitments to issue the same) for any Real Property Collateral issued by a title insurance company satisfactory to Agent and in form and substance satisfactory to Agent.

"Mortgages" means, individually and collectively, any mortgages, deeds of trust, or deeds to secure debt, executed and delivered by any Borrower or Guarantor in favor of Agent, in form and substance satisfactory to Agent, that encumber any Real Property of such Borrower or Guarantor.

"Multiemployer Plan" means a "multiemployer plan" (within the meaning of Section 4001(a)(3) of ERISA) to which any Borrower, any of its Subsidiaries, or any ERISA Affiliate makes, is making, is obligated, or within the last six years has been obligated, to make contributions.

"Net Cash Proceeds" means:

(a)    with respect to any sale or disposition by any Borrower, any Guarantor or any of their respective Subsidiaries of assets, the amount of cash proceeds received (directly or indirectly) from time to time (whether as initial consideration or through the payment of deferred consideration) by or on behalf of such Person, in connection therewith after deducting therefrom only (i) the amount of any Indebtedness secured by any Permitted Lien on any asset (other than (A) Indebtedness owing to Agent or any Lender under the Agreement or the other Loan Documents and (B) Indebtedness assumed by the purchaser of such asset) which is required to be, and is, repaid in connection with such sale or disposition, (ii) reasonable fees, commissions, and expenses related thereto and required to be paid by such Person in connection with such sale or disposition and (iii) taxes paid or payable to any taxing authorities by such Person in connection with such sale or disposition, in each case to the extent, but only to the extent, that the amounts so deducted are, at the time of receipt of such cash, actually paid or payable to a Person that is not an Affiliate of any Borrower, any Guarantor or any of their respective Subsidiaries, and are properly attributable to such transaction;

(b)    with respect to the issuance or incurrence of any Indebtedness by any Borrower, any Guarantor or any of their respective Subsidiaries, or the issuance by any Borrower, any Guarantor or any of

-14-

their respective Subsidiaries of any shares of its Stock, the aggregate amount of cash received (directly or indirectly) from time to time (whether as initial consideration or through the payment or disposition of deferred consideration) by or on behalf of such Person in connection with such issuance or incurrence, after deducting therefrom only (i) reasonable fees, commissions, and expenses related thereto and required to be paid by such Person in connection with such issuance or incurrence, (ii) taxes paid or payable to any taxing authorities by such Person in connection with such issuance or incurrence, in each case to the extent, but only to the extent, that the amounts so deducted are, at the time of receipt of such cash, actually paid or payable to a Person that is not an Affiliate of any Borrower, any Guarantor or any of their respective Subsidiaries, and are properly attributable to such transaction; and

(c)     with respect to the receipt of Extraordinary Receipts, the aggregate amount of cash received (directly or indirectly) from time to time by or on behalf of any Borrower, any Guarantor or any of their respective Subsidiaries after deducting therefrom only reasonable costs and expenses of collection with respect thereto.

"Noteholder Group" means the informal group of unaffiliated holders of Notes, which group holds a majority of the principal amount of the outstanding Notes.

"Notes" means those certain 10% Senior Secured Notes due 2011 issued by the Parent, as described in the Indenture, in an aggregate principal amount not to exceed $142,000,000.

"Notice Period" has the meaning specified therefor in Section 8.1(d) of the Agreement.

"Obligations" means (a) all loans (including the Term Loan), Advances, debts, principal, interest, contingent reimbursement obligations with respect to outstanding Letters of Credit, premiums, liabilities (including all amounts charged to Borrowers' Loan Account pursuant hereto), obligations (including indemnification obligations), fees (including the fees provided for in the Fee Letter), charges, costs, Lender Group Expenses, lease payments, guaranties, covenants, and duties of any kind and description owing by Borrowers to the Lender Group pursuant to or evidenced by the Loan Documents and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all interest not paid when due and all Lender Group Expenses that Borrowers, Guarantors or their respective Subsidiaries are required to pay or reimburse by the Loan Documents, by law, or otherwise, and (b) all Bank Product Obligations.  Any reference in the Agreement or in the Loan Documents to the Obligations shall include all or any portion thereof and any extensions, modifications, renewals, or alterations thereof.

"Orders" means the Interim Order and the Final Order.

"Originating Lender" has the meaning specified therefor in Section 13.1(e).

"Overadvance" has the meaning specified therefor in Section 2.5.

"Parent" has the meaning specified therefor in the preamble to the Agreement.

"Participant" has the meaning specified therefor in Section 13.1(e).

"Participant Register" has the meaning specified therefor in Section 13.1(k).

"Patent Security Agreement" has the meaning specified therefor in the Security Agreement.

"PBGC" means the Pension Benefit Guaranty Corporation or any entity succeeding to any or all of its functions under ERISA.Q3W4

-15-

"<u>Pension Plan</u>" means an employee pension benefit plan (as defined in Section 3(2) of ERISA) other than a Multiemployer Plan (a) that is or has been within the last six years maintained or sponsored by any Borrower, any of its Subsidiaries, or any ERISA Affiliate or to which any Borrower, any of its Subsidiaries, or any ERISA Affiliate has within the last six years made, or was obligated to make, contributions, and (b) that is or was subject to Section 412 of the IRC, Section 302 of ERISA or Title IV of ERISA.

"<u>Permitted Discretion</u>" means a determination made in the exercise of reasonable (from the perspective of a secured lender) business judgment.

"<u>Permitted Dispositions</u>" means (a) sales or other dispositions of Equipment that (i) is substantially worn, damaged, or obsolete in the ordinary course of business or (ii) has been replaced in connection with an upgrade or updating of Equipment made in the ordinary course of business consistent with past practices, (b) sales of Inventory to buyers in the ordinary course of business, (c) the use or transfer of money or Cash Equivalents in a manner that is not prohibited by the terms of the Agreement or the other Loan Documents, (d) the licensing, on a non-exclusive basis, of patents, trademarks, copyrights, and other intellectual property rights in the ordinary course of business, (e) dispositions in connection with the shutdown of Unprofitable Restaurants and (f) dispositions permitted under clauses (x) and (y) of the proviso in <u>Section 6.3</u>.

"<u>Permitted Holders</u>" means the Persons identified on <u>Schedule P-1</u>.

"<u>Permitted Investments</u>" means (a) Investments in cash and Cash Equivalents, (b) Investments in negotiable instruments for collection, (c) advances made in connection with purchases of goods or services in the ordinary course of business, (d) Investments received in settlement of amounts due to a Borrower or any Subsidiary of a Borrower effected in the ordinary course of business or owing to a Borrower or any Subsidiary of a Borrower as a result of Insolvency Proceedings involving an Account Debtor or upon the foreclosure or enforcement of any Lien in favor of a Borrower or any Subsidiary of a Borrower and (e) Investments by (i) a Borrower in another Borrower or Subsidiary of a Borrower that is a Guarantor and (ii) a Guarantor in a Borrower.

"<u>Permitted Liens</u>" means (a) Liens held by Agent to secure the Obligations, (b) Liens for unpaid taxes, assessments, or other governmental charges or levies that either (i) are not yet delinquent, or (ii) do not cause an Event of Default and for which the underlying taxes, assessments, or charges or levies are the subject of Permitted Protests, (c) judgment Liens that do not constitute an Event of Default under <u>Section 7.3</u> of the Agreement, (d) Liens in existence as of the Filing Date and which are Permitted Liens under the Pre-Petition Credit Agreement, (e) the interests of lessors under operating leases, (f) Liens arising by operation of law in favor of warehousemen, landlords, carriers, mechanics, materialmen, laborers, or suppliers, incurred in the ordinary course of Borrowers' business and not in connection with the borrowing of money, and which Liens either (i) are for sums not yet delinquent, or (ii) are the subject of Permitted Protests, (g) Liens on amounts deposited in connection with obtaining worker's compensation, unemployment insurance or other types of social security benefits, (h) Liens on amounts deposited in connection with the making or entering into of bids, tenders, or leases in the ordinary course of business and not in connection with the borrowing of money, (i) Liens on amounts deposited as security for surety or appeal bonds in connection with obtaining such bonds in the ordinary course of business, (j) with respect to any Real Property, easements, rights of way, zoning restrictions and similar encumbrances that (i) do not materially interfere with or impair the use or operation thereof and (ii) are not Environmental Liens, (k) to the extent subject to the Intercreditor Agreement, (i) the Liens of the Trustee (or its agent or designee) to secure the Indebtedness under the Indenture Documents permitted to exist under the terms of the Agreement and (ii) the Indenture Adequate Protection, (l) the Pre-Petition Adequate Protection and (m) the Carve-Out; provided, that, with respect to the Liens listed in clauses (c) through (j) and (k)(i) above, payment and enforcement in respect thereof is, in each case, stayed under the Bankruptcy Code or pursuant to orders of the Bankruptcy Court.

"<u>Permitted Protest</u>" means the right of Administrative Borrower or any of its Subsidiaries to protest any Lien (other than any Lien that secures the Obligations or that would cause an Event of Default), taxes, or

-16-

rental payment, provided that (a) a reserve with respect to such obligation is established on a Borrower's or any of its Subsidiaries' books and records in such amount as is required under GAAP, (b) any such protest is instituted promptly and prosecuted diligently by Administrative Borrower or any of its Subsidiaries, as applicable, in good faith, and (c) Agent is satisfied that, while any such protest is pending, there will be no impairment of the enforceability, validity, or priority of any of the Agent's Liens.

"Person" means natural persons, corporations, limited liability companies, limited partnerships, general partnerships, limited liability partnerships, joint ventures, trusts, land trusts, business trusts, or other organizations, irrespective of whether they are legal entities, and governments and agencies and political subdivisions thereof.

"Plan" means (a) an employee benefit plan (as defined in Section 3(3) of ERISA) other than a Multiemployer Plan which is or was within the last six years maintained or sponsored by any Borrower or any of its Subsidiaries or to which any Borrower or any of its Subsidiaries has within the last six years made, or was obligated to make, contributions, (b) a Pension Plan, or (c) a Qualified Plan.

"Plan Documentation" means the Plan of Reorganization and all documentation related thereto or referenced therein, including without limitation any amendments, modifications or supplements to any of the foregoing, including any subsequent plans of reorganization, any motions related thereto and the Confirmation Order.

"Plan of Reorganization" means, as the same may be amended, modified or otherwise supplemented in compliance with this Agreement, a joint plan of reorganization of the Borrowers and Guarantors in their Bankruptcy Cases which either (a) provides for indefeasible payment in full in cash and in accordance with the terms of the this Agreement of all Obligations due and owing as of the effective date of such plan of reorganization or (b) is otherwise in form and content acceptable to Agent and the Lenders.

"Plan Support Agreement" means an agreement among the Borrowers and the holders of a majority of the outstanding amount of the Notes setting forth the terms of the restructuring of the Notes and certain other obligations of the Borrowers, which agreement shall provide for the agreement of such Note holders to vote to accept a plan of reorganization that provides for, among other things, the payment in full in cash of all of the Pre-Petition Obligations and all of the Obligations.

"Pre-Petition Adequate Protection" has the meaning specified therefor in item (b) on Schedule 3.1.

"Pre-Petition Adequate Protection Payments" means (a) reimbursement, on a current basis, of all costs and expenses of Pre-Petition Agent and the Pre-Petition Lenders (including attorneys' and consultants' fees) in connection with the Bankruptcy Cases, and (b) monthly payments of accrued unpaid interest under the Pre-Petition Credit Agreement.

"Pre-Petition Agent" has the meaning specified therefor in the recitals to the Agreement.

"Pre-Petition Borrowers" has the meaning specified therefor in the recitals to the Agreement.

"Pre-Petition Credit Agreement" has the meaning specified therefor in the recitals to the Agreement.

"Pre-Petition Lenders" has the meaning specified therefor in the recitals to the Agreement.

"Pre-Petition Obligations" has the meaning specified therefor in the recitals to the Agreement.

"Pro Rata Share" means, as of any date of determination:

-17-

(a)     with respect to a Lender's obligation to make Advances and right to receive payments of principal, interest, fees, costs, and expenses with respect thereto, (i) prior to the Revolver Commitments being terminated or reduced to zero, the percentage obtained by dividing (y) such Lender's Revolver Commitment, by (z) the aggregate Revolver Commitments of all Lenders, and (ii) from and after the time that the Revolver Commitments have been terminated or reduced to zero, the percentage obtained by dividing (y) the aggregate outstanding principal amount of such Lender's Advances by (z) the aggregate outstanding principal amount of all Advances,

(b)     with respect to a Lender's obligation to participate in Letters of Credit, to reimburse the Issuing Lender, and right to receive payments of fees with respect thereto, (i) prior to the Revolver Commitments being terminated or reduced to zero, the percentage obtained by dividing (y) such Lender's Revolver Commitment, by (z) the aggregate Revolver Commitments of all Lenders, and (ii) from and after the time that the Revolver Commitments have been terminated or reduced to zero, the percentage obtained by dividing (y) the aggregate outstanding principal amount of such Lender's Advances by (z) the aggregate outstanding principal amount of all Advances,

(c)     with respect to a Lender's obligation to make the Term Loan and right to receive payments of interest, fees, and principal with respect thereto, (i) prior to the making of the Term Loan, the percentage obtained by dividing (y) such Lender's Term Loan Commitment, by (z) the aggregate amount of all Lenders' Term Loan Commitments, and (ii) from and after the making of the Term Loan, the percentage obtained by dividing (y) the principal amount of such Lender's portion of the Term Loan by (z) the principal amount of the Term Loan, and

(d)     with respect to all other matters as to a particular Lender (including the indemnification obligations arising under Section 15.7), the percentage obtained by dividing (i) such Lender's Revolver Commitment *plus* the outstanding principal amount of such Lender's portion of the Term Loan, by (ii) the aggregate amount of Revolver Commitments of all Lenders *plus* the outstanding principal amount of the Term Loan; provided, however, that in the event the Revolver Commitments have been terminated or reduced to zero, Pro Rata Share under this clause shall be the percentage obtained by dividing (A) the outstanding principal amount of such Lender's Advances *plus* such Lender's ratable portion of the Risk Participation Liability with respect to outstanding Letters of Credit *plus* the outstanding principal amount of such Lender's portion of the Term Loan, by (B) the outstanding principal amount of all Advances *plus* the aggregate amount of the Risk Participation Liability with respect to outstanding Letters of Credit *plus* the outstanding principal amount of the Term Loan.

"Protective Advance" has the meaning specified therefor in Section 2.3(d)(i).

"Qualified Cash" means, as of any date of determination, the amount of unrestricted cash and Cash Equivalents of Borrowers and their Subsidiaries that is in Deposit Accounts or in Securities Accounts, or any combination thereof, and which such Deposit Account or Securities Account is the subject of a Control Agreement and is maintained by a branch office of the bank or securities intermediary located within the United States.

"Qualified Plan" means an employee benefit plan (as defined in Section 3(3) of ERISA) other than a Multiemployer Plan (a) that is or was within the last six years maintained or sponsored by any Borrower or any of its Subsidiaries (including any participation by a Borrower or any of its Subsidiaries in a multiple employer plan), and (b) that is intended to be tax-qualified under Section 401(a) of the IRC.

"Real Property" means any estates or interests in real property now owned or hereafter acquired by any Borrower, Guarantor or a Subsidiary of any Borrower or Guarantor and the improvements thereto.

"Real Property Collateral" means any other Real Property of a Borrower or Guarantor which is subject to Agent's Lien, whether or not such Lien is granted pursuant to a Mortgage.

-18-

"<u>Record</u>" means information that is inscribed on a tangible medium or which is stored in an electronic or other medium and is retrievable in perceivable form.

"<u>Register</u>" has the meaning specified therefor in <u>Section 13.1(h)</u>.

"<u>Registered Loan</u>" has the meaning specified therefor in <u>Section 13.1(h)</u>.

"<u>Registered Note</u>" has the meaning specified therefor in <u>Section 13.1(j)</u>.

"<u>Related Party Register</u>" has the meaning specified therefor in <u>Section 13.1(k)</u>.

"<u>Related Fund</u>" means a fund, money market account, investment account or other account managed by a Lender or an Affiliate of such Lender or its investment manager and used for the purpose of investing in, buying or making loans.

"<u>Remedial Action</u>" means all actions required by Environmental Laws as a result of a release of Hazardous Materials in violation of Environmental Laws to (a) clean up, remove, remediate, contain, treat, monitor, assess, evaluate, or in any way address Hazardous Materials in the indoor or outdoor environment, (b) prevent or minimize a release or threatened release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the environment, (c) restore or reclaim natural resources or the environment, (d) perform any pre-remedial studies, investigations, or post-remedial operation and maintenance activities, or (e) conduct any other actions with respect to Hazardous Materials authorized by Environmental Laws.

"<u>Reorganization Milestone</u>" means each of the events set forth on <u>Schedule R-1</u>.

"<u>Replacement Lender</u>" has the meaning specified therefor in <u>Section 14.2(a)</u>.

"<u>Report</u>" has the meaning specified therefor in <u>Section 15.17</u>.

"<u>Required Lenders</u>" means (a) if WFCF, together with its Affiliates and Related Funds, shall hold at least 25% of the Revolver Commitments (or at least 25% of the Revolver Usage if such commitments have been terminated), then WFCF shall constitute Required Lenders, (b) if WFCF, together with its Affiliates and Related Funds, shall hold less than 25% of the Revolver Commitments (or less than 25% of the Revolver Usage if such commitments have been terminated) and Twin Haven, together with its Affiliates and Related Funds, shall hold at least 25% of the principal balance of the Term Loan, then Twin Haven shall constitute Required Lenders or (c) if WFCF, together with its Affiliates and Related Funds, shall hold less than 25% of the Revolver Commitments (or less than 25% of the Revolver Usage if such commitments have been terminated) and Twin Haven, together with its Affiliates and Related Funds, shall hold less than 25% of the principal balance of the Term Loan, then Required Lenders shall be those Lenders whose aggregate Pro Rata Shares (calculated under clause (d) of the definition of Pro Rata Shares) equal or exceed 50.1%.

"<u>Reserve Percentage</u>" means, on any day, for any Lender, the maximum percentage prescribed by the Board of Governors of the Federal Reserve System (or any successor Governmental Authority) for determining the reserve requirements (including any basic, supplemental, marginal, or emergency reserves) that are in effect on such date with respect to Eurocurrency funding (currently referred to as "<u>Eurocurrency liabilities</u>") of that Lender, but so long as such Lender is not required or directed under applicable regulations to maintain such reserves, the Reserve Percentage shall be zero.

"<u>Restaurant</u>" means an "Uno Chicago Grill" or a "Pizzeria Uno" restaurant operated by a Borrower or a Subsidiary of a Borrower.

"**Revolver Commitment**" means, with respect to each Lender, its Revolver Commitment, and, with respect to all Lenders, their Revolver Commitments, in each case as such Dollar amounts are set forth beside such Lender's name under the applicable heading on <u>Schedule C-1</u> or in the Assignment and Acceptance pursuant to which such Lender became a Lender hereunder, as such amounts may be reduced or increased from time to time pursuant to <u>Section 2.4(e)</u> or pursuant to assignments made in accordance with the provisions of <u>Section 13.1</u>.

"**Revolver Lenders**" means those Lenders holding a Revolver Commitment or, if the Revolver Commitments have been terminated, those Lenders holding any portion of the Revolver Usage.

"**Revolver Usage**" means, as of any date of determination, the sum of (a) the amount of outstanding Advances, *plus* (b) the amount of the Letter of Credit Usage.

"**Risk Participation Liability**" means, as to each Letter of Credit, all reimbursement obligations of Borrowers to the Issuing Lender with respect to an L/C Undertaking, consisting of (a) the amount available to be drawn or which may become available to be drawn, (b) all amounts that have been paid by the Issuing Lender to the Underlying Issuer to the extent not reimbursed by Borrowers, whether by the making of an Advance or otherwise, and (c) all accrued and unpaid interest, fees, and expenses payable with respect thereto.

"**S&P**" has the meaning specified therefore in the definition of Cash Equivalents.

"**SEC**" means the United States Securities and Exchange Commission and any successor thereto.

"**Secretary**" means, with respect to any Person, the duly elected or appointed secretary or other officer of such Person charged with keeping the corporate records of such Person.

"**Securities Account**" means a securities account as that term is defined in the Code.

"**Security Agreement**" means a security agreement, in form and substance satisfactory to Agent, executed and delivered by the Borrowers and Guarantors in favor of Agent, together with all supplements executed in connection therewith.

"**Settlement**" has the meaning specified therefor in <u>Section 2.3(e)(i)</u>.

"**Settlement Date**" has the meaning specified therefor in <u>Section 2.3(e)(i)</u>.

"**Specified Institution**" means any bank, securities intermediary or other such Person that is, as of any date of determination, a party to a Control Agreement.

"**Specified Permitted Liens**" means Liens which are Permitted Liens under the terms of the Pre-Petition Credit Agreement and which, as of the Filing Date, were valid, properly perfected, non-avoidable and, as provided by applicable law, senior in priority to the Liens securing the Pre-Petition Obligations.

"**Stock**" means all shares, options, warrants, interests, participations, or other equivalents (regardless of how designated) of or in a Person, whether voting or nonvoting, including common stock, preferred stock, or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Exchange Act).

"**Subsidiary**" of a Person means a corporation, partnership, limited liability company, or other entity in which that Person directly or indirectly owns or controls the shares of Stock having ordinary voting power to elect a majority of the board of directors (or appoint other comparable managers) of such corporation, partnership, limited liability company, or other entity.

-20-

"Swing Lender" means WFCF or any other Lender that, at the request of Administrative Borrower and with the consent of Agent agrees, in such Lender's sole discretion, to become the Swing Lender under Section 2.3(d).

"Swing Loan" has the meaning specified therefor in Section 2.3(b).

"Taxes" has the meaning specified therefor in Section 15.11(a).

"Term Loan" has the meaning specified therefor in Section 2.2.

"Term Loan Commitment" means, with respect to each Lender, its Term Loan Commitment, and, with respect to all Lenders, their Term Loan Commitments, in each case as such Dollar amounts are set forth beside such Lender's name under the applicable heading on Schedule C-1 or in the Assignment and Acceptance pursuant to which such Lender became a Lender hereunder, as such amounts may be reduced or increased from time to time pursuant to assignments made in accordance with the provisions of Section 13.1.

"Term Loan Lenders" means those Lenders holding a Term Loan Commitment or portion of the Term Loan.

"Term Sheet" means the General Information & Summary of Terms as to the setting forth, generally the terms and conditions for the credit facility contemplated by this Agreement, dated January [__], 2010

"Total Commitment" means, with respect to each Lender, its Total Commitment, and, with respect to all Lenders, their Total Commitments, in each case as such Dollar amounts are set forth beside such Lender's name under the applicable heading on Schedule C-1 attached hereto or on the signature page of the Assignment and Acceptance pursuant to which such Lender became a Lender hereunder, as such amounts may be reduced or increased from time to time pursuant to assignments made in accordance with the provisions of Section 13.1.

"Trademark Security Agreement" has the meaning specified therefor in the Security Agreement.

"Triggering Event" means (a) for purposes of the Carve-Out, the earlier to occur of (i) the date Agent provides notice to the Borrowers, with a copy to Borrower's counsel at the address set forth in Section 11, of (A) an Event of Default and (B) termination of the Pipeline Period for purposes of the Carve-Out or (ii) the date upon which the failure of the Borrowers to notify Agent of the occurrence of a Default or Event of Default constitutes a failure to comply with the requirements of Section 5.3 and (b) for purposes of the Indenture Adequate Protection Payments, the earlier to occur of (i) the date Agent provides notice to Twin Haven, with a copy to its counsel at the address set forth in Section 11, of an Event of Default or (ii) the date upon which the failure of the Borrowers to notify Agent of the occurrence of a Default or Event of Default constitutes a failure to comply with the requirements of Section 5.3.

"Trustee" means U.S. Bank National Association, in its capacity as Trustee and Collateral Agent under the Indenture.

"Twin Haven" means Twin Haven Special Opportunities Fund III, L.P., a Delaware limited partnership.

"Underlying Issuer" means a third Person which is the beneficiary of an L/C Undertaking and which has issued a letter of credit at the request of the Issuing Lender for the benefit of Borrowers.

"Underlying Letter of Credit" means a letter of credit that has been issued by an Underlying Issuer.

"United States" means the United States of America.

A/73262114.9/3004422-0000318600

"<u>Uno Holdings II</u>" means Uno Holdings II, LLC, a Delaware limited liability company, as debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code.

"<u>Unprofitable Restaurant</u>" means a Restaurant (a) that has been operated by a Borrower or one of its Subsidiaries for at least 12 months and whose EBITDA for the immediately preceding 12-month period is less than $1; or (b) that has been operated by a Borrower or one of its Subsidiaries for less than 12 months and whose EBITDA has been less than $1 since inception on a cumulative basis.

"<u>Voidable Transfer</u>" has the meaning specified therefor in <u>Section 16.6</u>.

"<u>Wells Fargo</u>" means Wells Fargo Bank, National Association, a national banking association.

"<u>WFCF</u>" means Wells Fargo Capital Finance, Inc., a California corporation (formerly known as Wells Fargo Foothill, Inc.).

A/73262114.9/3004422-0000318600

<u>**SCHEDULE 3.1**</u>

The obligation of each Lender to make its initial extension of credit provided for in the Agreement is subject to the fulfillment, to the satisfaction of Agent and each Lender (the making of such initial extension of credit by any Lender being conclusively deemed to be its satisfaction or waiver of the following), of each of the following conditions precedent:

(a) the Filing Date shall have occurred on or before February 1, 2010;

(b) The Bankruptcy Court shall have entered the Interim Order, which shall (i) be in full force and effect and shall not have been vacated, modified, amended (without the express written consent of Agent and the Lenders), reversed, overturned or stayed in any respect, and, in the event that the Interim Order is the subject of a pending appeal, the performance of any obligation of any Borrower or Guarantor shall not be the subject of a stay pending appeal, (ii) provide for the payment in full, in cash of all Pre-Petition Obligations (other than reimbursement, indemnification and other contingent obligations of the Pre-Petition Borrowers under the Pre-Petition Credit Agreement), with respect to which the Interim Order shall provide adequate protection to the Pre-Petition Agent and the Pre-Petition Lenders (the "<u>Pre-Petition Adequate Protection</u>") in the form of (A) replacement liens and super-priority administrative expense claims, subordinate only to the Pre-Petition Credit Agreement Liens claims and interests, the Liens, claims and interests under this Agreement and the other Loan Documents and the Carve-Out and (B) the Pre-Petition Adequate Protection Payments; in each case, as provided in the Interim Order and the Final Order and (iii) adequate protection to the Trustee and the Note holders (the "<u>Indenture Adequate Protection</u>") in the form of (A) replacement liens and super-priority administrative expense claims, subordinate only to the adequate protection claims and liens of the Pre-Petition Agent and the Pre-Petition Lenders, the Pre-Petition Credit Agreement Liens, claims and interests, the Liens, claims and interests under this Agreement and the other Loan Documents and the Carve-Out and (B) the Indenture Adequate Protection Payments;

(c) Agent and the Lenders shall have received and be satisfied with all "first day" pleadings and "first day" orders filed on the Filing Date, which shall not, in any event, be adverse to Agent or the Lenders or inconsistent with the terms of the Loan Documents;

(d) Agent shall be satisfied that all obligations of the Borrowers and Guarantors with respect to the Loan Documents are secured by valid, enforceable and non-avoidable first priority Liens and security interests in all of the property and assets of the Borrowers and Guarantors, subject, as to priority, only to the Carve-Out and the Specified Permitted Liens;

(e) Agent shall have received each of the following documents, in form and substance satisfactory to Agent, duly executed, and each such document shall be in full force and effect:

(i) to the extent that any of the banks party to the Control Agreements entered into in connection with the Pre-Petition Credit Agreement require the re-documentation thereof, Control Agreements reasonably acceptable to Agent which provide Agent with springing dominion and control over the funds deposited to the Deposit Accounts subject to such Control Agreements,

(ii) the Copyright Security Agreement,

(iii) the Disbursement Letter,

(iv) the Fee Letter,

(v) the Guaranty,

-1-

(vi)     the Intercompany Subordination Agreement,

(vii)    the Patent Security Agreement,

(viii)   the Security Agreement, together with, to the extent not already delivered to Agent, all certificates representing the shares of Stock pledged thereunder, as well as Stock powers with respect thereto endorsed in blank, and

(ix)     the Trademark Security Agreement;

(f)      Agent shall have received a certificate from the Secretary of each Borrower (i) attesting to the resolutions of such Borrower's Board of Directors authorizing its execution, delivery, and performance of this Agreement and the other Loan Documents to which such Borrower is a party, (ii) authorizing specific officers of such Borrower to execute the same, and (iii) attesting to the incumbency and signatures of such specific officers of such Borrower;

(g)      Agent shall have received copies of each Borrower's Governing Documents, as amended, modified, or supplemented to the Closing Date, certified by either (i) the appropriate officer of each applicable jurisdiction of organization for such Borrowers or (ii) the Secretary of Administrative Borrower;

(h)      Agent shall have received a certificate of status with respect to each Borrower, dated of a recent date prior to the Closing Date, such certificate to be issued by the appropriate officer of the jurisdiction of organization of such Borrower, which certificate shall indicate that such Borrower is in good standing in such jurisdiction;

(i)      Agent shall have received a certificate from the Secretary of each Guarantor (i) attesting to the resolutions of such Guarantor's Board of Directors authorizing its execution, delivery, and performance of the Loan Documents to which such Guarantor is a party, (ii) authorizing specific officers of such Guarantor to execute the same and (iii) attesting to the incumbency and signatures of such specific officers of Guarantor;

(j)      Agent shall have received copies of each Guarantor's Governing Documents, as amended, modified, or supplemented to the Closing Date, certified by the Secretary of such Guarantor;

(k)      Agent shall have received a certificate of status with respect to each Guarantor, each dated of a recent date prior to the Closing Date, such certificate to be issued by the appropriate officer of the jurisdiction of organization of such Guarantor, which certificate shall indicate that such Guarantor is in good standing in such jurisdiction;

(l)      Agent shall have received a certificate of insurance, together with the endorsements thereto, as are required by Section 5.8, the form and substance of which shall be satisfactory to Agent;

(m)     Agent shall have received an opinion of Borrowers' counsel in form and substance satisfactory to Agent;

(p)      Agent and the Lenders shall have received (i) completed reference checks with respect to all new members of each Borrower's or Guarantor's senior management, the results of which are reasonably satisfactory to Agent and the Lenders and (ii) all necessary Patriot Act compliance information and reports with respect to all new members of each Borrower's and each Guarantor's senior management, the results of which are satisfactory to Agent and the Lenders in their sole discretion;

(q)      Receipt by Agent and the Lenders of documentation and information reasonably requested by them in connection with their legal and business due diligence with respect to the Borrowers and the Guarantors, the results of which shall be satisfactory to Agent and the Lenders;

-2-

(r)     Agent shall have received the Budget, which shall be in form and substance satisfactory to Agent and the Lenders;

(s)     Agent shall have received the Plan Support Agreement, which agreement shall be in full force and effect and shall not have been amended, modified or supplemented without the prior written consent of Agent and the Lenders, and no party thereto shall have withdrawn its support for such restructuring or refused to abide by the terms thereof;

(t)     the Plan of Reorganization and all other Plan Documentation to be executed, delivered or filed pursuant thereto shall be in form and substance reasonably acceptable to the Agent and the Lenders or, if such Plan Documentation is not yet finalized, a restructuring term sheet with respect to the Notes shall have been provided in form and substance acceptable to the Agent and the Lenders;

(u)     Agent shall have received evidence, in form and substance satisfactory to Agent, that the Carve-Out Escrow Account shall have been established pursuant to documentation, including a Control Agreement with respect thereto, satisfactory to Agent in form and substance and that proceeds of the Term Loan in an amount equal to the Carve-Out Amount shall have been deposited to the Carve-Out Escrow Account;

(v)     Borrowers shall have paid all Lender Group Expenses incurred in connection with the transactions evidenced by this Agreement;

(w)     each Lender shall have received its formal credit approval for the transactions contemplated by the Loan Documents;

(x)     all other documents and legal matters in connection with the transactions contemplated by this Agreement shall have been delivered, executed, or recorded and shall be in form and substance satisfactory to Agent; and

(y)     the Closing Date shall have occurred on or before the date that is one Business Day after the entry of the Interim Order.

A/73262114.9/3004422-0000318600

## Schedule 5.2

Provide Agent (and if so requested by Agent, with copies for each Lender) with each of the documents set forth below at the following times in form satisfactory to Agent:

| | |
|---|---|
| Monthly (not later than the 30th day of each month) | **(a)**  a Borrowing Base Certificate,<br><br>**(b)**  a summary aging, by vendor, of Borrowers' and their Subsidiaries' accounts payable and any book overdrafts and an aging, by vendor, of any held checks,<br><br>**(c)**  a detailed report regarding Borrowers' and their Subsidiaries' cash, Cash Equivalents, including an indication of which amounts constitute Qualified Cash, and activity with respect to the Carve-Out Escrow Account, and<br><br>**(d)**  a sales report for each currently operating Restaurant of Borrowers and their Subsidiaries for the prior month, on a consolidated basis. |
| Quarterly | **(e)**  a report on each of Borrowers' and their Subsidiaries' Restaurants, together with a listing of any new Restaurants or locations owned, leased or franchised by any Borrower or any of its Subsidiaries, and a reconciliation explaining any change (whether due to a Permitted Disposition or otherwise) in the ownership or operation of the Restaurants and locations listed in the corresponding report for the immediately preceding quarter. |
| Unless earlier notice is otherwise required pursuant to the Bankruptcy Code, within 2 Business Days of filing or sending thereof | **(f)**  copies of all pleadings , motions, applications, financial information and other papers and documents filed by any Borrower or Guarantor in any Bankruptcy Case or submitted by any Borrower or Guarantor to the United States Trustee, in each case, along with a copy thereof to each of Agent, its counsel and each Lender; and<br><br>**(g)**  copies of all written reports given by any Borrower or Guarantor to any official or unofficial creditors' committee in the any Bankruptcy Case. |
| Upon request by Agent | **(h)**  proof of payment of Borrowers' and their Subsidiaries' applicable taxes,<br><br>**(i)**  a report regarding Borrowers' and their Subsidiaries' accrued, but unpaid, *ad valorem* taxes, and<br><br>**(j)**  such other reports as to the Collateral or the financial condition of Borrowers, Guarantors and their respective Subsidiaries, as Agent may reasonably request. |

**Schedule 5.3**

Deliver to Agent, each of the financial statements, reports, or other items set forth set forth below at the following times in form satisfactory to Agent:

| | |
|---|---|
| Weekly, within 5 Business Days after the end of each fiscal week commencing with the fiscal week ending February 21, 2010 | **(a)** a comparison to the Budget of actual performance for such fiscal week setting forth the actual cash receipts and disbursements for the period from January 18, 2010 to and including the most recent full fiscal week, and showing the variance in dollar amounts and by percentage, on an aggregate basis, of actual receipts and disbursements for the applicable periods from those set forth in the Budget, and<br><br>**(b)** a Compliance Certificate. |
| Every four fiscal weeks, commencing February 21, 2010, within 5 Business Days after the end of such fiscal week | **(c)** an updated Budget for the 13-fiscal week period commencing on the date such updated Budget is delivered. |
| Monthly (not later than (i) 30 days after the end of each fiscal month that is not the end of a fiscal quarter and (ii) 45 days after the end of each fiscal month that is the end of a fiscal quarter) | **(d)** an unaudited consolidated balance sheet, income statement (including a breakdown by division), and statement of cash flow covering Parent's and its Subsidiaries' operations during the prior fiscal month. |
| Quarterly (not later than 45 days after the end of each fiscal quarter of Parent) | **(e)** an unaudited consolidated balance sheet, income statement (including a breakdown by division), and statement of cash flow covering Parent's and its Subsidiaries' operations during the prior fiscal quarter and during the period commencing on the first day of the applicable fiscal year and ending on the last day of the prior quarter. |
| Annually (not later than 90 days after the end of each of Parent's fiscal years) | **(f)** consolidated financial statements of Parent and its Subsidiaries for each such fiscal year, audited by independent certified public accountants reasonably acceptable to Agent and certified, without any qualifications (including any (A) qualification or exception as to the scope of such audit, or (B) qualification which relates to the treatment or classification of any item and which, as a condition to the removal of such qualification, would require an adjustment to such item, the effect of which would be to cause any noncompliance with the provisions of Section 6.16, but excluding any "going concern" or like qualification or exception), by such accountants to have been prepared in accordance with GAAP (such audited financial statements to include a balance sheet, income statement (including a breakdown by division), and statement of cash flow and, if prepared, such accountants' letter to management); provided, however, the audited financial statements of Parent and its Subsidiaries for their fiscal year 2009 may contain a |

| | |
|---|---|
| | "going concern" qualification. |
| if and when filed by any Borrower or Guarantor, | **(g)** Form 10-Q quarterly reports, Form 10-K annual reports, and Form 8-K current reports, and<br><br>**(h)** any other filings made by any Borrower or Guarantor with the SEC. |
| within 2 Business Days after any Borrower, Guarantor or any of their respective Subsidiaries has knowledge of any event or condition that constitutes a Default or an Event of Default, | **(i)** notice of such event or condition and a statement of the curative action that Borrowers proposes to take with respect thereto. |
| promptly after the commencement thereof, but in any event within 5 days after the service of process with respect thereto on any Borrower, Guarantor or any of their respective Subsidiaries, | **(j)** notice of all actions, suits, or proceedings brought by or against any Borrower, Guarantor or any of their respective Subsidiaries before any Governmental Authority which reasonably could be expected to result in a Material Adverse Change. |
| upon the request of Agent, | **(k)** any other information reasonably requested relating to the financial condition of Borrowers, Guarantors or their respective Subsidiaries. |

**<u>Schedule R-1</u>**

**Reorganization Milestones**

| Due Date | Milestone |
|---|---|
| February 1, 2010 | Filing by the Borrowers of bankruptcy petitions and first day pleadings |
| February 25, 2010 | Filing by the Borrowers of the Plan of Reorganization and related disclosure statement |
| May 1, 2010 | Approval by the Bankruptcy Court of the disclosure statement for the Plan of Reorganization |
| June 15, 2010 | Confirmation of the Plan of Reorganization by the Bankruptcy Court |
| July 15, 2010 | Effectiveness of the Plan of Reorganization |
| * Any of the above mentioned dates may be extended for up to but not exceeding 90 days each, with the consent of the Agent and the Lenders. | |

# **EXHIBIT B**

## **Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| **UNO RESTAURANT HOLDINGS** | ) Case No. 10-_____ (____) |
| **CORPORATION**, *et al.* | ) |
| | ) **(Jointly Administered)** |
| Debtors. | ) |

---------------------------------------------------------------

## INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507 (1) APPROVING POSTPETITION FINANCING, (2) AUTHORIZING USE OF CASH COLLATERAL, (3) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (4) GRANTING ADEQUATE PROTECTION, (5) MODIFYING AUTOMATIC STAY, AND (6) SCHEDULING A FINAL HEARING

THIS MATTER having come before the Court upon the motion (the "DIP Motion") of

Uno Restaurant Holdings Corp. ("Uno"), and its direct and indirect subsidiaries (collectively, the

"Borrowers"),[1] each as a debtor and debtor in possession (collectively the "Debtors") in the

---

[1] The other Borrowers are:  8250 International Drive Corporation, Aurora Uno, Inc., B.S. of Woodbridge, Inc., Fairfax Uno, Inc., Kissimmee Uno, Inc., Marketing Services Group, Inc., Newport News Uno, Inc., Newton Takery, Inc., Paramus Uno, Inc., Pizzeria Uno corporation, Pizzeria Uno of 86th Street, Inc., Pizzeria Uno of Albany Inc., Pizzeria Uno of Bay Ridge, Inc., Pizzeria Uno of Bay Side, Inc., Pizzeria Uno of Bethesda, Inc., Pizzeria Uno of Brockton, Inc., Pizzeria Uno of Columbus Avenue, Inc., Pizzeria Uno of East Village Inc., Pizzeria Uno of Fair Oaks, Inc., Pizzeria Uno of Fairfield, Inc., Pizzeria Uno of Forest Hills, Inc., Pizzeria Uno of Kingston, Inc., Pizzeria Uno of Lynbrook Inc., Pizzeria Uno of Reston, Inc., Pizzeria Uno of South Street Seaport, Inc., Pizzeria Uno of Springfield, Inc., Pizzeria Uno of Syracuse, Inc., Pizzeria Uno of Union Station, Inc., Plizzettas of Concord, Inc., SL Properties, Inc., SL Uno Burlington, Inc., SL Uno Ellicott City, Inc., SL Uno Franklin Mills, Inc., SL Uno Frederick, Inc., SL Uno Greece, Inc., SL Uno Gurnee Mills, Inc., SL Uno Hyannis, Inc., SL Uno Maryville, Inc., SL Uno Portland, Inc., SL Uno Potomac Mills, Inc., SL Uno University Blvd., Inc., SL Uno Waterfront, Inc., SLA Brockton, Inc., SLA Due, Inc., SLA Lake Mary, Inc., SLA Mail II, Inc., SLA Mail, Inc., SLA Norfolk, Inc., SLA SU Casa, Inc., SLA Uno, Inc., Saxet Corporation, UR of Bel Air MD, Inc., UR of Bowie MD, Inc., UR of Columbia MD, Inc., UR of Danbury CT, Inc., UR of Dover NH, Inc., UR of Fairfield CT, Inc., UR of Inner Harbor MD, Inc., UR of Keene NH, Inc., UR of Landover MD, Inc., UR of Methuen MA, Inc., UR of Milford CT, Inc., UR of Paoli PA, Inc., UR of Wrentham MA, Inc., Uno Enterprises, Inc., Uno Foods Inc., Uno Restaurant Holdings Corporation, Uno Restaurant of Columbus, Inc., Uno Restaurant of St. Charles, Inc., Uno Restaurant of Woburn, Inc., Uno of America, Inc., Uno of Astoria, Inc., Uno of Aurora, Inc., Uno of Bangor, Inc., Uno of Concord Mills, Inc., Uno of Crestwood, Inc., Uno of Daytona, Inc., Uno of Dulles, Inc., Uno of Falls Church, Inc., Uno of Georgesville, Inc., Uno of Hagerstown, inc., Uno of Haverhill, Inc., Uno of Henrietta, Inc., Uno of Indiana, Inc., Uno of Kingstowne, Inc., Uno of Kirkwood, Inc., Uno of Lombard, Inc., Uno of Manassas, inc., Uno of Manchester, Inc., Uno of Massachusetts, Inc., Uno of New York, Inc., Un of Providence, Inc., Uno of Schaumburg, inc., Uno of Smithtown, Inc., Uno of Victor, Inc., Waltham Uno, Inc., Westminster Uno, Inc., Uno Restaurants II, LLC, UR of Attleboro MA, LLC, UR of Clay NY, LLC, UR of Fayetteville NY, LLC, UR of Fredericksburg VA, LLC, UR of Gainesville VA, LLC, UR of Millbury MA, LLC, UR of Nashua NH, LLC, UR of New Hartford NY, LLC, UR of Newington NH, LLC, UR of Plymouth MA, LLC, UR of Swampscott MA, LLC, UR of Taunton MA, LLC, UR of Tilton NH,

above-captioned chapter 11 cases (collectively, with any successor cases, the "Cases"), pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Bankruptcy Rules for the Southern District of New York, seeking entry of an interim order (this "Interim Order") *inter alia*:

(i)     authorizing the Debtors to obtain secured, superpriority postpetition financing (the "DIP Facility") pursuant to the terms and conditions of that certain Debtor in Possession Credit Agreement (as may be amended, supplemented, restated, or otherwise modified from time to time, the "DIP Agreement") by and among the Borrowers, Wells Fargo Capital Finance, Inc. as Arranger and Administrative Agent (in such capacity, together with it successors in such capacity, the "DIP Agent"), for and on behalf of itself and the other lenders party thereto from time to time (collectively, including the DIP Agent, the "DIP Lenders"), substantially in the form of Exhibit A attached to the DIP Motion;

(ii)    authorizing the Debtors to execute and deliver the DIP Agreement and other related loan documents (collectively with all documents comprising the DIP Facility, the "DIP Documents") and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

(iii)   granting to the DIP Agent and the DIP Lenders allowed superpriority administrative expense claims in each of the Cases and any Successor Cases (as defined herein) for the DIP Facility and all obligations owing thereunder and under the DIP Documents

---

LLC, UR of Virginia Beach VA, LLC, UR of Webster NY, LLC, UR of Winter Gardens FL, LLC, URC, LLC, Uno Restaurants, LLC, URC II, LLC, Pizzeria Uno of Westfarms, LLC, Uno Foods International LLC, UR of Merritt Island FL, LLC, UR of Melbourne FL, LLC.

(collectively, and including all "Obligations" as described in the DIP Agreement, the "DIP Obligations"), subject to the priorities set forth in paragraph 8 below;

(iv)     granting to the DIP Agent, for the benefit of itself and the DIP Lenders automatically perfected security interests in and liens on all of the DIP Collateral (as defined herein), including, without limitation, all property constituting "cash collateral" (as defined in section 363(a) of the Bankruptcy Code, "Cash Collateral"), which liens shall be subject to the priorities set forth in paragraph 7 below;

(v)     authorizing and directing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under each of the DIP Documents as they become due, including, without limitation, letter of credit fees (including issuance and other related charges), closing fees, extension fees, servicing fees, unused line fees, appraisal fees, administrative agent's fees, continuing commitment fees, the fees and disbursements of each DIP Agent's attorneys, advisers, accountants, and other consultants, and the legal expenses of the DIP Lenders, all to the extent provided by and in accordance with the terms of the respective DIP Documents;

(vi)     authorizing the Debtors' use of the Cash Collateral of the Prepetition Agent, Prepetition Lenders, Indenture Trustee and Noteholders (each as defined herein);

(vii)     providing adequate protection to the Prepetition Agent and Prepetition Lenders (to the extent any Prepetition Obligations remain outstanding), and the Indenture Trustee and Noteholders for any Diminution in Value (as defined herein) of their respective interests in the Prepetition Collateral (as defined herein), including the Cash Collateral;

(viii)     vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of

the DIP Documents and this Interim Order; and

   (ix) scheduling a final hearing (the "<u>Final Hearing</u>") to consider the relief requested in the DIP Motion and approving the form of notice with respect to the Final Hearing.

  The Court having considered the DIP Motion, the Affidavit of Louie Psallidas Pursuant to Local Bankruptcy Rule 1007-2 in Support of First Day Motions and Applications, the exhibits attached thereto, the DIP Documents, and the evidence submitted or adduced and the arguments of counsel made at the interim hearing held on January __, 2010 (the "<u>Interim Hearing</u>"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and 9014; and the Interim Hearing to consider the interim relief requested in the DIP Motion having been held and concluded; and all objections, if any, to the interim relief requested in the DIP Motion having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the interim relief requested is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and their creditors and equity holders, and is essential for the continued operation of the Debtors' businesses; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING BY THE DEBTORS, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

  A. *Petition Date*: On January 20, 2010 (the "<u>Petition Date</u>"), each of the Debtors filed a separate voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York commencing these Cases (the "<u>Court</u>").

  B. *Debtors in Possession*. The Debtors are continuing in the management and

operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these Cases.

C.     *Jurisdiction and Venue*.  This Court has jurisdiction, pursuant to 28 U.S.C. §§ 157(b) and 1334, over these proceedings, and over the persons and property affected hereby. Consideration of the DIP Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue for the Cases and proceedings on the DIP Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

D.     *Statutory Committee*.  As of the date hereof, the United States Trustee (the "U.S. Trustee") has not yet appointed an official committee of unsecured creditors in these Cases pursuant to section 1102 of the Bankruptcy Code (a "Statutory Committee").

E.     *Debtors' Stipulations*.  After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties in interest as set forth in paragraph 31 herein, the Debtors (on behalf of and for themselves and their estates) admit, stipulate, acknowledge and agree that (collectively, paragraphs E(i) through E(viii) below are referred to herein as the "Debtors' Stipulations"):

(i)     *Prepetition Facility:*  Pursuant to that certain Credit Agreement dated as of February 22, 2005 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Prepetition Credit Agreement," and together with all other loan and security documents executed in connection therewith, the "Prepetition Credit Documents"), among the Borrowers, Wells Fargo Foothill, Inc. as Arranger and Administrative Agent (the "Prepetition Agent"), and the lenders that are parties thereto from time to time (collectively, together with the Prepetition Agent, the "Prepetition Lenders"), the Prepetition Lenders provided credit and letter of credit facilities to the Borrowers and provided other financial accommodations to or for the

benefit of the Borrowers (collectively, the "Prepetition Facility").

(ii)    *Prepetition Obligations:*  The Prepetition Facility provided the Borrowers with (a) up to $32,000,000 in aggregate maximum principal amount of revolving commitments, including letter of credit and swingline loan commitments, with a sublimit for letters of credit of $20,000,000, and (b) up to $14,250,000 in aggregate principal amount of term loan commitments.  As of the Petition Date, the outstanding principal amount of all loans under the Prepetition Credit Agreement was $33,900,000, and the face amount of issued and outstanding letters of credit was $9,775,000 (collectively, together with any amounts paid, incurred or accrued prior to the Petition Date in accordance with the Prepetition Credit Documents, principal, accrued and unpaid interest, any fees, expenses, and disbursements (including, without limitation, attorneys' fees, related expenses and disbursements), indemnification obligations and other charges of whatever nature, whether or not contingent, whenever arising, due or owing in respect thereof, the "Prepetition Obligations").  The Prepetition Obligations are guaranteed by Uno Holdings II, LLC and other affiliates of the Borrowers party to that certain General Continuing Guaranty dated February 22, 2005 (as amended, supplemented, restated, or otherwise modified prior to the Petition Date).

(iii)    *Prepetition Indenture Obligations*:  Pursuant to that certain Indenture dated as of February 22, 2005 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Indenture," and together with all other loan and security documents executed in connection therewith, the "Indenture Documents"), among Uno, as issuer, certain of Uno's domestic subsidiaries and Uno Holdings II, LLC as guarantors, and U.S. Bank National Association as collateral agent and trustee (in such capacities, the "Indenture Trustee"), Uno incurred indebtedness to certain holders (collectively, the "Noteholders") for certain notes issued

pursuant to the Indenture in an initial aggregate principal amount at maturity of $142,000,000 (the "Notes," and together with accrued and unpaid interest, any fees, expenses, and disbursements (including, without limitation, attorneys' fees, related expenses and disbursements), indemnification obligations and other charges of whatever nature, whether or not contingent, whenever rising, due or owing in connection with the Indenture, the "Indenture Obligations").

        (iv)    *Prepetition Liens and Prepetition Collateral.* As more fully set forth in the Prepetition Credit Documents and Indenture Documents, prior to the Petition Date, the Borrowers granted security interests in and liens on, among other things, substantially all assets of the Borrowers (collectively, the "Prepetition Collateral") to: (a) the Prepetition Agent, for itself and the Prepetition Lenders (the "Prepetition Facility Liens"); and (b) the Indenture Trustee, for the benefit of the Noteholders (the "Indenture Liens", and together with the Prepetition Facility Liens, the "Prepetition Liens"). The Indenture Liens on the Prepetition Collateral are subordinate to the Prepetition Facility Liens on the Prepetition Collateral in accordance with the Intercreditor Agreement (as defined herein).

        (v)    *Priority of the Prepetition Liens; Intercreditor Agreement.* The Debtors, Prepetition Agent, Indenture Trustee and Noteholder Group stipulate, acknowledge and agree that the Prepetition Agent and Indenture Trustee entered into that certain Intercreditor and Lien Subordination Agreement dated February 22, 2005 (as amended, supplemented or modified prior to the Petition Date, the "Intercreditor Agreement") to govern the respective rights, interests, obligations, priority, and the positions of the Prepetition Agent, on behalf of itself and the Prepetition Lenders, and Indenture Trustee, on behalf of itself and the Noteholders, with respect to the assets and properties of the Borrowers and other obligors, which Intercreditor Agreement

remains in full force and effect and binding on the parties thereto.

(vi) *Validity, Perfection and Priority of Prepetition Liens, Prepetition Obligations and Indenture Obligations.* Subject to the provisions of paragraph 31 of this Order, the Debtors (for themselves and their estates), the Prepetition Agent, for itself and the Prepetition Lenders, and the Indenture Trustee, for itself and the Noteholders, acknowledge and agree that: (a) as of the Petition Date, the Prepetition Liens on the Prepetition Collateral were valid, binding, enforceable, non-avoidable and properly perfected; (b) as of the Petition Date, the Prepetition Facility Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to certain liens otherwise permitted by the Prepetition Credit Documents (to the extent any such permitted liens were valid, properly perfected, non-avoidable and senior in priority to the Prepetition Facility Liens as of the Petition Date, the "<u>Permitted Prior Liens</u>");[2] (c) as of the Petition Date, the Indenture Liens were junior and subordinate to the Prepetition Facility Liens and Permitted Prior Liens, and otherwise had priority over any and all other liens on the Prepetition Collateral; (d) the Prepetition Obligations and Indenture Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors; (e) no offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Facility Liens, Prepetition Obligations, Indenture Liens or Indenture Obligations exist, and no portion of the Prepetition Facility Liens, Prepetition Obligations, Indenture Liens or Indenture Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (whether equitable or

---

[2] Nothing herein shall constitute a finding or ruling by this Court that any such Permitted Prior Liens are valid, senior, enforceable, prior, perfected or non-avoidable. Moreover, nothing shall prejudice the rights of any party in interest including, but not limited, to the Debtors, the Prepetition Agent, the Prepetition Lenders, the Indenture Trustee, the Noteholders, the DIP Agent, the DIP Lenders, and any Statutory Committee to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any such Permitted Prior Lien and/or security interest.

otherwise, provided that as set forth in the Intercreditor Agreement, the Indenture Liens are subordinated to the Prepetition Liens) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (f) the Debtors and their estates have no claims, objections, challenges, causes of actions, and/or choses in action, including without limitation, avoidance claims under chapter 5 of the Bankruptcy Code, against any of the Prepetition Agent, Prepetition Lenders, Indenture Trustee, Noteholders or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees; (g) as of the Petition Date, the value of the Prepetition Collateral securing the Prepetition Obligations exceeded the amount of those obligations, and accordingly the Prepetition Obligations are allowed secured claims within the meaning of section 506 of the Bankruptcy Code, in a principal amount (and including the face amount of issued and outstanding letters of credit) of not less than $43,675,000, together with accrued and unpaid interest, fees (including, without limitation, attorneys' fees and related expenses), and any and all other charges of whatever nature owing in respect of such Prepetition Obligations; and (h) any payments made on account of the Prepetition Obligations to or for the benefit of the Prepetition Agent or the Prepetition Lenders prior to the Petition Date were on account of amounts in respect of which the Prepetition Agent and the Prepetition Lenders were oversecured, were payments out of the Prepetition Collateral, and such payments did not diminish any property otherwise available for distribution to unsecured creditors.

(vii)     *Cash Collateral*.  The Debtors represent that all of the Debtors' cash, including the cash in their deposit accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitute the Cash Collateral of the Prepetition Agent, Prepetition Lenders, Indenture Trustee and Noteholders.

(viii)     *Default by the Debtors*.  The Debtors acknowledge and stipulate that the

A/73267843.7

Debtors are in default of their debts and obligations under the Prepetition Credit Documents and the Indenture Documents.

F.     _Findings Regarding the Postpetition Financing_.

(i)     _Need for Postpetition Financing and Use of Cash Collateral_.  The Debtors' need to obtain credit pursuant to the DIP Facility and to use Cash Collateral is immediate and critical in order to enable the Debtors to continue operations and to administer and preserve the value of their estates.  The ability of the Debtors to finance their operations, maintain business relationships with their vendors, suppliers and customers, to pay their employees, and to otherwise finance their operations requires the availability of working capital from the DIP Facility and the use of Cash Collateral, the absence of either of which would immediately and irreparably harm the Debtors, their estates, their creditors and equity holders, and the possibility for a successful reorganization.  The Debtors do not have sufficient available sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business without the DIP Facility and authorized use of Cash Collateral.

(ii)     _No Credit Available on More Favorable Terms_.  Given their current financial condition, financing arrangements, and capital structure, the Debtors are unable to obtain financing from sources other than the DIP Lenders on terms more favorable than the DIP Facility.  The Debtors have been unable to obtain unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense.  The Debtors have also been unable to obtain credit:  (a) having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien.  Financing on a

postpetition basis is not otherwise available without granting the DIP Agent, for the benefit of itself and the DIP Lenders, (1) perfected security interests in and liens on (each as provided herein) all of the Debtors' existing and after-acquired assets with the priorities set forth in paragraph 7 hereof, (2) superpriority claims with the priorities set forth in paragraph 8, and (3) the other protections set forth in this Interim Order.

(iii)    *Priming of the Prepetition Facility Liens and Indenture Liens*.  The priming of the Prepetition Facility Liens and Indenture Liens on the Prepetition Collateral pursuant to section 364(d) of the Bankruptcy Code, as further described below, will enable the Debtors to obtain the DIP Facility and to continue to operate their businesses for the benefit of their estates and creditors.  The Prepetition Agent and Prepetition Lenders consent, and the Indenture Trustee and Noteholders consent or are deemed to consent to such priming liens and are entitled to receive adequate protection as set forth in this Interim Order, pursuant to sections 361, 363 and 364 of the Bankruptcy Code, for any diminution in the value of their interests in the Prepetition Collateral (including Cash Collateral) resulting from, among other things, the subordination to the Carve Out (as defined herein) and to the DIP Liens, the Debtors' use, sale or lease of such Prepetition Collateral, and the imposition of the automatic stay (collectively, and solely to the extent of any such diminution in value, the "Diminution in Value").

(iv)    *Use of Proceeds of the DIP Facilities; Payment of Prepetition Obligations.*  As a condition to the entry into the DIP Agreement, the extension of credit under the DIP Facility and the agreement for the use of Cash Collateral, the DIP Agent and DIP Lenders require, and the Debtors have agreed that proceeds of the DIP Facility shall be used, in each case in a manner consistent with the terms and conditions of the DIP Documents, including any covenant (the "Budget Compliance Covenant") contained therein pertaining to compliance

with the Budget (as defined in the DIP Documents and as the same may be modified from time to time in accordance with the consents required under the DIP Documents), solely for (1) payment in full of the Prepetition Obligations, (2) working capital, letters of credit, and other general corporate purposes, (3) permitted payment of costs of administration of the Cases (subject to the limitations of the Carve Out (as defined herein)), (4) payment of fees and expenses due under the DIP Facility, (5) payment of any authorized Adequate Protection Payments, and (6) payment of such prepetition expenses, in addition to the Prepetition Obligations permitted to be so paid in accordance with the consents required under the DIP Documents, and as approved by the Court. Payment of the Prepetition Obligations in accordance with this Interim Order is necessary as the DIP Agent and DIP Lenders will not otherwise consent to providing the DIP Facility and extending credit to the Debtors thereunder, and the Prepetition Agent, Prepetition Lenders, Indenture Trustee and Noteholders will not otherwise consent to the use of their Cash Collateral and other Prepetition Collateral or the subordination of their liens to the Carve Out. Such payment will not prejudice the Debtors or their estates, because payment of such amounts is on account of the Prepetition Agent and the Prepetition Lenders were oversecured being oversecured and is subject to the rights of parties in interest under paragraph 31 herein.

G.  _Application of Proceeds of Collateral_.  As a condition to the entry into the DIP Documents, the extension of credit under the DIP Facility and the authorization to use Cash Collateral and other Prepetition Collateral, the Debtors have agreed that as of and commencing on the date of entry of the Interim Hearing, the Debtors shall apply the proceeds of DIP Collateral as set forth in the DIP Documents.

H.  _Adequate Protection_.  The Prepetition Agent, for the benefit of itself and the

Prepetition Lenders (to the extent any Prepetition Obligations remain outstanding), and the Indenture Trustee, for the benefit of itself and the Noteholders, are each entitled to receive adequate protection on account of their respective interests in the Prepetition Collateral pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code to the extent of any Diminution in Value of their respective interests in the Prepetition Collateral (including the Cash Collateral). Pursuant to sections 361, 363, 364 and 507(b), as adequate protection:  (i) the Prepetition Agent, for the benefit of itself and the Prepetition Lenders, will receive (a) adequate protection liens and superpriority claims, as more fully set forth in paragraphs 12 and 13 herein, (b) current payments of interest, fees and other amounts due under the Prepetition Credit Documents as more fully set forth in paragraph 14 herein, and (c) ongoing payment of the reasonable fees, costs and expenses, including, without limitation, legal and other professionals' fees and expenses, of the Prepetition Agent and Prepetition Lenders as more fully set forth in paragraph 14 herein; and (ii) the Indenture Trustee, for the benefit of itself and the Noteholders, will receive (a) adequate protection liens and superpriority claims, as more fully set forth in paragraphs 12 and 13 herein, (b) reimbursement of the reasonable fees and expenses of Akin Gump Strauss Hauer & Feld LLP ("Akin Gump"), counsel to the informal group of Noteholders (the "Noteholder Group"), as more fully set forth in paragraph 14, and (c) reimbursement of the all costs and expenses of the Indenture Trustee (including attorneys' and consultant's fees), as more fully set forth in paragraph 14 herein.

     I.     *Sections 506(c) and 552(b)*.  In light of (i) the DIP Agent's and DIP Lenders' agreement to subordinate their liens and superpriority claims to the Carve Out; (ii) the Prepetition Agent's and Prepetition Lenders' agreement to subordinate their liens and superpriority claims to the Carve Out, DIP Liens and DIP Superpriority Claims; (iii) the

Indenture Trustee's and Noteholders' agreement to subordinate their liens and superpriority claims to the Carve Out, DIP Liens, DIP Superpriority Claims, Credit Facility Adequate Protection Liens and Credit Facility Superpriority Claims (each capitalized term as defined herein), each of the DIP Agent, DIP Lenders, Prepetition Agent, Prepetition Lenders, Indenture Trustee and Noteholders are entitled to (a) a waiver of any "equities of the case" claims under section 552(b) of the Bankruptcy Code, and (b) upon entry of a Final Order, a waiver of the provisions of section 506(c) of the Bankruptcy Code.

       J.      *<u>Good Faith of the DIP Agent and the DIP Lenders</u>*.

       (i)      *Willingness to Provide Financing*.  The DIP Lenders each have indicated a willingness to provide financing to the Debtors subject to:  (a) the entry of this Interim Order and the Final Order; (b) approval of the terms and conditions of the DIP Facility and the DIP Documents; and (c) entry of findings by this Court that such financing is essential to the Debtors' estates, that the DIP Agent and DIP Lenders are extending credit to the Debtors pursuant to the DIP Documents in good faith, and that the DIP Agent's and DIP Lenders' claims, superpriority claims, security interests, liens, rights, and other protections granted pursuant to this Interim Order and the DIP Documents will have the protections provided in section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument or reconsideration of this Interim Order or any other order.

       (ii)      *Business Judgment and Good Faith Pursuant to Section 364(e)*.  The terms and conditions of the DIP Facility and the DIP Documents, and the fees paid and to be paid thereunder, are fair, reasonable, and the best available to the Debtors under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration.  The DIP

Facility and the use of Cash Collateral were negotiated in good faith and at arms' length among the Debtors, DIP Agent, DIP Lenders, Prepetition Agent, Prepetition Lenders, Indenture Trustee and Noteholder Group. Use of Cash Collateral and credit to be extended under the DIP Facility shall be deemed to have been so allowed, advanced, made, used or extended in good faith, and for valid business purposes and uses within the meaning of section 364(e) of the Bankruptcy Code. Accordingly, the DIP Agent and DIP Lenders are entitled to the protection and benefits of section 364(e) of the Bankruptcy Code and this Interim Order and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument or reconsideration of this Interim Order or any other order.

K.   *Final Hearing*.  At the Final Hearing, the Debtors will seek final approval of the proposed postpetition financing arrangements and use of Cash Collateral arrangements pursuant to a proposed final order (the "Final Order"), which shall be in form and substance acceptable to the DIP Agent, DIP Lenders, Prepetition Agent, and Noteholder Group, approving such postpetition financing arrangements, notice of which Final Hearing and Final Order will be provided in accordance with this Interim Order.

L.   *Notice*.  Notice of the Interim Hearing and the emergency relief requested in the DIP Motion has been provided by the Debtors, whether by facsimile, email, overnight courier or hand delivery, to certain parties in interest, including:  (i) the U.S. Trustee; (ii) the Securities and Exchange Commission; (iii) the Internal Revenue Service; (iv) the parties included on the Debtors' list of the thirty (30) largest unsecured creditors; (v) counsel to the Prepetition Agent for itself and for the Prepetition Lenders; (vi) counsel to the Indenture Trustee for itself and for the Noteholders; and (vii) counsel for the Noteholder Group.  The parties have made reasonable efforts to afford the best notice possible under the circumstances and such notice is good and

sufficient to permit the interim relief set forth in this Interim Order, and no other or further notice is or shall be required.

Based upon the foregoing findings and conclusions, the DIP Motion and the record before the Court with respect to the DIP Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.     <u>Interim Financing Approved</u>.  The DIP Motion is granted as set forth herein, the Interim Financing (as defined herein) is authorized and approved, and the use of Cash Collateral on an interim basis is authorized, subject to the terms and conditions set forth in this Interim Order.

2.     <u>Objections Overruled</u>.  All objections to the Interim Financing to the extent not withdrawn or resolved are hereby overruled.

**<u>DIP Facilities Authorization</u>**

3.     <u>Authorization of the DIP Financing and DIP Documents</u>.  The DIP Documents are hereby approved for the Interim Financing.  The Debtors are expressly and immediately authorized, empowered and directed to execute and deliver the DIP Documents and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Documents, and to deliver all instruments and documents which may be required or necessary for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens (as defined herein) described in and provided for by this Interim Order and the DIP Documents.  The Debtors are hereby authorized and directed to pay the principal, interest, fees, expenses and other amounts described in the DIP Documents as such become due and without need to obtain further Court approval, all to the extent provided in the DIP Documents, including, without limitation, closing fees, letter of credit fees (including

-16-

issuance, fronting, and other related charges), unused revolver fee, servicing fees, appraisal fees, administrative agent's fees, the fees and disbursements of the DIP Agent's and DIP Lenders' attorneys, advisers, accountants, and other consultants,[3] whether or not the transactions contemplated hereby are consummated. All collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations or otherwise, will be deposited and applied as required by this Interim Order and the DIP Documents. Upon execution and delivery, the DIP Documents shall represent valid and binding obligations of the Debtors, enforceable against each of the Debtors and their estates in accordance with their terms.

4.     _Authorization to Borrow._  Until the earlier of (a) the Maturity Date (as defined in the DIP Agreement) and (b) the termination of obligations under the DIP Documents by the DIP Agent upon the occurrence and during the continuation of an Event of Default (as defined herein) (such earlier date, the "_Commitment Termination Date_"), and subject to the terms, conditions, limitations on availability and reserves set forth in the DIP Documents, DIP Facility, and this Interim Order, and in order to prevent immediate and irreparable harm to the Debtors' estates, the Debtors are hereby authorized to request extensions of credit under the DIP Facility (in the form of loans and letters of credit) of (i) $27 million under the Term Loan (as defined in the DIP Documents) and (ii) up to an aggregate principal amount of $11.9 million at any one

---

[3] The payment of the fees and expenses for professionals of the DIP Agent and DIP Lenders shall not be subject to allowance by the Court. Professionals for the DIP Agent and DIP Lenders shall not be required to file fee applications or comply with the U.S. Trustee fee guidelines. Each professional for the DIP Agent and DIP Lenders shall provide a copy (via email or other electronic means) of its fee and expense statement to the U.S. Trustee and counsel for the Statutory Committee contemporaneously with the delivery of such fee and expense statement to the Debtors. To the extent that the U.S. Trustee or Statutory Committee has an objection to the fees and expenses of any such professional, they shall be afforded ten (10) days after receipt of such fee and expense statement to raise an objection. If any objection is raised and cannot be resolved and/or is not withdrawn within ten (10) days after such objection has been raised, the Court shall adjudicate the matter.

time outstanding, including a sublimit for letters of credit up to $20 million under the Revolver Commitment (as defined in the DIP Documents) (together, the "Interim Financing").  All letters of credit outstanding under the Prepetition Facility and Prepetition Facility Documents shall be deemed issued and outstanding under the DIP Facility and DIP Documents as of the Petition Date.

5.      DIP Obligations.  The DIP Documents and this Interim Order shall constitute and evidence the validity and binding effect of the Debtors' DIP Obligations, which DIP Obligations shall be enforceable against the Debtors, their estates and any successors thereto, including without limitation, any trustee or other estate representative appointed in the Cases, or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, "Successor Cases").  Upon entry of this Interim Order, the DIP Obligations will include all loans, letter of credit reimbursement obligations, and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to the DIP Agent or DIP Lenders under the DIP Documents or this Interim Order, including, without limitation, all principal, accrued interest, costs, fees, expenses and other amounts owed pursuant to the DIP Documents.  The DIP Obligations shall be due and payable, without notice or demand, and the use of Cash Collateral shall automatically cease on the Commitment Termination Date, except as provided in paragraph 11 herein.

6.      DIP Liens and DIP Collateral.  Effective immediately upon the execution of this Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent is hereby granted, for the benefit of itself and the DIP Lenders, continuing, valid, binding, enforceable, non-avoidable and automatically and properly perfected postpetition

-18-

security interests in and liens on (the "<u>DIP Liens</u>") any and all presently owned and hereafter acquired personal property, real property and other assets of the Debtors, whether owned or consigned by or to, or leased from or to the Debtors, including, without limitation, the following (collectively, the "<u>DIP Collateral</u>")[4]:  all (i) Prepetition Collateral; (ii) Accounts; (ii) Books; (iii) Chattel Paper; (iv) Deposit Accounts, (v) Equipment and fixtures, (vi) General Intangibles, (vii) Inventory, (viii) Investment Related Property, (ix) Negotiable Collateral, (x) Supporting Obligations, (xi) Commercial Tort Claims, (xii) money, cash and Cash Equivalents, (xiii) proceeds of all leases and leasehold interests, (xiv) owned Real Property, (xv) unencumbered assets, including proceeds of any and all lawsuits or causes of action, (xvi) all bankruptcy avoidance actions or claims arising under section 549 of the Bankruptcy Code and the proceeds thereof; (xvii) Patent Collateral; (xviii) Trademark Collateral; (xix) Copyright Collateral; and (xx) Proceeds.

   7. <u>DIP Lien Priority</u>.  The DIP Liens securing the DIP Obligations shall be junior to the (a) Carve Out, and (b) Permitted Prior Liens, and shall otherwise be senior in priority and superior to any security, mortgage, collateral interest, lien or claim on or to any of the DIP Collateral.  Other than as set forth herein, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Cases or any Successor Cases.  The DIP Liens shall be valid and enforceable against any trustee or other estate representative appointed in the Cases or any Successor Cases, upon the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Cases or Successor Cases.  The DIP Liens shall not be

---

[4] All defined terms in the description of DIP Collateral shall have the meanings ascribed thereto in the DIP Documents.  All terms not specifically defined in the DIP Documents shall have the meanings ascribed to such terms in Article 8 or 9 of the Uniform Commercial Code.

subject to sections 506(c), 510, 549, or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of any estate pursuant to section 551 of the Bankruptcy Code shall be made *pari passu* with or senior to the DIP Liens.

8.    <u>DIP Superpriority Claims</u>. Upon entry of this Interim Order, the DIP Agent and DIP Lenders are hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (collectively, the "<u>DIP Superpriority Claims</u>") for all DIP Obligations. The DIP Superpriority Claims shall be subordinate only to the Carve Out, and shall (a) otherwise have priority over any and all administrative expenses and unsecured claims against the Debtors or their estates in any of the Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b) (except as set forth herein), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114, and any other provision of the Bankruptcy Code, except as set forth herein, and (b) at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative to the extent permitted by law. The DIP Superpriority Claim shall not extend to any avoidance actions or claims arising under chapter 5 of the Bankruptcy Code, except that the DIP Superpriority Claim shall extend any avoidance actions or claims arising under section 549 of the Bankruptcy Code and the proceeds thereof.

9.    <u>No Obligation to Extend Credit</u>. None of the DIP Agent or DIP Lenders shall have any obligation to make any loan or advance under the DIP Documents, or to issue, amend, extend or renew any letters of credit issued under or deemed issued under the DIP Documents, unless all of the conditions precedent to the making of such extension of credit or the issuance of

such letter of credit under the applicable DIP Documents and this Interim Order have been satisfied in full or waived by the DIP Agent and the DIP Lenders, each in its sole discretion.

10.    <u>Use of DIP Facility Proceeds; Payment of Prepetition Obligations</u>.  From and after the Petition Date, the Debtors shall use advances of credit under the DIP Facility only for the purposes specifically set forth in this Interim Order, the DIP Documents and in compliance with the Budget Compliance Covenant.  Notwithstanding any first-day orders entered authorizing the Debtors to pay any prepetition or other expenses, all such payments shall be made in accordance with the Budget and Budget Compliance Covenant.  A copy of the Budget is attached to this Interim Order as Exhibit 1.  Immediately upon the Closing Date (as defined in the DIP Documents), the Debtors are authorized and directed to draw Interim Financing under the DIP Facility to repay in full all outstanding Prepetition Obligations.  The payment of the Prepetition Obligations shall be subject to the rights of parties in interest set forth in paragraph 31 of this Interim Order, <u>provided</u> that upon expiration of the Challenge Period (as defined herein), the Debtors' payment of the Prepetition Obligations shall be deemed to be indefeasible, final and not subject to challenge.

**Authorization to Use Cash Collateral**
**and Adequate Protection**

11.    <u>Authorization to Use Cash Collateral</u>.  Subject to the terms and conditions of this Interim Order and the DIP Documents, and in accordance with the Budget, the Debtors are authorized to use Cash Collateral until the Termination Declaration Date (as defined herein); <u>provided</u>, <u>however</u>, that during the five (5) days after the Termination Declaration Date, the Debtors may use Cash Collateral in accordance with the terms and provisions of the Budget solely to meet payroll and to pay expenses critical to the preservation of the Debtors and their estates with the prior written consents required under the DIP Documents.  Nothing in this

Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted in this Interim Order, the DIP Facility, the DIP Documents, and in accordance with the Budget.

12. <u>Adequate Protection Liens</u>.

(a) *Credit Facility Adequate Protection Liens*. Pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition Agent and Prepetition Lenders in the Prepetition Collateral (to the extent any Prepetition Obligations remain outstanding) against any Diminution in Value of such interests in the Prepetition Collateral, the Debtors hereby grant to the Prepetition Agent, for the benefit of itself and the Prepetition Lenders, continuing valid, binding, enforceable, non-avoidable and automatically perfected postpetition security interests in and liens on the DIP Collateral (the "<u>Credit Facility Adequate Protection Liens</u>").

(b) *Indenture Adequate Protection Liens*. Pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, as adequate protection of the interest of the Indenture Trustee, on behalf of the Noteholders, in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Debtors hereby grant to the Indenture Trustee, for the benefit of itself and the Noteholders, continuing valid, binding, enforceable, non-avoidable and automatically perfected postpetition security interests in and liens on the DIP Collateral (the "<u>Indenture Adequate Protection Liens</u>", and together with the Credit Facility Adequate Protection Liens, the "<u>Adequate Protection Liens</u>").

(c) *Priority of Adequate Protection Liens*

(i) The Credit Facility Adequate Protection Liens shall be junior only

to the : (A) Carve Out; (B) DIP Liens; (C) Prepetition Facility Liens; and (D) Permitted Prior Liens. The Credit Facility Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral.

(ii)     The Indenture Adequate Protection Liens shall be junior only to the: (A) Carve Out; (B) DIP Liens; (C) Prepetition Facility Liens; (D) Credit Facility Adequate Protection Liens; (E) Indenture Liens; and (F) Permitted Prior Liens. The Indenture Adequate Protection Liens shall be senior to all other security interests in, liens on, or claims against any of the DIP Collateral.

(iii)     Except as provided herein, the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest by any court order heretofore or hereafter entered in the Cases or any Successor Cases, and shall be valid and enforceable against any trustee appointed in any of the Cases or any Successor Cases, or upon the dismissal of any of the Cases or Successor Cases. The Adequate Protection Liens shall not be subject to sections 506(c), 510, 549, or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of any estate pursuant to section 551 of the Bankruptcy Code shall be made *pari passu* with or senior to the Adequate Protection Liens.

13.     Adequate Protection Superpriority Claims.

(a)     *Credit Facility Superpriority Claim*. As further adequate protection of the interests of the Prepetition Agent and Prepetition Lenders in the Prepetition Collateral (to the extent any Prepetition Obligations remain outstanding) against any Diminution in Value of such interests in the Prepetition Collateral, the Prepetition Agent and Prepetition Lenders are each hereby granted as and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy

Code an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (the "Credit Facility Superpriority Claims").

(b)     *Indenture Superpriority Claim.*  As further adequate protection of the interests of the Indenture Trustee, on behalf of the Noteholders, in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Indenture Trustee, on behalf of itself and the Noteholders, is hereby granted as and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (the "Indenture Superpriority Claims", and together with the Credit Facility Superpriority Claim, the "Adequate Protection Superpriority Claims").

(c)     *Priority of Adequate Protection Superpriority Claims.*  The Credit Facility Superpriority Claims shall be junior only to the Carve Out and DIP Superpriority Claims.  The Indenture Superpriority Claims shall be junior only to the Carve Out, the DIP Superpriority Claims, and the Credit Facility Superpriority Claims.  Except as set forth herein, the Adequate Protection Superpriority Claims shall have priority over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code.

14.     Adequate Protection Payments and Protections.

(a)     *Credit Facility Adequate Protection Payments and Protections.*  As further adequate protection, to the extent any Prepetition Obligations remain outstanding, the Debtors

are authorized and directed to provide adequate protection to the Prepetition Agent and Prepetition Lenders, in the form of: (i) monthly payments of interest, fees and other amounts due under the Prepetition Credit Documents; and (ii) ongoing payment of the Prepetition Agent's and Prepetition Lenders' reasonable fees, costs and expenses, including, without limitation, legal and other professionals' fees and expenses (together, the "Credit Facility Adequate Protection Payments").

(b)     *Indenture Adequate Protection Payments and Protections.*  As further adequate protection, and subject to the Intercreditor Agreement, the Debtors are authorized and directed to provide adequate protection to the Indenture Trustee, for and on behalf of itself and the Noteholders, in the form of: (i) ongoing payment of the reasonable fees and expenses of Akin Gump, counsel to the Noteholder Group; (ii) ongoing payment of the costs and expenses of the Indenture Trustee, including attorneys' and consultant's fees (together, the "Indenture Adequate Protection Payments," and together with the Credit Facility Adequate Protection Payments, the "Adequate Protection Payments").[5]  However, following a Triggering Event (as defined in paragraph 29), the Indenture Adequate Protection Payments incurred in connection with the Cases or any Successor Cases shall not exceed the aggregate amount of $200,000.

15.     Section 507(b) Reservation.  Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection

_____

[5] The payment of the fees and expenses for professionals of the Prepetition Agent, Prepetition Lenders, Indenture Trustee and Noteholder Group shall not be subject to allowance by the Court.  Professionals for the Prepetition Agent, Prepetition Lenders, Indenture Trustee and Noteholder Group shall not be required to file fee applications or comply with the U.S. Trustee fee guidelines.  Each professional for the Prepetition Agent, Prepetition Lenders, Indenture Trustee or Noteholder Group shall provide a copy (via email or other electronic means) of its fee and expense statement to the U.S. Trustee and counsel for the Statutory Committee contemporaneously with the delivery of such fee and expense statement to the Debtors.  To the extent that the U.S. Trustee or Statutory Committee has an objection to the fees and expenses of any such professional, they shall be afforded ten (10) days after receipt of such fee and expense statement to raise an objection.  If any objection is raised and cannot be resolved and/or is not withdrawn within ten (10) days after such objection has been raised, the Court shall adjudicate the matter.

provided to any of the Prepetition Agent, Prepetition Lenders, Indenture Trustee and/or Noteholders hereunder is insufficient to compensate for any Diminution in Value of their respective interests in the Prepetition Collateral during the Cases or any Successor Cases.

**Provisions Common to DIP Financing
and Use of Cash Collateral Authorizations**

16.     <u>Amendment of the DIP Documents</u>.  The DIP Documents may from time to time be amended, modified or supplemented by the parties thereto without notice or a hearing if: (i) the amendment, modification, or supplement is (A) in accordance with the DIP Documents, (B) beneficial to the Debtors, and (C) not prejudicial in any material respect to the rights of third parties; (ii) a copy (which may be provided through electronic mail or facsimile) of the amendment, modification or supplement is provided to counsel for any Statutory Committee and the U.S. Trustee upon three (3) business days notice; and (iii) the amendment, modification or supplement is filed with the Court; <u>provided</u>, <u>however</u>, that consent of any Statutory Committee or the U.S. Trustee, and approval of the Court is not necessary to effectuate any such amendment, modification or supplement.  Except as otherwise provided in this paragraph 16, no waiver, modification, or amendment of any of the provisions of any DIP Document shall be effective unless set forth in writing, signed on behalf of the Debtors and with the necessary consents required under and executed in accordance with the DIP Documents, and approved by the Court on notice.

17.     <u>Budget Maintenance</u>.  The Budget and any modification to, or amendment or update of, the Budget shall be in form and substance acceptable to and approved by the DIP Agent and DIP Lenders, each in its sole discretion.  The Budget may be amended or modified in writing from time to time only with the written consents required under the DIP Documents. The Debtors shall update the Budget from time to time (provided that any update shall be in form

-26-

and substance acceptable to the DIP Agent and DIP Lenders, each in its sole discretion), but in any event not less than every four fiscal weeks, commencing February 21, 2010 (with delivery to the DIP Agent, DIP Lenders, Indenture Trustee, Noteholder Group and any Statutory Committee thereafter within 5 business days after the end of each such fourth fiscal week).

18.     <u>Modification of Automatic Stay</u>.  The automatic stay imposed under Bankruptcy Code section 362(a) is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to:  (a) permit the Debtors to grant the DIP Liens, Adequate Protection Liens, DIP Superpriority Claims, and Adequate Protection Superpriority Claims; (b) permit the Debtors to perform such acts as the DIP Agent, DIP Lenders, Prepetition Agent, Prepetition Lenders, Indenture Trustee, or Noteholder Group each may request in its sole discretion to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the DIP Agent, DIP Lenders, Prepetition Agent, Prepetition Lenders, Indenture Trustee and Noteholders under the DIP Documents, the DIP Facility and this Interim Order; (d) authorize the Debtors to pay, and the DIP Agent, DIP Lenders, Prepetition Agent, Prepetition Lenders, Indenture Trustee and Noteholders to retain and apply, payments made in accordance with the terms of this Interim Order; and (e) permit the Debtors to pay the Prepetition Obligations consistent with the terms of this Interim Order.

19.     <u>Perfection of DIP Liens and Adequate Protection Liens</u>.  This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens and Adequate Protection Liens without the necessity of filing or recording any financing statement or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of

doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens and Adequate Protection Liens, or to entitle the DIP Agent, DIP Lenders, Prepetition Agent, Prepetition Lenders, Indenture Trustee and Noteholders to the priorities granted herein. Notwithstanding the foregoing, each of the DIP Agent, Prepetition Agent and Indenture Trustee is authorized to file, as it deems necessary in its sole discretion, such financing statements, mortgages, notices of liens and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the applicable DIP Liens and/or Adequate Protection Liens, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens and/or the Adequate Protection Liens. The Debtors are authorized and directed to execute and deliver promptly upon demand to the DIP Agent, Prepetition Agent, and Indenture Trustee all such financing statements, mortgages, notices and other documents as any of the DIP Agent, DIP Lenders, Prepetition Agent, Prepetition Lenders or Indenture Trustee may reasonably request. The DIP Agent, Prepetition Agent, and Indenture Trustee, each in its discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien or similar instrument.

20.     Proceeds of Subsequent Financing. If the Debtors, any trustee, any examiner with enlarged powers, any responsible officer or any other estate representative subsequently appointed in these Cases or any Successor Cases, shall obtain credit or incur debt pursuant to Bankruptcy Code sections 364(b), 364(c) or 364(d) in violation of the DIP Documents at any

time prior to the repayment in full of all DIP Obligations, the cancellation, backing or cash collateralization of letters of credit under the DIP Facility, and the termination of the DIP Agent's and DIP Lenders' obligation to extend credit under the DIP Facility, including subsequent to the confirmation of any plan with respect to any or all of the Debtors and the Debtors' estates, then all the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent to be applied as set forth in the DIP Documents.

21.     <u>Maintenance of DIP Collateral</u>.  Until the payment in full in cash of all DIP Obligations, the cancellation, backing, or cash collateralization of letters of credit under the DIP Facility, and the termination of the DIP Lenders' obligations to extend credit under the DIP Facility, the Debtors shall:  (a) insure the DIP Collateral as required under the DIP Facility; and (b) maintain the cash management system which has first been agreed to by the required consents under the DIP Documents, or as otherwise required by the DIP Documents.

22.     <u>Disposition of DIP Collateral; Rights of DIP Agent and DIP Lenders</u>.  The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral other than as permitted in the DIP Documents without the prior written consents as required under the DIP Documents (and, other than as set forth in the Intercreditor Agreement, no such consent shall be implied, from any other action, inaction or acquiescence by the DIP Agent, DIP Lenders, Prepetition Agent, Prepetition Lenders, Indenture Trustee, Noteholder Group or Noteholders, or an order of this Court).

23.     <u>DIP Termination</u>.  On the Commitment Termination Date, (a) all DIP Obligations shall be immediately due and payable, all commitments to extend credit under the DIP Facility will terminate, and all letters of credit outstanding shall be cash collateralized, backed or cancelled, and (b) all authority to use Cash Collateral shall cease, <u>provided</u>, <u>however</u>, that for the

five (5) days after the Termination Declaration Date, the Debtors may use Cash Collateral solely as set forth in paragraph 11 herein.

24.     Events of Default.  The occurrence of an "Event of Default" under the DIP Agreement, including, among other things, the failure of the Debtors to perform the obligations as set forth on and when required by Exhibit 2 attached hereto (subject to any extensions or waivers as permitted under the DIP Documents), shall constitute an event of default under this Interim Order, unless expressly waived in writing in accordance with the consents required in the DIP Documents (collectively, the "Events of Default"):

25.     Rights and Remedies Upon Event of Default.  Immediately upon the occurrence and during the continuation of an Event of Default, (a) the DIP Agent, as directed by the required DIP Lenders as provided in the DIP Documents, may declare (i) all DIP Obligations owing under the DIP Documents to be immediately due and payable, (ii) the termination, reduction or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains, (iii) the termination of the DIP Agreement and any other DIP Document as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations, and/or (iv) a termination, reduction or restriction on the ability of the Debtors to use Cash Collateral, except as provided in paragraph 11 hereof; and (b) to the extent any Prepetition Obligations remain outstanding, the Prepetition Agent may declare a termination, reduction or restriction of the ability of the Debtors to use any Cash Collateral, except as provided in paragraph 11 (any such declaration by the DIP Agent or the Prepetition Agent, shall be referred to herein as a "Termination Declaration").  The Termination Declaration shall be given by email (or other electronic means) to counsel to the Debtors, counsel to the Prepetition Agent, counsel to the Indenture Trustee, counsel to the Noteholder

Group, counsel to any Statutory Committee, and the U.S. Trustee (the earliest date any such Termination Declaration is made shall be referred to herein as the "Termination Declaration Date"). The DIP Obligations shall be due and payable, without notice or demand, and the use of Cash Collateral shall automatically cease on the Termination Declaration Date, except as provided in paragraph 11. Any automatic stay otherwise applicable to the DIP Agent or the DIP Lenders is hereby modified so that seven (7) days after the Termination Declaration Date (the "Remedies Notice Period"), (x) the DIP Agent and the DIP Lenders shall be entitled to exercise all rights and remedies against the DIP Collateral in accordance with the DIP Documents and this Interim Order and shall be permitted to satisfy the DIP Obligations and DIP Superpriority Claims, subject to the Carve Out, (y) the Prepetition Agent and the Prepetition Lenders shall be entitled to exercise their rights and remedies to satisfy the Prepetition Obligations, Credit Facility Superpriority Claims, and Credit Facility Adequate Protection Payments, subject to the Carve Out, and (z) subject to the terms of the Intercreditor Agreement, the Indenture Trustee, for the benefit of itself and the Noteholders, shall be entitled to exercise its rights and remedies to satisfy the Indenture Obligations, Indenture Superpriority Claims, and Indenture Adequate Protection Payments, subject to the Carve Out. Notwithstanding anything to the contrary, during the Remedies Notice Period, the Debtors shall be entitled to seek an emergency hearing with the Court for the sole purpose of contesting whether an Event of Default has occurred and/or is continuing. Unless the Court determines during the Remedies Notice Period that an Event of Default has not occurred and/or is not continuing, the automatic stay shall automatically be terminated at the end of the Remedies Notice Period without further notice or order, and the Debtors shall no longer have the right to use or seek to use Cash Collateral, and the DIP Agent, DIP Lenders, Prepetition Agent, Prepetition Lenders, and, subject to the terms of the

Intercreditor Agreement, the Indenture Trustee and Noteholders, shall be permitted to exercise all remedies set forth herein, in the DIP Agreement, the DIP Documents, Prepetition Credit Agreement, Prepetition Credit Documents, Indenture, or Indenture Documents, as applicable, and as otherwise available at law against the DIP Collateral and/or Prepetition Collateral, without further order of or application or motion to the Court, and without restriction or restraint by any stay under sections 362 or 105 of the Bankruptcy Code, or otherwise, against the enforcement of the liens and security interest in the DIP Collateral or any other rights and remedies granted to the DIP Agent and DIP Lenders with respect thereto pursuant to the DIP Agreement, DIP Documents, or this Interim Order.

26. <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order</u>.  The DIP Agent and DIP Lenders each have acted in good faith in connection with negotiating the DIP Documents, extending credit under the DIP Facility, allowing use of Cash Collateral and their reliance on this Interim Order is in good faith.  Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter reversed, modified, amended or vacated by a subsequent order of this Court or any other court, the DIP Agent and DIP Lenders are each entitled to the protections provided in section 364(e) of the Bankruptcy Code.  Any such reversal, modification, amendment or vacatur shall not affect the validity, perfection, priority, allowability, enforceability or non-avoidability of any advances previously made or made hereunder, or lien, claim or priority authorized or created hereby.  Any liens or claims granted to the DIP Agent or DIP Lenders hereunder arising prior to the effective date of any such reversal, modification, amendment or vacatur of this Interim Order shall be governed in all respects by the

original provisions of this Interim Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

27. <u>Indemnification of DIP Agent and DIP Lenders</u>.  The Debtors shall indemnify and hold harmless the DIP Agent and each DIP Lender and their respective shareholders, directors, agents, officers, subsidiaries and affiliates, successors and assigns, attorneys and professional advisors, in their respective capacities as such, from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions or causes of action, whether groundless or otherwise, and reasonable costs and expenses incurred, suffered, sustained or required to be paid by an indemnified party of every nature and character arising out of or related to the DIP Documents, or the DIP Facility or the transactions contemplated thereby and by this Interim Order, whether such indemnified party is party thereto, as provided in and pursuant to the terms of the DIP Documents and as further described therein and herein, except to the extent resulting from such indemnified party's gross negligence or willful misconduct as determined by a final non-appealable order of a court of competent jurisdiction.  The indemnity includes indemnification for the DIP Agent's and each DIP Lender's exercise of discretionary rights granted under the DIP Facility.  In all such litigation, or the preparation therefor, the DIP Agent and each DIP Lender shall be entitled to select its own counsel and, in addition to the foregoing indemnity, the Debtors agree to promptly pay the reasonable fees and expenses of such counsel.

28. <u>Rights of Access and Information</u>. Without limiting the rights of access and information afforded the DIP Agent and DIP Lenders under the DIP Documents, the Debtors shall be, and hereby are, required to afford representatives, agents and/or employees of the DIP Agent and DIP Lenders reasonable access to the Debtors' premises and their books and records in accordance with the DIP Documents, and shall reasonably cooperate, consult with, and

provide to such persons all such information as may be reasonably requested.  In addition, the

Debtors authorize their independent certified public accountants, financial advisors, investment

bankers and consultants to cooperate, consult with, and provide to the DIP Agent and DIP

Lenders all such information as may be reasonably requested with respect to the business, results

of operations and financial condition of any Borrower.

        29.    <u>Carve Out</u>.

        (a)    *Carve Out*.  As used in this Interim Order, the "<u>Carve Out</u>" shall

encompass the following expenses: (a) following the occurrence of a Triggering Event,

(i) allowed fees, and reimbursement for disbursements of professionals retained by the Debtors

and/or a statutory committee of unsecured creditors (the "<u>Professional Fee Payments</u>") in an

aggregate amount for all such Professional Fee Payments incurred upon and after the occurrence

of such Triggering Event not to exceed $1,500,000 (the <u>Carve Out Amount</u>"); (ii) fees pursuant

to 28 U.S.C. § 1930 and any fees payable to the clerk of the Bankruptcy Court; and (iii) fees

payable to a chapter 7 trustee in an aggregate amount not to exceed $50,000 and (b) without

reducing the Carve Out Amount, all Professional Fee Payments allowed, or subsequently

allowed, and payable under sections 330 and 331 of the Bankruptcy Code, to the extent incurred

prior to such Triggering Event (the "<u>Pipeline Period</u>").  The Carve Out Amount shall be funded

with proceeds of the Term Loan (as defined in the DIP Agreement) and segregated in an interest

bearing deposit account.  As used in this paragraph 29, the term "<u>Triggering Event</u>" shall mean

the earlier to occur of (a) the date the DIP Agent provides to the Borrowers, with a copy to

Borrowers' counsel at the address set forth in the DIP Documents, a notice of (i) an Event of

Default and (ii) termination of the Pipeline Period for purposes of the Carve Out or (b) the date

upon which the failure of the Borrowers to notify the DIP Agent of the occurrence of a Default

(as defined in the DIP Documents) or Event of Default constitutes a failure to comply with the requirement to give such a notice under the DIP Documents.

(b)     *No Direct Obligation to Pay Professional Fees; No Waiver of Right to Object to Fees.*  The DIP Agent and DIP Lenders shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any professionals retained by the Debtors and/or any statutory committee appointed incurred in connection with the Cases or any Successor Cases.  Nothing in this Interim Order or otherwise shall be construed (i) to obligate the DIP Agent or DIP Lenders, in any way to pay compensation to or to reimburse expenses of any professionals retained by the Debtors and/or any statutory committee appointed, or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement; (ii) to increase the Carve Out Amount if actual Professional Fee Payments incurred after a Triggering Event exceed the Carve Out Amount; (iii) as consent to the allowance of any professional fees or expenses of any professionals retained by the Debtors and/or any statutory committee appointed; or (iv) to affect the right of the Prepetition Agent, Prepetition Lenders, DIP Agent, DIP Lenders or Indenture Trustee to object to the allowance and payment of such fees and expenses.

30.     <u>Limitations on the DIP Facility, DIP Collateral, Cash Collateral, and Carve Out</u>. The DIP Facility, DIP Collateral, Cash Collateral, and Carve Out may not be used: (a) in connection with or to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type (i) adverse to the interests of the DIP Agent, DIP Lenders, Prepetition Agent, Prepetition Lenders, Indenture Trustee, Noteholders, or their rights and remedies under the DIP Documents, Prepetition Credit Documents, Indenture Documents or this Interim Order, as applicable, including, without limitation, for the payment of any services rendered by the professionals retained by the Debtors or any Statutory Committee in connection

with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment determination, declaration or similar relief (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, the DIP Obligations, Prepetition Obligations or Indenture Obligations, (iii) for monetary, injunctive or other affirmative relief against any DIP Agent, DIP Lender, Prepetition Agent, Prepetition Lender, Indenture Trustee, or Noteholder, or their respective collateral, or (iv) preventing, hindering or otherwise delaying the exercise by the DIP Agent or any DIP Lender of any rights and/or remedies under this Interim Order, the DIP Documents, or applicable law, or the enforcement or realization (whether by foreclosure, credit bid, further order of the Court or otherwise) by the DIP Agent or DIP Lenders upon any of the DIP Collateral; (b) to make any distribution under a plan of reorganization in any of the Cases; (c) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consents required under the DIP Documents; (d) to pay any fees or similar amounts to any person who has proposed or may propose to purchase interests in any of the Debtors without the prior written consents required under the DIP Documents, (e) subject to the limited use of Cash Collateral set forth in paragraph 11 above, objecting to, contesting, or interfering with in any way the DIP Agent's or DIP Lenders' enforcement or realization upon any of the DIP Collateral once an Event of Default has occurred; (f) using or seeking to use Cash Collateral or selling or otherwise disposing of DIP Collateral without the consents required under the DIP Documents; (g) using or seeking to use any insurance proceeds constituting DIP Collateral without the consents required under the DIP Documents; (h) incurring Indebtedness (as defined in the DIP Agreement) outside the ordinary course of business without the prior

consents required under the DIP Documents; (i) objecting to or challenging in any way the

claims, liens, or interests (including interests in the Prepetition Collateral or DIP Collateral) held

by or on behalf of any DIP Agent, DIP Lender, Prepetition Agent, Prepetition Lender, Indenture

Trustee or Noteholder; (j) asserting, commencing or prosecuting any claims or causes of action

whatsoever, including, without limitation, any actions under chapter 5 of the Bankruptcy Code,

against any DIP Agent, DIP Lender, Prepetition Agent, Prepetition Lender, Indenture Trustee, or

Noteholder; (k) prosecuting an objection to, contesting in any manner, or raising any defenses to,

the validity, extent, amount, perfection, priority, or enforceability of any of the Prepetition

Obligations, Indenture Obligations, Prepetition Liens, DIP Obligations or DIP Liens or any other

rights or interests of any of the Prepetition Agent, Prepetition Lenders, Indenture Trustee,

Noteholders, DIP Agent or DIP Lender; or (l) preventing, hindering or otherwise delaying the

exercise by any DIP Agent, DIP Lender, Prepetition Agent, Prepetition Lender, or Indenture

Trustee of any rights and remedies granted under this Interim Order.  Notwithstanding the

foregoing, an aggregate amount not to exceed $50,000 of the DIP Facility, DIP Collateral, Cash

Collateral and Carve Out may be used by any Statutory Committee to investigate the Prepetition

Facility Liens or Indenture Liens within the Challenge Period (as defined herein).

      31.    <u>Reservation of Certain Third Party Rights and Bar of Challenges and Claims</u>.

Nothing in this Interim Order or the DIP Documents shall prejudice the rights of any Statutory

Committee, if granted standing by the Court, and, solely if no Statutory Committee is appointed,

any other party in interest granted standing by the Court (other than the Debtors and their

successors), to seek, solely in accordance with the provisions of this paragraph 31, to assert

claims against the Prepetition Agent, Prepetition Lenders, Indenture Trustee or Noteholders on

behalf of the Debtors' or Debtors' creditors or interest holders or to otherwise challenge the

Debtors' Stipulations, including, but not limited to those in relation to: (a) the validity, extent, priority, or perfection of the mortgages, security interests, and liens of any Prepetition Agent, Prepetition Lender or Indenture Trustee; (b) the validity, allowability, priority, fully secured status or amount of the Prepetition Obligations; (c) the validity, allowability, priority, or amount of the Indenture Obligations; or (d) any liability of the Prepetition Agent and/or Prepetition Lenders with respect to anything arising from the Prepetition Facility, or of the Indenture Trustee or Noteholders with respect to anything arising from the Indenture. A party in interest, including any Statutory Committee, if appointed, must, after obtaining Court-approved standing, commence, as appropriate, a contested matter or adversary proceeding raising such claim, objection or challenge, including, without limitation, any claim or cause of action against any Prepetition Agent, Prepetition Lender, Indenture Trustee or Noteholder (each, a "Challenge") within sixty (60) calendar days following the date of entry of a Final Order, and if no Final Order is entered, within seventy-five (75) calendar days following the date of entry of this Interim Order (together, the "Challenge Period"). The applicable Challenge Period may only be extended with the written consent of the applicable Prepetition Agent, Prepetition Lender, Indenture Trustee, or Noteholder, or by order of the Court for cause shown prior to the expiration of the applicable Challenge Period. Only those parties in interest who commence a Challenge within the Challenge Period may prosecute such Challenge. As to (i) any parties in interest, including the Statutory Committee, who fail to file a Challenge within the Challenge Period, or, if any such Challenge is filed and overruled or (ii) any and all matters that are not expressly the subject of a timely Challenge: (A) any and all such Challenges by any party (including, without limitation, any Statutory Committee, any chapter 11 trustee, and/or any examiner or other estate representative appointed in these Cases, and any chapter 7 trustee and/or examiner or other estate

representative appointed in any Successor Case), shall be deemed to be forever waived and barred, (B) all of the findings, Debtors' Stipulations, waivers, releases, affirmations and other stipulations as to the priority, extent, and validity as to the Prepetition Agent's, each Prepetition Lender's, Indenture Trustee's and each Noteholder's claims, liens, and interests shall be of full force and effect and forever binding upon the Debtors, the Debtors' bankruptcy estates and all creditors, interest holders, and other parties in interest in these Cases and any Successor Cases, and (C) any and all claims or causes of action against any of the Prepetition Agent, Prepetition Lenders, Indenture Trustee and/or Noteholder relating in any way to the Debtors shall be released by the Debtors' estates, all creditors, interest holders and other parties in interest in these Cases and any Successor Cases.

32.     No Third Party Rights.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

33.     Continued Effectiveness of Intercreditor Agreement.  The Intercreditor Agreement shall continue in full force and effect and be binding on the Indenture Trustee and Noteholders, to the same extent as it was prior to the Petition Date and the entry of this Interim Order, and shall inure to the benefit of the DIP Agent and DIP Lenders with the same force and effect to the DIP Agent as it currently does to the Prepetition Agent as if the DIP Agent were originally named therein as the "Original Senior Agent" and as if the DIP Lenders were originally named therein as the "Senior Lenders" named therein.  Except as expressly set forth in the prior sentence, nothing in this Interim Order or the DIP Documents shall (a) modify or amend any terms of the Intercreditor Agreement or (b) affect the validity or effectiveness of the Intercreditor Agreement.  Other than with respect to references in this paragraph 33 to any

provision hereof being subject to the terms of the Intercreditor Agreement (in which case the terms of the Intercreditor Agreement shall govern and control), in the event of any direct conflict between the terms and conditions of the Intercreditor Agreement and this Interim Order, the provisions of this Interim Order and DIP Documents shall govern and control.

34.     Section 506(c) Claims.  Upon entry of the Final Order, no costs or expenses of administration which have been or may be incurred in the Cases or any Successor Cases at any time shall be charged against any DIP Agent, DIP Lender, Prepetition Agent, Prepetition Lender, Indenture Trustee or Noteholder, or any of their respective claims or the DIP Collateral or Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the applicable DIP Agent, DIP Lender, Prepetition Agent, Prepetition Lender, Indenture Trustee or Noteholders and no such consent shall be implied from any other action, inaction, or acquiescence by any such agents or lenders.

35.     No Marshaling/Applications of Proceeds.  The DIP Agent, DIP Lenders, Prepetition Agent, Prepetition Lenders, Indenture Trustee and Noteholders shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral, as the case may be, and proceeds shall be received and applied pursuant to the DIP Documents.

36.     Section 552(b).  The DIP Agent, DIP Lenders, Prepetition Agent, Prepetition Lenders, Indenture Trustee and Noteholders shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to any of the Prepetition Agent, Prepetition Lenders, Indenture Trustee or Noteholders with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral.

-40-

37.     <u>Joint and Several Liability</u>.  Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder and in accordance with the terms of the DIP Facility and the DIP Documents.

38.     <u>Discharge Waiver</u>.  The Debtors expressly stipulate, and the Court finds and adjudicates that, the DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been paid in full in cash on or before the effective date of a confirmed plan of reorganization.  None of the Debtors shall propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets or entry of any confirmation order or sale order that is not conditioned upon the payment in full in cash, on the effective date of such plan of reorganization or sale, of all DIP Obligations and the cancellation, backing, or cash collateralization of all letters of credit issued under the DIP Documents.

39.     <u>Rights Preserved</u>.  Other than as expressly set forth in this Interim Order, any other rights, claims or privileges (whether legal, equitable or otherwise) of the DIP Agent, DIP Lenders, Prepetition Agent, Prepetition Lenders, Indenture Trustee and Noteholders are preserved.

40.     <u>No Waiver by Failure to Seek Relief</u>.  The failure of any DIP Agent, DIP Lender, Prepetition Agent, Prepetition Lender, Indenture Trustee or Noteholder to seek relief or otherwise exercise its rights and remedies under this Interim Order, the DIP Documents, the Prepetition Credit Documents, the Indenture, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the applicable DIP Agent, DIP Lender, Prepetition Agent, Prepetition Lender, Indenture Trustee or Noteholder.

41.     <u>Binding Effect of Interim Order</u>.  Immediately upon entry by this Court (notwithstanding any applicable law or rule to the contrary), the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, DIP Agent, DIP Lenders, Prepetition Agent, Prepetition Lenders, Indenture Trustee, Noteholders, all other creditors of any of the Debtors, any Statutory Committee or any other court appointed committee, appointed in the Cases, and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of the Cases, any Successor Cases, or upon dismissal of any Case or Successor Case.

42.     <u>No Modification of Interim Order</u>.  Until and unless the DIP Obligations and Prepetition Obligations (to the extent any Prepetition Obligations remain outstanding) have been indefeasibly paid in full in cash, and all letters of credit under the DIP Facility and Prepetition Facility shall have been cancelled, backed, or cash collateralized in accordance with the terms thereof (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms), and all commitments to extend credit under the DIP Facility have been terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly:  (a) without the prior written consents required in the DIP Documents, the Prepetition Agent (until the Prepetition Facility is indefeasibly repaid in full) and Indenture Trustee (to the extent permitted or required under the Intercreditor Agreement) (i) any modification, stay, vacatur or amendment to this Interim Order; or (ii) a priority claim for any administrative expense or unsecured claim against the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation any administrative expense of the kind specified in sections 503(b), 507(a) or 507(b) of the Bankruptcy Code) in any of the Cases or Successor Cases, equal or superior to the DIP

Superpriority Claims, other than the Carve Out, (iii) any other order allowing use of Cash Collateral; and (b) without the prior written consents required under the DIP Documents, any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens. The Debtors irrevocably waive any right to seek any amendment, modification or extension of this Interim Order without the prior written consent, as provided in the foregoing, of the DIP Agent, Prepetition Agent and Indenture Trustee, as applicable, and no such consent shall be implied by any other action, inaction or acquiescence of the applicable DIP Agent, DIP Lenders, Prepetition Agent, Prepetition Lenders, or Indenture Trustee.

43.     <u>Interim Order Controls</u>.  In the event of any inconsistency between the terms and conditions of the DIP Documents or this Interim Order, the provisions of this Interim Order shall govern and control.

44.     <u>Survival</u>.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered:  (a) confirming any plan of reorganization in any of the Cases; (b) converting any of the Cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing any of the Cases or Successor Cases.  The terms and provisions of this Interim Order, including the claims, liens, security interests and other protections granted to the DIP Agent, DIP Lenders, Prepetition Agent, Prepetition Lenders, Indenture Trustee and Noteholders pursuant to this Interim Order and/or the DIP Documents, notwithstanding the entry of any such order, shall continue in the Cases, in any Successor Cases, or following dismissal of the Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until all DIP Obligations have been indefeasibly paid in full and all letters of credit under the DIP Facility shall have been cancelled, backed, or cash

collateralized in accordance with the terms thereof and all commitments to extend credit under the DIP Facility are terminated. The terms and provisions concerning the indemnification of the DIP Agent and/or DIP Lenders shall continue in the Cases, in any Successor Cases, following dismissal of the Cases or any Successor Cases, following termination of the DIP Documents and/or the repayment of the DIP Obligations.

45. <u>Final Hearing</u>. The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for _____, 2010 at ___:00 __.m. (Eastern Time) before the Honorable _____, United States Bankruptcy Judge, Courtroom _____ at the United States Bankruptcy Court for the Southern District of New York. On or before _____, 2010, the Debtors shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "<u>Final Hearing Notice</u>"), together with a copy of this Interim Order and the DIP Motion, on: (a) the parties having been given notice of the Interim Hearing; (b) any party which has filed prior to such date a request for notices with this Court; (c) counsel for any Statutory Committee; (d) the Securities and Exchange Commission; and (e) the Internal Revenue Service. The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than on _____, 2010 at __:00 __.m. (Eastern Time), which objections shall be served so as to be received on or before such date by: (i) counsel to the Debtors, attn: Joseph H. Smolinsky, Esq., Weil, Gotshal & Manges LLP, 767 Fifth, Avenue, New York, NY 10153; (ii) counsel to any Statutory Committee; (iii) counsel to the DIP Agent and Prepetition Agent, attn: Julia Frost-Davies, Esq. and Andrew J. Gallo, Esq., Bingham McCutchen LLP, One Federal Street, Boston, MA 02110 and Stephanie W. Mai, Esq., Bingham McCutchen LLP, 399 Park Avenue, New York, NY 10022; (iv) counsel to the Indenture Trustee,

attn: _____, Esq., _____; (v) counsel to the Noteholder Group, attn: Philip C. Dublin, Esq., and Kristina M. Wesch, Esq., Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036; and (vi) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, NY 10004.

46.     <u>Effect of this Interim Order</u>.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon execution thereof.

47.     <u>Retention of Jurisdiction</u>.  The Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

SO ORDERED by the Court this _____ day of _____, 2010.

_____
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT 1

## Uno Restaurant Holdings Corporation

13 Week Cash Flow Forecast

| | | | | | | | Week Ending | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1/24/2010 | 1/31/2010 | 2/7/2010 | 2/14/2010 | 2/21/2010 | 2/28/2010 | 3/7/2010 | 3/14/2010 | 3/21/2010 | 3/28/2010 | 4/4/2010 | 4/11/2010 | 4/18/2010 |
| Total Cash Receipts | $ 5,336,024 | $ 5,394,173 | $ 5,252,613 | $ 5,011,053 | $ 6,180,123 | $ 5,606,538 | $ 5,223,862 | $ 5,565,955 | $ 5,629,163 | $ 5,267,523 | $ 5,263,517 | $ 5,390,669 | $ 5,171,900 |
| | | | | | | | | | | | | | |
| **Cash Disbursements** | | | | | | | | | | | | | |
| Trade | (3,777,446) | (2,672,649) | (2,424,562) | (2,847,753) | (3,298,914) | (2,330,628) | (2,229,267) | (2,617,174) | (3,019,063) | (2,305,535) | (2,142,476) | (2,558,846) | (2,935,875) |
| Payroll | (2,427,052) | (2,679,641) | (2,017,850) | (1,983,931) | (2,579,212) | (2,490,556) | (1,982,677) | (1,944,851) | (1,926,857) | (2,401,513) | (1,934,349) | (1,902,846) | (1,947,572) |
| Occupancy | (755,510) | (710,760) | (1,273,800) | (446,958) | (202,682) | (213,800) | (1,564,953) | (442,682) | (205,248) | (213,800) | (1,577,417) | (473,838) | (235,794) |
| Total Operating Disbursements | (6,960,008) | (6,063,050) | (5,716,212) | (5,278,642) | (6,080,808) | (5,034,984) | (5,776,897) | (5,004,707) | (5,151,168) | (4,920,848) | (5,654,242) | (4,935,530) | (5,119,241) |
| | | | | | | | | | | | | | |
| Professional Fees & Restructuring | (845,071) | (60,000) | (10,000) | (544,500) | (10,000) | (10,000) | (742,000) | (268,000) | (10,000) | (135,000) | (10,000) | (1,020,000) | (110,000) |
| | | | | | | | | | | | | | |
| Financing | 11,250,000 | - | (433,818) | - | - | - | (443,435) | - | - | - | (450,185) | - | - |
| | | | | | | | | | | | | | |
| Total Cash Disbursements | 3,444,921 | (6,123,050) | (6,160,030) | (5,823,142) | (6,090,808) | (5,044,984) | (6,962,332) | (5,272,707) | (5,161,168) | (5,055,848) | (6,114,426) | (5,955,530) | (5,229,241) |
| | | | | | | | | | | | | | |
| **Net Cash Flow** | $ 8,780,945 | $ (728,877) | $ (907,417) | $ (812,089) | $ 89,314 | $ 561,554 | $ (1,738,469) | $ 293,248 | $ 467,995 | $ 211,674 | $ (850,909) | $ (564,862) | $ (57,340) |
| | | | | | | | | | | | | | |
| **DIP** | | | | | | | | | | | | | |
| Borrowing Base | 29,050,021 | 29,050,021 | 29,141,955 | 29,141,955 | 29,141,955 | 29,141,955 | 28,469,268 | 28,469,268 | 28,469,268 | 28,469,268 | 29,101,051 | 29,101,051 | 29,101,051 |
| | | | | | | | | | | | | | |
| Maximum Revolver Facility Size | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 |
| Letters of Credit | 9,775,000 | 8,275,000 | 8,275,000 | 8,275,000 | 8,275,000 | 8,275,000 | 8,275,000 | 8,275,000 | 8,275,000 | 8,775,000 | 8,775,000 | 8,775,000 | 8,775,000 |
| | | | | | | | | | | | | | |
| Maximum Revolver Balance / Borrowing Base | 15,225,000 | 16,725,000 | 16,725,000 | 16,725,000 | 16,725,000 | 16,725,000 | 16,725,000 | 16,725,000 | 16,725,000 | 16,225,000 | 16,225,000 | 16,225,000 | 16,225,000 |
| Beginning Revolver Balance | 19,650,000 | 9,274,806 | 11,503,683 | 12,411,100 | 13,223,189 | 13,133,875 | 12,572,321 | 14,310,791 | 14,017,543 | 13,549,547 | 13,337,873 | 14,188,782 | 14,753,644 |
| Draw / (Paydown) on Revolver | (10,375,194) | 2,228,877 | 907,417 | 812,089 | (89,314) | (561,554) | 1,738,469 | (293,248) | (467,995) | (211,674) | 850,909 | 564,862 | 57,340 |
| Ending Revolver Balance | 9,274,806 | 11,503,683 | 12,411,100 | 13,223,189 | 13,133,875 | 12,572,321 | 14,310,791 | 14,017,543 | 13,549,547 | 13,337,873 | 14,188,782 | 14,753,644 | 14,810,984 |
| | | | | | | | | | | | | | |
| Term Loan | 27,000,000 | 27,000,000 | 27,000,000 | 27,000,000 | 27,000,000 | 27,000,000 | 27,000,000 | 27,000,000 | 27,000,000 | 27,000,000 | 27,000,000 | 27,000,000 | 27,000,000 |
| | | | | | | | | | | | | | |
| Total Debt including Letters of Credit | 46,049,806 | 46,778,683 | 47,686,100 | 48,498,189 | 48,408,875 | 47,847,321 | 49,585,791 | 49,292,543 | 48,824,547 | 49,112,873 | 49,963,782 | 50,528,644 | 50,585,984 |
| | | | | | | | | | | | | | |
| **Availability on DIP Facility** | $ 5,950,194 | $ 5,221,317 | $ 4,313,900 | $ 3,501,811 | $ 3,591,125 | $ 4,152,679 | $ 2,414,209 | $ 2,707,457 | $ 3,175,453 | $ 2,887,127 | $ 2,036,218 | $ 1,471,356 | $ 1,414,016 |
| | | | | | | | | | | | | | |
| **Cash** | | | | | | | | | | | | | |
| Beginning Cash | 1,994,249 | 400,000 | 400,000 | 400,000 | 400,000 | 400,000 | 400,000 | 400,000 | 400,000 | 400,000 | 400,000 | 400,000 | 400,000 |
| Ending Cash | 400,000 | 400,000 | 400,000 | 400,000 | 400,000 | 400,000 | 400,000 | 400,000 | 400,000 | 400,000 | 400,000 | 400,000 | 400,000 |

Notes: Shown on a bank cash basis. All EBITDA add-backs for borrowing base may not have been included.

**EXHIBIT 2**

**Reorganization Milestones**
**(Schedule R-1 to the DIP Agreement)**

| Due Date | Milestone |
|---|---|
| February 1, 2010 | Filing by the Borrowers of bankruptcy petitions and first day pleadings |
| February 25, 2010 | Filing by the Borrowers of the Plan of Reorganization and related disclosure statement |
| May 1, 2010 | Approval by the Bankruptcy Court of the disclosure statement for the Plan of Reorganization |
| June 15, 2010 | Confirmation of the Plan of Reorganization by the Bankruptcy Court |
| July 15, 2010 | Effectiveness of the Plan of Reorganization |
| * Any of the above mentioned dates may be extended for up to but not exceeding 90 days each, with the consent of the Agent and the Lenders. | |

# **EXHIBIT C**

**Budget**

**Uno Restaurant Holdings Corporation**

13 Week Cash Flow Forecast

| | | | | | | | Week Ending | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1/24/2010 | 1/31/2010 | 2/7/2010 | 2/14/2010 | 2/21/2010 | 2/28/2010 | 3/7/2010 | 3/14/2010 | 3/21/2010 | 3/28/2010 | 4/4/2010 | 4/11/2010 | 4/18/2010 |
| Total Cash Receipts | $ 5,336,024 | $ 5,394,173 | $ 5,252,613 | $ 5,011,053 | $ 6,180,123 | $ 5,606,538 | $ 5,223,862 | $ 5,565,955 | $ 5,629,163 | $ 5,267,523 | $ 5,263,517 | $ 5,390,669 | $ 5,171,900 |
| **Cash Disbursements** | | | | | | | | | | | | | |
| Trade | (3,777,446) | (2,672,649) | (2,424,562) | (2,847,753) | (3,298,914) | (2,330,628) | (2,229,267) | (2,617,174) | (3,019,063) | (2,305,535) | (2,142,476) | (2,558,846) | (2,935,875) |
| Payroll | (2,427,052) | (2,679,641) | (2,017,850) | (1,983,931) | (2,579,212) | (2,490,556) | (1,982,677) | (1,944,851) | (1,926,857) | (2,401,513) | (1,934,349) | (1,902,846) | (1,947,572) |
| Occupancy | (755,510) | (710,760) | (1,273,800) | (446,958) | (202,682) | (213,800) | (1,564,953) | (442,682) | (205,248) | (213,800) | (1,577,417) | (473,838) | (235,794) |
| Total Operating Disbursements | (6,960,008) | (6,063,050) | (5,716,212) | (5,278,642) | (6,080,808) | (5,034,984) | (5,776,897) | (5,004,707) | (5,151,168) | (4,920,848) | (5,654,242) | (4,935,530) | (5,119,241) |
| Professional Fees & Restructuring | (845,071) | (60,000) | (10,000) | (544,500) | (10,000) | (10,000) | (742,000) | (268,000) | (10,000) | (135,000) | (10,000) | (1,020,000) | (110,000) |
| Financing | 11,250,000 | - | (433,818) | - | - | - | (443,435) | - | - | - | (450,185) | - | - |
| Total Cash Disbursements | 3,444,921 | (6,123,050) | (6,160,030) | (5,823,142) | (6,090,808) | (5,044,984) | (6,962,332) | (5,272,707) | (5,161,168) | (5,055,848) | (6,114,426) | (5,955,530) | (5,229,241) |
| **Net Cash Flow** | $ 8,780,945 | $ (728,877) | $ (907,417) | $ (812,089) | $ 89,314 | $ 561,554 | $ (1,738,469) | $ 293,248 | $ 467,995 | $ 211,674 | $ (850,909) | $ (564,862) | $ (57,340) |
| **DIP** | | | | | | | | | | | | | |
| Borrowing Base | 29,050,021 | 29,050,021 | 29,141,955 | 29,141,955 | 29,141,955 | 29,141,955 | 28,469,268 | 28,469,268 | 28,469,268 | 28,469,268 | 29,101,051 | 29,101,051 | 29,101,051 |
| Maximum Revolver Facility Size | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 |
| Letters of Credit | 9,775,000 | 8,275,000 | 8,275,000 | 8,275,000 | 8,275,000 | 8,275,000 | 8,275,000 | 8,275,000 | 8,275,000 | 8,775,000 | 8,775,000 | 8,775,000 | 8,775,000 |
| Maximum Revolver Balance / Borrowing Base | 15,225,000 | 16,725,000 | 16,725,000 | 16,725,000 | 16,725,000 | 16,725,000 | 16,725,000 | 16,725,000 | 16,725,000 | 16,225,000 | 16,225,000 | 16,225,000 | 16,225,000 |
| Beginning Revolver Balance | 19,650,000 | 9,274,806 | 11,503,683 | 12,411,100 | 13,223,189 | 13,133,875 | 12,572,321 | 14,310,791 | 14,017,543 | 13,549,547 | 13,337,873 | 14,188,782 | 14,753,644 |
| Draw / (Paydown) on Revolver | (10,375,194) | 2,228,877 | 907,417 | 812,089 | (89,314) | (561,554) | 1,738,469 | (293,248) | (467,995) | (211,674) | 850,909 | 564,862 | 57,340 |
| Ending Revolver Balance | 9,274,806 | 11,503,683 | 12,411,100 | 13,223,189 | 13,133,875 | 12,572,321 | 14,310,791 | 14,017,543 | 13,549,547 | 13,337,873 | 14,188,782 | 14,753,644 | 14,810,984 |
| Term Loan | 27,000,000 | 27,000,000 | 27,000,000 | 27,000,000 | 27,000,000 | 27,000,000 | 27,000,000 | 27,000,000 | 27,000,000 | 27,000,000 | 27,000,000 | 27,000,000 | 27,000,000 |
| Total Debt including Letters of Credit | 46,049,806 | 46,778,683 | 47,686,100 | 48,498,189 | 48,408,875 | 47,847,321 | 49,585,791 | 49,292,543 | 48,824,547 | 49,112,873 | 49,963,782 | 50,528,644 | 50,585,984 |
| **Availability on DIP Facility** | $ 5,950,194 | $ 5,221,317 | $ 4,313,900 | $ 3,501,811 | $ 3,591,125 | $ 4,152,679 | $ 2,414,209 | $ 2,707,457 | $ 3,175,453 | $ 2,887,127 | $ 2,036,218 | $ 1,471,356 | $ 1,414,016 |
| **Cash** | | | | | | | | | | | | | |
| Beginning Cash | 1,994,249 | 400,000 | 400,000 | 400,000 | 400,000 | 400,000 | 400,000 | 400,000 | 400,000 | 400,000 | 400,000 | 400,000 | 400,000 |
| Ending Cash | 400,000 | 400,000 | 400,000 | 400,000 | 400,000 | 400,000 | 400,000 | 400,000 | 400,000 | 400,000 | 400,000 | 400,000 | 400,000 |

Notes: Shown on a bank cash basis. All EBITDA add-backs for borrowing base may not have been included.